COPY

1  MARC M. SELTZER (54534)
   mseltzer@susmangodfrey.com
2  RYAN C. KIRKPATRICK (243824)
   rkirkpatrick@susmangodfrey.com
3  SUSMAN GODFREY L.L.P.
   1901 Avenue of the Stars, Suite 950
4  Los Angeles, CA  90067-6029
   Telephone:  (310) 789-3100
5  Fax:  (310) 789-3150

6  SHERRIE R. SAVETT
   *(Admitted Pro Hac Vice)*
7  ssavett@bm.net
   ARTHUR STOCK
8  *(Admitted Pro Hac Vice)*
   astock@bm.net
9  PHYLLIS M. PARKER
   *(Admitted Pro Hac Vice)*
10 pparker@bm.net
   BERGER & MONTAGUE, P.C.
11 1622 Locust Street
   Philadelphia, PA  19103
12 Tel:  (215) 875-3000
   Fax:  (215) 875-4604
13
14 *Attorneys for Lead Plaintiff and the Class*

15 (See Signature Page for Name and
   Address of Additional Counsel for Plaintiff)

16          UNITED STATES DISTRICT COURT

17          CENTRAL DISTRICT OF CALIFORNIA

18               WESTERN DIVISION

19 ROBERT C. DANIELS, on Behalf of        )
   Himself and All Others Similarly       ) Case No. CV 08-03812 GW(VBKx)
20 Situated,                              )
                                          )
21          Plaintiff,                    ) CLASS ACTION
                                          )
22                                        ) THIRD AMENDED
                                          ) CONSOLIDATED CLASS
23      vs.                               ) ACTION COMPLAINT FOR
                                          ) VIOLATION OF FEDERAL
24                                        ) SECURITIES LAWS
   MICHAEL W. PERRY, A. SCOTT             )
25 KEYS, and ERNST & YOUNG LLP,           ) JURY TRIAL DEMANDED
                                          )
26          Defendants.                   )
                                          )
27 _____

28

981588v1/010900

**FILED**
CLERK, U.S. DISTRICT COURT

OCT - 9 2009
3:12

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

1
2

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

3    I.    INTRODUCTION .................................................................. 1

4    II.    OVERVIEW OF THE CASE ................................................ 2

5
6    III.    THE PARTIES AND CRITICAL PLAYERS ...................... 9

7        A.    Plaintiff ........................................................................ 9

8        B.    The Holding Company and the Bank ......................... 9

9        C.    Defendants ................................................................... 10

10            1.    Officers ............................................................ 10

11            2.    Ernst & Young LLP ......................................... 16

12
13    IV.    JURISDICTION AND VENUE .......................................... 17

14    V.    CLASS ACTION ALLEGATIONS ................................... 18

15    VI.    FACTUAL BACKGROUND REGARDING INDYMAC AND ITS CORE
16        LENDING BUSINESS ........................................................ 19

17        A.    General Background .................................................... 19

18        B.    IndyMac's Underwriting, Risk Management, and Appraisal
19            Practices Were Grossly Deficient Prior to and During the Class
20            Period ........................................................................... 25

21        C.    Internal Audits, Outside Audits, and OTS Examinations
22            Repeatedly Identified Underwriting, Appraisal and Internal
            Control Deficiencies at IndyMac ............................... 43

23    VII.    DEFENDANTS MISLEAD AND DEFRAUD INVESTORS ..................... 47

24
25        A.    Defendant Perry Misleads Investors Regarding IndyMac's Risk
            Management, Underwriting, and Appraisal Practices ................. 47

26
27            1.    False and Misleading Statements Related to
                Underwriting, Risk Management, and Appraisals ................. 47

28

2. Defendant Perry Acted With Scienter ........................................50

B. All Defendants Falsely Certify IndyMac's Internal Controls Notwithstanding Actual Knowledge of Serious, Uncorrected Internal Control Deficiencies ................................................................53

C. Defendants Keys and Perry Lie to Investors Regarding An Independent Accounting Firm's Findings Regarding the Adequacy of IndyMac's ALL Methodology. ......................................58

D. On February 12, 2008, Defendants Perry and Keys Mislead Investors Regarding IndyMac's Dealings With the Office of Thrift Supervision and the Soundness of the Company ......................60

    1. OTS Initiates Its Review of IndyMac Four Months Early and Issues an Initial Ratings Downgrade on January 17, 2008 ..........................................................................................60

    2. Perry and Keys Make False and Misleading Statements Regarding IndyMac's Dealings with OTS and IndyMac's Financial Condition Following the Commencement of the January 2008 Emergency Examination. ....................................63

    3. Perry and Keys Made the Foregoing Statements With Scienter ......................................................................................65

E. Defendant Perry Misleads Investors Regarding IndyMac's Dramatic Over-Reliance on Brokered Deposits ..................................66

    1. During the Class Period, IndyMac Relied Excessively on Brokered Deposits to Maintain Its Reported Solvency, and Later Admitted That Those Brokered Deposits Were Used from an "Expediency Perspective" Only ..........................66

    2. False and Misleading Statements Relating to Brokered Deposits ........................................................................................70

    3. Defendant Perry Acted With Scienter ......................................72

F. All Defendants Misrepresent IndyMac's Assets, Liabilities and Earnings in Financial Statements ............................................................73

    1. Defendants Perry and Keys Authored Materially Misleading Financial Statements ..............................................74

2.  Ernst's False and Misleading Statements Opining That IndyMac's 2006 and 2007 Financials Conformed with GAAP and GAAS ................................................................. 76

3.  The Facts Demonstrating the Inadequacy of IndyMac's Allowances for Loan Losses Were Known to Each Defendant .......................................................................... 77

4.  Defendants Knew of, and Ignored Numerous Red Flags Demonstrating that the Allowance for Loan Losses in 2006 and 2007 Were Insufficient. ............................... 81

5.  Defendants' Certification of Insufficient ALL in the Face of Rising Delinquencies, Declining Property Values, Riskier Loan Portfolios, and Numerous Adverse Audit Findings and Internal Control Problems, Violated GAAP ........ 85

6.  Defendants' Approval of Decreasing Loan Loss Reserves for 2006 Violated Applicable Regulatory Guidance on Directional Consistency and Rendered the 2006 Financial Statements Materially False and Misleading ............................. 88

7.  Defendant Ernst Deliberately Disregarded Guidance Regarding ALL Provided in the 2006 AICPA Audit and Accounting Guide .................................................................. 92

8.  The Standards of GAAS, and Contemporaneous AICPA Audit Risk Alerts Required Ernst to Ensure that it Had A Thorough Understanding of IndyMac's Business, Internal Controls and Awareness of Growing Risks Facing the Banking Industry ........................................................................ 95

9.  Ernst Ignored the AICPA Audit Risk Alert for 2007/2008 Which Identified Specific Risk Factors Relating to IndyMac ............................................................................ 99

10. The Falsity of IndyMac's ALL Is Confirmed by The Astonishing Degree to Which IndyMac's Reserves Proved Inadequate. ..................................................................... 100

11. Post-Class Period Improprieties and GAAP Violations Confirm that Defendants' Manipulation of IndyMac Financial Statements was Deliberate. ................................. 101

G.    Perry And Keys Make Additional False and Misleading Statements Regarding IndyMac's Credit and Loan Loss Reserves and the Financial Soundness of the Bank...........................103

VIII.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS PROXIMATELY CAUSED ECONOMIC LOSS TO INDYMAC'S INVESTORS ................................................................................105

A.    Defendants' First Partial Disclosure ..................................106

B.    Second Partial Disclosure, Which Was Accompanied by Multiple False and Misleading Statements........................109

C.    The Class Period Ends ......................................................111

IX.  THE COLLAPSE OF INDYMAC AND OTHER POST-CLASS PERIOD DEVELOPMENTS ......................................................................113

X.  APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD-ON-THE-MARKET DOCTRINE..................................................................114

XI.  NO STATUTORY SAFE HARBOR............................................115

XII.  PRAYER ...............................................................................122

## I.    **INTRODUCTION**

Lead Plaintiff Robert C. Daniels, individually and on behalf of all other persons or entities who purchased the common stock of IndyMac Bancorp, Inc. ("IndyMac" or the "Company") between March 1, 2007 and May 12, 2008, inclusive (the "Class Period"), alleges the following based upon information and belief, except as to those allegations concerning himself, which are based upon personal knowledge.  Plaintiff's information and belief allegations are based upon, among other things:  (a) the investigation conducted by and through his attorneys, including interviews with numerous former employees of IndyMac's banking subsidiary, some of whom conditioned their cooperation on a promise of anonymity; (b) review and analysis of filings made by IndyMac with the United States Securities and Exchange Commission ("SEC"); (c) review and analysis of data submitted by IndyMac's banking subsidiary to the United States Department of the Treasury's Office of Thrift Supervision ("OTS"); (d) review and analysis of data contained in the Audit Report entitled "*Safety and Soundness*: Material Loss Review of IndyMac Bank, FSB" (the "Treasury Report"), dated February 26, 2009, issued by the United States Department of the Treasury's Office of Inspector General ("OIG"), Department of the Treasury; (e) review and analysis of press releases, public statements, news articles, securities analysts' reports, statements by government agencies, documents filed in IndyMac's bankruptcy court proceeding, and other publications disseminated by or concerning IndyMac; (f) review and analysis of complaints filed in other litigation involving IndyMac or its subsidiaries; (g) review and analysis of accounting literature and guidance including literature relevant to banking institutions; and (h) other publicly available information about IndyMac.  Many of the facts supporting the allegations contained herein are known only to the defendants or are within their control.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth in this complaint after a reasonable opportunity for discovery.

## II.    **OVERVIEW OF THE CASE**

1.    IndyMac was the holding company for IndyMac Bank, F.S.B. ("IndyMac Bank," the "Bank" or, collectively, "IndyMac"), formerly one of the ten largest residential mortgage originators and servicers in the United States.  The Bank accounted for substantially all of the Company's assets and revenue.  The Bank and IndyMac were essentially synonymous because the Bank was the only material operating entity of the holding company.  During the Class Period, IndyMac stock lost over 90% of its market value, falling from a Class Period high of $37.50 per share on June 6, 2007, to $2.32 per share at the close of trading on May 13, 2008.  On July 11, 2008, the OTS seized IndyMac Bank.  The collapse of the Bank was as of that time the second largest failure of a thrift banking institution in United States history, the largest failure of any bank in 24 years, and has so far cost the FDIC about $9 billion — one-tenth of its insurance fund — to cover IndyMac Bank's deposits.  IndyMac, the parent of IndyMac Bank, subsequently declared bankruptcy, and IndyMac and IndyMac Bank and their principal officers are currently the targets or subjects of investigations by the FBI, Federal Deposit Insurance Corporation ("FDIC"), SEC, and a federal grand jury in Los Angeles.

2.    The reasons for the Bank's collapse have now become evident:  it underwrote, originated and sold poor-quality, risk-laden mortgages, and used "brokered deposits" to fund rapid and irresponsible growth.  As *The Economist* aptly put it in an article dated January 8, 2009:  "What remains of IndyMac's franchise is of questionable value, to put it charitably.  It loaded up on dodgy mortgages, and most of its deposits were of the unstable brokered sort (today it has a mere $6.5 billion)."

3.    As numerous witnesses, independent reports, and news articles have documented, IndyMac was managed and operated with a singular focus: originate as many loans as possible in disregard of quality or underwriting standards, and when deemed necessary, alter internal reports to hide known problems with loan

originations.  IndyMac was able to hide the perils it faced due to these reckless and unsafe practices as long as home values rose and few losses were caused by defaults because homeowners could refinance or sell their homes.  And, due to the rise of complex mortgage-backed securities, IndyMac did not retain most of the direct risk posed by the loans it originated and underwrote prior to and during the first portion of the Class Period.  The situation changed in the second half of 2007, when home prices dropped, credit markets froze, and IndyMac was no longer able to sell or securitize mortgages.  Suddenly, IndyMac was left holding the low-quality and highly risky mortgages that it had originated and underwritten, and was subject to repurchase demands by those to whom it had previously sold its mortgages and derivative debt securities.  As Jason Arnold of RBC Capital Markets observed: "The pure underlying factor that made the house fall down was that it was predicated on the view that home prices would continue to rise perpetually. When that didn't work out was when the cracks started to emerge."

4.    Additional information concerning IndyMac's reckless and fraudulent practices came to light on February 26, 2009, when the OIG issued its Audit Report described above.  The Treasury Report is based on four months of investigative fieldwork, which included interviews with OTS, FDIC, and IndyMac Bank employees (including current and former members of IndyMac's Enterprise Risk Management Division and internal audit department), review of OTS supervisory files and records for IndyMac dating back to 2000, and review of IndyMac Bank documents that had been obtained by the FDIC.

5.    The OIG found that the Bank had (1) institutionalized unsound loan underwriting practices; (2) lacked stable core deposits and relied excessively on brokered deposits; and (3) grossly inadequate loan loss reserves.  Significantly, all of these violations of safe and sound banking practices resulted from key decisions made by defendants Michael W. Perry ("Perry") and A. Scott Keys ("Keys"), and were known by defendant Ersnt & Young LLP ("Ernst"), and none of these

1   violations were adequately disclosed to the investing public.  Indeed, the Treasury

2   Report reveals that in April 2008—at the same time that defendants were engaging

3   in the wrongful course of conduct alleged herein—an OTS examiner recommended

4   that OTS (a regulatory agency with limited resources and no obligation to

5   IndyMac's shareholders) "should publicly disclose IndyMac's poor earnings

6   position to prevent any liability to investors who had the potential to lose money

7   should the institution fail."

8       6.    Notwithstanding these fundamental weaknesses, IndyMac, Perry, and

9   Keys made a variety of false positive statements to investors regarding IndyMac's

10  financial condition in order to raise desperately needed capital, prop up the

11  Company's stock price, and prevent a run on the Bank.  On August 28, 2007, in a

12  press release announcing the hiring of 600 employees from a failed mortgage

13  lender, Perry stated that IndyMac had "weathered the storm," "remain[ed] in a solid

14  financial position," had "limited exposure to the current market-related liquidity

15  issues that many other mortgage lenders are experiencing," and would return to

16  profitability in 2008.

17      7.    The following statements, which provide background and context for

18  the public statements at issue in this action, were untrue.  These statements may be

19  grouped into six general categories:

20          (a)   Statements regarding underwriting standards, appraisal

21  standards and internal controls:  In order to reassure investors about the quality of

22  the mortgage portfolio that IndyMac was holding, Perry repeatedly touted

23  IndyMac's "strong" and "prudent" underwriting practices, the "superior" credit

24  quality of its loans, and the fact that IndyMac purportedly independently verified

25  appraisals and credit scores.   These statements were all materially false and

26  misleading.  While the particulars are alleged in more detail below, IndyMac's top

27  management's true philosophy and practices are epitomized by defendant Perry's

28  own words, reported to have been uttered to other Company employees:  "Business

guys rule. F*** you to compliance guys." The Treasury Report concluded that among the key causes of IndyMac's failure were its high risk business strategy, aggressive growth, and unsound loan underwriting practices.

(b)    Statements regarding IndyMac's internal controls:  Defendants Perry, Keys, and Ernst repeatedly and unequivocally certified the adequacy and effectiveness of IndyMac's internal controls in the face of internal audit reports, external audit reports, and OTS examination reports showing serious, persistent problems with IndyMac's internal controls, most notably in the Conduit Division and IndyMac's Allowance for Loan Losses ("ALL") methodology.

(c)    Statements Regarding Independent Validation of ALL Methodology:  On February 12, 2008, Keys and Perry approved and filed a Form 8-K discussing an assessment of IndyMac's ALL methodology by an independent consulting firm.  According to Perry and Keys: "We hired a nationally recognized independent consulting firm to conduct a thorough assessment of portfolio asset grades and loss allowance. The study concluded that we have responded well to the declining market, appropriately graded our loans, impairments were adequate and we have appropriate expertise in the workout and financial areas to manage the portfolio."  That independent consultant, however, said just the opposite.  The Treasury Report discloses that the independent consultant found serious deficiencies in IndyMac's ALL methodology and recommended corrective action.  Keys and Perry simply lied to investors about this study and the adequacy of IndyMac's ALL controls and methodology.

(d)    Statements related to IndyMac's dependence on brokered deposits:  Perry repeatedly assured investors that IndyMac's deposit base was "stable," that IndyMac had "managed [its deposits] well," and that the risk of deposits leaving the company was not on "our radar screen of being concern to us."  These statements were materially false and misleading:  during the Class Period, over 37% percent of IndyMac's deposits were brokered deposits, known within the

1    industry as "hot money" because they can and are easily moved to another

2    institution.  And, on June 30, 2008, IndyMac admitted that such deposits were

3    being used for "expediency" purposes only, and that IndyMac had been actively

4    trying to reduce its reliance upon them.  The Treasury Report concluded that one of

5    the causes of IndyMac's failure was its lack of core, stable deposits, noting that

6    during the period August 2007 through March 2008 its brokered deposits increased

7    from about $1.5 billion to $6.9 billion.

8    　　　　　　(e)    Statements Related to OTS Oversight and IndyMac's Financial

9    Condition after Commencement of the OTS Examination:  On February 12, 2008,

10   Perry was questioned regarding any actions the OTS had taken in relation to

11   IndyMac.  Perry responded that "I think they have complimented us on our

12   nimbleness in terms of our ability to change our business model . . . they haven't

13   asked us to do anything . . . I feel like they think we're doing a pretty good job

14   managing through this crisis period."  Similarly, on February 12, 2008, both Perry

15   and Keys issued a Form 8-K reassuring investors that IndyMac was in a

16   "fundamentally sound financial positon."  Unknown to the investing public, in

17   January 2008, the OTS initiated an examination of IndyMac four months ahead of

18   schedule.  Within ten days of the initiation of that examination, on January 17,

19   2008, OTS informed IndyMac's Board of Directors (which included Perry) that it

20   downgraded IndyMac's "Capital Adequacy, Asset Quality, Mangement

21   Adminsitration, Earnings, Liquidity and Sensitivity" composite ("CAMELS")

22   rating to 3, and lowered the asset quality and earnings component ratings to 4,

23   based on results of off-site monitoring and initial findings of the examination

24   started on January 8, 2008.  According to OTS's enforcement guidance, this created

25   a presumption that formal enforcement action would be taken against the Bank.  As

26   OTS Director John M. Reich would later state regarding the examination, "[t]he

27   OTS had significant concerns with the bank's funding strategy, had directed

28   appropriate changes and was finalizing a new set of enforcement actions to address

its numerous problems."   In the course of this examination, OTS identified ten issues requiring IndyMac board attention, and twenty-four issues requiring corrective action, including "develop[ing] a clear strategy including scripts for media and customer inquiries to minimize effects of public disclosure of capital position and potential run on deposits."   In light of Perry's and Keys' actual knowledge of the OTS's actions and serious concerns for the viability of IndyMac, their false and misleading representations to the contrary were at the very least deliberately reckless.

(f)    Financial Statements And Allowances for Loan Loss:   IndyMac issued financial statements for year-end 2006 and throughout the Class Period with allowances for loan losses that were grossly inadequate.   IndyMac and defendants further touted that those reserves were not only adequate and reported in a manner consistent with Generally Accepted Accounting Principles ("GAAP"), but that they were in fact "conservative" and that the OTS did not "have concerns about our reserves."   These statements were materially false and misleading:   in these financial statements, the ratio of reserves to loan assets was lower in 2006 than it had been in 2005, even though IndyMac had abandoned its pre-existing underwriting standards and the general economic conditions in the home loan mortgage market had worsened, both of which would necessarily result in increased delinquencies and foreclosures.   This egregious violation of GAAP, where inadequate loan loss allowances fraudulently inflated net income and earnings per share, gives rise to a strong inference of scienter.   The extraordinary degree to which IndyMac's purportedly "conservative" loan loss allowances were inadequate further confirms that Perry and Keys were deliberately manipulating IndyMac's books and records rather than being merely slow to foresee risks to IndyMac's business.   Defendant Ernst fraudulently certified financial statements containing those inadequate ALLs.   The Treasury Report confirmed that one of the key causes of IndyMac's failure was its grossly inadequate loan loss reserves, noting that

IndyMac's ALLs actually *declined* as a percentage of total loans every year from December 31, 2005 to December 31, 2006, even as the Company's loan portfolio was becoming riskier, charge-offs and defaults rose, and property values declined.

8.      These false and misleading statements were intended to, and did, facilitate IndyMac's efforts to raise the capital it needed to stay solvent for as long as it did, and to prevent a run on its banking subsidiary by the bank's depositors. IndyMac sold over $700 million of common and preferred stock during the Class Period and, throughout the Spring of 2008, IndyMac was secretly seeking a private capital infusion (a project known within IndyMac by the code words "Project Ironman").

9.      The truth about the adverse condition of IndyMac's mortgage portfolio and financial position began to be partially revealed on November 6, 2007, and further revelations were made on May 12, 2008 when the Company announced its results for the first quarter of 2008, admitted that it would not be profitable in 2008, and reported that it suffered a first quarter loss of $184.2 million (a loss of $2.27 per share) because of writedowns in the value of its assets and increases to reserves. The Company also held an investor conference call, in which Perry attributed the massive quarterly loss and the inability to return to profitability to, *inter alia*, rapidly increasing non-performing assets and loan repurchase demands from secondary market investors, and as a result, the need to establish significant credit reserves for these and forecasted future Non-Performing Assets ("NPAs") and charge-offs. IndyMac's losses were directly correlated to IndyMac's reckless loan underwriting and appraisal practices and revealed the falsity of IndyMac's prior statements regarding the "conservative" nature of its loan loss reserves.

10.     As a result of these disclosures on May 12, 2008, IndyMac's stock dropped from a close of $3.43 per share on May 9, 2008, to close at $2.32 per share on May 13, 2008 on high volume — a two-day decline of $1.11 per share, or 32%, and a 90% drop from its Class Period high of $37.50 per share.

### III.    THE PARTIES AND CRITICAL PLAYERS

#### A.    Plaintiff

11.    Plaintiff Daniels purchased the common stock of IndyMac during the Class Period as detailed in the certification filed with Daniels' original complaint, has not sold those shares, which are now worthless, and has suffered injury and damages as a result of the wrongful acts of defendants as alleged herein.

#### B.    The Holding Company and the Bank

12.    Non-party IndyMac was a savings and loan holding company for wholly-owned subsidiaries and majority-owned subsidiaries, including its principal asset IndyMac Bank, F.S.B, its only material operating subsidiary.  IndyMac is a Delaware corporation whose principal executive offices were located at 888 East Walnut Street, Pasadena, California 91101-7211.  During the Class Period, IndyMac's common stock traded on the New York Stock Exchange under the symbols NDE (until April 30, 2007) and IMB (effective May 1, 2007).  As of May 6, 2008, 100,888,890 shares of IndyMac common stock were issued and outstanding.  On July 31, 2008, IndyMac filed a petition for bankruptcy relief seeking liquidation under Chapter 7 in the United States Bankruptcy Court for the Central District of California.  But for its bankruptcy, IndyMac would have been named as a defendant herein.

13.    Non-party IndyMac Bank was a hybrid thrift/mortgage bank headquartered in Pasadena, California.  IndyMac Bank originated mortgages in all 50 States of the United States and, as of February 2008, was (1) the largest savings and loan headquartered in Los Angeles County, California, and the seventh largest nationwide, based on its reported assets; (2) the second largest independent mortgage lender in the nation; (3) the ninth largest residential mortgage originator, based on third quarter 2007 mortgage origination volume; and (4) the eighth largest mortgage servicer.  The OTS closed IndyMac Bank on July 11, 2008, and appointed the FDIC as receiver.  On the same date, the OTS chartered a new

1    institution, IndyMac Federal Bank, FSB, appointed the FDIC as conservator of

2    IndyMac Bank, and transferred substantially all of IndyMac's assets and certain

3    liabilities to a new corporate entity, IndyMac Federal Bank. But for its liquidation,

4    the Bank would have been named as a defendant herein.

5            **C.**    **Defendants**

6                 **1.**    **Officers**

7          14.    Defendant Perry was Chairman of the Board, a director and Chief

8    Executive Officer ("CEO") of IndyMac and IndyMac Bank.

9          15.    Defendant Perry joined IndyMac in January 1993 having previously

10    had over 20 years of business experience with mortgage banking companies,

11    financial institutions and real estate firms, including four years as an auditor with

12    KPMG Peat Marwick. He is also a Master Certified Mortgage Banker, as

13    designated by the Mortgage Bankers Association, and a Certified Public

14    Accountant. Perry made and participated in the issuance of improper statements,

15    including the preparation of the improper press releases and SEC filings. He was

16    the public face of the Company. Perry signed each of the Company's quarterly

17    reports on Form 10-Qs issued during the Class Period, and the Company's Form

18    10-Ks for the years ended December 31, 2006 and 2007, respectively. As reported

19    in the Company's latest proxy statement, on its Schedule 14A filed with the SEC on

20    March 24, 2008 ("the 2008 Proxy"), defendant Perry had "responsibility for the

21    day-to-day operations of IndyMac [since] 1993." Perry's responsibilities are

22    described in the 2008 Proxy as follows:

23       As the Company's Chairman and Chief Executive Officer, Mr. Perry is

24       responsible for the overall direction and administration of all programs

25       and services provided by the Company and for ensuring that all aspects

26       of the Company's activities are conducted commensurate with the best

27       interests of shareholders, customers, employees, and other key

28       stakeholders. His responsibilities include: (i) setting the strategic

vision and establishing a strategic, financial and risk management plan for the Company, (ii) recruiting and retaining a senior management team which has the talent and experience to execute the plan, (iii) monitoring the Company's execution, financial and operating performance, (iv) adapting the Company's strategic and execution plans based on Company performance and conditions in the mortgage market and U.S. economy, and (v) managing all key activities related to IndyMac's being a public corporation. He reports to the Board of Directors as the highest ranking official of the Company. Based on his broad responsibilities, Mr. Perry is the only Named Executive Officer of the Company whose short-term cash incentive compensation is based solely on the year over year EPS growth rate of the company.

Mr. Perry's responsibilities, as described above, are significantly broader than any other Named Executive Officer at the Company.

