MARC M. SELTZER (54534)
mseltzer@susmangodfrey.com
RYAN C. KIRKPATRICK (243824)
rkirkpatrick@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Fax: (310) 789-3150

SHERRIE R. SAVETT
*(Admitted Pro Hac Vice)*
ssavett@bm.net
ARTHUR STOCK
*(Admitted Pro Hac Vice)*
astock@bm.net
PHYLLIS M. PARKER
*(Admitted Pro Hac Vice)*
pparker@bm.net
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

*Attorneys for Lead Plaintiff and the Class*

(See Signature Page for Name and
Address of Additional Counsel for Plaintiff)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ROBERT C. DANIELS, on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL W. PERRY, A. SCOTT KEYS, and ERNST & YOUNG LLP,<br><br>Defendants. | Case No. CV 08-03812 GW(VBKx)<br><br>**PLAINTIFF'S SUPPLEMENTAL SUBMISSION** |

Plaintiff provides this supplemental submission in response to the Court's request at oral argument on January 14, 2010, that Plaintiff explain how an amended complaint, if deemed necessary, could address the concerns raised in the Court's Tentative Thoughts on Defendants' Motion to Dismiss the Third Amended Complaint ("Tentative Ruling"). This submission first gives an overview of the new evidence of fraud that has come to light after the submission of the Third Amended Consolidated Complaint ("TACC"), and then responds to the Court's Tentative Ruling.

A.   Underline New Allegations

An amended complaint would plead the following new evidence, much of which derives from the Bankruptcy Trustee Complaint previously submitted to this Court. The Trustee Complaint—which was filed after the deadline for filing the TACC—is being resubmitted herewith as Exhibit A.

1.   Scienter of all Defendants

IndyMac's business model had always depended on two elements: (a) rising real estate prices and (b) the ability to sell loans. As long as real estate prices were rising, individuals who could not afford their loan payments would be able to avoid default by selling their property, or, if a borrower did default, IndyMac could recover its loan value through foreclosure. And as long as IndyMac was able to sell loans it originated, it would not retain the risks of poorly underwritten loans. The low default and delinquency rates IndyMac experienced in the 2002-2005 period were entirely dependent on both of these conditions. With the disappearance of these two conditions, IndyMac's historical default rates were not a suitable basis for calculating Allowance for Loan Losses ("ALL") going forward. Nonetheless, IndyMac, like Countrywide and Washington Mutual, kept using those same historical models.

The new allegations would establish with greater specificity when Defendants knew that IndyMac's world had changed and that historical models could no longer be relied upon.  As alleged in the Trustee Complaint, Early Payment Defaults and repurchase demands began increasing in early 2006.  On October 3, 2006, Perry was advised that IndyMac had violated its own Liquidity Policy because it had been unable to sell the loans it had generated, which caused Loans Held for Sale to increase by $2.9 billion.  Trustee Complaint ¶ 205.  Perry acknowledged his awareness of the problem, and of the violation of Liquidity Policy, by e-mail, noting, "I see this as a problem." *Id.* ¶ 206.

On October 30, 2006, Keys demonstrated his awareness of the same issue, acknowledging at an Audit Committee meeting that: (a) "problem assets are trending up"; (b) only 84% of the loan production from the Conduit Division had been sold in the third quarter, far short of 100% in the previous quarter; and (c) that Early Payment Defaults were rising.  *Id.* ¶ 216.  Ernst was either in attendance at the Audit Committee meeting, or, as it was required to do, reviewed the Audit Committee meeting minutes in connection with its 2006 audits.

At a Board meeting on December 5, 2006, one director noted that loans originated through the Conduit Division were especially likely to lead to Early Payment Defaults, which require IndyMac to repurchase loans it had sold to third parties, usually at a loss. *Id.* ¶ 217.  These were the loans that IndyMac could no longer count on selling.  Perry was a Board Member and attended the Board meeting.  Ernst was required to review the minutes.

By Fall 2007, IndyMac's precarious financial condition was well-known to Defendants:

- On September 5, 2007, one of IndyMac's directors emailed senior management regarding a recent analysis by Moody.  That director

2

stated that Moody's "estimates are alarming" and "it appears that we are drastically under-estimating our losses." *Id.* ¶ 228.