16. Moreover, according to witnesses, news articles, and as alleged in greater detail below, Perry was a "hands-on-manager" who sometimes personally reviewed mortgage applications, and was well aware of IndyMac's fraudulent and improper mortgage origination practices. In a special report on IndyMac dated September 15, 2008, and titled "IndyMac's Last Gasps," the *Los Angeles Business Journal* described, based on a review of internal IndyMac documents and employee interviews, Perry's hands-on-management-role as so extreme as to amount to "a sort of corporate dictatorship." According to the article "Perry's fingerprints were all over IndyMac, all the way down to a multipart, SAT-style test that employees had to pass before being hired." Employees "painted a detailed picture of a Company colored by an aggressive and sometimes boorish Chief Executive who created a corporate culture that gave the Company little chance of surviving a major market downturn." Perry reviewed and had access to numerous reports before and during the Class Period which revealed the extent of the Company's deteriorating

financial condition and utter abandonment of loan underwriting standards, and signed the Company's financial statements and Sarbanes-Oxley Act certifications, as alleged below.

17. During the Class Period, Perry was paid a portion of his compensation in the form of IndyMac stock, a fact which he touted to investors in a comment on the Company's "IMB Report" blog, on November 29, 2007. Perry also used his own purchases of IndyMac stock as a way to support his statements to the public that IndyMac had "turned the corner." On that occasion, Perry responded to an IndyMac shareholder's suggestion that "insider buying" at what were claimed to be then depressed stock price levels would send a strong message to the market about the viability of IndyMac. In his response, Perry stated he agreed with the shareholder and committed to purchasing additional shares as soon as the window for insiders to trade opened, which would occur once 4th quarter earnings were released in late January 2008.

18. Under pressure to keep to his public promise, and in an effort to bolster confidence in IndyMac while IndyMac was actively seeking a major capital infusion or find a buyer, a deferred compensation plan trust of which Perry was the beneficiary acquired 328,988 shares of IndyMac stock on February 15, 2008, at the market price of $7.93 per share. Under IndyMac's deferred compensation plan, executives may elect to invest balances in IndyMac common stock or in a cash fund. According to IndyMac's 2008 shareholders' proxy statement, the investments vest over a period of three to five years. The February 2008 purchase was made with a long-term cash incentive grant made in 2007 and awarded to him in March 2008 with a "target value" of $2,812,966. Also in March 2008, Perry was paid a short-term cash incentive grant with a "target value" of $3,429,288. Thus, in making the February 2008 purchase, Perry was using unvested deferred compensation plan funds derived from IndyMac.

19.    In addition, the total purchase amount was a very small expenditure relative to the amount of money Perry had earned from prior sales of IndyMac stock and the value of Perry's total stock holdings.  Specifically, Perry reaped over $32 million dollars by selling IndyMac stock during the period from 2003 to 2007, and his salary and non-equity compensation in 2006 totaled $4,086,779.

20.    Perry and other top executives and directors were required to own and refrain from selling IndyMac stock in accordance with certain Company requirements.  Under IndyMac's "Stock Ownership Guidelines," IndyMac's CEO, "whose tenure now exceeds five years," was "expected to own common stock (including 70 percent of the net value of vested stock options) with a value equal to five times his annual salary."  All other IndyMac executive officers with tenure of more than three years were expected to own certain minimum amounts of common stock with values equal to certain multiples of their salary.  According to IndyMac's Proxy:  "Currently [as of March 24, 2008], due to the current market conditions… all of the NEOs [named executive officers] and 6 of the 9 non-employee directors are out of compliance with the ownership requirements and will refrain from selling IndyMac stock until such time as they are in compliance."  Thus, Perry's February 2008 purchase helped to bring him in compliance with Company guidelines.

21.    Defendant Keys was, at all relevant times, Executive Vice President and Chief Financial Officer ("CFO") of IndyMac, until April 25, 2008, when he took a leave of absence.  As the Company's Executive Vice President and Chief Financial Officer, Keys had direct responsibility for the content of IndyMac's public financial statements and reports.  Keys participated in the making of false and misleading statements, including the preparation of the improper press releases and SEC filings prior to his departure on April 25, 2008.  Defendant Keys signed the Company's quarterly reports on Form 10-Qs issued during the Class Period

1  prior to April 25, 2008, and the Company's annual report on Form 10-Ks for the

2  years 2006 and 2007.

3      22.    Keys also signed Sarbanes-Oxley Act certifications accompanying

4  each of those reports.  In those certifications, Keys represented that he was

5  "responsible for IndyMac's establishing and maintaining disclosure controls and

6  procedures and internal control over financial reporting," and that he had designed

7  IndyMac's internal controls to ensure that all material issues were brought to his

8  attention.

9      23.    Mr. Keys' wide-ranging responsibilities at IndyMac were detailed in

10 the Company's 2007 proxy statement:

11     As the Company's Chief Financial Officer, Mr. Keys has goals that are

12     milestone based, rather than revenue based.  …  Those goals include:

13     … the maintenance of a strong, effective, and automated financial

14     reporting control environment, including the timely resolution of any

15     financial reporting control/deficiencies discovered by Mr. Keys, other

16     members of IndyMac management, Internal Audit, and the Company's

17     independent registered public accounting firm, Ernst & Young, LLP.

18     This includes policies and procedures for all his areas of responsibility,

19     especially external and internal financial reporting.

20 Thus, defendant Keys reviewed and had access to all reports before and during the

21 Class Period that revealed the extent of the Company's deteriorating financial

22 condition and financial reporting and control deficiencies.

23     24.    Prior to joining IndyMac in 2002, Keys had been a partner at Ernst,

24 serving as partner in charge of Ernst's Ohio Valley banking practice.  According to

25 IndyMac's press release, "[Keys] specialized in the financial services industry and

26 was one of Ernst & Young's top experts in mortgage banking and asset

27 securitization."  From his work as an accountant within the banking practice, Keys

28 was thoroughly knowledgeable of the need to understand all aspects of a business

1  in order to prepare materially accurate financial statements. In particular, Keys'

2  experience as both an accountant and chief financial officer for banks made him

3  aware of the centrality of accurate calculation of ALL to the accuracy of financial

4  statements of a bank and bank holding company.

5      25.   Keys' compensation was also tied to the performance (or, more

6  accurately, publicly reported performance) of the Company. Keys' total

7  compensation for 2007 was $1,274,658, which included $542,875 in salary, and

8  $312,500 in short term cash incentive compensation and $370,094 long-term

9  incentive compensation.

10      26.   During the Class Period, Perry and Keys, as senior executive officers

11  and directors of IndyMac, were privy to non-public information concerning the

12  Company's business, finances, products, markets and present and future business

13  prospects via access to internal corporate documents, conversations with other

14  corporate officers and employees, attendance at management and Board meetings

15  and committees thereof and via reports and other information provided to them in

16  connection therewith. Because of their possession of such information, Perry and

17  Keys knew or recklessly disregarded the fact that the materially adverse

18  information alleged herein had not been disclosed to, was being concealed from,

19  and was the subject of misrepresentations to the investing public.

20      27.   Perry and Keys participated in the drafting, preparation, and approval

21  of the various public and shareholder and investor reports and other

22  communications complained of herein and were aware of, or recklessly

23  disregarded, the misstatements contained therein and omissions therefrom, and

24  were aware of their materially false and misleading nature. Because of their Board

25  membership, and top executive and managerial positions with IndyMac, the

26  defendants had access to the adverse undisclosed information about IndyMac's

27  financial condition and performance as particularized herein and knew (or

28  recklessly disregarded) that these adverse facts rendered the positive representations

1  made by or about IndyMac and its business issued or adopted by the Company

2  materially false and misleading.

3      28.    Perry and Keys, because of their positions of control and authority as

4  the top officers and as directors of the Company, and their duties as set forth in

5  IndyMac's proxy statement, and by their obligation to sign these documents, were

6  able to and did control the content of the various SEC filings, press releases and

7  other public statements pertaining to the Company during the Class Period.  Perry

8  and Keys were provided with copies of the documents alleged herein to be

9  misleading prior to or shortly after their issuance and had the ability and

10  opportunity to prevent their issuance or cause them to be corrected.  Accordingly,

11  Perry and Keys are responsible for the accuracy of the public reports and releases

12  detailed herein, and are therefore primarily liable for the representations contained

13  therein.

14      29.    Perry and Keys are liable as participants in a fraudulent scheme and

15  course of business that operated as a fraud or deceit on purchasers of IndyMac's

16  stock by disseminating materially false and misleading statements and/or

17  concealing material adverse facts.  The scheme (i) deceived the investing public

18  regarding IndyMac's business, operations, and the intrinsic value of IndyMac's

19  stock; and (ii) caused plaintiff and other members of the Class to purchase

20  IndyMac's stock at artificially inflated prices and suffer damages as a proximate

21  result thereof.

22          **2.    Ernst & Young LLP**

23      30.    Defendant Ernst was IndyMac's auditor for fiscal years 2006 and

24  2007.  It is one of the four largest accounting firms in the United States, and has

25  represented itself as an expert in accounting for the financial services industry.

26  Ernst provided an unqualified auditor's report on IndyMac's financial statements in

27  each of these years, representing that it had conducted its audits in accordance with

28  Generally Accepted Auditing Standards ("GAAS") and that IndyMac's financial

statements were prepared and presented in conformity with GAAP, which is required of all SEC filers. These reports were included and published in IndyMac's Form 10-Ks for 2006 and 2007. In fact, as alleged below, both representations were false. Ernst's audits were not conducted in accordance with GAAS and the financial statements failed to comply with GAAP.

31. During the Class Period, Ernst was apprised of all material issues surrounding IndyMac's internal controls and financial reporting. In periodic financial reports filed with the SEC dated March 1, 2007, April 26, 2007, July 31, 2007, November 6, 2007, and February 29, 2008, Perry and Keys both certified that Ernst had been notified of (a) "all significant deficiencies in the design or operation of internal controls" and (b) "any fraud, whether material or not."

## IV.    JURISDICTION AND VENUE

32. This Court has jurisdiction over the subject matter of this action pursuant to section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331, 1337 and 1367.

33. The claims alleged herein arise under sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC.

34. Venue is proper in this District pursuant to section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) and (c). Substantial acts in furtherance of the alleged fraud and its effects, including the preparation and dissemination to the investing public of materially false and misleading financial statements, occurred in this District. Additionally, the Company's headquarters are located in Pasadena, California, in this District.

35. In connection with the acts, omissions and other wrongs complained of herein, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail,

interstate telephone communications, and the facilities of the national securities markets.

## V.   CLASS ACTION ALLEGATIONS

36.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who purchased or otherwise acquired the common stock of IndyMac during the Class Period of March 1, 2007 through May 12, 2008, inclusive, and who were damaged thereby.   Excluded from the Class are defendants, the officers and directors of IndyMac and its subsidiaries, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants, IndyMac, or the IndyMac Bank have or had a controlling interest.

37.    The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, IndyMac's stock was actively traded on the New York Stock Exchange.   While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by IndyMac or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

38.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of the federal securities laws that is complained of herein.

39.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

40.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    Whether the documents, reports, filings, releases and statements caused to be disseminated to the Class by defendants during the Class Period misrepresented material facts about the business, performance and financial condition of IndyMac;

(c)    Whether defendants participated in and pursued the common course of conduct and fraudulent scheme complained of herein;

(d)    Whether defendants acted knowingly or with deliberate recklessness in making false and misleading statements of material fact; and

(e)    Whether the market price of IndyMac stock during the Class Period was artificially inflated due to the misrepresentations and omissions complained of herein.

41.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VI.    FACTUAL BACKGROUND REGARDING INDYMAC AND ITS CORE LENDING BUSINESS

### A.    General Background

42.    At all relevant times, substantially all of IndyMac's lending business involved loans secured by real estate.  Prior to and during the Class Period, IndyMac specialized in Alt-A single family mortgages which were made to

1  borrowers who were not required to verify their income or provide documents in
2  order to obtain their loans.  Because of the lack of income verification, Alt-A loans
3  were not as conservative as conforming loans, which were eligible to be sold to
4  government sponsored enterprises ("GSEs"), such as Fannie Mae and Freddie Mac.
5  Alt-A loans are also sometimes referred to as "no doc" loans, "low doc" loans,
6  "stated income loans" and "liar loans."  IndyMac also offered subprime mortgage
7  loans, which are mortgages that are offered to relatively less creditworthy
8  borrowers, and, like the various non-traditional adjustable rate mortgage ("ARM")
9  products described below, typically could not be sold to GSEs such as Fannie Mae
10  and Freddie Mac.

11      43.    IndyMac also extended varieties of risky loans to its Alt-A customers
12  as well as to its prime customers:

13      •    Option ARM loans.  With an ARM loan, instead of a fixed rate
14          of interest, the interest rate is periodically adjusted over the term
15          of the loan based on indices such as Treasury securities or the
16          London Interbank Offered Rate ("LIBOR").  Option ARM loans
17          were unique among ARM loans in that they give the borrower
18          the option each month to make either a full, interest-only, or a
19          "minimum payment," less than the interest due on the loan.
20          Such minimum payment Option ARM loans were thus
21          negatively amortizing loans.

22      •    "100% LTV (loan-to-value) loans" and "80/20 loans."  With
23          these loans, the home buyer took out two loans, one for the 80%
24          of the purchase price and another for 20% of the purchase price
25          or "value" of the property.

26      •    "Hybrid ARMs."  With these loans, the initial interest rate is
27          fixed for some period of time, usually two to five years, and

28

then "floats," or changes according to an established banking index, thereafter.

- <u>Home equity lines of credit ("HELOCs")</u>.  These loans allowed homeowners to obtain cash by borrowing money either through a first or second lien loan or line of credit on a home they already owned.

- <u>"Closed End Seconds."</u>  These loans were secured by second mortgages on a home, and were junior in priority in the event of foreclosure.

- <u>Teaser rate loans and Negative Amortization Loans</u>.  These loans required extremely small payments, or no payments at all, typically for the first six months, and then required much larger payments thereafter.

44.    During the period from 2001 through 2006, IndyMac's lending practices were extremely lucrative for IndyMac and its executives.  IndyMac's publicly reported profits tripled during that time.  Prior to 2007, when the market for mortgages was expanding exponentially, defendants largely ignored the risks involved in the non-traditional mortgages originated by IndyMac and encouraged IndyMac's sales staff to originate mortgages without adhering to prudent origination and securitization practices.  As an analyst at Friedman, Billings, Ramsey observed about IndyMac, "[t]he sales culture took over and the sales division really drove the company."

45.    In 2005 and 2006, there were signs the market had hit its peak and some lenders began to make fewer loans.  IndyMac nonetheless increased its lending volume by 50 percent.  According to David Balsam, the Chief Financial Officer of IndyMac Mortgage Bank until 2006, quoted in the *Los Angeles Business Journal* article noted above and dated September 15, 2008:  "Other people, meaning Wells Fargo, and so on, they pulled back.  When Mike [Perry] thought he

was winning market share, he wasn't really winning market share — they were relinquishing market share to him.  In [IndyMac's] busy-ness to grow, they took on a lot of loans, in some cases very thin-margin loans that were lower quality."  The article also quoted Joanne Kim, CEO of Wilshire Bancorp Inc., the Los Angeles-based parent of Wilshire State Bank, a $2.4 billion-asset institution that sold as much as 80 percent of its loans to IndyMac and Countrywide as stating: "IndyMac was willing to buy anything."

46.    IndyMac's focus on originating and underwriting as many loans as possible without regard to quality posed few problems for IndyMac when housing prices were increasing and interest rates remained low.  There were several reasons for this.  First, if a buyer was not able to afford his payments, the bank received title through foreclosure to a home worth more than the amount owed.  Second, property owners could refinance or sell their properties prior to default so long as property values continued to increase and interest rates remained low.  Third, borrowers — particularly those who purchased a second home or investment property — were more likely to default on a depreciating asset than an appreciating asset.  As one analyst has succinctly explained in regard to Alt-A loans:

> Because little or no determination is made of the borrower's ability to service the loan, the home itself becomes the source of the repayment.  . . . The lender is literally banking on the borrower's ability to refinance the loan at some point or, once again in a worst case scenario, sell the home at a price that satisfies the outstanding loan obligation and allows the borrower to recover most, if not all, of his/her equity.

47.    As the real estate market slowed in 2006 and 2007, and housing prices stagnated and then fell, the importance of loan *quality* came to the forefront.  With home prices declining and refinancing increasingly unavailable, customers' ability to actually pay their mortgages became critical to minimize IndyMac's loss

exposure.  Thus, sound underwriting practices and accurate and reliable appraisals of property values also became critical to minimizing IndyMac's loss exposure. Defendant Perry reassured investors on April 26, 2007, that IndyMac's loss exposure was minimal even in the face of declining home values because of IndyMac's purportedly rigorous underwriting standards:  "We get not only a full appraisal, but we do an automated appraisal, in addition to it.  We independently check their credit.  We verify their employment.  We verify their income and their assets and we check their income for reasonableness.  We do a lot of steps on those loans.  We think that's a prudent business for us."

48.    To further reassure investors of the "safety and soundness" of the Company's business, IndyMac repeatedly touted the low loan-to-value ("LTV") ratios on its Alt-A loans.  A low LTV ratio of 70% meant that the lender should not lose money even if the price of the property declined by 20%, or more, depending on the cost of foreclosure.  Obviously, this meant that property had to be valued fairly in the first instance:  an artificially inflated appraisal would result in an artificially low LTV ratio, which would create a false impression that the mortgage loan was less risky.

49.    IndyMac's mortgage default rate began to rise in 2006, almost doubling between year-end 2005 and 2006.  In 2007, the default and foreclosure rates on IndyMac mortgages began to sky-rocket with 90 day delinquencies doubling in the first two quarters, and tripling in the third and fourth quarters.

50.    For capital markets-funded lenders such as IndyMac, there were two exit strategies for a loan: sale or securitization.  Even among depositories such as IndyMac, the capital required of investments in non-prime loans by bank/thrift regulators discouraged them from holding these assets in whole loan form because of the impact on their balance sheets.  When foreclosures started to surge in 2007, the market for securities backed by non-conforming loans (such as those in which IndyMac specialized) froze up.  IndyMac found it increasingly difficult to sell or

securitize its mortgages in order to raise capital.  As a result, billions of dollars in loans held for sale had to be converted into loans held for investment, and capital reserves had to be increased.  From September 30, 2007 to December 31, 2007, for example, IndyMac's single-family residence ("SFR") loans held for investment increased from $4.9 billion to $13.1 billion, while loans held for sale decreased from $14 billion to $3.4 billion.  As summarized in IndyMac's Fourth Quarter 2007 earnings report, "IndyMac transferred $10.3 billion of loans to its SFR loans held for investment portfolio due to a lack of investor demand for those non-agency products . . . As part of the transfer substantial credit reserves were established."

51.    In addition to being unable to sell or securitize its mortgages, IndyMac became subject to increasing "repurchase" demands from the investors to whom IndyMac had sold mortgages and mortgage-backed securities.  Contracts between lenders originating subprime mortgage loans and purchasers of those loans typically require the originating lender to buy back faulty loans in certain circumstances. For example, repurchase is often required if a borrower defaults on an early payment, or representations and warranties made to investors were false or breached.

52.    Repurchase demands to IndyMac sky-rocketed in 2007.  According to IndyMac's earnings presentation for fourth quarter 2007, IndyMac's repurchase volume increased from $194 million in 2006 to $613 million in 2007, a 300% increase.  This required IndyMac to dramatically increase its capital reserves pursuant to federal regulatory guidelines.

53.    Thus, in contrast to its past practices, pursuant to which IndyMac underwrote or originated loans and quickly moved them off its books, IndyMac now owned those mortgages —because (a) it was unable to sell or securitize them, (b) it had to repurchase them, and (c) it was unable to get brokers to repurchase them.  As a result, IndyMac's adherence to its internal underwriting guidelines became critical to the Company's survival.  Instead, IndyMac violated its internal

1    guidelines, and became substantially exposed to severe risks caused by its deficient

2    underwriting practices.

3        **B.**    **IndyMac's Underwriting, Risk Management, and Appraisal**

4            **Practices Were Grossly Deficient Prior to and During the Class**

5            **Period**

6        54.    Because, prior to August 2007, IndyMac was able to avoid the risks

7    associated with poorly underwritten mortgages, defendant Perry encouraged a

8    company culture that focused on originating as many loans as possible without

9    regard to prudent underwriting practices.

10        55.    IndyMac's institutional disregard for basic principles of underwriting

11    and risk management have been documented in numerous articles, lawsuits, and

12    investigative reports, and has been corroborated by both confidential and non-

13    confidential witnesses interviewed by Lead Plaintiff's counsel.

14        56.    Michelle Leigh ("Leigh") was First Vice President and Division Head

15    of Post Production Quality Control ("PPQC") in the Consumer Lending Group at

16    IndyMac from August 4, 2004 to September 2006.   In that position she was

17    responsible for sampling and reviewing all IndyMac loans.  According to Leigh, the

18    PPQC audited between 600 and 1200 loans each month, and she had access to

19    detailed information about IndyMac's actual loan underwriting practices.   Soon

20    after she took over the PPQC, Leigh discovered that there were a high percentage of

21    loans that never should have been made. There were three categories of loans that

22    the PPQC reviewed. The first was called 'Current' and consisted of loans that had

23    been funded in the past 90 days. The second category was "Delinquent" and

24    consisted of loans that were 90 days or more past due.  The third category was

25    "Fraud" and was evaluated by IndyMac's Enterprise Risk Management Division.

26    The industry norm for problems in the Current category was 1% to 2%.  However,

27    Leigh discovered at IndyMac, in the Current category, between 11% and 15% of

28

1  the loans had problems — ten times the industry norm.  She discovered that in the

2  Delinquent category, approximately 25% of the loans had problems.

3     57.    Leigh was required to write PPQC quarterly reports on her findings in

4  her sampling of loan audits.  Leigh prepared one preliminary report that identified

5  63 adverse findings of significant problems in the loans that she had reviewed.

6  Leigh took her report to her Senior Vice President, Nick Niland ("Niland").  Niland

7  and Leigh went over her adverse findings with the business units and with Michelle

8  Minier ("Minier"), Executive Vice President in charge of IndyMac's central

9  Mortgage Operations.  Leigh stated that Minier ridiculed Leigh's concerns.  Minier

10  told Leigh that she did not know what she was talking about in the findings she put

11  in the report and instructed her to wipe off most of the loans that had significant

12  findings.  Leigh told Minier that they would not do so, or the regulators would shut

13  down IndyMac Bank.  Leigh stated that she was told by Minier that Perry was

14  aware of Leigh's preliminary report.  The original report prepared by Leigh fell

15  within the category of "financial reporting control deficiencies, discovered by …

16  members of IndyMac management" which, according the IndyMac's 2007 Proxy

17  Statement, Keys was responsible for reviewing and resolving.  Leigh understood

18  that her report or the information contained therein was to be provided to the Board

19  of Directors.  Minier instructed Leigh to take out the negative information from her

20  preliminary report before the final report was given to IndyMac's Board of

21  Directors.  Leigh refused to alter her report, telling Minier that it was accurate.  The

22  report was given to an IndyMac attorney who re-wrote the report, reducing the

23  number of adverse findings from 63 to 11.  According to Leigh, the attorney, who

24  had been hired by Minier, said he did not care about regulators and had found that

25  regulators could be manipulated.  In addition, Niland told Leigh that if the loans

26  stayed on the report it would lower bonuses for management, and if they were

27  removed, it would result in higher bonuses.

28

58.    An example of one non-conforming loan in Leigh's preliminary report was a "stated income" home loan to an employee of Disneyland, who claimed an annual income of $90,000.   In fact, the borrower's loan file disclosed that she earned $11.00 per hour as a cafeteria cashier.  According to Leigh, Minier refused to permit this loan to be included in Leigh's preliminary  report to IndyMac's Board of Directors.  Leigh was so offended by the actions of Minier, the attorney, and Niland that on September 8, 2006 she wrote letters to the FDIC, Freddie Mac, and Fannie Mae complaining that IndyMac Bank was operating in a manner that was not in compliance with regulatory guidelines.

59.    The Bank's PPQC Department had been put under the supervision of the Mortgage Operations Department, eliminating any checks on the Mortgage Operations Department.   This organizational structure and lack of oversight violated FDIC, Fannie Mae and Freddie Mac regulations.  *See* 12 C.F.R. § 364, Appendix A, Part II, A. Leigh was ultimately fired by IndyMac at approximately the same time as  other top internal control supervisors, including Charles Williams ("Williams"), the head of Bank's internal audit department.  According to Leigh, Perry asked Williams to ignore a major problem that Williams had discovered, but Williams refused to do so.  According to Leigh, she and Williams were terminated (directly or constructively) because they called attention to structural deficiencies in the Bank's internal controls, and noted specific deficiencies in internal controls over loan underwriters.  Leigh also stated that she believes that she and Williams were fired because Perry and Minier sought to hide the negative findings reflected in Leigh's report from IndyMac's board, and the only way for them to do that was to fire them.  "They did not want anything found."

60.    Unchecked, shoddy internal controls remained the rule into and throughout the Class Period.   Wesley E. Miller ("Miller"), who worked as an underwriter for IndyMac in California from 2005 to 2007, stated that when he rejected a loan as questionable, he was berated by sales managers who then went

1    over his head and obtained approval of the loan from senior vice presidents.

2    According to Miller, the underwriters' decisions might simply be overruled or the

3    underwriter might be pressured or ordered to change his decision, because the

4    managers' instructions were to "find a way to make this [loan application] work."

5         61.    Scott Montilla ("Montilla"), a former IndyMac loan underwriter in

6    Arizona during the same time period, stated that about one-half of his decisions to

7    reject loans were overridden by the Bank's executives.  Moreover, according to

8    Montilla, some borrowers told him that they had no idea their stated incomes were

9    being inflated as part of the application process.