- As early as November 2007, the OTS recommended to senior management that, based on the Bank's capital ratios, IndyMac needed to raise outside capital and senior management was aware that OTS intended to downgrade IndyMac's ratings. *Id.* ¶ 137.

- On January 4, 2008, Perry informed the Director Defendants and related parties that he did not want potential investors to conduct due diligence before submitting a term sheet because of concerns about how the marketplace would perceive Bancorp. *Id.* ¶ 139.

- On January 9, 2009, IndyMac's Board discussed the need to raise capital and the potential for a run on the bank (i.e., a liquidity crisis). *Id.* ¶ 74.

- On February 8, 2008, IndyMac's senior management told the board that there was "a very real risk that the OTS could soon pressure the Bank to raise dilutive capital." *Id.* ¶ 137.

- Also on February 8, 2008, Perry told an outside investor that IndyMac was "literally fighting for" its life. *Id.* ¶ 74.

Four days later, Perry and Keys told investors that IndyMac was in a "fundamentally sound financial condition."[1]  A little over a month later, the 2007

---

[1] Although the Court has not indicated that further allegations are needed to show Perry's scienter with respect to underwriting and appraisal claims, court filings in other jurisdictions provide further corroboration of Perry's personal involvement in the fraudulent underwriting and appraisal practices that required IndyMac to increase its ALL in 2006, which it failed to do.  According to a Complaint filed by purchasers of IndyMac mortgage pass-through certificates, *In re: IndyMac Mortgage-Backed Securities Litig.*, S.D.N.Y. C.A. No. 09-04583 (Oct. 29, 2009) in 2006 Perry pushed a program where bank management would overrule underwriters' decisions to deny loan applicants.  In late 2006 or early 2007, Perry sent an e-mail to all sales personnel and loan underwriters requesting names of any

Form 10-K was issued.  Three months later, IndyMac had collapsed.

Contrary to Defendants' assertions, the Trustee Complaint confirms that IndyMac was not merely a victim of market conditions.  On October 22, 2007, Perry admitted that: "roughly 2/3rds of our credit losses were poor management judgment not the market."  *Id.* ¶ 231.

An amended complaint would also include allegations based on *IndyMac Federal Bank, F.S.B. v. PMI Mortgage Ins. Co.*, N.D. Cal. C.A. No. 08-4303. Between May and August 2007, IndyMac delivered 6,242 loans, with aggregate value of over $500 million, to PMI, which would insure payments on these loans following securitization.  PMI determined that over 80% of the loans delivered in this period contained material underwriting deficiencies, and sought to rescind its insurance agreement.  An amended complaint would allege PMI informed IndyMac Bank of its findings by a letter to an IndyMac senior officer dated December 4, 2007.  The letter, from PMI Managing Director, stated: "as our account team has discussed with you, it is clear that the audit results far exceed our tolerances for data and decision variances."  Given the dramatic effect that PMI's rescission would have on IndyMac, these facts would necessarily have been made known to Defendants and required a further adjustment to ALL.

## 2. Ernst's Failure to Include a Going Concern Reservation in its Opinion

The Trustee Complaint gives rise to allegations that Ernst was deliberately reckless in failing to include a "going concern reservation" in its 2007 opinion letter, which was issued on February 28, 2008.  Such a reservation would state what

---

underwriters who rejected loans, because such underwriters were "not with the program."  Underwriters received bonuses for approving loans, and were overruled or reprimanded when they did not.

the Defendants knew and investors did not: that there was a significant risk that IndyMac would be unable to meet its obligations over the next few months, and might be forced into liquidation.  The new evidence includes:

(1)   In October 2007, Keys informed the Board of Directors that IndyMac had violated its own liquidity policy because it had transferred $175 million to IndyMac Bank. Trustee Complaint ¶ 209.

(2)   In November 2007, senior management had been informed that OTS intended to downgrade the Bank's CAMELS rating from "2" to "3", and would require IndyMac to raise significant outside capital.  *Id.* ¶ 137(b).