10        62.    Confidential Witness A ("CW A") was a Manager in IndyMac's fraud

11   audit and investigation unit from December 2004 until October 2007.  According to

12   CW A, everyone at IndyMac knew that the underwriters were "pushing" bad loans

13   and that the idea that IndyMac's Alt-A loans were any different than subprime

14   loans was nonsense.  Often, CW A's investigations would reveal that the IndyMac

15   underwriter or sales person had pushed through a loan with inadequate or fanciful

16   documentation.  CW A stated that the front office often overrode any findings and

17   delinquencies or improper conduct by underwriters, with no or weak explanations.

18   According to CW A, central mortgage operations, including Perry, knew full well

19   of the rampant loan fraud but did not care so long as home prices continued to rise.

20   According to CW A, Perry had "vitriol" for quality control/audits and Perry took

21   actions to "neuter" the quality control/audits department by moving the quality

22   control department from the secondary mortgage division to the central mortgage

23   operations division. As a result, the quality control department was now controlled

24   by the very division it was supposed to monitor.

25        63.    Confidential Witness B ("CW B") was a Senior Underwriter who

26   joined IndyMac in 1997, and worked in IndyMac's Wholesale Mortgage Division

27   until July 2008.  CW B confirmed that underwriters were incentivized by

28   IndyMac's bonus system to approve loans without adequate review, and some took

advantage of the opportunity.  For example, one underwriter in Wisconsin was approving 20 loan applications per day.  CW B was also assigned to process loan applications acquired in connection with IndyMac's hiring of over 1,400 professionals from American Home Mortgage, a bankrupt loan originator that had concentrated heavily in making subprime loans.  For loans that had previously reached the first stage of approvals at American Home Mortgage, she and other employees were instructed to approve loans whether or not they met IndyMac's standards.  Many loans did not meet IndyMac's standards, but were approved anyway.  CW B described American Home Mortgage employees as operating a "fraud shop" within IndyMac.  Eventually IndyMac hired ten former American Home Mortgage underwriters to approve additional loans generated by that company because IndyMac appraisers were unwilling to approve many of these loans.

64.    Cody Holland joined IndyMac as a loan officer in September 2007. According to Holland, IndyMac regularly violated its own internal guidelines for loan approvals.  Although the guidelines at that time required borrowers to have minimum FICO scores of 620, loans were approved for borrowers with scores as low as 580.  IndyMac also regularly approved loans with loan-to-value ratios as high as 100%, notwithstanding Perry's public statements that IndyMac had discontinued such loans.

65.    Confidential Witness C ("CW C") was a Mortgage Underwriter in a regional office of IndyMac beginning in August 2007.  According to CW C, loan underwriters were told to approve loans that did not satisfy the current guidelines. Loan officers regularly bypassed regional underwriters to gain approval of loans outside the guidelines by contacting senior operations management at the Bank's Pasadena headquarters, who would order approval of loans in markets with which they were not familiar.  FICO score requirements were regularly waived in order to increase loan volume.  Also, according to CW C, IndyMac went so far as instruct

employees during loan underwriting training sessions as to how to obtain exceptions to the lending guidelines, and underwriters began to view the mortgage guidelines as a joke. In addition, appraisals were frequently provided by a small number of brokers who were chosen because of their willingness to inflate appraisals.

66.    Confidential Witness D ("CW D") was an IndyMac Underwriting Team Leader from 2005 to July 2007, and supervised eight underwriters. CW D confirmed that Frank Sillman, head of the IndyMac Mortgage Bank Division, regularly overrode underwriters' decisions to deny loans. Underwriters were pressured to approve loans and told to "do anything to keep the loan from going to Countrywide." Moreover, as an underwriting team leader, CW D received an e-mail towards the end of the month from his Regional Manager, imploring CW D to "approve as many loans as you can because we need a certain amount of mortgage volume this month."

67.    On June 30, 2008, the Center for Responsible Lending (the "CRL") issued a report titled "IndyMac: What Went Wrong? How an 'Alt-A' Lender Fueled its Growth with Unsound and Abusive Mortgage Lending," which corroborates and/or reports the witness statements recounted above. The CRL describes itself as a national nonprofit, nonpartisan research and policy organization dedicated to protecting home ownership and family wealth by working to eliminate abusive financial practices. CRL is affiliated with Self-Help, the nation's largest community development financial institution. Based on interviews with 19 former employees, mostly underwriters, and review of pending actions against the Bank and affiliates, CRL uncovered evidence of pressure from managers and underwriters to approve unsound loans in contravention of IndyMac's internal underwriting guidelines, and the overruling of underwriters' decisions to deny loans with falsified paperwork and inflated appraisals.

68.    The Treasury Report confirms CRL's findings.  Following extensive review of documents and interviews with OTS, FDIC and IndyMac employees, the Report concludes that the Bank's "unsound underwriting practices" – including blatantly deficient and unsupported property appraisals – was a key factor causing the Bank's failure.  In its discussion of this factor, the Treasury Report states:

> To explore the impact of thrift underwriting on loan performance, we reviewed 22 delinquent loans that represented a cross-section of the loan products in IndyMac's loans held to maturity portfolio. These loans were 90 days or more delinquent as of August 31, 2008. We reviewed the loan files and discussed the loans with IndyMac officials who were retained by FDIC in the conservatorship. . . .
>
> **For the loans reviewed, we found little, if any, review of borrower qualifications, including income, assets, and employment.** We also found weaknesses with property appraisals obtained to support the collateral on the loans. For example, among other things, we noted instances where IndyMac officials accepted appraisals that were not in compliance with the Uniform Standard of Professional Appraisal Practice (USPAP). We also found instances where IndyMac obtained multiple appraisals on a property that had vastly different values. There was no evidence to support, or explain why different values were determined. In other instances, IndyMac allowed the borrowers to select the appraiser. As illustrative of these problems, the file for one 80/20, $1.5 million loan we reviewed contained several appraisals with values ranging between $639,000 and $1.5 million. There was no support to show why the higher value appraisal was the appropriate one to use for approving the loan. (Emphasis added)

69.    The OIG reviewed a sample of 22 loans in the course of its material loss review—out of a total loan portfolio of approximately 44,000 loans totaling $13 billion.  The Treasury Report included a detailed description of four loans it reviewed which dramatically illustrate some of the weakest underwriting practices.  Three of the loans were originated during or just before the Class Period.

**Loan 1:** On May 2, 2007, IndyMac approved a $926,000 stated income loan for the borrower, which was secured by a one acre lot in Delray Beach, Florida. The loan was an adjustable rate mortgage with a 5-year term and a beginning interest rate of 5.875 percent, which was subject to change monthly[.]

As a stated income loan, IndyMac performed no verification of the borrower's self-employment income of $50,000 a month ($600,000 annually). IndyMac also did not verify the borrower's assets. The loan file contained a copy of a signed request by the borrower to the Internal Revenue Service (IRS) for copies of past tax returns, but we found no evidence that IndyMac ever obtained the tax returns. According to an IndyMac official, IndyMac had borrowers sign such requests as a "scare tactic," assuming that they would be more forthcoming on their stated income. In practice, however, we were told that IndyMac seldom forwarded the signed requests on to the IRS.

The loan file contained an appraisal which indicated that the property value was $1.43 million. This value was based on comparable properties that had been improved with single family residences. However, the comparable properties were located closer to the ocean and bay, and their values were based on listing price instead of the actual selling price. The appraised value also did not take in consideration a slowdown in the real estate market.  We saw no

1    evidence in the loan file that IndyMac resolved these and other
2    anomalies with the appraisal.

3    **Loan 2:**  In November 2007, IndyMac approved a $3 million stated
4    income loan, secured by the borrower's primary residence in
5    Scottsdale, Arizona. The loan proceeds were used to refinance the
6    primary residence which the borrower had owned for 11 years and
7    reported its value as $4.9 million.

8         As a stated income loan, IndyMac performed no verification of
9    the borrower's reported self-employment income of $57,000 a month
10   ($684,000 annually). Contrary to IndyMac policy, the borrower
11   selected the appraiser who appraised the property at $4.9 million.
12   Notes in the loan file indicated that the borrower had listed the
13   property for sale in November 2006, first at a price of $4.9 million
14   that was later reduced to $4.5 million before the borrower pulled the
15   property off the market. Despite this, the appraiser concluded that the
16   value of $4.9 million appeared to be reasonable. IndyMac accepted
17   the appraiser's value based on a review of online sale and public
18   records. It did not physically inspect the property.

19        The borrower made no payments on the loan before default.
20   The total delinquent loan amount as of November 2008 was
21   $3,015,625. According to the IndyMac official, the property sold in
22   October 2008 for $2.0 million.

23   **Loan 3:** In February 2007, IndyMac provided the borrower a stated
24   income, 80/20 loan, for a combined total of $1.475 million, to
25   purchase a property in Marco Island, Florida.

26        As a stated income loan, IndyMac performed no verification of
27   the borrower's reported income of $28,500 a month ($342,000
28   annually). For 80/20 loans, IndyMac allowed an $800,000/$200,000

maximum loan amount and a maximum combined loan amount of $1 million. This loan was an exception to IndyMac policy as the combined loan amount of $1,475,000 exceeded the maximum combined loan amount. The loan exception was approved anyway.

Various appraisals in the loan file contained significant differences with no indication of how they were resolved by IndyMac. A January 2007 appraisal valued the property at $1.48 million. A valuation analysis prepared by an IndyMac employee on January 25, 2007, stated that the skill level of the appraiser was unacceptable—the appraiser had not provided accurate comparable properties to the subject property and did not accurately consider the location of the property. The IndyMac employee estimated the property value at $1 million and recommended that another appraisal be obtained. Another note in the loan indicated that the IndyMac official overruled the employee's recommendation and the appraisal was accepted. The IndyMac official, however, adjusted the appraised value approximately 10 percent lower, to $1.33 million, citing as a justification that a property on the same street had sold for $1.97 million.

The borrower made no payments before defaulting on the combined $1.48 million loans. According to the IndyMac official, the borrower deeded the property to the thrift in lieu of foreclosure. The IndyMac official estimated in November 2008 that the property was worth about $700,000.

70.    The Treasury Report also noted that IndyMac faced significant risk because IndyMac "had several significant asset concentrations that warranted a higher level of capital in the current environment, such as nontraditional mortgage loans with negative amortization potential, Alt-A loans, and geographic

1  concentration of loans in California and areas rated high-risk by several mortgage

2  insurance companies."  According to the Treasury Report, OTS had filed a report in

3  2005 noting the dangerous asset concentrations in IndyMac's portfolio, and had

4  expressed concerns with IndyMac's liquidity.

5  71.  IndyMac's improper and fraudulent lending practices were also

6  documented in the complaint filed in the action styled *Financial Guaranty*

7  *Insurance Co. v. IndyMac Bank, F.S.B.*, Case No. 08-CV-06010-LAP, currently

8  pending in the United States District Court for the Southern District of New York.

9  The FGIC is a financial guaranty insurance company headquartered in New York,

10  which works closely with state and local governments.  The complaint in that case

11  quotes former employees stating:

(a)  According to a former IndyMac central banking group vice-president,
that IndyMac institutionalized exceptions to its own underwriting
guidelines that allowed IndyMac to make and approve mortgage loans
that should have been denied under the actual guidelines and that
direct fraud by IndyMac loan sales representatives was rampant in the
mortgage loan origination process at IndyMac;

(b)  According to a former IndyMac loan underwriter, that IndyMac's loan
origination process had evolved into organized chaos where, at
management's direction, any concessions or adjustments were made in
order to close loans that would not normally be made, including
adjusting appraisals to make the loan work;

(c)  According to a former IndyMac vice president in IndyMac's mortgage
banking segment, that in order to keep pace with its competition,
IndyMac greatly loosened its underwriting guidelines in order to bring
in more loans;

(d)  According to a former IndyMac senior auditor in IndyMac's central
mortgage operations, that an increasing number of loans were made

through apparently fraudulent or misrepresented documentation and there was an increase in defaults because of these misrepresentations in the underwriting process, the relaxation of the underwriting guidelines and approval of borderline loans;

(e)     According to a former IndyMac investigator in IndyMac's central mortgage operations, that the quality of IndyMac's loan origination process had become a running joke within IndyMac, and that a whole class of IndyMac originated mortgages were referred to internally as 'Disneyland Loans', because of insufficient documentation or the borrower's inability to repay the mortgage; and

(f)     According to a former IndyMac senior loan processor, that the increase in the number of IndyMac-originated delinquent loans was due to misrepresentations and fraud occurring in the mortgage loan origination process.

72.     A review of IndyMac loans by MBIA Insurance Company ("MBIA"), an insurer of certain asset-backed securities originated by IndyMac, showed that 418 of 6,970 loans securitized by IndyMac in mortgage pool INDS 2007-1 had defaulted by December 31, 2007, within one year of securitization, and typically, in little more than a year from origination.  All but 17 of the 418 defaulted loans were in material non-compliance with IndyMac's underwriting guidelines.  In mortgage pool INDS 2007-2, also insured and reviewed by MBIA, 294 of 297 defaulted loans were in material non-compliance with IndyMac's underwriting guidelines. Additional facts demonstrating IndyMac's inadequate and fraudulent underwriting practices are set forth complaint filed by MBIA in a case entitled *MBIA Insurance Co. v. IndyMac ABS, Inc.,* Los Angeles Co. Super. Ct. Case No. BC422358 (filed Sept. 22, 2009).

73. The following examples are illustrative of the mortgage loans reviewed by MBIA and their non-compliance with defendants' representations to investors:

(a) On September 22, 2006, a loan with a principal balance of $39,600.00 was made to a borrower in Goodrich, Michigan on a property with an original appraisal value of $198,000.00 and a senior loan balance of $158,500.00. The borrower stated that he was employed as a truck driver, did not own his vehicle, and had income of $8,950.00 per month in 2006.. The borrower had been employed by his current employer for approximately 2 weeks when applying for the loan, demonstrated liquid assets of only $568.00, and had no prior housing payment history. His stated income was not substantiated by the credit/asset profile. The borrower filed for bankruptcy on February 18, 2008, and the borrower's court filings indicate the borrower earned $3,854 per month—less than 44% of what had been stated at the time of the origination of the loan. (Loan #6074318 – INDS 2001-1).

(b) On January 24, 2007, a loan with a principal balance of $70,500.00 was made to a borrower in Rosamond, California secured by a property with an original appraisal value of $352,654.00 and a senior loan balance of $282,100.00. The borrower stated his income to be $11,000 per month. However, the borrower demonstrated only $3,802.40 in net assets. Further, the borrower was self-employed and had been at her job for only 7 months. The loan file did not contain a required CPA letter  to verify self-employment. Moreover, prior to being self-employed, the borrower was an employee of the mortgage broker issuing the loan and prior to purchasing the property had lived with her family. Accordingly, the stated income was unreasonable on its face based on the nature of the borrower's employment. (Loan # 125257414 – INDS 2007-2).

(c) On February 5, 2007, a loan with a principal balance of $57,750.00 was made to a borrower in Hemet, California on a property with an

original appraisal value of $385,000.00 and a senior loan balance of $308,0000.00. The borrower stated his income to be $11,700.00 per month as a food court manager at a local Costco Wholesale Club.  The stated income was unreasonable on its face based on the borrower's employment.  The borrower filed for bankruptcy on November 26, 2007.  The borrower's court filings indicated the borrower earned only $4,168 per month, less than 36% of what had been stated at the time of the origination of the loan.  (Loan # 125280044 – INDS 2007-1).

74.    Those mortgage loans are illustrative of IndyMac's failure to comply with its own loan underwriting guidelines, contrary to representations made to purchasers of asset-backed securities, and investors.

75.    In addition, a significant number of mortgage loans had debt to income ratios far in excess of applicable underwriting guidelines, loan-to-value ratios far in excess of applicable underwriting guidelines, and were made on the basis of "stated incomes" that unreasonable on their face.  The information conveyed to purchasers of those securities, including information regarding debt to income and CLTV statistics for the mortgage loan pools, was materially false.

76.    On July 20, 2008, *The New York Post* published an article by investigative reporter Teri Buhl titled "[OTS] Officials Missed IndyMac Red Flags."  That article listed three "red flags" that regulators should have noticed, and defendants — including Ernst — were aware of long before the Bank's collapse:

> IndyMac was late in adhering to a federal rule banning lenders from lending to people who did not provide ample documentation verifying their income.
>
> The rule, which was mandated by a group of regulators that included the Federal Reserve, FDIC and OTS, took effect in September 2006. But according to internal IndyMac compliance documents reviewed by *The Post*, IndyMac didn't comply until

1   November 2007 - something OTS compliance officials should have

2   spotted.

3   Another missed opportunity, [advocacy group The Committee

4   for Responsible Lending] said, came when the lender would pull

5   employees in on the weekends in 2006 to tweak loan documents by

6   inflating home appraisals on mortgages that had been rejected by Wall

7   Street. Had OTS safety and soundness officers reviewed IndyMac's

8   appraisal valuation processes, CRL said, they would have noticed the

9   practice.

10   The third strike for the regulators came in August 2007, when

11   IndyMac bought branches of the defunct American Home Mortgage,

12   even though data show the bank had a growing problem with non-

13   performing assets.

14   "The bottom line is that the IndyMac failure could have been

15   prevented if common sense lending standards had been required in

16   2006," said Martin Eakes, CRL's CEO.

17   77.    Further evidencing the fraudulent quality of the loans underwritten and

18   originated by IndyMac, and its deviation from safe and sound banking practices, on

19   December 31, 2008, *Bloomberg.com* reported that Fannie Mae and Freddie Mac

20   had found IndyMac to be liable to repurchase between $1 billion and $10 billion in

21   loans that violated representation and warranty agreements between IndyMac and

22   those agencies.  When a mortgage originator sells the loan, it makes representations

23   and warranties to the buyer with respect to the borrower, the property securing the

24   loan, the mortgage instruments, and the underwriting.  If those representations and

25   warranties are false or breached — which most commonly occurs when there is

26   fraud or misrepresentation in the underlying mortgage — the originator/underwriter

27   is obligated to repurchase the mortgage.  James Lockhart, the director of the Federal

28   Housing Finance Agency, the regulator of Fannie Mae and Freddie Mac, explained

the reason for such incredibly large repurchase demands: "In 2006 and 2007, the underwriting was so poor, there was a lot of fraud that happened or a total misrepresentation."

78.    IndyMac's fraudulent underwriting practices also encompassed its solicitation and use of artificially inflated property appraisals.    IndyMac's solicitation and use of inflated appraisals from non-independent appraisers is currently the subject of investigations by the FBI and FDIC.  As *The New York Post* reported on August 3, 2008:

> The federal investigation into mortgage fraud at IndyMac Federal Bank has expanded into the company's Homebuilder Division, according to a bank executive interviewed by the FBI and FDIC. Investigators have seized 2005-06 construction loan audit reports from the files of the Homebuilder Division, the executive told *The Post*, and later questioned him and other workers about the reports, he said.

> The recently renamed Homebuilder Division, which lent money on commercial and residential construction projects until [it] stopped lending at the end of 2007, had a staggering 52 percent of its $1.3 billion in loans classified as non-performing as of March 31, [2008], according to a government filing.

> Even in a down market, a non-performing rate closer to 20 percent to 30 percent is more usual, according to a person familiar with the local real estate market.

> Based on the question asked by investigators, one focus of the probe appears to center on whether or not the appraisal inspectors inflated real-estate development project values and whether IndyMac loan officers gave independent appraisers false information.

> "They asked about how we verify appraisal values," said the executive, who spoke on the condition of anonymity.

1    "I explained the lack of risk controls in place for that group,
2    such as loan officers who were allowed to pick their own appraisers
3    instead of using a third party to assign an independent appraiser -
4    which is a typical industry practice," he said.

5    79.    Independent witnesses have corroborated the existence of such
6    fraudulent appraisal practices.  According to Andrew Eliopolus ("Eliopolus"),
7    President of Eliopolus Development, a private construction company, IndyMac
8    approved a $36.5 million loan to Eliopulos Development in order to develop real
9    estate near Lancaster, California that contained 539 home plots on about 900 acres.
10    Later, in April 2007, in connection with a renewal on the loan, IndyMac
11    commissioned an appraisal and determined that the property was worth $82 million.
12    On the basis of this appraisal the loan was extended through December 31, 2007.
13    This appraisal permitted IndyMac to claim that the loan-to-value ratio was 33%,
14    and that the loan was oversecured.  In order to extend the loan beyond January 1,
15    2008, IndyMac required a new appraisal, which was completed in December 2007,
16    and determined that the property was worth only $17 million, even though there
17    had not been a significant shift in real estate values in the area where the project
18    was located in the eight months between the two appraisals.  The loan had been
19    reviewed by the "IndyMac Bank Senior Loan Committee," which Eliopolus was
20    told consisted solely of Perry.

21    80.    According to Vernon Martin, the Company's Chief Commercial
22    Appraiser in 2001 and 2002, IndyMac hired Perry's father and father-in-law as the
23    sole construction inspectors in the Sacramento, California region.  Perry's father
24    remained associated with IndyMac as a purportedly independent inspector through
25    2008.  IndyMac also relied heavily on a small number of appraisers who were
26    known to be more "flexible" than others, that is, more willing to grant higher
27    appraisals to parcels of land.  In one instance, prior to the Class Period, a
28    commercial property that had been purchased for $2 million was appraised at $17

1   million a few months later, even though the property had no tenants.  In another

2   instance, an undeveloped parcel of land was purchased for $18 million, and

3   appraised at $30 million on the claimed basis that the developer added value to the

4   property simply by buying it.

5         81.   According to former IndyMac loan officer Cody Holland ("Holland"),

6   IndyMac continued to manipulate appraisals into the Class Period, and said

7   manipulation affected both residential and commercial mortgages.  Specifically,

8   IndyMac selected particular appraisers who were known to inflate their appraisals

9   for properties where the loan appeared questionable.  Holland's statements are

10   corroborated by the confidential witnesses cited in the complaint filed in the action

11   styled *Cedeno v. IndyMac Bancorp, Inc., et al.*, Case No. 06-CV-6438-JGK, filed in

12   the United States District Court for the Southern District of New York, who are

13   alleged to have said that IndyMac told its outside appraisers the "target value" that

14   was needed to secure approval of a residential loan.  Appraisers who

15   accommodated the Bank's requested appraisal values were rewarded with

16   additional work, while those who did not were cut off.  IndyMac's Chief Appraiser

17   and other executives were aware of and acquiesced in this practice.  IndyMac's

18   management intimidated and threatened to fire employees who rejected fraudulent

19   appraisals.

20         82.   The Treasury Report also identified particularly unsound underwriting,

21   risk management and appraisal practices "in several significant areas of

22   [IndyMac's] operations" based on interviews with OTS, FDIC and IndyMac

23   employees and review of documents.  In particular, The Treasury Report also found

24   that the appraisals in the Home Builders Division ("HBD") (1) violated policies and

25   procedures; (2) violated OTS and Uniform Standards of Professional Appraisal

26   Practice; (3) used inflated appraised values; (4) lacked market analysis and

27   feasibility studies to support appraised value; (5) valued properties far in excess of

28

1    the recent sale prices for the subject properties; and (6) used retail values for

2    subdivisions instead of prospective market value at the time of completion.

3         83.    In early 2008, an independent auditor was brought in to examine

4    IndyMac's appraisal practices, among other things.  The primary finding of the

5    firm, based on interviews with retail and wholesale underwriters, was that IndyMac

6    underwriting was not centrally managed and was not consistent across the

7    Company.

8         84.    In short, fraudulent and reckless loan underwriting practices—

9    including the solicitation and use of fraudulent, manipulated appraisals—were

10   pervasive both prior to and during the Class Period.  As discussed below, IndyMac

11   and Perry not only concealed these practices, they made repeated false statements

12   touting the relatively conservative nature of IndyMac's underwriting policies and

13   practices in order to reassure investors that IndyMac would "fare better" than other

14   lenders.

15   **C.    Internal Audits, Outside Audits, and OTS Examinations**

16   **Repeatedly Identified Underwriting, Appraisal and Internal**

17   **Control Deficiencies at IndyMac**

18        85.    Perry, Keys, and Ernst were fully aware of these deficiencies in

19   underwriting and internal controls because they were repeatedly identified in

20   internal audits, outside audits, and OTS examinations—yet never corrected.

21        86.    For example, the Conduit Division was one of IndyMac's most

22   troubled divisions.  An internal IndyMac audit identified problems with the Conduit

23   Divisions loan approval and underwriting processes as early as 2005, and

24   recommended that the division increase investment in infrastructure and personnel.

25   According to OTS, no changes were ever made.

26        87.    In 2006, an IndyMac internal audit again reported problems in the

27   Conduit Division.  That same year, Ernst itself reported the Conduit Division as a

28   financial reporting control deficiency.  Ernst found that the division did not have an

1    effective process or system in place to oversee the execution of its trading activities

2    or for monitoring the exposure to sellers which increased credit risk.

3        88.    According to OTS, the problems were never addressed and Ernst

4    continued to certify IndyMac's financial statements and internal controls.  Indeed,

5    in its January 2007 examination OTS <u>again</u> found that the problems in the Conduit

6    Division remained uncorrected.  This time, it referred the matter to IndyMac's

7    Board of Directors—Chaired by Perry—and required it to "provide actions taken

8    (1) to address the internal audit findings noted in the 2006 and 2007 internal audits,

9    (2) to improve the internal control environment, and (3) to ensure the Division

10   develops more robust, transparent management reports"  OTS then required that the

11   following corrective action be taken: "Ensure the Conduit Division corrects the

12   internal audit findings noted in the last report and ensure that the Division is

13   operating in a strong internal control environment.  In addition, the Division must

14   develop more robust, transparent management reports."  Moreover, according to the

15   Treasury Report, "IndyMac management" independently identified credit risks in

16   the Conduit Division in **February 2007**, including the need to implement tighter

17   seller approval and underwriting standards.

18       89.    In its January 2007 examination, OTS also identified serious issues

19   with IndyMac's appraisals.  OTS found that the borrowers, rather than the mortgage

20   originator, were paying the appraisers directly, which did not ensure appraiser

21   independence.  In several of the loan files, the OTS appraiser noted inadequate

22   documentation.  In the examiner workpapers, the OIG noted that the examiner

23   found appraisals where the property valuation was made without physical site

24   inspection of the subject property or comparable properties, appraisals for which

25   the appraiser was not located in the immediate area, appraisals where the valuations

26   were based on public data sources, and appraisals in which no photos of the

27   property or comparables were provided.