(3)   At a January 9, 2008 Joint IndyMac and IndyMac Bank Board Special Meeting, Perry warned that IndyMac could not count on raising capital due to poor market conditions and discussed the risk of a run on the bank.  *Id.* ¶ 74(a).  Ernst was obligated to review these Board Minutes as part of its 2007 audit, and therefore knew that the risk of a bank run was being discussed internally.

(4)   On January 17, 2008, more than a month before Ernst issued its audit opinion, OTS issued a letter to all members of IndyMac's Board stating that the Bank's CAMELS assets rating had been downgraded from "2" to "4" effective December 31, 2007.  Ernst was required to review this letter as part of its audit.

(5)   IndyMac Board Meeting Minutes of February 8, 2008 acknowledge the "very real risk" that OTS would require IndyMac to raise dilutive capital.  *Id.* ¶ 137(c).

(6)   By March 2008, FDIC determined that, to avoid failure, the Bank needed to raise an astonishing *$3.5 billion* in additional capital to avoid collapse.  *Id.* ¶ 127(e).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

     Despite its review of Board Minutes demonstrating both that IndyMac would be required to raise additional capital, and was unable to raise additional capital, Ernst provided a "clean" audit opinion dated February 28, 2008 containing no reservation.

     AU §341 requires auditors to evaluate whether there is substantial doubt about the entity's ability to continue as a going concern for the following year. Where substantial doubts exist, the auditor's opinion should contain a "going concern reservation." "If … the auditor concludes that substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time remain, the audit report should include an explanatory paragraph (following the opinion paragraph) to reflect that conclusion." AU §341.12. Omission of such a reservation, when required, is actionable. *Umsted v. Andersen LLP*, 2003 U.S. Dist. LEXIS 19887, at \*\*17-18 (Nov. 5, 2003). There are five primary factors that an auditor must consider in determining whether a going concern reservation is needed:

- Recurring operating losses;
- Indications of strained liquidity;
- Failure to meet minimum regulatory capital requirements or to adhere to the terms of an approved capital plan;
- Concerns expressed or actions taken by regulatory authorities regarding alleged unsafe or unsound practices; and
- Indications of strained relationships between management and regulatory authorities.[2]

     Four of these conditions were present at IndyMac by February 28, 2008: (i) IndyMac had experienced operating losses in Q3 and Q4; (ii) liquidity was a

---

[2] *The American Institute of Certified Public Accountants (AICPA) Audit and Accounting Guide (AAG for Banks and Savings Institutions* (edition with conforming changes as of May 1, 2006) at §§5.108-118.

recurrent concern of the Board of Directors, as described in the Trustee Complaint; (iii) the CAMELS downgrade had already been communicated by the OTS; and (iv) the communications discussed in Board minutes indicated a strained relationship between OTS and IndyMac.   And, a month later, IndyMac had fallen out of compliance with minimum capital requirements.[3]

The public did not learn there was a significant risk that IndyMac would be unable to continue as a going concern until May 12, 2008, the close of the Class Period, when the stock price fell 32%.

### B.   Responses to the Court's Tentative Ruling

Plaintiff respectfully submits the following responses to certain of the Court's tentative thoughts, and correlates the new allegations discussed above with questions raised in the Court's Tentative Ruling:

1.   **"If the Court dismisses the ALL-based allegations, will that dispose of the case against EY entirely?" (¶ 1 of the Tentative Ruling**):   No. First, as discussed above, an amended complaint would contain allegations concerning Ernst's failure to include a going concern reservation in its 2007 audit report, which is independently actionable.

Second, Ernst's certifications of IndyMac's internal controls are actionable independent of whether the ALL claims are sustained because they are different claims.   For example, an auditor could negligently believe that ALL is adequate based on internal reports it received from various divisions.   But—as with IndyMac—the auditor could also know that the divisions are inconsistently calculating ALL and that the internal controls over financial reporting are therefore

---

[3] Ernst approved of fraudulently backdating a cash infusion in order to mask this deficiency, TACC ¶¶210-12.  Ernst's subsequent backdating of a cash infusion is further circumstantial evidence of its willingness to conceal the severe going concern risk that IndyMac faced.