28

90.    According to the Treasury Report, there is no evidence that IndyMac ever adequately addressed these appraisal issues.    Indeed, in early 2008, an independent auditor was brought in to examine IndyMac's appraisal practices, among other things.    The primary finding of the firm, based on interviews with retail and wholesale underwriters, was that IndyMac's appraisal policies were deficient and underwriting was not centrally managed and was not consistent across the Company.

91.    The January 2007 examination also identified problems with IndyMac's forecasting, ALL methodologies, and the classification of troubled assets, requiring the following corrective actions to be taken by IndyMac:

- "Establish a policy and related procedures for the identification and classification of troubled collateral dependent loans."

- "Refine current ALLL practices or introduce new methodologies to take advantage of more robust data and improve forecasts."[1]

- "Ensure the new earning forecasting process is implemented."

- "Develop and implement thrift-wide risk measures and sub-allocate, as appropriate, to all individual business units."

92.    Most, if not all, of these issues were never corrected.  For example, in January 2008—a year after the January 2007 OTS examination— an independent accounting firm brought in to examine IndyMac's financial reporting identified persisting deficiencies in IndyMac's calculation of ALL.    The independent accounting firm found that there were no internal controls in place to ensure that different divisions were applying the same standards, and no internal controls were in place to ensure that they were using sound methodology in calculating ALL.

---

[1] "ALLL" stands for "allowance for loan and lease losses."  Because IndyMac did not have substantial leasing activities, its financial statements generally refer to ALL.  For purposes of this complaint, the acronyms "ALL" and "ALLL" are interchangeable.

93.    The January 2008 OTS Examination, discussed in greater detail below, confirmed that serious internal control problems were never corrected—and deteriorated even further—throughout 2007.    The 2008 Examination Report identified ten matters requiring IndyMac board attention, and 24 corrective actions needed to be taken by IndyMac.    Four of the ten matters requiring IndyMac board attention related to internal controls, and at least ten of the corrective actions related to internal controls problems that affected the calculation of ALL.

94.    IndyMac had also been aware of potential problems with the Home Construction Lending ("HCL") Division well before the Class Period.    In 2004, an internal audit found several problems, including (1) a $517 million bridge loan for which an appraisal was not obtained to support collateral value; (2) loans with expired insurance policies; (3) 22 loans that did not have evidence of building permits in file; (4) 122 title endorsements checks for new liens or delinquent taxes recorded against property that could affect IndyMac's lien position; and (5) money provided to borrowers for 18 loans did not have supporting documentation for these amounts as required with such documents as invoices or contracts.

95.    In the January 2007 examination, the OTS identified these same problems as persisting.    According to its 2007 Report of Examination, the OTS reported serious concerns in the underwriting standards of the HCL Division and could not verify that management had determined that sufficient funds existed to complete projects.

96.    As IndyMac's two most senior officers, Keys and Perry were aware of each of these audits and reports.    Both certified in six different class period SEC filings that they were "responsible for establishing and maintaining internal controls" and "ha[d] designed such internal controls to ensure that material information relating to the company . . . is made known to such officers by others within those entities." As defined by SEC rules, "internal controls" include both those related to financial reporting and those necessary to ensure disclosure of

material facts to investors.   Moreover, Keys was responsible—and compensated based on his management of—all reports and audits relating in any way to internal controls.   Each of the above reports and audits necessarily affected IndyMac's financial reporting, as items such as loan loss allowances are necessarily based on the collateral value of assets.

97.   Ernst was also aware of each of these audits and reports.  Not only is investigation of such facts necessary for an PCAOB-compliant audit, Perry and Keys certified on six occasions that they disclosed "all significant deficiencies in the design or operation of internal controls which could adversely affect the issuer's ability to record, process, summarize, and report financial data and have identified for the issuer's auditors any material weaknesses in internal controls."  Moreover, with respect to the Conduit Division, Ernst had itself identified the division as an internal control deficiency.

## VII.   DEFENDANTS MISLEAD AND DEFRAUD INVESTORS

### A.   Defendant Perry Misleads Investors Regarding IndyMac's Risk Management, Underwriting, and Appraisal Practices

#### 1.   False and Misleading Statements Related to Underwriting, Risk Management, and Appraisals

98.   As alleged above, IndyMac systematically disregarded sound underwriting practices, systematically overrode IndyMac's own underwriting standards and risk control procedures, routinely approved loans based on fraud and misrepresentations, engaged in fraud and misrepresentation in accepting mortgage applications, fired or forced out employees who attempted to sound the alarm regarding IndyMac's underwriting practices, and otherwise fostered a corporate culture that encouraged employees to push mortgages through without regard to underwriting standards.

99.   Notwithstanding these practices, defendant Perry repeatedly represented to investors throughout the Class Period that IndyMac had "strong

underwriting guidelines," was a "prudent manager of risks," independently verified appraisals and income for reasonableness, had "high standards . . . for credit quality," and had put "risk management at the core of [IndyMac's] operations." The false and misleading statements regarding the Bank's underwriting practices and risk management are summarized below:

(a)    "We manage [the] credit risk [associated with non-performing assets] by implementing strong underwriting guidelines and risk-based pricing."   IndyMac March 1, 2007 Form 10-K and April 26, 2007 Form 10-Q (signed by Perry).

(b)    "[W]e verify [our] appraisal[s], we review [our] appraisals.  We get not only a full appraisal but we do an automated appraisal in addition to it.  We independently check their credit.  We verify employment.  We verify their income and their assets and we check their income for reasonableness.  We do a lot of steps on those loans.  We think that's a prudent business for us."  Statement by Perry, on April 26, 2007, 1Q Earnings Call With Securities Analysts and Investors.

(c)    "We have made significant investments in our pre-production and post-production quality control processes to identify potential issues that could cause repurchases.  We believe that these efforts have improved our production quality."  IndyMac, April 26, 2007 Form 10-Q (signed by Perry).

(d)    That the Company would "maintain our high standards for customer service and credit quality."  July 19, 2007 Posting on the IMBreport.com (quoting Perry).

(e)    Touting "prudent underwriting practices" in home building division.  Statement by Perry, on July 31, 2007 2Q 2007 Earnings Call.

1
2
3

   (f) "Our philosophy is to put risk management a the core of our operations[.]" IndyMac July 31, 2007 Form 10-Q and November 6, 2007 10-Q (signed by Perry).

4
5
6

   (g) Touting "prudent regulatory compliance and risk management" and strong risk management practices. IndyMac September 7, 2007 Press Release (quoting Perry).

7
8
9
10

   (h) "I would say today 99% of our production is prior approved, fully underwritten under the stringent underwriting guidelines." Statement by Perry, on November 6, 2007 3Q 2007 Earnings Call.

11  100. These statements were false and misleading for the reasons alleged in
12 Paragraphs 54 to 95 above. Throughout the Class Period, IndyMac had grossly
13 deficient — and in fact fraudulent — underwriting and risk management policies
14 and practices. And IndyMac in fact applied loose or non-existent underwriting
15 standards, overrode decisions of quality control personnel, and had poor quality
16 loans, as confirmed by IndyMac's delinquency rates and massive repurchase
17 demands. As Joanne Kim, CEO of Wilshire Bancorp Inc., stated:  "IndyMac was
18 willing to buy anything."

19  101. IndyMac also made false and misleading statements relating
20 specifically to underwriting and credit quality of IndyMac's homebuilder division,
21 including the following:

22
23
24
25
26

   (a) "At December 31, 2006, non-performing loans for the builder construction portfolio are at 0.78%. . . .  We manage this credit risk by implementing strong underwriting guidelines and risk-based pricing.  Our current weighted average loan-to-value ratio is 73%." IndyMac 2006 Form 10-K, issued March 1, 2007.

27
28

   (b) "The bulk of our subdivision construction business is a very prudent business. . . . I think we clearly substantially tightened

our condo guidelines but I would say overall I am very pleased with our underwriting and credit quality." Statement by Perry, on July 31, 2007 2Q 2007 Earnings Call.

(c)    Purported good performance of builder construction divisions is attributable in part to "prudent underwriting practices." Statement by Perry, on July 31, 2007 2Q 2007 Earnings Call.

(d)    "We've . . . done a great job in underwriting those [subdivision construction] loans. It's just a really challenging cycle for those homebuilders now." Statement by Perry, on November 6, 2007 Securities Analyst Conference Call.

102.   These statements were false and misleading for the reasons alleged in Paragraphs 79, 80, and 94, above. The underwriting on IndyMac's homebuilder loans was particularly rife with fraud and inadequate controls, as confirmed by the Treasury Report. Indeed, six months after declaring the Homebuilder Division to be a "very prudent business" for IndyMac, IndyMac — in the wake of rising delinquencies and defaults — shut down the entire division. The Homebuilder Division is currently the target of an FBI investigation.

## 2.    Defendant Perry Acted With Scienter

103.   Perry made the above statements with scienter because he had actual knowledge of IndyMac's deficient and fraudulent underwriting, risk management, and appraisal policies. Perry was personally involved in the fraud. As Leigh stated, in 2006, Perry was aware of the preliminary report that Leigh had prepared containing negative findings including that 11 to 15 percent of all current loans had problems, far exceeding the industry norms. Leigh also stated that she believes that Perry fired her and others because Perry and Minier sought to hide the negative findings in her report from IndyMac's board, and the only way for them to do that was to fire them. "They did not want anything found." Those actions are completely inconsistent with his public statements about the importance of risk

management and sound loan underwriting.  Perry also made structural changes — such as the termination of senior compliance officers and placing compliance under the control of central mortgage operations — that were clearly intended to "neuter" the compliance department.

104.   Perry also knew of the findings by the internal audit team, IndyMac's internal audit team concerning the home construction division in 2004, 2005, and 2006, discussed in ¶ 94 above.  Perry also knew of Ernst's concerns regarding risk management in the Conduit Division in 2006, (¶ 97) and the concerns reflected in the OTS's January 2007 Report of Examination regarding IndyMac's appraisal practices. (¶ 88)  He also knew that these concerns remained uncorrected.

105.   According to the Treasury Report, in the beginning of 2007 Perry "expressed concerns about the thrift's subprime portfolio in an e-mail message to his executives that discussed the secondary market disruption."   In the message, Perry "stated that the thrift's financial condition was suffering from the effects of its subprime loans and was in the process of structuring a transaction to sell approximately $1.1 billion of them."  However, Perry also stated that "Wall Street had 'pulled financing from investors.'"  The Treasury Report also stated that Perry "said that the thrift also needed to revisit product guidelines in the high risk areas such as subprime, fully financed mortgages, as well as the thrift's highest loan-to-value (LTV) products and make those products 'considerably more conservative.'"

106.   In the same period, Perry was publicly stating that IndyMac already employed strict underwriting guidelines, (¶ 99), and that: "[W]e verify [our] appraisal[s], we review [our] appraisals.  We get not only a full appraisal but we do an automated appraisal in addition to it.  We independently check their credit.  We verify employment.  We verify their income and their assets and we check their income for reasonableness.  We do a lot of steps on those loans.  We think that's a prudent business for us."

107.  Even apart from the direct evidence of his personal involvement in directing improper lending practices to take place, the fraud and misconduct was so pervasive at IndyMac that there is a strong inference that Perry was aware of it. Perry was not a detached executive — he was described by numerous witnesses as a "hands-on manager" who sometimes personally reviewed mortgage applications. According to a former manager at IndyMac quoted in the September 15, 2008 *Los Angeles Business* article, "[a]ll the strategic direction of IndyMac was Mike [Perry] dictating it."  Indeed, he was the sole public face of the company — answering virtually every question on Company earnings calls himself.  And IndyMac's own regulatory filings describe the broad scope of his duties.

> …responsible for the overall direction and administration of all programs and services provided by the Company and for ensuring that all aspects of the Company's activities are conducted commensurate with the best interests of shareholders, customers, employees, and other key stakeholders.  His responsibilities include: (i) setting the strategic vision and establishing a strategic, financial and risk management plan for the company, (ii) recruiting and retaining a senior management team which has the talent and experience to execute the plan, (iii) monitoring the Company's execution, financial and operating performance, (iv) adapting the Company's strategic and execution plans based on Company performance and conditions in the mortgage market and U.S. economy, and (v) managing all key activities related to IndyMac's being a public corporation.  He reports to the Board of Directors as the highest ranking official of the Company.

> \* \* \*

> Mr. Perry's responsibilities, as described above, are significantly broader than any other Named Executive Officer at the Company.

*See* IndyMac's Proxy Statement dated March 24, 2008.

108. Defendant Perry himself, in the statements concerning underwriting and appraisal practices quoted above, represented to the investing public that he had personal knowledge of the practices he was discussing.

109. In light of the pervasiveness of the fraud and misconduct, the fact that both named and confidential witnesses confirm that Perry (and all other senior management) was not only aware of it, but ordered it, and the facts contained in the Treasury Report, there is a strong inference that made the false statements alleged in Paragraphs 99 and 101, above, knowingly.

**B.** **All Defendants Falsely Certify IndyMac's Internal Controls Notwithstanding Actual Knowledge of Serious, Uncorrected Internal Control Deficiencies**

110. In 2002, Congress passed the Sarbanes-Oxley Act (the "Act"). One of the primary purposes of the Act was to mandate a set of internal procedures designed to ensure accurate financial disclosures, and to require disclosure of facts that would materially affect the accuracy of financial disclosures. The Act requires that the signing officers certify that they are "responsible for establishing and maintaining internal controls" and "have designed such internal controls to ensure that material information relating to the company and its consolidated subsidiaries is made known to such officers by others within those entities, particularly during the period in which the periodic reports are being prepared." 15 U.S.C. § 7241(a)(4). The officers must "have evaluated the effectiveness of the company's internal controls as of a date within 90 days prior to the report" and "have presented in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date." The signing officers must also "indicate[] in the report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date

1    of their evaluation, including any corrective actions with regard to significant
2    deficiencies and material weaknesses."

3        111.    The Act also requires that the signing officers disclose to auditors "all
4    significant deficiencies in the design or operation of internal controls which could
5    adversely affect the issuer's ability to record, process, summarize, and report
6    financial data and have identified for the issuer's auditors any material weaknesses
7    in internal controls."    The external auditors must then certify the effectiveness of
8    the Company's internal controls—which is separate from the certification of the
9    financial statements themselves.

10       112.    In the 2006 Form 10-K, dated March 31, 2007, IndyMac stated that
11   Perry and Keys supervised an evaluation of the effectiveness and design of
12   IndyMac's disclosure controls, that the disclosure controls and procedures were
13   effective, and that management had concluded that IndyMac's internal controls
14   over financial reporting was effective as of December 31, 2007.

15       113.    In their respective Sarbanes-Oxley Act certifications, both Perry and
16   Keys certified the accuracy of these statements, and certified that they:

17   •    are "responsible for establishing and maintaining disclosure controls
18        and procedures . . .  and internal control over financial reporting" for
19        Indymac;

20   •    "evaluated the effectiveness of the registrant's disclosure controls and
21        procedures and presented in this report our conclusions about the
22        effectiveness of the disclosure controls and procedures, as of the end of
23        the period covered by this report based on such evaluation";

24   •    "disclosed in this report any change in the registrant's internal control
25        over financial reporting that occurred during the fourth fiscal quarter
26        that has materially affected, or is reasonably likely to materially affect,
27        the registrant's internal control over financial reporting"; and

28

981588v1/010900                              54

- Disclosed to Ernst "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information."

114.  Ernst in turn—having been told of all significant deficiencies and weaknesses in the Company's internal controls—expressed an "unqualified opinion" that IndyMac's internal controls over financial reporting were effective.

115.  These statements and certifications were all false.  As discussed in Paragraphs 85-97, Ernst, Indymac's internal audit team, and OTS had **each** identified serious internal control issues in the Conduit Division in both 2006 and January 2007 that had not been corrected at the time the 2007 Form 10-K was issued.  In fact, one month before the issuance of the 2007 Form 10-K, OTS required IndyMac board action with respect to "internal control environment" of the Conduit Division, which originated 33% of IndyMac Bank's total loans in 2006.  And, in the same month that IndyMac issued the 2007 Form 10-K, IndyMac management independently identified credit risks in the Conduit Division in February 2007, including the need to implement tighter seller approval and underwriting standards.

116.  In January 2007, OTS also required "corrective action" to be taken with respect to IndyMac's calculation of ALL.  These problems were not resolved by the time the 2007 Form 10-K was filed.  Indeed, an independent accounting firm identified the same problems in January 2008—a year later.  Moreover, IndyMac never disclosed any changes to its calculation of ALL (which it would have been required to do, because the Sarbanes-Oxley Act—and Perry's and Keys' certifications—requires disclosure of "**any** change in the registrant's internal control over financial reporting that occurred . . . that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting").

117.  Each of the defendants acted with scienter because they had actual knowledge of these internal control deficiencies with respect to the Conduit Division and ALL methodology, as discussed above at ¶¶ 165 to 210.  Perry and Keys certified on six occasions that they were responsible for the internal controls, had evaluated them, and had ensured that all internal control issues were reported to them.  Both received all internal audits, all external audits, and OTS reports; indeed, managing such reports was Keys' job, as explained in the 2007 Proxy.  And IndyMac management itself identified serious credit risks in the Conduit Division in February 2007—the same month that the 2007 Form 10-K was issues.  Perry and Keys also certified in that they disclosed all material deficiencies to Ernst— meaning that Ernst had actual knowledge of the same facts.  Moreover, Ernst itself cited the Conduit Division as an internal control problem in 2006.  Despite the problems going uncorrected—as confirmed by both OTS's 2007 Report of Examination and the Treasury Report—Ernst gave its "unqualified opinion" as to the accuracy of IndyMac's ALL and effectiveness of IndyMac's internal controls.

118.  Perry and Keys made identical misrepresentations in each of the quarterly financial reports issued in 2007.  In each of those reports, Perry and Keys certified that they were responsible for internal controls, that those internal controls were effective, and that there had been no material changes in IndyMac's internal controls.  These representations, like those in the 2007 Form 10-K, were each knowingly false in light of the fact that OTS had, in January 2007, (a) referred the internal control problems in the Conduit Division to IndyMac's board of directors, and required corrective action, and (b) required corrective action to be taken with respect to IndyMac's calculation of ALL.

119.  Perry, Keys, and Ernst again misrepresented the state of IndyMac's internal controls in the 2007 Form 10-K, issued February 29, 2008.  In that report, Perry and Keys again certified IndyMac's internal controls and did not identify any deficiencies in those controls.  Ernst—who, according to the certifications of Perry

1    and Keys, was informed of all material deficiencies—gave another unqualified

2    opinion regarding those controls.

3        120.   These certifications were patently false.  Less than two months before

4    the issuance of the 2007 Form 10-K, (a) OTS and the FDIC had initiated an

5    examination four months ahead of schedule that identified *ten* matters requiring

6    IndyMac board attention, and *twenty-four* matters requiring corrective action,

7    including numerous matters relating to deficient internal controls; and (b) an

8    external auditor had identified serious deficiencies in the ALL methodology.  The

9    specific internal control issues identified by OTS include:

10       •    (i) "implementing additional controls" to "strengthen the quarterly

11            compilation process";

12       •    (ii) "ensure that timely valuations are obtained for problem loans and

13            that sufficient adjustment is made to address declining real estate

14            values";

15       •    (iii) "revise the HCL scoring matrix to ensure that all modified loans

16            are evaluated for review and classification purposes in a timely

17            manner";

18       •    (iv) "ensure independent IAR audits of HCL and HBD are conducted at

19            least quarterly by IAR staff or through third-party reviews";

20       •    (v) "seek confirmation from other model owners that adequate

21            documentation will be maintained on an ongoing basis";

22       •    (vi) "require Business Unit owners to certify that model documentation

23            is up-to-date a complies with the Model Review Policy";

24       •    (vii) "increase pricing and valuation cohorts used in the Bank's IRR

25            model";

26       •    (viii) "grant review and approval authority over the cohorts to CIRRG's

27            Model   Research   and   Review   Group   to   provide   independent

28

confirmation that the cohorts accurately capture the characteristics of the portfolio; and

- (ix) "ensure resource sufficiency to conduct thorough internal asset reviews."

121.  In short, each of the defendants told investors, without qualification that IndyMac's internal controls were effective when they were aware—based on internal audits, external audits, and OTS examinations—that the exact opposite was true. That is the exact type of fraud that the Sarbanes-Oxley Act was designed to prevent, deter, and punish.

**C.      Defendants Keys and Perry Lie to Investors Regarding An Independent Accounting Firm's Findings Regarding the Adequacy of IndyMac's ALL Methodology.**

122.  Keys and Perry not only failed to disclose the severe internal control problems with respect to IndyMac's financial reporting of its ALL, they blatantly misrepresented to investors that an independent consultant had found IndyMac's ALL methodology sound and its ALL adequate.

123.  In or about January 2008, IndyMac hired an independent accountant to examine and assess IndyMac's ALL methodology.   In the presentation accompanying IndyMac's fourth quarter 2007 earnings report, which was signed by Keys and Perry and filed as a Form 8-K, Perry and Keys described the audit as follows:  "We hired a nationally recognized independent consulting firm to conduct a thorough assessment of portfolio asset grades and loss allowance.  The study concluded that we have responded well to the declining market, appropriately graded our loans, impairments were adequate and we have appropriate expertise in the workout and financial areas to manage the portfolio."

124.  This representation was patently false.  The Treasury Report described the result of the audit as follows: "During early 2008, IndyMac hired an independent public accountant (IPA) to review the ALLL compliance methodology.

1   The IPA found weaknesses with the thrift's ALLL policy.  Various business units

2   were inconsistently calculating their own ALLL and senior management did not

3   provide detailed guidance on how they expected the divisions to develop historical

4   losses, look-back periods, and baseline factors."

5       125.   Keys and Perry made the foregoing misrepresentation with scienter.

6   Both had actual knowledge of results of the IPA's assessment: Keys in his capacity

7   as Chief Financial Officer responsible for internal and external audit findings

8   related to internal controls, and Perry in his capacity as CEO and Chairman of

9   IndyMac.  In the 2007 Form 10-K, filed at virtually the same time, both Perry and

10  Keys represented that they was responsible for internal controls and had ensured

11  that any deficiencies were reported to them.

12      126.   This misrepresentation was unquestionably material.   As discussed

13  below in Paragraph 159, ALL is critical to investors and regulators because it has a

14  direct impact on earnings and dictates whether an institution is "well-capitalized"

15  under Federal banking rules.  Any deficiency in the calculation of ALL would have

16  a major impact on earnings in the future, would risk IndyMac's "well-capitalized"

17  ratio in the future, and would create uncertainty surrounding all of IndyMac's

18  financial reporting.  This misrepresentation proximately caused losses to investors

19  when IndyMac announced on May 12, 2008 that (a) IndyMac had incurred an

20  additional $123 million in realized loan losses in first quarter of 2007; (b) had to

21  increase ALL by a further $131 million dollars during that quarter; (c) had

22  underestimated total credit costs by 200% for that quarter; and (d) IndyMac's entire

23  financial reporting and forecasting models were deficient.

24

25

26

27

28

**D.**     **On February 12, 2008, Defendants Perry and Keys Mislead Investors Regarding IndyMac's Dealings With the Office of Thrift Supervision and the Soundness of the Company**

**1.**     **OTS Initiates Its Review of IndyMac Four Months Early and Issues an Initial Ratings Downgrade on January 17, 2008**

127.   As indicated above, IndyMac Bank was regulated by OTS.   This supervision was critical to investors, who relied on OTS to ensure that IndyMac was properly valuing assets and liabilities and ensuring that the Company remained "well-capitalized."   As Roth Capital Partners observed in a May 1, 2007 analyst report, "the benefit of neither the company's access to the [Federal Home Loan Bank] system or its supervision by the OTS should be underestimated in our opinion."   Thus, investors evaluating the health of the company relied heavily upon the views of and actions taken by OTS.

128.   According to the OTS Fact Sheet on IndyMac, the OTS first became involved in November 2007.   According to the OTS Fact Sheet, IndyMac Bank changed its business model in November 2007 to focus on originating agency-eligible loans "[I]n response to market conditions and OTS concerns."

129.   On January 7, 2008, OTS started an examination of IndyMac Bank "four months ahead of schedule due to concerns the agency noted through its off-site monitoring and meetings with management."   *See id.*   According to OTS spokesman William Ruberry, OTS also "called in the FDIC with us early on in the process."   The Treasury Report confirms that OTS contacted FDIC on December 20, 2007 "because of InduMac's deteriorating position."

130.   Ten days after initiating the exam, on January 17, 2008, OTS "[i]ssued initial ratings downgrades based on the off-site monitoring and the initial findings of the regular examination."   Specifically, OTS issued a letter to IndyMac's board of directors, chairman, and CEO that the bank's composite CAMELS rating was

1  downgraded from a 2 to a 3, effective December 31, 2007. The Asset Quality and
2  Earnings component ratings were adjusted from a 2 to a 4.

3      131.  The Treasury Report indicates that the severity of the downgrade of
4  the critical composite CAMELS rating from a 2 to a 3 on January 17, 2008, would
5  almost certainly trigger a formal enforcement action by the OTS under OTS's
6  enforcement guidelines.  Thus, as of at least January 17, 2008, Perry and Keys
7  knew that OTS had serious concerns and that it was virtually certain that a formal
8  enforcement action would be taken.

9      132.  As a result of the examination commencing January 7, 2008, **ten**
10  different matters required the attention of IndyMac's Board of Directors, chaired by
11  Perry, including:

12      •    (i) "Return the Bank's capital ratios to a level that supports its risk
13           profile."

14      •    (ii) "Provide the OTS with a forecast that includes a range of capital
15           necessary to achieve and maintain sufficient capital ratios until
16           implementation of the new strategic plan can provide income at a level
17           that will support the Bank operations."

18      •    (iii) "Ensure that liquidity strategies are in place to manage the Bank's
19           inability to access high-rate brokered deposits, and if additional
20           restrictions are placed on Federal Home Loan Bank Board (FHLB) and
21           Federal Reserve Bank (FRB) borrowing limits."