1   inadequate.   The auditor would be clearly liable for falsely certifying internal
2   controls, but would not necessarily be liable for ALL claims.

3          Here, Plaintiff has alleged that Ernst received reports beginning in 2006
4   detailing internal control deficiencies that were never corrected, most particularly
5   with respect to the Conduit and Home Construction Lending Divisions.   TACC ¶¶
6   86-87, 94, 110-121, 175-176.   Notwithstanding this actual knowledge of internal
7   control deficiencies, Ernst gave an unqualified opinion as to IndyMac's internal
8   controls.   As other courts have found, that conduct is independently actionable.   *See*
9   *In re Washington Mutual, Inc. Securities, Derivative & ERISA Litigation*, 2009 WL
10  3517630, at *10 (W.D. Wash., Oct. 27, 2009) ("*Washington Mutual II"*) (finding
11  internal control claims actionable against numerous defendants where "an internal
12  WaMu document from September 2005, [] highlighted gaps in WaMu's internal
13  controls related to its drive to increase loan volume" and plaintiffs alleged "the
14  problems identified were slowly addressed, never fully remediated, and never
15  disclosed to the public."); *see also In re Washington Mutual, Inc. Securities,*
16  *Derivative & ERISA Litigation*, 259 F.R.D. 490, 506 (W.D. Wash. 2009)
17  ("*Washington Mutual I"*) ("Misstatements about the adequacy of internal controls
18  are actionable.") (citing *In re New Century*, 588 F. Supp. 2d 1206, 1226 (C.D. Cal.
19  2008)).

20         2.      **When did Defendants know the reserves would be inadequate and**
21  **of the "market cataclysm"? (¶ 2 of the Tentative Ruling):**   Plaintiff submits that
22  the new allegations discussed above address the Court's concerns regarding when
23  exactly the Defendants knew about the change in the market and the quality of
24  IndyMac's loan portfolio.   By no later than October 2006, Defendants knew about
25  the changing market conditions, the fact that "problem assets were trending up," the
26  rise in early-payment default demands, and the inability to resell loans.   Trustee
27  Complaint ¶ 216.   Indeed, shortly thereafter banking regulatory agencies issued a

"revised" Policy Statement in 2006 for bank management and auditors, to emphasize that assessment of ALL must reflect the new "uncertain economic environment" and proliferation of "concentrations in untested loan products." Interagency Joint Press Release, Dec. 13, 2006 (announcing issuance of Revised ALL Policy Statement).  To the extent helpful, Plaintiff can also allege additional quarterly statistics for 2006 that illustrate the severity of the problems that IndyMac began facing in the second half of 2006, both within IndyMac's loan portfolio and the market generally.

3.      **Should the Court consider ALL in gross terms or proportionate terms? (¶ 2 of the Tentative Ruling):**  If deemed necessary, Plaintiff will also amend the complaint to further allege that the ALL figures must be analyzed in "proportion to other statistics" instead of simply in "gross terms."   (1/14/10 Tentative Opinion, p. 2 n.1).  As the Court correctly states, "[t]o some extent the proportional analysis makes sense because the gross figures could be fundamentally misleading depending upon changes in overall volume."  *Id.*  This conclusion is consistent with the 2006 Interagency Policy Statement on the Allowance for Loan and Lease Losses (the "2006 Policy Statement"), which confirms that the adequacy of ALL is measured by testing the ALL percentage against all known credit quality trends for directional consistency.  "[I]f declining credit quality trends relevant to the type of loans in an institution's portfolio are evident, the ALL level ***as a percentage of the portfolio*** should generally *increase*, barring unusual charge-off activity."  *Id.* at p. 9 (emphasis added).  It is also consistent with the case law:

-   *In re Reliance Securities Litigation*, 91 F. Supp 2d 706, 722 (D. Del. 2000) (allegations that the auditor was aware that the Company's loan loss rate sharply increased from 4.5% of net finance receivables in 1993 to 25.3% in 1996 at the same time the company's loan loss reserves declined from 6.18% of net finance receivables in 1993 to 4.08% in 1996, supported finding that auditor and other

defendants recklessly misrepresented that company's financial position).