22      •    (iv) "Develop a clear strategy including scripts for media and customer
23           inquiries to minimize effects of public disclosure of capital position and
24           potential run on deposits."

25      •    (v) "Ensure that timely valuations are obtained for problem loans and
26           that sufficient adjustment is made to address declining real estate
27           values."

28

- • (vi) "Provide the OTS with a detailed plan for reducing the level of classified and non-performing assets."
- • (vii) "Provide OTS with a detailed business plan and budget supporting the new Government Sponsored Enterprise Business oriented business model, or any alternative business strategy."
- • (viii) "Ensure that all significant risks are identified, quantified, monitored and controlled to preserve the safety and soundness of the institution."
- • (ix) "Ensure adequate resources are available to provide support and documentation for assumptions used in risk management models, valuation models, and information submitted to OTS for the Thrift Financial Report."

133.   OTS also identified *twenty-four* different "corrective actions to be taken by IndyMac," including:

- • (i) "Develop a contingency plan to ensure uninterrupted funding should the bank be unable to access broker deposits."
- • (ii) "Develop plans for responding to media and customer inquiries regarding the Bank's inability to meet funding obligations."
- • (iii) "Augment capital to ensure that it supports the Bank's risk profile."
- • (iv) "Ensure that timely valuations are obtained for problem loans and that sufficient adjustment is made to address declining real estate values."
- • (v) "Enhance the forecasting process to include worst case scenarios and contingency plans."
- • (vi) "Ensure adequate resources are available to provide support and documentation for assumptions used in risk management models,

1    valuation models, and information submitted to OTS for the Thrift

2    Financial Report."

3    134.   Thus, by the end of January 2008, IndyMac—including its two most

4    senior officers, Perry and Keys—were well aware of the dire financial position of

5    IndyMac and OTS's serious concerns with its viability.

6    **2.    Perry and Keys Make False and Misleading Statements**

7    **Regarding IndyMac's Dealings with OTS and IndyMac's**

8    **Financial Condition Following the Commencement of the**

9    **January 2008 Emergency Examination.**

10   135.   At the February 12, 2008 Fourth Quarter 2007 Earnings Conference

11   Call, Perry was questioned by a securities analyst regarding regulatory actions that

12   might be taken against IndyMac:

13   **Michael Rogers, Conning Assessment Management, Analyst**: . . .

14   For the regulatory perspective, do you see the tenor of regulation and

15   the scrutiny and the potential regulatory actions that your regulator

16   could take, do you see that being maybe more severe going forward?

17   Are they - any sense that they might require some more stressful

18   reserve additions?

19   **Defendant Perry**:   I don't think so, on the strip (sic) more stressful

20   reserve additions.  I think we've had - we worked really hard over the

21   years to build a very strong, positive and open relationship with our

22   regulators. . . .

23   I think they have complimented us on our nimbleness in terms of our

24   ability to change our business model, okay?  Certainly, they're

25   concerned about the whole industry, what regulator wouldn't be, given

26   what has gone on in the whole financial services sector.  And certainly,

27   they're more concerned about entities that are more susceptible to the

28   housing market, like lndyMac.  And I think that, given that, that we

1  continue to have a positive relationship with them, they haven't asked

2  us to do anything that -- they haven't asked us to do anything. . . . So,

3  I feel like they think we're doing a pretty good job managing through

4  this crisis period.. . . I don't think they're going to have concerns about

5  our reserves (emphasis added).

6  136.  Perry's response was materially false and misleading.  The OTS had

7  initiated an examination four months ahead of schedule. Within ten days of the

8  initiation of that examination, OTS had given IndyMac Bank an initial ratings

9  downgrade that virtually guaranteed formal enforcement action.  As OTS Director

10  John M. Reich would later state regarding the examination, "[t]he OTS had

11  significant concerns with the bank's funding strategy, had directed appropriate

12  changed and was finalizing a new set of enforcement actions to address its

13  numerous problems.  IndyMac was actively seeking to arrange a significant capital

14  infusion or find a buyer."  As described above, the "matters requiring IndyMac

15  board attention" and the "corrective actions to be taken" were numerous and

16  serious.  In addition, OTS had raised concerns regarding the Conduit Division in

17  the January 7, 2007 inspection and required numerous corrective actions. In light of

18  these facts — none of which were disclosed to investors during the Class Period —

19  Perry's statements that (a) he did not think the OTS would require more stressful

20  reserve additions; (b) OTS had not "asked us to do anything"; (c) OTS "think[s]

21  we're doing a pretty good job managing through this crisis period"; and (d) "I don't

22  think they're going to have concerns about our reserves" were all materially false

23  and misleading.  They were intended to, and did, convey the materially false

24  impression that OTS was somehow satisfied with IndyMac's financial condition

25  and had vouched for IndyMac's viability.

26  137.  Also on February 12, 2008, Keys and Perry signed and filed an 8-K

27  reassuring investors worried about the financial condition of the Company.  In that

28  filing, Keys and Perry state that "We remain in a fundamentally sound financial

1  position. . . . We believe we can maintain our 'well-capitalized' capital ratios even

2  under worsening industry conditions."

3      138.  These statements were false and misleading in light of the drastic

4  actions taken by OTS and FDIC a month earlier.  OTS had just initiated a review

5  four months ahead of schedule, which ultimately required board response on issues

6  such as "[d]evelop a clear strategy including scripts for media and customer

7  inquiries to minimize effects of public disclosure of capital position and potential

8  run on deposits" and "[e]nsure that liquidity strategies are in place to manage the

9  Bank's inability to access high-rate brokered deposits."  Perry and Keys did not

10  believe their statement that IndyMac was in sound financial position, and, even if

11  they did, it was still misleading because it failed to disclose known facts tending to

12  seriously undermine the accuracy of those opinions.

13      **3.    Perry and Keys Made the Foregoing Statements With**

14          **Scienter**

15      139.  Perry and Keys made the foregoing statements with scienter because

16  they had actual knowledge of OTS's actions and beliefs. Perry, as IndyMac's

17  controlling officer, was the principal contact between IndyMac and the OTS.  As

18  Perry told investors on February 12, 2008:  "And throughout this whole crisis . . . I

19  probably send [our regulators] a note a day, okay."  Perry was unquestionably

20  aware that regulators had initiated an examination four months ahead of schedule

21  due to concerns specific to IndyMac.  He also knew that, on January 17, 2008, OTS

22  issued a letter to IndyMac's board of directors, chairman, and CEO that the Bank's

23  composite CAMELS rating was downgraded from a 2 to a 3, which created a

24  presumption that a formal enforcement action would be taken. In light of these

25  facts, Perry's February 12, 2008 statements — such as that OTS "thinks we're

26  doing pretty good job managing through this crisis period" — were knowingly

27  false.

28

140. As IndyMac's CFO, Keys was also aware of OTS's actions and beliefs. As discussed in the 2007 Proxy, Keys was responsible for all audit findings, and he and Perry were jointly responsible for reviewing and certifying IndyMac's internal controls (which are necessarily implicated by OTS findings). Indeed, as of *February 29, 2008*—two weeks after making the foregoing representations—Keys certified that he was "responsible for establishing and maintaining disclosure controls and procedures . . . internal control over financial reporting" and that he had designed all such controls to ensure that "material information relating to the registrant" was made known to him. In light of his actual knowledge of the OTS actions taken less than a month prior to February 12, 2008, his representations that IndyMac was in a "fundamentally sound financial position" and could maintain its "well-capitalized" capital ratios were knowingly false and misleading. Indeed, OTS examiners believed that IndyMac investors were being so misled by such statements that, in April 2008, one of them recommended that OTS "should publicly disclose IndyMac's poor earnings position to prevent any liability to investors who had the potential to lose money should the institution fail."

**E.    Defendant Perry Misleads Investors Regarding IndyMac's Dramatic Over-Reliance on Brokered Deposits**

    **1.    During the Class Period, IndyMac Relied Excessively on Brokered Deposits to Maintain Its Reported Solvency, and Later Admitted That Those Brokered Deposits Were Used from an "Expediency Perspective" Only**

141. Brokered deposits are certificates of deposit that are marketed to independent brokers who are charged with dividing holdings of wealthy individuals or cash-rich businesses into $100,000 units to enable them to take full advantage of FDIC insurance. Brokered deposits are also known to bank analysts and examiners as "hot money." Unlike consumer deposits, in which there is a relationship

between the bank and the consumer and the deposit base therefore remains relatively constant, brokered deposits will quickly move to whichever institution will pay the highest interest rate.  Thus, while broker deposits can help boost liquidity, they also can pose liquidity risks when large numbers are withdrawn in a short period.

142.  Excessive reliance on brokered deposits is a red-flag to investors and has been implicated in many of history's largest bank failures.  As FDIC Chairwoman Sheila Bair has stated:  "It is quite easy to get brokered deposits, and there's not a lot of market discipline with the brokered deposits.  When there's excessive reliance on them, particularly to fuel rapid growth on the balance sheet, that's definitely a high-risk factor."  Steve Andrews, President and CEO of the Bank of Alameda, has made similar comments:  "As a general rule, if an institution is relying on brokered deposits to fuel asset growth, it should raise a red flag with both investors and regulators. . . Keeping the percentage under 10 percent is a prudent approach versus letting the percentage creep over 25 percent or more."

143.  From December 2006 to March 2008, 64% of IndyMac's growth in overall deposits was fueled by brokered deposits.  As of March 31, 2008, brokered deposits made up 37% of IndyMac's overall deposits.  These facts — which were highly material and would have immediately raised red flags with investors — were never disclosed in a meaningful and reasonably accessible fashion to investors during the Class Period.

144.  According to the *Los Angeles Business Journal*, in a "Special Report" on IndyMac titled "IndyMac's Last Gasps" published on September 15, 2008, IndyMac's core deposits in the first quarter of 2008 — $3 billion out of total deposits of $19 billion — were far below the industry standard:  For many banks, core deposits can account for more than 50 percent of a deposit base.  The article quotes a bank president and consultant as noting that "Anytime you see an institution that is growing through noncore deposits, it is one of the big red flags

1  that should alert either the regulators or the public that the institution may be
2  engaged in some kind of higher-risk, higher-reward activity."

3      145.  According to the *Los Angeles Business Journal,* Perry favored
4  brokered deposits as part of his strategy to use the Company's thrift status as an
5  engine for making more loans rather than building a stable deposit base of local
6  customers with checking and savings accounts.  Perry fostered the use of brokered
7  deposits to help fund IndyMac's rapid growth.  The article quotes a former CFO of
8  IndyMac's Mortgage Bank who said that Perry "did not value deposit gathering —
9  period.   [Perry] said, 'Deposit gathering is a commodity business and asset
10 gathering is where the money is.'"

11     146.  On May 12, 2008, the final day of the Class Period, IndyMac first
12 disclosed the extent of its reliance on brokered deposits, telling investors in the
13 Form 10-Q that if IndyMac were to fall under well-capitalized levels (as it
14 simultaneously revealed it might), and that "even with a [brokered deposit] waiver,
15 if the interest rate limitations on brokered and solicited deposits were to be reduced,
16 either by the lack of a full brokered deposit wavier or by the interest rate limits on
17 brokered or solicited deposits, we anticipate that we would reduce our assets and,
18 most likely, curtail our lending activities."   In other words, IndyMac was stating
19 that it was so heavily reliant on brokered deposits that <u>any</u> limitation on its ability
20 to accept them would cause the Company to restrict its lending activities.

21     147.  On June 30, 2008, IndyMac admitted that it had been forced to rely on
22 brokered deposits since "last summer" to maintain liquidity when the credit market
23 collapsed. IndyMac further stated that brokered deposits "were used from an
24 expediency perspective" only and that IndyMac had been working on reducing its
25 reliance upon them.   Thus, IndyMac admitted that brokered deposits are not a
26 prudent and stable funding base.

27     148.  In an August 1, 2008 interview, FDIC chairwoman Sheila Bair
28 confirmed that IndyMac was "unattractive" to buyers precisely because of its

1   reliance on brokered deposits: "[IndyMac] did not have a strong what we call a
2   core deposit base. A lot of the deposits were brokered, meaning securities brokers
3   just placed deposits [for] the institution — as opposed to the institution having a
4   relationship with the customer directly ... So there are a number of things about this
5   institution that, to be honest with you, make it unattractive to a potential purchaser."

6      149.   The Treasury Report concludes that "lack of core deposits" was a key
7   trigger of IndyMac's failure.   The Treasury Report accurately characterizes
8   brokered deposits as one of IndyMac's "volatile funding sources," which the Report
9   defined as a "source of funds that may present a potential risk to earnings and
10  capital associated with brokered or other rate-sensitive deposits that may be only
11  temporarily available or require premium rates to retain."

12     150.   As of September 2006, IndyMac had over $9 billion in outstanding
13  FHLB advances. An FDIC examiner commented in examination workpapers
14  reviewed by the IG, that IndyMac's FHLB advances represented 34 percent of total
15  assets, high in comparison to other similar size institutions. This examiner also
16  wrote that IndyMac should be monitored closely. OTS's examiner responded that
17  these were "eye-opening stats." In March 2008, FHLB advances remained high, at
18  32 percent of total assets.

19     151.   IndyMac increased its use of brokered deposits beginning in August
20  2007, when the market for the thrift's loans collapsed. During the period August
21  2007 through March 2008, brokered deposits increased from about $1.5 billion to
22  $6.9 billion.

23     152.   The Treasury Report notes that the lack of core deposits was fatal
24  when combined with IndyMac's aggressive business strategy and deficient
25  underwriting: "This strategy ultimately caused the thrift to make a large number of
26  bad loans, resulting in credit losses that could not be overcome, particularly when
27  the real estate and secondary markets collapsed in mid-2007 and loans had to be
28  held to maturity. At this point, IndyMac's capital position was put in jeopardy and,

1   combined with its lack of retail deposits and reliance on brokered deposits and

2   FHLB advances, caused a liquidity crisis."

3       **2.    False and Misleading Statements Relating to Brokered**

4               **Deposits**

5       153.   As alleged in Paragraphs 141 to 152 above, during the Class Period

6   IndyMac dramatically increased its reliance on brokered deposits, which are a far

7   less stable source of capital than consumer deposits.   During the Class Period,

8   IndyMac never disclosed in a meaningful manner reasonably accessible to investors

9   the percentage of its deposits that were brokered deposits.   Stock analysts were

10  unaware of the Company's increasing dependence on brokered deposits, as

11  evidenced by the absence of any discussion of the issue prior to the end of the Class

12  Period.

13      154.   Notwithstanding the foregoing, IndyMac repeatedly and falsely touted

14  IndyMac's "purportedly stable funding" base and stated that the maturation of CDs

15  (a common instrument of brokered deposits) "isn't on our radar screen of being

16  important to us."   Specifically, Perry made the following false and misleading

17  statements:

18          (a)    "I don't know [the average time to maturity on CDs] off the top

19  of my head, but there isn't anything [where] you're kind of going that I'm worried

20  about . . . the CD maturing and I'm going to have a big liquidity issue at some point

21  here.   It just isn't on our radar screen of being of concern to us.   I mean, we're

22  monitoring those types of situations, and certainly, whenever a financial institution

23  has a loss, you could have a loss of confidence, but I think given the fact that over

24  95% of our deposits are federally insured, I think we've managed that pretty well."

25  Statement of Perry, made on February 12, 2008 4Q 2007 Earnings Conference Call

26          (b)    "I think we've managed [our deposits] pretty successfully and I

27  think expect to manage it[.]."   Statement of Perry, on February 12, 2008 4Q 2007

28  Earnings Conference Call.

1   (c)   "The bottom line is, we have a very stable funding structure[.]"
2   Statement of Perry, on February 12, 2008 4Q 2007 Earnings Conference Call.

3   (d)   "[W]e have very strong liquidity, a good amount of excess
4   capital and there are no realistic scenarios that I can foresee that would impair
5   IndyMac's viability[.]"   August 2, 2007 Posting on the IMBreport.com (quoting
6   Perry).

7   (e)   Touting liquidity risks as "about as close to none as you could
8   have."  Statement of Perry, at September 7, 2007 "Investor Day" Conference.

9   (f)   "You know, we have tremendous liquidity. . . . So, you know,
10   the bottom line is I think we have a very strong and secure funding source and
11   tremendous liquidity which I think, when you combine strong capital position with
12   strong liquidity, that's what gets you through these cycles in the mortgage market."
13   Statement of Perry, on July 31, 2007 2Q 2007 Earnings Call.

14   155.   These statements are false and misleading for the reasons alleged in at
15   Paragraphs 141 to 152, above.  Brokered deposits are not stable assets — they are,
16   in the words of the IG, "volatile funding sources," a fact that Perry admitted on
17   June 30, 2008, when he stated that such deposits were used from "an expediency
18   perspective."  And it is unquestionable that excessive reliance on brokered deposits
19   poses a liquidity risk.

20   156.   Moreover, in light of Perry's admission on June 30, 2008 that IndyMac
21   had been actively working to reduce its reliance on brokered deposits — a fact
22   never disclosed to investors during the Class Period —Perry's February 12, 2008
23   statements that (a) the maturation of CDs "just isn't on our radar screen of being of
24   concern to us," and (b) IndyMac had "managed [its deposits] pretty well," were
25   false and misleading.  While CDs and brokered deposits are not the same, CDs are a
26   common vehicle for brokered deposits.  The analyst's question regarding maturity
27   of CDs was reasonably understood to be directed at the issue of brokered deposits
28   and the potential for bank-runs, because brokered deposits are highly volatile and

1  frequently moved after maturation. Thus, Perry's statement that such maturations
2  were not on IndyMac's "radar screen" and that IndyMac had "managed [its
3  deposits] pretty well" were intended to, and did, imply to investors that those assets
4  were stable and that IndyMac did not have concerns with such withdrawals. That
5  was false: if IndyMac had been actively working to reduce its dependence on
6  brokered deposits and such deposits were only used as an "expediency" measure (as
7  admitted in June 2008), the risk posed by excessive reliance on brokered deposits
8  was on IndyMac's "radar screen" and rendered IndyMac's funding base anything
9  other than "stable." Perry's statements were therefore misleading.

10          **3.    Defendant Perry Acted With Scienter**

11          157.  Defendant Perry made the foregoing statements with knowledge that
12  they were false and misleading. IndyMac maintained internal reports of the
13  percentage of deposits that were brokered deposits, and those reports were
14  transmitted to regulators. In light of his managerial responsibilities and role, Perry
15  saw those reports. Perry's knowledge is also evidenced by Perry's June 30, 2008
16  blog posting stating that IndyMac had began actively building such deposits since
17  the summer of 2007 to increase liquidity, that such deposits had been used as an
18  "expediency perspective" measure, and that IndyMac was allegedly working to
19  reduce its reliance upon them. It is implausible (and certainly not more probable
20  than not) that Perry did not know about IndyMac's excessive reliance on brokered
21  deposits until after February 12, 2008. Further, former CFO of IndyMac Mortgage
22  Bank, David Balsam, confirmed in a September 15, 2008 *Los Angeles Business*
23  *Journal* article that he had discussions with Perry regarding brokered deposits and
24  that reliance on brokered deposits were part of IndyMac's strategic direction.
25  Finally, Perry, as a mortgage industry veteran, was aware that over-reliance on
26  brokered deposits was a factor in many of the savings and loan failures of the 1980s
27  and therefore poses liquidity risks.

28

**F.    All Defendants Misrepresent IndyMac's Assets, Liabilities and Earnings in Financial Statements**

158.    All Defendants are liable for their participation in the issuance of false and misleading financial statements during the Class Period.  Defendants Perry and Keys signed IndyMac's Forms 10-K for 2006 and 2007 and IndyMac's interim quarterly reports on Forms 10-Q falsely stating that the financial statements therein, which included the ALL, were prepared in conformity with GAAP.  In the Form 10-KS for 2006 and 2007, Ernst falsely stated that it had completed an audit conducted pursuant to the standards promulgated by the Public Accounting Oversight Board ("PAOB") and GAAS established by the American Institute of Certified Public Accountants ("AICPA") (together, "GAAS"), and affirmed that the financial statements had been prepared in conformity with GAAP.  In fact, the Company's financial statements contained materially insufficient ALL on IndyMac's portfolio of loans held for investment ("LHFI").  The understatement of the critical ALL metric had the effect of inflating earnings for the reported periods. Moreover, the understatement of ALL gave investors a false picture of the Company's true financial health by understating the actual amount of IndyMac's impaired loans as of the date of the financial statements.

159.    ALL is also a critical metric because it affects the Company's capital levels. Under OTS policy, when the ALLL exceeds 1.25 percent of risk-weighted assets, it must be excluded from the equation that measures risk-based capital levels.  If the threshold were to fall below 10 percent, IndyMac would not have been considered "well capitalized" for regulatory purposes.  A lack of a "well-capitalized" classification has numerous adverse effects, most notably the inability to accept brokered deposits.  Because IndyMac relied on brokered deposits for its solvency, IndyMac had a strong incentive to understate ALL.

160.    Consistent with requirements of GAAP, and existing SEC guidance, relevant established rules and interpretive literature of accounting bodies, and by

1    federal bank regulatory agencies, defendants Perry and Keys were required to
2    ensure that the ALL was recorded and maintained at a level appropriate to cover
3    estimated losses on loans determined to be impaired as of the date of the issuance of
4    the financial statements.   To make this determination, Defendants would have to
5    take into account *all* internal and external factors affecting the collectability of the
6    portfolio as of the evaluation date.   Defendant Ernst was concurrently required to
7    adhere to GAAS in its audits of these financial statements, to ensure material
8    conformity with GAAP thereby.

9        161.   All Defendants were aware of every one of the factors that caused the
10   level of ALL to be understated at the time they were issued in the financial
11   statements in IndyMac's Forms 10-K for the years ended 2006 and 2007,
12   respectively.  As discussed below, the level of ALL decreased from years end 2005
13   to year end 2006, and increased insufficiently in 2007 as the real estate industry,
14   and IndyMac's own business collapsed further, despite the fact that the numerous
15   critical statistics and ratios – rising delinquencies, non-performing assets as a
16   percent of total assets, high-risk negative amortization  ARMs – were all rising at
17   the same time as external conditions, such as home prices in IndyMac's principal
18   market areas, were further deteriorating.   These negative internal and external
19   factors all clearly indicated that IndyMac's loan portfolio was subject to increasing
20   risk of default, and that the ALL should have increased in that time consistent with
21   GAAP and other regulatory guidance and requirements.

22        **1.     Defendants Perry and Keys Authored Materially Misleading**
23            **Financial Statements**

24        162.   Defendants Perry and Keys both signed each of the annual reports on
25   Forms 10-K and quarterly reports on Forms 10-Q issued during the Class Period,
26   as well as the Sarbanes-Oxley Act certifications in which Perry and Keys asserted
27   that they had taken appropriate steps to assure themselves – and investors – that
28   the Company's financial statements were produced through a system of adequate

1  controls, and were free from material misstatements.    Thus, the financial

2  statements are statements of, and the responsibility of, Perry and Keys.

3      163.  As of December 31, 2006, the Company reported an allowance for

4  loan losses of $62.3 million, compared to $55.1 million as of December 31, 2005.

5  In 2006, however, the $62.3 million allowance was approximately 0.62% of the

6  total loan portfolio of assets held for investment, whereas the relationship at the

7  end of the prior year reflected a ratio of 0.67%.  The reduction lacked any basis

8  because of the multitude of company-specific negative statistics (e.g. increasing

9  delinquency rates and increasing percentages of non-performing assets) and

10  economic and geographic factors (such as a heavy concentration of loans in

11  California, where housing prices were deteriorating) that were contributing to

12  deterioration in the credit quality of the loan portfolio as of December 31, 2006.

13  As of December 31, 2007, the Company reported an allowance for loan losses of

14  $398.1 million.    This was a significantly higher percentage of the total loan

15  portfolio than had been reported in 2006, but was still patently unreasonable in

16  light of the continuing and accelerating collapse of the real estate market in 2007

17  and the rapidly increasing rates of default and delinquency suffered by IndyMac's

18  loan portfolio.  For example, the allowance represented only 30% of the value of

19  non-performing loans held for investment, significantly below the 58% ratio in

20  2006 and 127% ratio in 2005.  *See* Chart in ¶ 173 below.

21      As such, the Company's relevant financial statements, materially understated

22      the allowance for loan losses, materially overstated the value of its loan

23      portfolio net of the allowance for loan losses and, thereby, overstated its net

24      income during the Class Period because the numbers reported in its public

25      filings were not derived in conformity with GAAP and were not faithful to

26      SEC guidelines.

27

28

1
2
3

**2.    Ernst's False and Misleading Statements Opining That IndyMac's 2006 and 2007 Financials Conformed with GAAP and GAAS**

4    164.    Defendant Ernst was IndyMac's outside auditor during the Class

5    Period, for fiscal years 2006 and 2007.   Ernst issued unqualified (or "clean") audit

6    opinions on IndyMac's 2006 and 2007 financials  which were included in the

7    Company's Forms 10-K for years ending December 31, 2006 and 2007,

8    respectively, in which Ernst represented that it had conducted its audits in

9    conformity with GAAS, and that IndyMac's financial statements were prepared and

10    presented in conformance with GAAP.  Specifically, IndyMac's 2006 Form 10-K

11    contained the following representation by Ernst:

12    We have audited the accompanying consolidated balance sheets

13    of IndyMac Bancorp, Inc. and subsidiaries (the Company) as of

14    December 31, 2006 and 2005, and the related consolidated statements

15    of earnings, shareholders' equity and comprehensive income, and cash

16    flows for each of the three years in the period ended December 31,

17    2006.    These financial statements are the responsibility of the

18    Company's management.  Our responsibility is to express an opinion

19    on these financial statements based on our audits.

20    We conducted our audits in accordance with the standards of the

21    Public Company Accounting Oversight Board (United States).  Those

22    standards require that we plan and perform the audit to obtain

23    reasonable assurance about whether the financial statements are free of

24    material misstatement.  An audit includes examining, on a test basis,

25    evidence supporting the amounts and disclosures in the financial

26    statements.  An audit also includes assessing the accounting principles

27    used and significant estimates made by management, as well as

28

evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of the Company at December 31, 2006 and 2005, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2006, in conformity with U.S. generally accepted accounting principles.