- *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1151 (S.D. Cal. 2008) (upholding claims that company issued false financials by understating the reserve for potential losses on sale of real estate owned ("REO") by the company. "Throughout the class period increased defaults and foreclosures caused Accredited's gross REO to increase significantly. Defendants failed to *proportionately* increase the REO [real estate owned] reserve, however, and instead allegedly decreased the reserve as a *proportion* of gross REO.") (emphasis added); *see also id.* (sustaining ALL claims where, "beginning with the third quarter of 2005, Accredited's ALL allegedly decreased *as a percentage* of the company's delinquent loans . . .") (emphasis added).

4. **Was the ALL ratio too conservative in 2005? (¶ 2 of the Tentative Ruling):** If necessary, Plaintiff will allege facts showing that Ernst's suggestion that ALL may have been set too high in 2005—and therefore the reduction in 2006 represented return to appropriate levels rather than a new fraud—must be rejected. First, this theory has no basis in any of the numerous documents filed with the Court, and Plaintiff can allege that there was no surplus of reserves from 2005 that would indicate that it was too high. Second, Plaintiff would allege that over-reserving is a violation of GAAP just as under-reserving is. FAS 5 prohibits setting "too conservative" a reserve. Third, Plaintiff would make clear that IndyMac would have no incentive to understate ALL in the prior periods because it would depress earnings. Absent any evidence to suggest that such under-reserving occurred, the assumption that it did occur is unwarranted.

5. **Was ALL "egregiously inappropriate" or simply "not enough"? (¶ 3 of the Tentative Ruling):** The best estimate Plaintiff can derive from currently available information suggests that ALL understatement was about 400% at year-end 2006. TACC ¶ 209. Plaintiff respectfully disagrees that this is a case

where the reserves were simply "not enough." *Cf. Washington Mutual I,* 259 F.R.D. at 507 (finding, under Rule 9(b) standard, sufficient allegations of fraud where "WaMu under-provisioned its Allowance by over 40% in 2006, by at least 63% in the first quarter of 2007, and by at least 56% in the second quarter of 2007"). This conclusion is bolstered by the Treasury Report, which found the level of IndyMac's ALL at the outset of 2007 to have been inexplicable.

6. "**Which side is correct about how long the reserves are intended to cover—the life of the loan or simply just one year?" (¶ 4 of the Tentative Ruling**): As an initial matter, Plaintiff submits that Plaintiff's interpretation of the governing accounting regulations must be credited on a motion to dismiss. While the accounting regulations relied upon by Defendants may themselves be judicially noticeable, Defendants' interpretation of them is not.[4]

Moreover, to the extent deemed necessary, Plaintiff will amend the TACC to further explain that the reserves are intended to cover the "life of the loan," not just one year. FAS 5 requires the accrual of a loss contingency when information available before the issuance of the financials indicates that it is "probable" that the loan portfolio has been impaired at that date, and the amount of loss can be "reasonably estimated." FAS 5, AICPA § 9.32. If available information indicates it is "probable" that a loan or portfolio of loans has been impaired at the balance sheet date, such a conclusion applies to the entirety of the loan, not to one year's portion thereof. If deemed necessary, Plaintiff can plead additional accounting standards making this point clear.

---

[4] *See Darensburg v. Metropolitan Transp. Comm'n,* No. C-05-01597 EDL, 2006 WL 167657, at *2 (N.D. Cal. Jan. 20, 2006) ("To the extent that these documents are public records or records of a public entity that contain undisputed facts, they are judicially noticeable. The Court, however, declines Defendant's invitation to take judicial notice of the complex inferences that Defendant would have it draw from the facts contained in those documents—inferences which Plaintiffs vigorously dispute."); *United States v. Southern California Edison Co.,* 300 F. Supp. 2d 964, 974 (E.D. Cal. 2004) ("A court may not take judicial notice of one party's opinion of how a matter of public record should be interpreted.").