\* \* \*

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of the Company's internal control over financial reporting as of December 31, 2006, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 26, 2007 expressed an unqualified opinion thereon.

165.  The 2007 Form 10-K contained a substantially identically worded representation by Ernst, with only dates changed.  The financial report within the 2007 Form 10-K republished all of the financial misrepresentations in the 2006 report, including the materially misleading loan loss allowance, and Ernst stated that both the 2006 and 2007 financial statements were in conformity with GAAP.

### 3. The Facts Demonstrating the Inadequacy of IndyMac's Allowances for Loan Losses Were Known to Each Defendant

166.  As the auditor of IndyMac's financials, Ernst was well aware of the rising delinquencies and increasingly risky composition of IndyMac's held for investment-portfolio from the reported statistics in the financial statements.  In addition, as independent auditors of IndyMac, Ernst had access to all the

Company's regularly-generated reports generated by the Company. Ernst similarly had access to all internal, external, and OTS audit findings showing material deficiencies. Indeed, both Keys and Perry certified in IndyMac's 2006 and 2007 10-Ks that all material deficiencies that would affect financial reporting in any way had been reported to Ernst. Finally, Ernst was aware of its own audit findings, including its finding in 2006 that the Conduit Division was a serious internal control problem.

167. As IndyMac's two highest executives, with ultimate responsibility over both financial reporting and financial controls, Perry and Keys also had access to and reviewed all reports and audits. Indeed, according the IndyMac's 2007 Proxy, Keys' compensation was tied to his ability to manage all audit findings and supervise all financial reports. Moreover, Keys, as IndyMac's Chief Financial Officer, would have been responsible for ensuring that the ALL adequately reflected all internal and external factors impacting the value of collateral and the collectability of related loans.

168. In addition, as the Company stated in its 2007 10-K, in the "Management" section, "[m]anagement maintain[ed] a central database of internally identified findings, and this, in conjunction with operational and financial controls, requires follow-up and accountability for any issues identified in this process." Additionally, IndyMac internally created a "Portfolio Characteristics Report" every month, which listed all of the individual loans in IndyMac Bank's portfolio, and stated whether they were non-performing. This Report was submitted to Executive Vice President Patrick Hymel and the Enterprise Risk Management Group, and was available to Perry, Keys, and Ernst.

169. As discussed in Paragraphs 103 to 109, Perry was also aware of—and in fact directed—IndyMac's severely deficient underwriting practices. Keys was similarly aware of IndyMac's failure to conform with fundamental underwriting standards. Because appraisals dictated the collateral value of assets—and therefore

directly affect financial reporting, Keys was necessarily aware of OTS's January 2007 Report of Examination, which identified "serious issues with IndyMac's appraisals," including appraisals made without physical site inspection, appraisals based on public data, and appraisals performed by appraisers hired by the borrower. That same report also identified problems in the underwriting standards in the HCL Division, and serious underwriting deficiencies in the Conduit Division— deficiencies that had been noted in multiple audits dating back to 2004 and yet uncorrected. Keys was also necessarily aware of those prior internal and external audits of the Conduit Division—which originated $31 billion in loans in 2006— because he was responsible for managing all internal and external audits that affected financial reporting.

170. The following chart shows five key metrics which alone demonstrate that IndyMac should have reported higher ALL in the 2006 Form 10-K than it had in the 2005 Form 10-K:

### Case Schiller Index, Value of 30 and 90 Day Delinquent Loans, and Loan Loss Allowance

| | Value of Delinquent Loans | | Delinquent Loans as % of Loans Outstanding | | 3 Month Change in Case-Schiller Index - Los Angeles | 12 Month Change in Case-Schiller Index – Los Angeles | Loan Loss Allowance as % of Loans Held for Investment Outstanding |
|---|---|---|---|---|---|---|---|
| | 30 Day | 90 Day | 30 Day | 90 Day | | | |
| 12/31/05 | 136,676 | 63,220 | 0.95% | 0.44% | 3.48% | 21.80% | 0.67% |
| 03/31/06 | 144,694 | 94,107 | 0.89% | 0.58% | 1.31% | 18.30% | 0.65% |
| 06/30/06 | 132,430 | 105,094 | 0.87% | 0.69% | 1.73% | 13.00% | 0.66% |
| 09/30/06 | 191,949 | 122,703 | 1.05% | 0.67% | .026% | 7.10% | 0.61% |
| 12/31/06 | 292,979 | 164,572 | 1.50% | 0.84% | -1.42% | 2.00% | 0.62% |
| 03/31/07 | 442,419 | 294,772 | 2.36% | 1.51% | -2.01% | -1.40% | 0.76% |
| 06/30/07 | 579,655 | 447,253 | 2.84% | 2.19% | -0.93% | -4.10% | 0.89% |
| 09/30/07 | 609,838 | 704,064 | 2.70% | 3.12% | -2.80% | -7.00% | 1.89% |
| 12/31/07 | 817,793 | 1,344,834 | 4.12% | 6.78% | -.854% | -13.70% | 2.40% |
| 03/31/08 | | | | | -11.1% | -21.72% | 2.89% |

171.   Thus, at the same time that IndyMac was decreasing ALL, real estate prices had turned, 30-day delinquencies are up 58% from the previous year, and 90-day delinquencies were up over 90% from the previous year,

172.   All of the data on this chart was known to all Defendants.  The value of loans and value of delinquent loans were required to be filed and were filed by IndyMac Bank with the FDIC every quarter, under the direction of Perry and Keys. Ernst was responsible for familiarity with industry conditions as well as the condition of IndyMac, particularly its loan portfolio which was its principal business.  Ernst would have seen, as part of its audit procedures, documents filed by the Bank with FDIC.  The Case-Schiller index data is the most highly regarded index of real estate prices, is published by Standard & Poor's and easily available over the internet and through many business news services.  The Case-Schiller index is updated monthly, and is well known to real estate financial professionals.

173.   The following chart, based entirely on information contained in IndyMac's Forms 10F progressively greater risks in each year, yet decreased ALL entering 2007 and insufficiently increased ALL at the outset of 2008, in violation of GAAP:

|  | FY 2005 | FY 2006 | FY 2007 |
|---|---|---|---|
| **ALLL as % of HFI** | **.67%** | **.62%** | **2.4%** |
| Non-performing assets as % of total assets | .34% | .63% | 4.61% |
| ALLL as % of non-performing loans held-for-investment | 127% | 58% | 30% |
| ALLL as a % of all non-performing assets | 76% | 34% | 26% |

| HELOC 30-day delinquencies | 0.21% | 1.56% | 3.50% |
|---|---|---|---|
| Option ARMS Negative Amortization | 56% | 83% | 91% |
| Repurchases of Sold Loans | $108M | $194M | $618M |

174.   Not only was the risk of loss rising; realized loan losses had already risen.   Indeed, from December 31, 2005 to December 31, 2007, realized LHFI losses increased 167%.   From December 31, 2006 to December 31, 2007, those losses increased by another 400%—for an aggregate increase of 678%.   In the face of these actual, already realized losses, Perry and Keys *decreased* the ALL ratio at the end of 2006.   By the end of 2007, Perry and Keys had increased the ALL ratio by 400% over 2005 levels, but that increase was clearly inadequate in light of the 678% increase in realized loan losses from 2005 levels

### 4.    **Defendants Knew of, and Ignored Numerous Red Flags Demonstrating that the Allowance for Loan Losses in 2006 and 2007 Were Insufficient.**

175.   At the time Perry and Keys signed and Ernst gave its unqualified opinion on the 2006 and 2007 financial statements (in March 2007 and February 2008, respectively), each knew or recklessly ignored the following facts or red flags, which were in their possession from available company reports, all which facts, together and separately, contradicted and undermined information in the financial statements, particularly the allowance for loan losses which affected income and earnings:

a.    The percentage of loans delinquent by 90 days increased 91% between 2005 and 2006.   IndyMac's delinquency rates skyrocketed in late 2006 and

1    throughout 2007, and yet IndyMac's allowance for loan losses **decreased** for the

2    year 2006 and then increased slowly in 2007.

3        b.    Home prices in the Los Angeles metropolitan area, where the Bank

4    had a significant concentration, had gone from increasing at an astonishing rate of

5    21.80% in 2005 to decreasing by 1.42% in the last three months of 2006, yet

6    IndyMac decreased its ALL as a percentage of loss for 2006.  During 2007, home

7    prices in that area continued to decline at a rapid rate, and by December 31, 2007,

8    had fallen 13.7% from the previous year.    Nevertheless, the Company

9    insufficiently increased its ALL.

10       c.    The Company had ever-increasing exposures in its highest risk loan

11   categories:

12                (i)    Option ARMs comprised approximately 75% of all loans made

13                      by IndyMac from 2004 to 2006, and 75% of borrowers were

14                      making only minimum payments on those ARMs in 2006.

15               (ii)    Negative Amortization ARM loans increased from 56% of all

16                      Option ARM loans at the end of 2005 to 83% of all Option

17                      ARM loans at the end of 2006 to 91% of all Option ARM loans

18                      at the end of 2007.  *See* ¶ 173.

19              (iii)    The Conduit Division originated 33% of the Bank's loans in

20                      2006, up from 25% in 2005.  Defendants were all aware that

21                      loans from this Division presented greater risks than loans

22                      generated by other divisions.  *See* ¶¶ 87-88.

23              (iv)    Non-performing loans-the highest risk category of all, increased

24                      from 0.34% of all assets at year-end 2005 to 0.63% at year-end

25                      2006 to 4.61% at year-end 2007.  Despite this, the ALL as

26                      percentage of non-performing loans held for investment

27                      declined from 127% in 2005 to 58% in 2006 to 30% in 2007.

28                      *See* ¶ 173.

d.    For the 2006 Form 10-K and subsequent quarterly reports, the fact that OTS had conducted an examination on January 8, 2007 (just before the 2006 Form 10-K was released) and: (a) found serious underwriting and internal control deficiencies in the Conduit Division; (b) required IndyMac to "[r]efine current ALLL practices or introduce new methodologies to take advantage of more robust data and improve forecasts"; (c) required IndyMac to "[e]stablish a policy and related procedures for the identification and classification of troubled collateral dependent loans"; and "identified serious issues with IndyMac's appraisals." This information was known to Defendants prior to issuance of the 2006 Form 10-K. *See* ¶¶ 88-91.

e.    For the 2007 Form 10-K, the fact that on January 17, 2008, OTS downgraded the Bank's CAMELS ratings, crucial metrics of the Bank's financial health, IndyMac's ratings as of December 31, 2007, citing, <u>inter alia</u>, deficient practices affecting ALL and requiring twenty-four different corrective actions.  This information was known to Defendants prior to issuance of the 2007 Form 10-K. *See* ¶¶ 93, 120

f.    For the 2007 Form 10-K, the fact that an independent public accountant hired by IndyMac early 2008 to review ALL compliance methodology found that IndyMac's business units were inconsistently calculating ALL, and that senior management failed to provide detailed guidance on how the business units should develop historical loss data, look-back periods, and other baseline factors essential to the calculation.  *See* ¶¶ 123-125

g.    The fact that IndyMac's internal audit review noted serious underwriting problems in its Home Construction Lending Division as early as 2004 and continued to cite the underwriting problems in this Division in 2005 and 2006, which remained uncorrected through 2007 until the Division was closed. *See* ¶ 94

h.    The fact that Ernst itself, in its management report to IndyMac's Board in connection with its year-end audit for 2006, found that IndyMac's Conduit

Division, which was responsible for many of IndyMac's problem loans, experienced financial reporting control deficiencies in 2006, and yet no changes or adjustments to the ALL were made.

i.    The fact that, as discussed in Paragraphs 68 to 73 above, IndyMac engaged in fundamentally unsound and fraudulent loan underwriting and real estate appraisal practices, which the OIG was able to identify by examining 22 individual loan files, and which securitization insurer MBIA also determined by examination of a small number of loan files, and which were corroborated by numerous witnesses who described a Company-wide culture that, at every level, emphasized increased loan origination volume in derogation of safe and sound underwriting standards.

j.    The fact that IndyMac had high concentrations of risky loans in California and Florida, two of the areas where real estate was collapsing most dramatically in 2006 and 2007.

k.    The fact that until November 2007 IndyMac failed to adhere to a federal rule, issued jointly by the Office of the Comptroller of the Currency, the Federal Reserve, the FDIC, the OTS, and the National Credit Union Administration, effective in September 2006, that forbade lending to individuals without income verification in most circumstances *see* Interagency Guidance on Nontraditional Mortgage Product Risks, 71 Fed. Reg. 58609, 58614 (Oct. 4, 2006) ¶ 78 above.

l.    The fact that throughout the Class Period, IndyMac's business units were inconsistently calculating ALL, and senior management failed to provide detailed guidance on how the business units should develop historical loss data, look-back periods, and other baseline factors essential to the calculation, according to a report of an independent public accountant hired by IndyMac early 2008 to review ALL compliance methodology which was summarized in the Treasury Report.

m.    The fact that the number of loans that had to be repurchased by IndyMac nearly doubled in 2006, and tripled in 2007—reflecting the fundamentally deficient quality of IndyMac's underwriting.

176.    All of the factors discussed above demonstrate that IndyMac was facing increasing risks of loan defaults in 2006, compared to earlier periods, and the principle of directional consistency discussed in ¶¶ 184-191 below, required that ALL should have been higher, not lower, than in 2005.    Perry's and Keys' certification of the ALL, and Ernst's unqualified opinion thereon, were deliberately false and misleading in light of these red flags.

**5.    Defendants' Certification of Insufficient ALL in the Face of Rising Delinquencies, Declining Property Values, Riskier Loan Portfolios, and Numerous Adverse Audit Findings and Internal Control Problems, Violated GAAP**

177.    Management is required to report its financial statements, including the determination of ALL, in accordance with GAAP.    The Company's auditor, in order to issue an unqualified audit opinion on the reported financials, including ALL, must ensure that those financials, including ALL, have been prepared in accordance with GAAP.    Despite these requirements, with respect to ALL, Perry and Keys falsely reported that its 2006 and 2007 year-end financials on Forms 10-K and its quarterly financials on Forms 10-Q, which included the ALL, complied with GAAP when they did not, and defendant Ernst falsely issued an unqualified opinion asserting that the year-end 2006 and 2007 financials, including the ALL, were presented in accordance with GAAP when they were not.

178.    The Company's portfolio of loans held for investment was presented within the Company's balance sheet separately from other asset balances such as cash, securities, or loans held for sale.    Aligned with the loan portfolio was an allowance for loan losses.    The Company's allowance for loan losses was, purportedly, meant to reflect, as reported in the relevant financial statements, the

1    Company's estimate of all probable credit losses resident within the loan portfolio.

2    This estimate of probable losses was required by GAAP.

3         179.   In IndyMac's financial statements, the Company used the term "ALL"

4    to refer to Allowance for Loans Losses on Loans Held for Investment.   In other

5    words, IndyMac calculated ALL only for its loans held for investment ("LHFI")

6    portfolio – not for loans held for sale, and not for repurchases.   The term "Credit

7    Reserves" is a broader term which refers to five categories of reserves and refers to

8    the amount of reserves on the balance sheet.   While only one category of "Credit

9    Reserves" referred to ALL, all five categories of "Credit Reserves" related to

10   reserves for losses involving IndyMac's lending activity.   "Credit Costs" refer to an

11   increase in all categories of reserves during a particular quarter.   Credit Costs are

12   taken as an expense on the Company's Income Statement and reduces income for

13   that quarter.    GAAP are the official standards accepted by the SEC and

14   promulgated, in part, by the AICPA.   Each defendant certified that IndyMac's

15   financial statements were in material conformity with GAAP.   Each is liable for

16   these misrepresentations.   Among the GAAP violations by Defendants are:

17        (a)      The principle that conservatism be used as a prudent reaction to

18        uncertainty to try to ensure that uncertainties and risks inherent in business

19        situations are adequately considered. (FASCON 2 ¶¶ 95, 97);

20        (b)      The provisions of Financial Accounting Standard ("FAS") No. 5

21        ("FAS 5") that provide that an estimated loss from a loss contingency, such as

22        the collectibility of receivables, should be accrued (i.e., increase the allowance

23        for loan losses) by a charge to income, and requires the accrual of a loss

24        contingency when information available prior to the issuance of the financial

25        statements indicates that a loss on a loan or portfolio of loans 1) it is *probable*

26        (defined as likely to occur) that the loss has been incurred at the date of the

27        financial statements and (2) the amount of the loss can be *reasonably*

28        *estimated*.  (FAS 5 ¶¶ 3, 4, 8)

(c)      The provision of FAS No. 5 that require consideration of underwriting, and provide that a loan may even be impaired *at origination* "if a faulty credit granting decision has been made or loan credit review procedures are inadequate or overly aggressive, in which case, *the loss should be recognized at the date of loan origination*." *See* Audit and Accounting Guide for Depository and Lending Institutions: Banks and Savings Institutions, Credit Union, Finance Companies and Mortgage Companies ("AAG") (AAG 9.36).

180.  SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. The responsibility for preparing the financial statements in conformity with GAAP rests with the Company's management.  *See* AICPA's Auditing Standards ("AU") § 110.03.

181.  In addition to those requirements provided in GAAP, the SEC provides additional guidance for registrants, such as the Company, regarding management's methodology for estimating credit losses, in SAB 102, Selected Loan Loss Allowance Methodology and Documentation Issues ("SAB 102").  Specifically, SAB 102 states that "[i]t is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process" and consider the following factors:

- Levels of and trends in delinquencies and impaired loans;
- Levels of and trends in charge-offs and recoveries;
- Trends in volume and terms of loans;
- Effects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices;
- Experience, ability, and depth of lending management and other relevant staff;

- National and local economic trends and conditions;

- Industry conditions; and

- Effects of changes in credit concentrations.

182.  As discussed in ¶ 175 above, all Defendants violated these GAAP standards by ignoring all of the evidence – internal and external – that the credit quality of its loan portfolio had deteriorated as a result of underwriting violations, rising delinquencies and increasing concentrations in high-risk exotic loans like option ARMs, with a rise in negative amortizations, and the growth of IndyMac's Conduit Division which was identified as a financial reporting control deficiency by Ernst in 2006, and  which IndyMac's internal audit group reported as having problems  as early as 2005.  In addition, risk factors included the collapse of the housing market, especially in California and Florida, where IndyMac's loans were concentrated.

> **6.**      **Defendants' Approval of Decreasing Loan Loss Reserves for 2006 Violated Applicable Regulatory Guidance on Directional Consistency and Rendered the 2006 Financial Statements Materially False and Misleading**

183.  The Federal banking regulatory agencies which regulated IndyMac considered the accounting for ALL so critical that, on December 13, 2006, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the FDIC, the OTS and the National Credit Union Administration, issued a Revised Interagency Policy Statement On the Allowance for Loan and Lease Losses ("the 2006 ALLL Government Policy Statement").

184.  The 2006 ALLL Government Policy Statement reaffirmed that GAAP presents the most appropriate means for management to calculate ALL and that established GAAP principles require management to consider *all relevant internal and external circumstances* in determining the amounts of ALL in accordance with GAAP and SEC rules (principally FAS 5 and SAB 102).   The 2006 ALLL

Government Policy Statement affirms the GAAP requirement that ALLL should be "directionally consistent" with changes in the risk factors, so that if the risk factors – such as delinquencies, negative amortization ARMS, falling home prices reducing collateral values – rise, ALLL should rise as well.   Noting that for lending institutions like IndyMac, "ALLL represents one of the most significant estimates in an institution's financial statements and regulatory reports," the 2006 ALLL Government Policy Statement stated the key principle of "directional consistency" and the need to evaluate all relevant facts and circumstances in determining and approving ALL, for mortgage lenders like IndyMac.  According to the 2006 ALLL Government Policy Statement, in determining IndyMac's ALLL in accordance with GAAP, Defendants were required to consider "all significant factors that affect the collectability of the portfolio as of the evaluation date."  Defendants were required to consider "those qualitative or environmental factors that are likely to cause estimated credit losses associated with the institution's existing portfolio to differ from historical loss experience."  To do so, Defendants were required, for example, to conduct a comprehensive, well-documented, and consistently applied analysis of IndyMac's loan portfolio.   Among the qualitative or environmental factors that Defendants should have considered in estimating ALL were the following:

- changes in lending policies and procedures, including changes in underwriting standards
- changes in international, national, regional, and local economic and business and real estate market conditions that affect collectiblity of the loans
- increased  volume of the loan portfolio and changes in the nature and terms of the loans
- increases in volume and severity of past due loans,  and nonaccrual loans
- changes in the value of the underlying collateral

- • the existence and effect of concentrations of credit, and changes in the level of such concentrations, including geographic concentration of loans; and

- • the effect of other external factors such as competition and legal and regulatory requirements on the level of estimated credit losses in the institution's existing portfolio.

185.   The 2006 ALLL Government Policy Statement applied the notion of "directional consistency" to the ALLL determination.   In other words, if the risk factors described in ¶ 184 above increased, so should ALLL:   "[C]hanges in the level of the ALLL should be directionally consistent with changes in the factors, taken as a whole, that evidence credit losses, keeping in mind the characteristics of an institution's loan portfolio.   <u>For example, if declining credit quality trends relevant to the types of loans in an institution's portfolio are evident, the ALLL level as a percentage of the portfolio should generally increase, barring unusual charge-off activity</u>. Similarly, if improving credit quality trends are evident, the ALLL level as a percentage of the portfolio should generally decrease."

186.   In short, The 2006 ALLL Government Policy Statement emphasized the commonsense notion that if housing prices (underlying collateral) are losing value, while loan-to-value ratios and delinquencies in general are all rising, then ALLL as a percentage of loans held for investment should *increase.*

187.   Here, Perry and Keys violated the notion of "directional consistency" when they *decreased* ALL as a percentage of loans held for investment from 2005 to 2006, despite all known available information indicating that internal and external risk factors related to collectability of loans had dramatically *increased*. First, Perry and Keys were aware of the of the rampant violations of underwriting and appraisal practices.   Second, Perry and Keys had access to and reviewed the underlying data and statistics in their own financials, and should have reviewed a sample of IndyMac's loans.

188. Defendant Ernst similarly disregarded the mandate of observing "directional consistency" in giving an unqualified opinion that IndyMac's decreasing ALL—in the face of rapidly rising delinquencies, declining property values, exotic loans, and documented underwriting and internal control problems— "present fairly, in all material respects," the financial position of the Company. Any audit at all would have shown that loans were granted with no regard for underwriting standards, with little, if any documentation of borrowers' income or employment, that collateral values underlying the loans were untrustworthy because many were based on fraudulent appraisals and were concentrated in collapsing home-value markets of California and Florida. All these factors evidenced that IndyMac's historic loss experience was a useless model for calculating ALL in 2006 and 2007 and that the ratio of ALL to LHFI should have increased in tandem with rising internal and external risk factors.

189. Defendants Perry and Keys were aware of the 2006 ALLL Government Policy Statement because it was sent to banks accompanied by a cover letter from The Office of the Comptroller of the Currency, Board of Governors of The Federal Reserve System, The Federal Deposit Insurance Corporation, National Credit Union Administration, and The Office of Thrift Supervision. The cover letter, dated December 13, 2006, "suggested routing" the 2006 Policy Statement to the banks' Chief Executive Officer, Chief Financial Officer, Chief Lending Officer, and Board of Directors. Defendants understood the critical importance of the 2006 Interagency ALLL Policy Statement to IndyMac because it was sent from all five Federal government banking regulators, and addressed one subject only - the importance of GAAP as the proper standard for calculating ALL - and was specifically addressed to defendants Perry and Keys, IndyMac's CEO and CFO at that time. In performing its audit, Ernst recklessly ignored the 2006 ALLL Government Policy Statement, which because of its extreme importance, it had a

1  duty to be aware of and actually was aware of, and was required to apply to ensure

2  that IndyMac's financial statements were materially accurate.

3  **7.**   **Defendant Ernst Deliberately Disregarded Guidance**

4  **Regarding ALL Provided in the 2006 AICPA Audit and**

5  **Accounting Guide**

6  190.  The AICPA prepares and issues industry-specific Audit and

7  Accounting Guides ("AAG"), including one for banks and other depository and

8  lending institutions like IndyMac.  In 2006, the AICPA Financial Institution Guide

9  Combination Task Force ("Task Force") prepared and issued the AICPA Audit and

10  Accounting Guide for Depository and Lending Institutions:  Banks and Savings

11  Institutions, Credit Unions, Finance Companies and Mortgage Companies (with

12  conforming changes as of May 1, 2006) ("the 2006 AAG").  Defendant Ernst was

13  required to consider this guidance to ensure that IndyMac's financial statements,

14  including the ALL, were prepared in accordance with GAAP.

15  191.  As the 2006 AAG confirmed, loans and underlying collateral are the

16  primary focus of the audit of financial institutions like IndyMac.  The 2006 AAG

17  noted that for *financial* institutions, like IndyMac, since loans usually are the most

18  significant assets and generate the largest portion of revenues for banks, the auditor

19  must understand the unique features of and risk factors affecting the Company's

20  loan portfolios – and the consequent need to focus on the accuracy of the ALL

21  estimate – at the time of the audit. (AAG 8.01).  Thus, to plan and design audit

22  procedures  properly,  the  independent  accountant  needs  to  understand  the

23  institution's loan portfolio, lending processes, and loan accounting policies as well

24  as other factors such as economic conditions.  (AAG 8.02).

25  192.  The 2006 AAG identified specific risks that existed at IndyMac that

26  were blatant red flags for all Defendants who prepared and audited IndyMac's

27  financials.  For example, § 316 requires examination of incentives and pressures

28  present at the Company, including: (a) aggressive loan goals; (b) incentives for

origination; (c) relaxation of credit standards; (d) excessive concentrations of lending; (e) excessive lending in new products; (f) frequent or unusual exceptions to credit policy; and (g) financial stability or profitability is threatened by economic, industry or entity operating conditions, such as unusually large growth in the loan portfolio without commensurate growth in the ALL.  As discussed at Paragraphs 55 to 95, each of these pressures and incentives are present at IndyMac.