7.    **Were the OTS-identified internal control issues made known to Ernst prior to Ernst's opinions on the 2006 and 2007 10-Ks? (¶ 6 of the Tentative Ruling):**  Yes.  The Conduit Division was cited by both OTS[5] and Ernst as an internal control deficiency in 2006, before either the 2006 or 2007 10-Ks were issued.  The Treasury Report confirms that those problems were never corrected.  The deficiencies with IndyMac's ALL methodology were cited by OTS in 2007 and independent auditors found they still existed in early 2008.  Those reports preceded Ernst's February 28, 2008 certification of the 2007 Form 10-K.

8.    **Can loss causation exist where financials were not restated and the defendant did not admit they were understated? (¶ 9 of the Tentative Ruling):**  Yes.   Judge Pechman recently addressed this issue in *Washington Mutual I*, rejecting the outside auditor's contention that loss causation did not exist with respect to ALL claims where the plaintiff merely alleged later recognized losses and there was no restatement or admission of under-provisioning:

> Deloitte additionally argues that the alleged disclosures did not expressly acknowledge under-provisioning of WaMu's loan loss Allowance, but this argument is unavailing.  Loss causation requires that the drop in WaMu stock price be "causally related" to WaMu's misrepresentations. . . . A disclosure need not explicitly correct the prior misrepresentation.  If a disclosure reveals adverse information about WaMu's financial health that the misrepresentation had concealed, and this causes a drop in stock price, then the misstatement and the stock decline are causally related and loss causation exists.

259 F.R.D. at 508 (citations omitted).  The same reasoning applies here.

9.    **"If SOX certifications are not independently actionable, is there**

---

[5] IndyMac was required to provide Ernst with the results of periodic exams by the OTS (2006 Audit Guide, § 5.179).

any way to charge Perry with the ALL figures?" (¶ 13 of the Tentative Ruling):  As an initial matter, SOX certifications are actionable, as recognized in *Washington Mutual II* and *New Century*.  Further, Perry would still be liable as both the signatory on the financial statements themselves, and as a control person.  The ALL figures were public statements, included in SEC filings signed by Perry.

11.    "**Do scienter-based deficiencies in connection with Keys matter at this point considering the problems with Plaintiffs' ALL-based allegations?**" **(¶ 14 of the Tentative Ruling):**  Yes.  Plaintiff has several other claims against Keys independent of the ALL claims, including the internal control claims and his statement on February 12, 2008—when IndyMac was descending into bankruptcy and internally discussing the possibility of a bank run—that IndyMac was in a "fundamentally sound financial condition."

12.    **Has Plaintiff adequately alleged falsity of the statement concerning the Homebuilder Division? (¶ 16 of the Tentative Ruling):**  Plaintiff believes that he has adequately alleged falsity under the *Brody* standard.  To the extent the Court disagrees, Plaintiff can allege additional facts explaining how this statement was misleading under the *Brody* standard.

13.    **What did Perry know and when regarding the OTS investigation? (¶ 17 of the Tentative Ruling):**  As discussed above, the Trustee Complaint also demonstrates that Perry and the other defendants knew by no later than November 2007 that OTS was likely to take some enforcement action.  Further, Perry knew of the OTS downgrade, the possibility of a run on the bank, and the requirement to raise dilutive capital by January 2008.  Those events all preceded the various false and misleading statements Perry is alleged to have made on February 12, 2008.

1    Dated:  January 28, 2010.

2

3                                              MARC M. SELTZER
                                               RYAN C. KIRKPATRICK
                                               SUSMAN GODFREY L.L.P.

4

5                                              KENNETH S. MARKS
                                               (Admitted Pro Hac Vice)
                                               kmarks@susmangodfrey.com

6                                              SUSMAN GODFREY L.L.P.
                                               1000 Louisiana Street, Suite 5100

7                                              Houston, TX  77002-5096
                                               Telephone:  (713) 651-9366

8                                              Fax:  (713) 654-6666

9                                              SHERRIE R. SAVETT
                                               ARTHUR STOCK

10                                             PHYLLIS M. PARKER
                                               BERGER & MONTAGUE, P.C.

11

12

13                                             By    /s/ Ryan C. Kirkpatrick
                                                       Ryan C. Kirkpatrick

14                                              Attorneys for Lead Plaintiff
                                                and the Class

15
     kal515053

16

17

18

19

20

21

22

23

24

25

26

27

28

1002623v1/010900                              14