193.   The 2006 AAG also identifies collateral risk (where the value of collateral is declining) and concentration risk (where the loan portfolio is concentrated in certain products or geographic regions) as two major credit risks requiring higher ALL.  Both those risks were present at IndyMac.

194.   The 2006 AAG identified the following factors related to loans as indicative of higher inherent risk (and, often, higher control risk) for loans and related amounts, all of which applied to IndyMac during the Class Period:

- High rate of growth in the loan portfolio
- Significant changes in the composition of an institution's portfolio
- Poor underwriting standards and procedures
- Significant nontraditional lending activities that involve a higher degree of risk, such as highly leveraged lending transactions
- Failure of personnel to follow management's written lending policies for underwriting and documentation
- Loans that are continuously extended, restructured, or modified
- Significant concentrations of loans in a particular industry or geographic area
- Significant concentrations of loan products with terms that give rise to a credit risk; such as, negative amortization loans, loans with high loan-to-value ratios, multiple loans on the same collateral that when

1    combined result in a high loan-to-value ratio, and interest-only loans.

2    (AAG 8.133)

3        195.   The 2006 AAG states that because of the risk for errors or fraud in

4    financial statements of companies, like IndyMac, whose major business is loans, it

5    is critical for the auditor to focus on internal controls and testing of the

6    underwriting process to be certain that the Company's underwriting policies are

7    strictly followed in granting loans.   "Effective internal control over financial

8    reporting in this area should provide reasonable assurance that errors or fraud in

9    management's financial statement assertions about the loan portfolio—including

10   those due to the failure to execute lending transactions in accordance with

11   management's written lending policies—are prevented or detected."  (AAG 8.136)

12       196.   The 2006 AAG recommended that auditors focus on the following key

13   factors to evaluate whether the ALLL estimate is reasonable:

14            •    The effectiveness of the institution's internal control related to

15                 loans and the allowance for loan losses

16            •    Current local, national, and international economic conditions

17                 and trends, particularly as they have affected collateral values

18            •    Composition of the loan portfolio and trends in volume and

19                 terms of loans, as well as trends in delinquent and nonaccrual

20                 loans that could indicate historical loss averages do not reflect

21                 current conditions

22            •    Identified potential problem loans and large groups of problem

23                 loans, including *delinquent and nonaccrual loans* and loans

24                 classified according to regulatory guidelines

25            •    Concentrations of loans to individuals or entities and their

26                 related interests, to industries, and in *geographic regions*

27            •    Quality of the internal loan review and internal audit functions

28            •    The effects of changes in lending policies and procedures,

1            including those for underwriting, credit monitoring, collection,

2            and chargeoffs that could indicate historical loss averages do not

3            reflect current conditions.

4     197. Ernst deliberately disregarded the foregoing standards. Not only did

5 Ernst ignore the obvious facts that delinquencies were increasing and collateral

6 values were decreasing, Ernst ignored (a) its own finding that the Conduit Division,

7 which originated approximately one-third of IndyMac's loans in 2006, was an

8 internal control deficiency, and (b) OTS's finding—which was communicated to

9 Ernst and confirmed by an independent public accountant in early 2008—that

10 IndyMac's ALL methodology was flawed. In the face of these known facts, Ernst's

11 unqualified opinions upon the 2006 and 2007 financials statements were knowingly

12 or recklessly false.

13     **8.**     **The Standards of GAAS, and Contemporaneous AICPA**

14           **Audit Risk Alerts Required Ernst to Ensure that it Had A**

15           **Thorough Understanding of IndyMac's Business, Internal**

16           **Controls and Awareness of Growing Risks Facing the**

17           **Banking Industry**

18     198. GAAS is comprised of ten basic standards that establish the

19 requirements of an auditor's performance and the objectives to be achieved in a

20 financial statement audit. Auditors are required to follow these standards in every

21 audit they conduct.

22     199. The GAAS standards fall into three basic categories: General

23 Standards, Fieldwork Standards, and Reporting Standards. The *General Standards*

24 provide critical guidance to the auditor on the exercise of due professional care in

25 the performance of the audit. The *Standards of Fieldwork* provide guidance on

26 audit planning, evaluation of internal controls, and collection of sufficient

27 evidential matter to form a reasonable basis for the auditor's audit opinion on the

28 financials. The *Standards of Reporting* provide guidance to the auditor on the

1    content of the audit report, and the remedies available to the auditor to modify that

2    report if it cannot give an unqualified opinion that the financial statements audited

3    have been prepared in material conformity with GAAP.  AU § 150.02.

4        200.   For purposes of its audits of IndyMac for 2006 and 2007, Ernst had a

5    professional obligation in accordance with GAAS to perform the following

6    procedures, among others:

7    (i)    In accordance with AU § 311 ("Planning and Supervision"),

8           Ernst was required to perform specific audit procedures to obtain

9           an understanding of IndyMac and its environment, including

10          internal controls, and to be able to assess the risks of material

11          misstatement in the financial statements (AU § 311.06-09).

12          Further, Ernst was required to consider, when planning and

13          performing its audits, matters affecting the industry in which

14          IndyMac operated, such as economic conditions, government

15          regulations, accounting practices common to the industry and

16          financial trends and ratios pertaining to the Company.  *Thus,*

17          *Ernst was required to be familiar with the Audit Risk Alerts*

18          *("ARA"s) and AICPA Audit and Accounting Guides ("AAG")*

19          *for auditors of banks and other lending institutions that were*

20          *issued during the 2005-2008 periods.*  These ARAs and AAGs

21          specifically identified risks associated with data-based evidence

22          indicating that mortgage lenders were engaging in loose

23          underwriting, offering exotic risk-laden, high loan-to-value

24          products, including option ARMs, all of which required the

25          auditor's increased skepticism and attention, especially with

26          respect to audits of ALLL.

27    (ii)   Develop knowledge about IndyMac's accounting systems as

28           they relate to the pricing models supporting the accounting

estimates used to determine the allowance for loan losses ( AAG Chs. 5, 9, and 10).

(iii)  Consider the operating effectiveness of controls for the origination of loans, including: "inspect[ion of] loan documents to determine whether the institution's lending policies [were] being followed" (AAG Ch. 8).

(iv)  Obtain sufficient appropriate audit evidence by performing audit procedures to afford a reasonable basis for an opinion regarding the financial statements under audit, including documentation surrounding the company's computation of an allowance for losses and evidence underlying collateral values (presumably on a test basis, but the procedures for which could be adjusted based on red flags or other findings);

(v)  Evaluate "(a) whether management's assumptions [were] reasonable and reflect … market information …, (b) the fair value measurement was determined using an appropriate model …, [and] (c) management used relevant information that was reasonably available at the time" (AU § 328.26).

(vi)  Obtain sufficient appropriate audit evidence regarding the fair value of collateral (AU § 328.25, AAG Ch. 9, in a subsection titled "Management's Methodology").

(vii)  Perform tests to corroborate management's representations such that reliance thereupon is appropriate. (AU § 333, "Management Representations," ¶ 2, AU § 319.95).

(viii)  Consider the information contained in IndyMac's internal audits and/or reviews of the Conduit Division (completed in 2005) and the Home Construction Loan Division (completed in 2004).

201.   At every step of its audits, Ernst was required to exercise professional skepticism, a necessary component of due professional care when performing its audits.  (AU § 230, "Due Professional Care in the Performance of Work").

202.  Contemporary 2005/2006 GAAS pronouncements specific to the banking industry, and applicable to IndyMac, highlighted in great detail the deteriorating industry and economic risk factors  plaguing the banking industry that posed risks which Ernst needed to be aware of in conducting its audit of IndyMac in 2006, including the methods and adequacy of ALL for loans held for investment. For example, the 2005-2006 AICPA Risk Alert ("ARA") warned of industry and economic developments and economic factors in the mortgage banking sector, including: (1) relaxation of lending standards, (2) the much talked-about housing bubble, and (3) the influx of new risky invested loan products introduced into the marketplace to gain competitive advantage, such as Option ARMs resulting in negative amortization.  Each of these risk factors was applicable to Indymac.  Yet Ernst approved a decrease in ALL for 2006 and in 2007 approved a slight percentage increase which recklessly ignored the cataclysmic deferioration in the Bank's loan portfolio and adverse external conditions such as declining housing prices in areas of the Bank's largest concentrations which impaired the Bank's loan portfolio to a much greater extend than reflected in the ALL.

203.   The 2005-2006 ARA also stated that auditors need to be aware of the following risks for home equity loans (HELOC), a large part of IndyMac's business, and source of losses:

- o    Interest-only features that require no amortization of principal for a protracted period;
- o    Limited or no documentation of a borrower's assets, employment and income;
- o    Higher loan-to-value and debt-to-income ratios;

1          o      Lower credit risk scores for underwriting home

2                  equity loans;

3          o      Greater use of automated valuation models and

4                  other collateral evaluation tools for the

5                  development of appraisals and evaluations; and

6          o      An increased number of transactions generated

7                  through a loan broker or other third party.

204. Ernst was required to take into account these risks when planning and performing its audits of IndyMac's 2006 and 2007 financial statements. It either did so and falsely certified IndyMac's financials, or it failed to conduct proper audits and nonetheless certified that it did.

**9.**      **Ernst Ignored the AICPA Audit Risk Alert for 2007/2008 Which Identified Specific Risk Factors Relating to IndyMac**

205. The AICPA issued an Audit Risk Alert ("ARA") for 2007/2008 setting forth "Bank, Credit Union, and other Depository and Lending Institution Industry Developments. This ARA emphasized the importance of understanding the company and its environment under AU § 311 ("planning and supervision") to assess the risks of material misstatement in the company's financials. The ARA highlighted the risks specifically affecting mortgage banks in light of the changing economy, increasing mortgage delinquencies, and declining property values. It advised auditors to scrutinize internal controls, examine incentive structures, and ALL. In approving IndyMac's ALL in the 2007 Form 10-K—which, as a percentage of non-performing LHFI, were even lower than in the 2006 Form 10-K—Ernst deliberately disregarded these highly-publicized risks and IndyMac's long history of underwriting, appraisal, and internal control deficiencies.

10. **The Falsity of IndyMac's ALL Is Confirmed by The Astonishing Degree to Which IndyMac's Reserves Proved Inadequate.**

206.   Not surprisingly, IndyMac's ALL proved grossly inadequate.   In the fiscal year 2007, IndyMac had to increase ALL by an astonishing $395 million— 600% of the ALL set at the beginning of that year.   During that year, IndyMac had net charge-offs for bad loans of $52.2 million– *a full 85%* - of the $62 million reserve it set as of December 31, 2006.  Those charge-offs are enormous relative to the reserves because reserves are set for the life of a loan.  Expending 85% of the ALL in the very first year indicates that the ALL was inadequate by many multiples.  Moreover, IndyMac ultimately exceeded its $62.4 million 2006 year-end ALL in the next quarter, taking a $46 million charge-off on uncollectible LHFIs in the first quarter of 2008.  Thus, by the end of first quarter 2008, IndyMac had already accumulated charge-offs equal to 160% of the $62.4 million ALL set at the end of 2006, with a growing number of defaults still coming down the pipeline. The following chart, derived from IndyMac's SEC filings, shows the increases to ALL and actual loan losses during the Class Period:

| | *FY 2006* | 1Q2007 | 2Q2007 | 3Q2007 | 4Q2007 | *FY 2007* | 1Q2008 |
|---|---|---|---|---|---|---|---|
| **ALL Reserve Balance (m)** | *$62.4M* | $67.6M | $76.8M | $161.7M | $398.0M | *$398M* | $483M |
| **HFI Charge-offs (aka "Realized Credit Losses")**[2] | *$12.8M* | $4M | $8M | $13.4M | $27M | *$52.2* | $46M |
| **HFI "Credit Costs" (i.e., increases to ALL)** | *$20M* | $10.7M | $17.2M | $98.3M | $269M | *$395.5M* | $131.5M |

---

[2]  These numbers do not include chargeoffs and reserves for the $10.3 billion in loans transferred from the loans held-for-sale portfolio to the loans held-for-investment portfolio.  Those assets were marked down by over $400 million upon transfer, and incurred over $80 million in losses in the first quarter of 2008.

207.  Because IndyMac entered bankruptcy, it filed no quarterly or annual financial statements with the SEC after that point, and had no opportunity to restate earlier periods.

208.  As shown in the foregoing chart, ALL remained grossly under-reserved throughout the Class Period.  Even after doubling ALL in both 3Q 2007 *and* 4Q 2007, realized loan losses on the LHFI portfolio in the following quarter equaled almost one-third of the entire FY 2007 ALL.

209.  While it is impossible to calculate the exact degree by which IndyMac under-reserved in light the lack of access to IndyMac's internal reports, the most appropriate proxy is adding (a) chargeoffs on that same portfolio of loans and (b) increases to ALL on that same portfolio of loans.  Under this measure, IndyMac's under-reserved by at least 400% at the outset of 2007, when it decreased ALL in the face of rising NPAs, delinquencies and loan losses.  However, this is simply a proxy: under the express provisions of GAAP, ALL is not a forecast of future charge-offs; rather, it is measured by current internal and external conditions at the time the reserve is calculated.  Thus, regardless of what the future chargeoffs ultimately were, IndyMac's ALL was egregiously low throughout the Class Period based on the facts known at the time: increasing delinquencies, increasing NPAs, increasing realized loan losses, decreasing property values, and deficient underwriting.

**11.**     **Post-Class Period Improprieties and GAAP Violations Confirm that Defendants' Manipulation of IndyMac Financial Statements was Deliberate.**

210.  Ernst and Perry committed other financial improprieties that are not at issue in this action, but demonstrate their disregard for requirements of presenting fair and accurate financial disclosures to investors.  As reported on December 22, 2008, Treasury Department Inspector General's investigation of IndyMac uncovered that, on May 9, 2008, Ernst had permitted IndyMac to backdate cash

1    infusions from the holding company back to March 31, 2008. This backdated

2    transaction was done to maintain IndyMac as a well-capitalized institution when, in

3    fact, it was not well-capitalized at that date. Perry in fact touted that IndyMac

4    remained well-capitalized at the May 12, 2008 conference call.

5        211. This back-dating plainly violated GAAP, and mislead investors who

6    had a right to know that IndyMac was not "well-capitalized" as of March 31, 2008,

7    or, at the very least, had the right to know that IndyMac was only well-capitalized

8    due to a backdated capital infusion. This type of fraud is presumably what led one

9    OTS examiner to suggest, in April 2008, that OTS publicly disclose IndyMac's

10   financial condition to prevent further losses by, and liability to, IndyMac investors.

11       212. The Treasury Department subsequently conducted a follow-up report

12   on the back-dating at IndyMac. The report, entitled "SAFETY AND

13   SOUNDNESS: OTS Involvement With Backdated Capital Contributions by

14   Thrifts," concluded that the backdating was improper because "the accounting

15   treatment is not in accordance with generally accepted accounting principles

16   (GAAP) and allows for misleading financial reporting by the thrifts."

17       213. Ernst's workpapers presented to the Inspector General showed that the

18   back-dating occurred in April 2008. A further investigation by the Inspector

19   General revealed that the back-dating in fact occurred on May 9, 2008. Thus, Ernst

20   misrepresented to federal authorities facts regarding the backdating of a capital

21   infusion. This conduct strongly implies that Ernst was not acting as an independent

22   auditor when it certified IndyMac's 2006 and 2007 Form 10Ks, and was instead

23   motivated by its close relationship with IndyMac and the substantial fees it was

24   earning from the engagement (over $3.5 million in 2006, and over $6 million in

25   2007).

26

27

28

**G.** **Perry And Keys Make Additional False and Misleading Statements Regarding IndyMac's Credit and Loan Loss Reserves and the Financial Soundness of the Bank**

214. In addition to authoring and certifying the aforementioned financial statements, Perry and Keys repeatedly and falsely touted that IndyMac's credit reserves were not only adequate and proper, but that they were conservative:

(a) "[W]e have conservatively built up our credit reserves well ahead of credit losses." Statement by Perry, on April 26, 2007, 1Q Earnings Call With Securities Analysts and Investors.

(b) "[W]e were still more conservative on our Alt-A and subprime residuals than the values that they did after they wrote them down. That's all I can say now. ... I think we feel very comfortable that [our residuals] are valued properly and conservatively and that we have a lot of credit reserves there." Statement by Perry, on April 26, 2007, 1Q Earnings Call With Analysts and Investors.

(c) "Credit reserves prudently increase well ahead of credit losses. IndyMac continued to prudently increase allowance for loan losses in the face of a difficult credit environment." Exhibit 99.2 to IndyMac, April 26, 2007 Form 8-K, signed by Keys.

(d) "[W]e feel we prudently manage [noninvestment grade and residual securities] and continue to be very conservative in valuing these securities." Statement by Perry, on July 31, 2007 2Q 2007 Earnings Call.

(e) "We believe that the credit reserves we have now built up are sufficient to absorb these charge-offs such that we are currently forecasting that our total credit provision/costs in 2008 will be roughly $372 million, down from $1.45 billion in 2007, which we believe will have a significant positive impact on our drive to return IndyMac to profitability in 2008. . . . We have the capital . . . to absorb nearly triple our presently forecasted 2008 credit costs and fight our way

through until the housing and mortgage markets do stabilize."    IndyMac February 12, 2008 Press Release (quoting Perry).

(g)    "We have an incredibly strong war chest of credit reserves at the end of '07."    Statement by Perry, on February 12, 2008 4Q 2007 Earnings Conference Call.

(h)    "We've reserved properly.  I don't think [our regulators are] going to have concerns about our reserves."  Statement by Perry, on February 12, 2008 4Q 2007 Earnings Conference Call.

(i)    "We remain in a fundamentally sound financial position. . . . We believe we can maintain our 'well-capitalized' capital rations even under worsening industry conditions. . . . We still have a solid cushion above the well-capitalized ratios."  February 12, 2008 Form 8-K (signed by Perry and Keys) and February 12, 2008 Annual Shareholder Letter (signed by Perry).

215.  For the same reasons that IndyMac's ALL was falsely stated, these statements were false and misleading.  IndyMac's loan loss reserves were not even within the realm of reason, let alone "conservative."  There is a strong inference that Perry and Keys made the foregoing statements with scienter for all of the reasons stated above with respect to ALL itself.

216.  Moreover, as Keys knew, Indymac had not "prudently" built up reserves ahead of credit losses.  IndyMac's realized loan losses on the HFI portfolio were 60% higher in FY 2006 than FY 2005, yet Keys decreased the reserves by 8% during that time frame.

217.  Perry's scienter can further be inferred from his (a) his active participation in the gutting of IndyMac's underwriting standards, (b) his early 2007 email to regulators regarding the freezing of the secondary market, (c) his participation in the unlawful back-dating of capital infusions to the Bank, and (d) his subsequent misrepresentation to investors on May 12, 2008 that IndyMac remained "well-capitalized" as of March 31, 2008.

218.   In addition, and as discussed at Paragraphs 127 to 140, at the time Perry and Keys made the statement on February 12, 2008 that "[w]e remain in a fundamentally sound financial position" and could maintain well-capitalized ratios, IndyMac's "house of cards" was collapsing: ALL was again proving inadequate, IndyMac's loan quality continued to deteriorate, repurchase demands increased, its CAMELS rating had been downgraded by the OTS to a 3 - which threatened the Bank with an informal enforcement action - only weeks earlier on January 17, 2008, $10.3 billion in loans held-for-sale had to be transferred to LHFI and marked down, the Bank was only months away from being taken over by the FDIC.  All of these facts were known to Perry and Keys, and demonstrate their scienter.

## VIII. <u>DEFENDANTS' FALSE AND MISLEADING STATEMENTS PROXIMATELY CAUSED ECONOMIC LOSS TO INDYMAC'S INVESTORS</u>

219.   Defendants' misrepresentations and omissions caused and maintained the artificial inflation in IndyMac's stock prices throughout the Class Period until the truth was revealed to the market.

220.   The truth about IndyMac's financial condition and the true risks associated with its mortgages began to enter the market with a series of partial disclosures and revelations beginning on November 6, 2007 and continuing to May 12, 2008, and thereafter, which were accompanied by Defendants' denials and continuing misrepresentations.

221.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for IndyMac stock. Plaintiff and the Class would not have purchased IndyMac stock at the artificially inflated prices which they paid.   However, the artificial inflation in IndyMac's stock was not eliminated at only one time.  Rather, the artificial price inflation was eliminated over time, beginning on November 6, 2007, as the stock continued to

1    trade at artificially inflated, albeit lower, prices until the end of the Class Period on

2    May 12, 2008 and thereafter, as additional information was disclosed.

3        222.    The truth about IndyMac began to be revealed through several partial

4    disclosures.

5        **A.    Defendants' First Partial Disclosure**

6        223.    The first partial disclosure occurred on November 6, 2007, when

7    IndyMac issued a press release reporting third quarter 2007 results stating that it

8    lost $202.7 million, a loss of $2.77 per share for the third quarter of 2007,

9    compared with net earnings of $86.2 million, or $1.19 per share, in the third quarter

10   of 2006, in part because the Company increased its credit reserves by 47% to $1.39

11   billion.  Also on November 6, 2007, Perry hosted the Company's Third Quarter

12   2007 earnings conference call with analysts.  During that conference call, and in a

13   PowerPoint presentation made available on the Company's website, and filed with

14   the SEC in a Form 8-K signed by Keys, Perry blamed the following factors for

15   IndyMac's loss, thereby partially disclosing some of the previously undisclosed

16   risks:

17       (1)    sharply increasing delinquency trends at IndyMac and for the industry,

18   especially for seconds in second mortgages;

19       (2)    worsening existing and new housing sales trends led to a substantial

20   rise in non-performing loans in IndyMac's home builder portfolio;

21       (3)    a significant ramp up in loan delinquencies and foreclosure rate to a

22   level above the 20-year high that was reached in the second quarter of 2002;

23       (4)    the Company "substantially bolstered [its] loan loss provision, the bulk

24   of which is going to [its] subdivision construction business where we I think

25   increased the provision there something like $75 million in the quarter";

26       (5)    dramatically increased provisions for future credit losses, including the

27   increasing of credit reserves by 47%, to $1.4 billion; and

28

224.  Increases to ALL—reflecting the inadequacy of IndyMac's prior reserves—was a leading cause of IndyMac's third quarter losses.  ALL increased by an astonishing *471%* in 3Q 2007, more than any other credit cost.  According to IndyMac's earnings presentation, increases to ALL accounted for losses of $0.59 per share during that one quarter.  Credit marks on delinquent loans held-for-sale accounted for losses of $.44 per share, and credit marks on current loans held-for-sale accounted for losses of $.54 per share. Both markdowns reflecting the poor underwriting and inadequate collateral values on those loans.  As one of IndyMac's presentation slides stated: "Key Driver of Q3 07 Loss Was Increased Provisions for Future Credit Losses."

225.  In the November 6, 2007 presentation, IndyMac also announced the closing of the Conduit Division, which, as discussed throughout this complaint, was riddled with internal control problems.  The Conduit Division accounted for $59 million of after tax losses in the third quarter of 2007 alone.  And, despite being closed in Fall 2007, the Conduit Division would ultimately account for 18% of IndyMac's net losses in 2007.  The Homebuilder Construction Division, which was also discontinued in 2007 and had been cited in numerous audits as an internal control problem, accounted for 15% of IndyMac's 2007 net losses.  The November 6, 2007 presentation disclosed that HCL NPAs were expected to rise to $330M in the fourth quarter of 2007—reflecting 30% of all HCL assets.

226.  In the conference call, Perry also admitted that (a) "credit risk management needs to improve" (b)"in hindsight, we could have expanded more cautiously from 2005 to 2007," (c) "[w]e went too far in expanding our product guidelines (misplaced credit risk including piggybacks, subprime and HELOCS); and (d) "[o]ur underwriting procedures failed to detect speculators." Implicitly admitting that IndyMac's prior risk control and underwriting practices had been deficient, Perry stated that "IndyMac has also taken appropriate steps to make the hard lessons learned about credit risk permanent," including (a) "implementing

companywide a 'Principles of Credit Underwriting'…[which] management, underwriters, and others involved in credit process must sign"; (b) establishing an "early detection and accountability system for current production and new products…that are designed to prevent credit mistakes from become major costs"; (c) making IndyMac's "Chief Investment Officer, who is independent of production and secondary marketing, . . . solely responsible for all non-GSE products, guidelines, and risk-based pricing, because the Thrift might own them any time the secondary market becomes disrupted"; and (d) "reorganize[ing] and upgrade[ing] our regional CEOs, and will now hold them fully accountable for both production and credit quality."

227.   Perry further admitted that IndyMac's Alt-A delinquency rate was now 7.3%, which was higher than the industry average of 6.85%, and was trending upwards relative to the industry.  This indicated that the risks created by IndyMac's deficient underwriting practices were materializing.

228.   Also on November 6, 2007, Defendants issued a Form 10-Q for the quarterly period ended September 30, 2007 ("Third Quarter 10-Q") which restated many of the same partial disclosures and admissions described above (combined with additional false and misleading statements recounted above.  The Third Quarter 10-Q also provided additional disclosures regarding IndyMac's homebuilder division. Specifically, the Third Quarter 10-Q noted that IndyMac's homebuilder portfolio had serious problems, "resulting in an increase in classified and non-performing loans and our allowance for loan losses at quarter-end. All loans in the portfolio are assigned a credit grade quarterly. . . .  At September 30, 2007, non-performing loans for the builder construction portfolio rose to 9.03%, or $106.1 million, from 0.78%, or $9.0 million, at December 31, 2006, and zero at September 30, 2006."

229.   Following these disclosures, the price of IndyMac's common stock dropped from a closing price of $12.49 on November 6, 2007 to a closing price of

1   $10.38 on November 8, 2007 on high volume — a two-day decline of $2.11, or
2   16.9%.  By comparison, the S&P Bank Index (symbol: BIX) declined only 5.9%
3   over the same two days.

4      230.  The price drop immediately following disclosure of a massive increase
5   in non-performing loans and loan loss allowance demonstrates that the artificial
6   inflation in the stock price caused by nondisclosure of improper underwriting and
7   appraisal practices, inadequate risk management, and inadequate loan loss reserves
8   had been partially dissipated.  Each of these improprieties would reasonably be
9   expected to contribute to subsequent increases in non-performing assets and the
10  need for writedowns.

11     **B.**    **Second Partial Disclosure, Which Was Accompanied by Multiple**
12            **False and Misleading Statements**

13     231.  On February 12, 2008, IndyMac issued a press release announcing
14  fourth quarter 2007 results and reporting a net loss of $509.1 million, or ($6.43) per
15  share, for the fourth quarter of 2007, compared with net earnings of $72.2 million,
16  or $0.97 per share, in the fourth quarter of 2006.  The press release quoted Perry as
17  follows:

18     "We absorbed $863 million in total pre-tax credit provisions/costs
19        during the quarter, and this led to our quarterly loss of $509
20        million.…Excluding non-investment grade and residual securities,
21        total Q4-07 charge-offs were $99 million, and the total related credit
22        reserve at December 31 was $1.1 billion, or 11.3 times the charge-off
23        amount in the fourth quarter of 2007.

24     232.  Also on February 12, 2008, Perry hosted the Company's fourth quarter
25  2007 earnings conference call with analysts, at which he repeated the reasons for
26  the Company's fourth quarter loss of $6.43 per share, which was much larger than
27  the forecasted loss for the quarter, primarily the Company's huge increase in
28  reserves taken that quarter (including a $269 million increase to ALL), and also

admitted the Company's growing exposures from delinquencies in its loan portfolios, including the failed homebuilder division.

233.    IndyMac also disclosed that HCL NPAs rose to $480 million from $103 million in the prior quarter—reflecting an astonishing 40% of all loans—due to, *inter alia*, a "reappraisal of over 66% of the portfolio showing substantial declines in value in land and development projects, and re-assessment of borrower ability to pay principal and interest in a timely fashion given the precipitous drop in sales."   In response, IndyMac had to increase the HCL reserves by $199 million. These corrective adjustments reflected the fact that the HCL loans were not properly underwritten and were based on fraudulent appraisals.

234.    IndyMac also announced that it had transferred $1.3 billion in loans held-for-sale to loans held-for-investment because they were not marketable.   In performing this transfer, IndyMac was required to take a $474 million credit mark on these loans.   This reflected the abysmal quality of those loans and the materialization of years of deficient underwriting and appraisals.   Based on IndyMac's markdown, it was estimating that over one-third of those loans was worthless and would never be paid off.

235.    These partial corrective disclosures were neutralized by numerous false and misleading statements made by Perry and Keys on February 12, 2008 in the Form 10-Q, press release, and Form 8-K, and on the investor conference call. Those misrepresentations included reassurances that (a) IndyMac was a well-capitalized, "fundamentally sound financial institution" with "an incredibly strong war chest of credit reserves," (b) OTS did not have concerns with IndyMac's financial position, (c) independent auditors had evaluated IndyMac's ALL methodology and found it effective, and (d) IndyMac's deposit base was stable and well-managed.   These false reassurances blunted the market impact of the negative facts revealed on February 12, 2008.

1    ## C.    The Class Period Ends

2    236.   On May 12, 2008, IndyMac reported a net loss of $184.2 million, or

3  $2.27 per share, for the first quarter of 2008, compared with net earnings of $52.4

4  million, or $0.70 per share, in the first quarter of 2007, and that it was suspending

5  the dividend on its preferred shares.   Specifically, in the May 12, 2008 press

6  release, the company admitted that, "**[w]ith respect to profitability, we do not**

7  **expect that IndyMac will be able to return to overall profitability until the**

8  **current decline in home prices decelerates**."   As Perry explained during the May

9  12, 2008 earnings conference call with analysts, IndyMac's deteriorating financial

10  condition was attributable to, *inter alia*, "rapidly increasing non-performing assets

11  and loan repurchase demands from secondary market investors, and as a result, the

12  need to establish significant credit reserves for these and forecasted future NPAs

13  and charge-offs. While clearly with the benefit of hindsight we made mistakes in

14  our lending and mortgage banking activities, so did most major industry players[.]"

15    237.   Perry also disclosed that "because we're one of the few mortgage

16  bankers out there, and because of the significant hits we've taken, our capital ratios

17  have clearly been depleted. . . . So as a result of that, our total risk-based capital

18  ratio was relatively close to the well capitalized minimum.  It was 10.26.  The ratio

19  there is 10.  Clearly, there are scenarios in this environment where we could not be

20  well capitalized and end up being adequately capitalized for a short period of time."

21    238.   Perry also admitted the persistent deficiencies in IndyMac's financial

22  reporting and forecasting, joking that "you can laugh all you want about this, but

23  when we forecast the third quarter losses, we missed by 12 times; when we forecast

24  fourth quarter credit losses, we missed by 8 times and in the first quarter this year,

25  when we forecast the first quarter, we missed by 2 times."  While the credit losses

26  are a broader category than ALL, both are intimately related and based on similar

27  valuations.  Perry was essentially acknowledging—after repeatedly claiming that

28  IndyMac's reserves were "conservative" and its ALL methodology sound—that

1  IndyMac's financial reporting procedures and internal controls were fundamentally

2  flawed.

3      239.  The Company revealed fuller details of its problems in its Form 10-Q

4  for the quarterly period ended March 31, 2008, issued May 12, 2008, filed with the

5  SEC and signed by Perry.  In that report, the Company explained that (a) had the

6  April 2008 Ratings Downgrades by Moody's Investor Services ("Moody's") and

7  Standard & Poor's Rating Services ("S&P") been in effect on March 31, 2008,

8  IndyMac would have no longer been deemed a "well-capitalized" savings

9  association under federal regulations and could no longer accept brokered deposits

10  without a waiver; and (b) "even with a waiver, if the interest rate limitations on

11  brokered and solicited deposits were to be reduced . . . we anticipate that we would

12  reduce our assets and, most likely, curtail our lending activities."  Thus, IndyMac

13  disclosed that its reliance on brokered deposits was so great that even an interest

14  rate limitation would cause IndyMac to curtail its lending activities.  This was

15  IndyMac's first disclosure directly to investors of the extent to which it relied on

16  brokered deposits.

17      240.  IndyMac further disclosed that it had incurred $123 million in charge-

18  offs during the prior quarter, and had to increase ALL <u>again</u>—this time by $131.5

19  million.  IndyMac also disclosed that its 30-day delinquency rate was 8.42%, and

20  its HCL NPAs had reached $584 million.

21      241.  As a result of Defendants' disclosures on May 12, 2008, IndyMac's

22  stock dropped to close at $2.32 per share on May 13, 2008 on high volume, from a

23  close of $3.43 per share on May 9, 2008 and a close of $3.06 per share on May 12,

24  2008 — a two-day decline of $1.11 per share, or 32%.  The price drop on this date

25  represents a dissipation of the artificial inflation caused by IndyMac

26  misrepresentations respecting quality of underwriting and appraisals; reliance on

27  brokered deposits; the inadequacy of loan loss reserves, and overall financial

28  condition.

## IX.    THE COLLAPSE OF INDYMAC AND OTHER POST-CLASS PERIOD DEVELOPMENTS

242.    On July 11, 2008, IndyMac Bank, the majority owned subsidiary and principal asset of IndyMac, was seized and closed by the OTS.    The FDIC was appointed receiver of the Bank.    On the same day, the OTS chartered a new institution, IndyMac Federal Bank, appointed the FDIC as conservator and transferred substantially all of the assets and certain liabilities of the Bank to IndyMac Federal Bank.    Perry is no longer affiliated with the Bank, nor is he affiliated with the IndyMac Federal Bank.    Since the Bank is in conservatorship, and its holding company, IndyMac, has filed for Bankruptcy, they are not named as a defendant in this Action.

243.    On July 16, 2008, the *Associated Press* reported that"[t]he FBI is investigating failed bank IndyMac Bancorp Inc. for possible fraud."

244.    On August 1, 2008, IndyMac filed for Chapter 7 bankruptcy protection in Los Angeles.    Chapter 7 is liquidation of the Company's assets to pay off its creditors.    The bankruptcy court filing signed by Defendant Perry estimated that IndyMac had between $50 million and $100 million in assets, but $100 million to $500 million in liabilities.    IndyMac Bank, operated since July 11, 2008 by the federal government, is no longer connected to the holding company IndyMac Bancorp at the time of the bankruptcy filing.

245.    On February 26, 2009 the OIG issued the Treasury Report following its intensive review of documents and interviews, to determine the causes of IndyMac's failure which cost the FDIC insurance fund $10.7 billion.    The Treasury Report concluded that the causes of IndyMac's failure were IndyMac's (1) high risk business strategy and aggressive growth; (2) lack of core deposits; (3) inadequate loss reserves; and (4) unsound loan underwriting practices.

246.    The Treasury Report concludes that "inadequate loss reserves" were one of the causes of IndyMac's failure.    The Report notes, as discussed herein, that

1  IndyMac's ALL *decreased* as a percentage of the thrift's total loans until 2007,

2  despite the fact that as early as 2004, IndyMac senior management began observing

3  the probability of a downgrade trend in real estate values, which could reduce the

4  collateral supporting loans and result in possible loan losses.  Therefore, among

5  other indications that the Company knew that its risk was increasing in a generally

6  deteriorating housing and credit market, IndyMac should have been increasing its

7  ALL.  The Report emphasizes that IndyMac was exposed to heightened risk from

8  its burgeoning portfolio of non-traditional loans especially option ARMs.  ARMs

9  comprised nearly 3 of every 4 loans that IndyMac made during the years 2004

10 through 2006.  In 2006, 75 percent of borrowers who took the option ARM were

11 only making the minimum payment.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD-ON-THE-MARKET DOCTRINE

14     247.   At all relevant times, the market for IndyMac stock was an efficient

15 market for the following reasons, among others:

16     (a)    IndyMac stock met the requirements for listing, and was listed

17 and actively traded on the NYSE, a highly efficient and automated market;

18     (b)    As a regulated issuer, IndyMac filed periodic public reports with

19 the SEC and the NYSE;

20     (c)    IndyMac regularly communicated with public investors via

21 established market communication mechanisms, including through regular

22 disseminations of press releases on the national circuits of major newswire services,

23 through analyst and investor conference calls and through other wide-ranging

24 public disclosures, such as communications with the financial press and other

25 similar reporting services; and

26     (d)    IndyMac was followed by numerous securities analysts,

27 including Lehman Brothers, The Friedman, Billings, Ramsey Group, RBC Capital

28 Markets, Fox-Pitt Kelton Cochran Caronia Waller, and Roth Capital Partners, who

1    issued regular reports and recommendations during the Class Period.  Each of these

2    reports was publicly available and entered the public marketplace.

3        248.   As a result of the foregoing, the market for IndyMac stock promptly

4    digested current information regarding IndyMac from all publicly available sources

5    and reflected such information in IndyMac stock prices. Under these circumstances,

6    all purchasers of IndyMac stock during the Class Period suffered similar injury

7    through their purchase of IndyMac stock at artificially inflated prices, and a

8    presumption of reliance applies.

9    **XI.    NO STATUTORY SAFE HARBOR**

10       249.   The statutory safe harbor provided for forward-looking statements

11   under certain circumstances does not apply to any of the false statements pleaded in

12   this Complaint.  Many of the specific statements pleaded herein were not identified

13   as "forward-looking statements" when made.   False statements contained in the

14   2006 and 2007 audited financial statements of IndyMac which all Defendants

15   represented had been prepared in conformity with generally accepted accounting

16   principles ("GAAP") are not eligible for "safe harbor" status by statute, see 15

17   U.S.C. § 78U-5(B)(2)(A).    To the extent there were any forward-looking

18   statements, there were no meaningful cautionary statements identifying important

19   factors that could cause actual results to differ materially from those in the

20   purportedly forward-looking statements.   Alternatively, to the extent that the

21   statutory safe harbor does apply to any forward-looking statements pleaded herein,

22   Defendants are liable for those false forward-looking statements because at the time

23   each of those forward-looking statements was made, the particular speaker knew

24   that the particular forward-looking statement was false, and/or the forward-looking

25   statement was authorized and/or approved by an executive officer of IndyMac who

26   knew that those statements were false when made.

27

28

1

**FIRST CLAIM FOR RELIEF**

2

**(Against Defendants Perry and Keys for Violations of Section 10(b) of the**

3

**Exchange Act and Rule 10b-5 Promulgated Thereunder)**

4    250.  Plaintiff repeats and realleges each and every allegation contained

5    above as if fully set forth herein.

6    251.  During the Class Period, defendants Perry and Keys carried out a plan,

7    scheme and course of conduct which was intended to and, throughout the Class

8    Period, did: (i) deceive the investing public, including Plaintiff and other Class

9    members, as alleged herein; and (ii) cause Plaintiff and other members of the Class

10    to purchase IndyMac stock at artificially inflated prices.  In furtherance of this

11    unlawful scheme, plan and course of conduct, defendants Perry and Keys, and each

12    of them, took the actions set forth herein.

13    252.  Defendants Perry and Keys (a) employed devices, schemes, and

14    artifices to defraud; (b) made untrue statements of material fact and/or omitted to

15    state material facts necessary to make the statements not misleading; and (c)

16    engaged in acts, practices, and a course of business which operated as a fraud and

17    deceit upon the purchasers of IndyMac's stock in an effort to maintain artificially

18    high market prices for those securities in violation of Section 10(b) of the Exchange

19    Act and Rule 10b-5.  Defendants Perry and Keys are sued as primary participants in

20    the wrongful and illegal conduct charged herein and defendants Perry and Keys are

21    sued as controlling persons, as alleged below.

22    253.  Defendants Perry and Keys, individually and in concert, directly and

23    indirectly, by the use, means or instrumentalities of interstate commerce and/or of

24    the mails, engaged and participated in a continuous course of conduct to conceal

25    adverse material information about the business, operations and future prospects of

26    IndyMac as specified herein.

27    254.  Defendants Perry and Keys, employed devices, schemes and artifices

28    to defraud, while in possession of material adverse non-public information and

1   engaged in acts, practices, and a course of conduct as alleged herein in an effort to

2   assure investors of IndyMac's sound financial position, prudent management of

3   risks, and the soundness of its mortgage originations and securitizations, despite the

4   challenging market conditions, which included the making of, or the participation in

5   the making of, untrue statements of material facts and omitting to state material

6   facts necessary in order to make the statements made about IndyMac and its

7   business operations and future prospects in the light of the circumstances under

8   which they were made, not misleading, as set forth more particularly herein, and

9   engaged in transactions, practices and a course of business which operated as a

10  fraud and deceit upon the purchasers of IndyMac stock during the Class Period.

11      255. Each of the defendants Perry and Keys' primary liability, and

12  controlling person liability, arises from the following facts: (i) defendants Perry and

13  Keys high-level executives and/or a director of IndyMac during the Class Period

14  and members of the IndyMac's management team or had control thereof; (ii)

15  defendants Perry and Keys, by virtue of their responsibilities and activities as a

16  senior officer and/or director of the Company was privy to and participated in the

17  creation, development and reporting of IndyMac's plans, statements and/or reports;

18  (iii) defendants Perry and Keys enjoyed significant personal contact and familiarity

19  with the other defendants and was advised of and had access to other members of

20  IndyMac's management team, internal reports and other data and information about

21  the IndyMac's operations at all relevant times; and (iv) defendants Perry and Keys

22  were aware of the Company's dissemination of information to the investing public

23  which they knew or recklessly disregarded was materially false and misleading.

24      256. Defendants Perry and Keys had actual knowledge of the

25  misrepresentations and omissions of material facts set forth herein, or acted with

26  reckless disregard for the truth in that they failed to ascertain and to disclose such

27  facts, even though such facts were available to them. Such material

28  misrepresentations and/or omissions were done knowingly or recklessly and for the

1  purpose and effect of concealing IndyMac's financial condition and future business
2  prospects from the investing public and supporting the artificially inflated price of
3  its securities.  As demonstrated by defendants Perry and Keys' misstatements of
4  IndyMac's business and operations throughout the Class Period, defendants Perry
5  and Keys, if they did not have actual knowledge of the misrepresentations and
6  omissions alleged, were reckless in failing to obtain such knowledge by deliberately
7  refraining from taking those steps necessary to discover whether those statements
8  were false or misleading.

9  257.  As a result of the dissemination of the materially false and misleading
10  information and failure to disclose material facts, as set forth above, the market
11  price of IndyMac stock was artificially inflated during the Class Period.  In
12  ignorance of the fact that market prices of IndyMac stock were artificially inflated,
13  and relying directly or indirectly on the false and misleading statements made by
14  defendants Perry and Keys, or upon the integrity of the markets in which the
15  IndyMac's stock trades, and/or on the absence of material adverse information that
16  was known to or recklessly disregarded by defendants Perry and Keys but not
17  disclosed in public statements by defendants Perry and Keys during the Class
18  Period, plaintiff and the other members of the Class acquired IndyMac stock during
19  the Class Period at artificially high prices and were damaged thereby.

20  258.  At the time of said misrepresentations and omissions, plaintiff and
21  other members of the Class were ignorant of their falsity, and believed them to be
22  true.  Had plaintiff and the other members of the Class and the marketplace known
23  the truth regarding IndyMac's financial condition, fraudulent loan origination and
24  securitization practices and the riskiness of its loans, which facts were not disclosed
25  by defendants Perry and Keys, plaintiff and other members of the Class would not
26  have purchased or otherwise acquired their IndyMac stock, or, if they had acquired
27  such stock during the Class Period, they would not have done so at the artificially
28  inflated prices which they paid.

259.   By virtue of the foregoing, defendants Perry and Keys have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

260.   As a direct and proximate result of defendants Perry's and Keys' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases of IndyMac's stock during the Class Period.

### SECOND CLAIM FOR RELIEF

**(Against Defendants Perry and Keys For Liability**

**Under Section 20(a) of the Exchange Act)**

261.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

262.   Defendants Perry and Keys acted as controlling persons of IndyMac and IndyMac Bank within the meaning of Section 20(a) of the Exchange Act as alleged herein.   By virtue of their high-level positions with the Company and participation in and/or awareness of the Company's operations, defendants Perry and Keys had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.   Defendants Perry and Keys were provided with or had unlimited access to information about IndyMac's and IndyMac Bank's financial condition, its loan origination and securitization practices and the low credit quality of its loans and copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

263.   In particular, defendants Perry and Keys had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the

1    power to control or influence the particular transactions giving rise to the securities

2    violations as alleged herein, and exercised the same.

3    264.  As set forth above, defendants Perry and Keys, and non-defendants

4    IndyMac and IndyMac Bank, each violated Section 10(b) and Rule 10b-5 by their

5    acts and omissions as alleged in this Complaint.  By virtue of their positions as

6    controlling persons, of IndyMac and IndyMac Bank, defendants Perry and Keys are

7    liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate

8    result of defendants Perry's and Keys' wrongful conduct, plaintiff and other

9    members of the Class suffered damages in connection with their purchases of the

10    IndyMac's stock during the Class Period.

11    <u>**THIRD CLAIM FOR RELIEF**</u>

12    **(Against Defendant Ernst & Young LLP for Violations of Section 10(b)**

13    **of the Exchange Act and Rule 10b-5 Promulgated Thereunder)**

14    265.  Plaintiff repeats and realleges each and every allegation contained

15    above as if fully set forth herein.

16    266.  During the Class Period, defendant Ernst carried out a plan, scheme

17    and course of conduct which was intended to and, throughout the Class Period, did:

18    (i) deceive the investing public, including Plaintiff and other Class members, as

19    alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to

20    purchase IndyMac stock at artificially inflated prices.

21    267.  Defendant Ernst (a) employed devices, schemes, and artifices to

22    defraud; (b) made untrue statements of material fact and/or omitted to state material

23    facts necessary to make the statements not misleading; and (c) engaged in acts,

24    practices, and a course of business which operated as a fraud and deceit upon the

25    purchasers of IndyMac's stock.

26    268.  Defendant Ernst, directly and indirectly, by the use, means or

27    instrumentalities of interstate commerce and/or of the mails, engaged and

28    participated in a continuous course of conduct to conceal adverse material

1    information about the business, operations and future prospects of IndyMac as

2    specified herein.     Specifically, defendant Ernst deceived investors by falsely

3    certifying the IndyMac's 2006 and 2007 Forms 10-K (filed March 1, 2007 and

4    February 29, 2008, respectively).

5          269.   Defendant Ernst had actual knowledge of the misrepresentations and

6    omissions of material facts set forth herein, or acted with reckless disregard for the

7    truth in that they failed to ascertain and to disclose such facts, even though such

8    facts were available to them.   Such material misrepresentations and/or omissions

9    were done knowingly or deliberately recklessly and for the purpose and effect of

10   concealing IndyMac's financial condition and future business prospects from the

11   investing public and supporting the artificially inflated price of its securities.

12         270.   As a result of the dissemination of the materially false and misleading

13   information and failure to disclose material facts, as set forth above, the market

14   price of IndyMac stock was artificially inflated during the Class Period.   In

15   ignorance of the fact that market prices of IndyMac stock were artificially inflated,

16   and relying directly or indirectly on the false and misleading statements made by

17   defendant Ernst, or upon the integrity of the markets in which the IndyMac's stock

18   trades, and/or on the absence of material adverse information that was known to or

19   recklessly disregarded by defendant Ernst but not disclosed in public statements

20   during the Class Period, plaintiff and the other members of the Class acquired

21   IndyMac stock during the Class Period at artificially high prices and were damaged

22   thereby.

23         271.   At the time of said misrepresentations and omissions, plaintiff and

24   other members of the Class were ignorant of their falsity, and believed them to be

25   true.  Had Lead Plaintiff and the other members of the Class and the marketplace

26   known the truth regarding IndyMac's financial condition, plaintiff and other

27   members of the Class would not have purchased or otherwise acquired their

28

1 IndyMac stock, or, if they had acquired such stock during the Class Period, they
2 would not have done so at the artificially inflated prices which they paid.

3    272.   By virtue of the foregoing, defendant Ernst violated Section 10(b) of
4 the Exchange Act, and Rule 10b-5 promulgated thereunder.

5    273.  As a direct and proximate result of defendant Ernst's wrongful
6 conduct, Lead Plaintiff and the other members of the Class suffered damages in
7 connection with their respective purchases of IndyMac's stock during the Class
8 Period.

## XII.  <u>PRAYER</u>

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying
Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil
Procedure;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the
other Class members against all defendants, jointly and severally, for all damages
sustained as a result of defendants' wrongdoing, in an amount to be proven at trial,
including prejudgment interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and
expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

Dated:  October 9, 2009.

MARC M. SELTZER
RYAN C. KIRKPATRICK
SUSMAN GODFREY L.L.P.

KENNETH S. MARKS
*(Admitted Pro Hac Vice)*
kmarks@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX  77002-5096
Telephone:  (713) 651-9366
Fax:  (713) 654-6666

1

2    SHERRIE R. SAVETT
     ARTHUR STOCK
3    PHYLLIS M. PARKER
     BERGER & MONTAGUE, P.C.

4

5    By _____ Marc Seltzer /RCK _____
                Marc M. Seltzer
6           Attorneys for Lead Plaintiff
            and the Class
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 9, 2009.

MARC M. SELTZER
RYAN C. KIRKPATRICK
SUSMAN GODFREY L.L.P.

KENNETH S. MARKS
*(Admitted Pro Hac Vice)*
kmarks@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
Fax: (713) 654-6666

SHERRIE R. SAVETT
ARTHUR STOCK
PHYLLIS M. PARKER
BERGER & MONTAGUE, P.C.


By_____
          Marc M. Seltzer
     Attorneys for Lead Plaintiff
     and the Class

# PROOF OF SERVICE

I, the undersigned, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 1901 Avenue of the Stars, Suite 950, Los Angeles, California 90067-6029.

On October 9, 2009, I served the foregoing document(s) described as follows:

## THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as stated on the attached service list, as follows:

__XX__ BY MAIL:
I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

_____ BY PERSONAL SERVICE:
I caused to be delivered such envelope by hand to the offices of the addressee.

_____ BY FEDERAL EXPRESS OR OVERNIGHT COURIER

_____ BY FAX
I served by facsimile as indicated on the attached service list.

__XX__ BY ELECTRONIC MAIL
I caused said documents to be prepared in portable document format (PDF) for e-mailing and served by electronic mail as indicated on the attached service list.

Executed on October 9, 2009, at Los Angeles, California.

_____ (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

__XX__ (Federal) I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

_____
Sandra L. Thomas
(Type or Print Name)

_____
(Signature)

# SERVICE LIST

**PLAINTIFF'S COUNSEL**

Marc M. Seltzer
*mseltzer@susmangodfrey.com*
Ryan C. Kirkpatrick
*ssklaver@susmangodfrey.com*
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Fax: (310) 789-3150

Kenneth S. Marks
*Admitted Pro Hac Vice*
kmarks@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Tel: (713) 651-9366
Fax: (713) 654-6666

Sherrie R. Savett
ssavett@bm.net
Arthur Stock
astock@bm.net
Phyllis M. Parker
pparker@bm.net
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

*Attorneys for Lead Plaintiff
And the Class*

**DEFENDANTS' COUNSEL**

Tammy Albarran
talbarran@cov.com
David B. Bayless
dbayless@cov.com
Kelly Patrice Finley
kfinley@cov.com
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111-5356
Tel: (415) 591-6000
Fax: (415) 591-6091

*Attorneys for Defendant
Michael W. Perry*

Miles N. Ruthberg
Miles.Ruthberg@lw.com
Peter A. Wald
Peter.Wald@lw.com
James J. Farrell
James.Farrell@lw.com
Robert W. Perrin
Robert.Perrin@lw.com
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, CA 90071-1560
Tel: (213) 485-1234
Fax: (213) 891-8763

*Attorneys for Defendant
Ernst & Young LLP*

Julie A. Smith
jasmith@willkie.com
Gregory S. Bruch
gbruch@willkie.com
WILLKIE FARR
 & GALLAGHER LLP
1875 K Street, NW
Washington, D.C. 20006-1238
Tel: (202) 303-1000
Fax: (202) 303-2000

*Attorneys for Defendant
A. Scott Keys*