UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No. CV 08-3812-GW(VBKx) Date May 6, 2010

decision. Therefore, the Court likely will follow the approach set forth above – either allow for amendment or further briefing as to the loss causation element as it relates to the ALL figures and statement number 22, but dismiss without leave to amend as to the findings relating to the Homebuilder Division (because even if Plaintiffs could conceivably amend the loss causation element as to that alleged mis-statement, they were on clear notice of their need to proffer proposed amendments as to falsity, and failed to do so).

**18. Control Person**

Finally, Perry argues that Plaintiffs fail to plead a claim of control person liability under Section 20(a) of the Exchange Act[54] because they have failed to plead a claim of primary liability against any defendant and because they fail to plead with particularity the circumstances of any control relationship. Plaintiffs do not address this argument in the slightest, nor does Perry raise it again in his Reply. In the absence of a detailed

---

[54] Section 20(a) provides as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of

not explained why such pleading is required. In response to the second, Plaintiffs conclude that it is simply "implausible" that the Homebuilder Division was "immune from the ALL deficiencies that the independent consultant found infected IndyMac's other divisions. Falsity, however, especially under the PSLRA, requires more than a simple conclusion that something is "implausible."

As set forth above in connection with Perry's motion, this claim is flawed both as to the falsity element and as to the loss causation element, and a further opportunity to amend is not warranted. To the extent Keys raises any different arguments, the Court need neither address nor resolve them.

---

[55] The loss causation ruling seemingly would not only apply to allegations concerning the reporting of the ALL in IndyMac's financial statements (including those additional statements alleged against Keys, but not against EY), but also to statements characterizing adjustments to ALL as "prudent," as recited in TACC ¶ 214(c).

the Executive Vice President and Chief Financial Officer of IndyMac[3] and EY was IndyMac's auditor for fiscal years 2006 and 2007. *See id.* ¶¶ 14, 21, 30.

IndyMac specialized in Alt-A single family and subprime mortgage loans, which were not based on full documentation and/or offered to relatively less creditworthy borrowers. *See id.* ¶ 42. IndyMac also offered a variety of risky loans to both its Alt-A and its "prime" customers, including Option ARM loans (which featured periodically adjusting rates and various monthly payment options), 80/20 loans (consisting of two separate loans), hybrid ARM loans (involving a fixed rate for a fixed period of time, which later changes), home equity lines of credit ("HELOCs"), "closed end seconds" (secured by second mortgages and junior in priority) and teaser rate and negative amortization loans (with very small or nonexistent payments at first and larger payments down the road). *See id.* ¶ 43.

On July 11, 2008, the United States Department of the Treasury's Office of Thrift Supervision ("OTS") seized the Bank and appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver, leading to IndyMac filing for bankruptcy protection shortly thereafter. *See id.* ¶¶ 1, 12-13, 242, 244. The Bank's and IndyMac's failings,

to the actor's actual making of the statements"); *In re Gap Stores Secs. Litig.*, 457

share information concerning the true nature and extent of the OTS's oversight of IndyMac during the class period. *See id.* ¶¶ 2-3, 5, 7, 98, 179.

Plaintiffs allege that IndyMac failed to adhere to prudent underwriting practices in connection with its lending activities over the course of the boom housing market from 2001 through 2006, such that "defendants largely ignored the risks involved in the non-traditional mortgages originated by IndyMac and encouraged IndyMac's sales staff to originate mortgages without adhering to prudent origination and securitization practices." *Id.* ¶ 44. In fact, as the market began to retreat from its peak during the 2005-2006 [redacted]

[57] In addition, as mentioned above, though the TACC adequately alleges the falsity/scienter of this statement insofar as it relates to Perry, it does not appear to have done so with respect to Keys.

under the *Brody* standard, as to statements numbers 25-27, they have done so with respect to statement number 30. *See, e.g.*, TACC ¶¶ 143, 146, 237, 239. In fact, given Plaintiffs' allegations about the general nature of brokered deposits and Perry's admission on June 30, 2008, that IndyMac had raised its deposits (including brokered deposits) during the prior summer to, among other things, "improve…operating liquidity," with the simultaneous indication that the company was working to decrease the percentage of brokered deposits as a percentage of its overall funding (at least suggesting a meaningful purpose in doing so), even the falsity of statements numbers 25-27 has been sufficiently pled under *Brody*.

The Court would therefore reject this argument entirely.[50]

**12. Liquidity and Funding Structure – Materiality**

Perry also argues that the descriptive terms used in connection with these statements were simply immaterial as a matter of law because reasonable investors would not consider them significant in light of the "total mix" of available information. This is especially true, Perry contends, in light of the fact that the brokered deposit data was publicly disclosed. However, Perry has argued only that information about brokered deposits was publicly available. If, indeed, brokered deposits are just one of several different funding sources, as Perry has elsewhere argued, it would seem that all other funding-source information would have to have been publicly available for this argument to work. Insofar as Perry has failed to demonstrate those facts thus far, this argument would not presently prevail.

**13. Falsity of Credit and Residual Securities Reserves**

Perry notes that ALL is only one category of "credit reserves," and Plaintiffs have alleged no facts about the falsity of any of the other categories. Similarly, Perry argues that Plaintiffs' allegations concerning ALL have nothing to do with statements concerning IndyMac's residual securities, another category of reserves. Plaintiffs only response in connection with these particular alleged misstatements is that they were misstated because the ALL figures were misstated and "ALL is a substantial component

[50] Even if the Court were to accept Perry's arguments with respect to this area, it is one of the few areas that Plaintiffs were able to identify in their supplemental submission as to which they could offer some further significant allegations (at least as to Perry).

[of] 'credit reserves.'" Plaintiff's Opposition to Perry's Motion at 28 n.8. Such conclusory reasoning does not satisfy the PSLRA. Nor does it address residual securities reserves at all.

Even if ALL alone could render statements about the credit reserves false or misleading, if that is the only basis for challenging these statements, the loss causation ruling mentioned above would rule out any ability to proceed with respect to such statements. In other words, for Plaintiffs to proceed with their claims based on credit reserves, they must plead more than simply that problems with IndyMac's ALL figures caused the credit (and/or residual securities) reserves to be similarly problematic.

Plaintiffs would be given leave to amend these allegations if they can do so.[51]

### 14. Materiality of Credit and Residual Securities Reserves

Perry argues that the terms used in describing IndyMac's Credit and Residual Securities Reserves are immaterial as a matter of law, especially because the company's SEC filings repeatedly disclosed specific information about the amount of the reserves and the nature of the company's portfolio. Plaintiffs do not respond to this argument (other than by way of reference to its ALL-based arguments). If Plaintiffs are to amend their allegations concerning credit and residual securities reserves, they must likewise shore up their materiality allegations.

### 15. Safe Harbor for Credit and Residual Securities Reserves Statements

Perry argues that these narrative statements were not included in financial statements prepared in accordance with GAAP and therefore are not statutorily excluded from safe harbor protections. *See* 15 U.S.C. § 78u-5(b)(2)(A). They are also, he argues, forward-looking, and were accompanied by meaningful cautionary statements, and therefore in fact protected by the PSLRA's safe harbor provisions. Perry also argues that Plaintiffs have not pled any "actual knowledge" on his behalf that his statements about credit and residual securities reserves were false. Access to information, he asserts, is simply not enough.

[51] Not having known that these allegations would have to survive on their own, independent of ALL-related allegations, Plaintiffs arguably have not had a sufficient opportunity to explain how they would amend. *See* Footnote 42, *supra*.

As noted above, Plaintiffs' only response on the issue of credit and residual securities reserves is focused on tying those reserves to ALL – which, as noted above, is problematic for Plaintiffs. Because of that difficulty (and because Plaintiffs have not addressed the issue – though the Court certainly could view that failure as an outcome-determinative concession as to these claims), the Court need not resolve this point at this time. If, indeed, Plaintiffs reallege claims based upon these statements, they should be prepared to confront this argument again.

**16. <u>Stock Purchases</u>**

Perry again points to his stock purchases in an attempt to negate scienter – 35,100 shares purchased on March 23, 2007, and an additional 328,987.99 shares on February 15, 2008, which more than doubled his holdings. Though they alleged that there were limitations on his ability to sell company stock if his holdings fell below a particular [illegible] facts indicating that Plaintiff was

"revelation" on February 12, 2008, can similarly only be tied to his earlier alleged mis-statements by way of euphemism. Perry also argues that the May 12, 2008, "revelations" failed to serve as loss causation for any of the purported misstatements, including underwriting, SOX certifications, findings relating to the Homebuilder Division, statements concerning the OTS, brokered deposits (and ALL).[53]

Perry does admit that the May 12, 2008, statements included a hypothetical in brokered deposits, however. Yet, the presentation of this hypothetical (if that

TACC ¶¶ 237, 239.

Finally, to the extent that Perry relies upon a demonstration of confidence in his ability by virtue of the March 24, 2008 shareholder vote, that is a jury argument, not one that is dispositive for purposes of a Rule 12(b)(6) motion (even if the Court looks at the issue through the *Iqbal/Twombly* lens).

As noted above in connection with EY's motion, it does not appear that Plaintiffs are able to cure any of these loss causation problems. Even Perry's statement that "roughly 2/3rds of our credit losses were poor management judgment not the market" would not do so, meaning that there is no obvious reason to allow either amendment or even further briefing as to these particular claims. However, as noted above, it is arguably the case that Plaintiffs would not have been aware of the preeminent [illegible] the Court would place on the element of loss causation in issuing this

discussion by the parties, it would appear that resolution of the question would depend upon whether Plaintiffs have validly stated a primary liability claim against Keys, to which this analysis now turns. *See No. 84 Employer-Teamster*, 320 F.3d at 945 ("In order to prove a prima facie case under Section 20(a), a plaintiff must prove: (1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator.") (omitting internal quotation marks); *see also Zucco Partners*, 552 F.3d at 990 (indicating that, though the control person question is "normally an 'intensely factual question,'" section 20(a) claims "may be dismissed summarily…if a plaintiff fails to adequately plead a primary violation of section 10(b)").

**D. Keys**

As an initial note, the same loss causation-related problems affecting the ALL-based allegations discussed above in connection with EY also apply to Keys. As such, the Court need not discuss or resolve any of the arguments the parties make concerning those allegations in connection with Keys's motion.[55]

**1. February 12, 2008, Statements Concerning the Independent Review**

Keys argues that Plaintiffs have not adequately pled falsity because they have not pled what the review actually said. In addition, like Perry, he argues that the statement in question did not concern the overall ALL methodology. As to the first point, Keys has

Title *John Folsom v. Indymac Bancorp, Inc., et al.*

Present: The Honorable GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS: (IN CHAMBERS) COURT ORDER**

Attached hereto is the tentative ruling on the three defendants' motions to dismiss the Third Amended Class Complaint. The Court sets a hearing date for **May 17, 2010 at 9:00 a.m.**

**2. Internal Controls**

Though Keys does not appear to raise the argument, if the Court follows the approach it adopted in *Tripp* – that SOX certifications do not themselves give rise to liability under section 10(b) and rule 10b-5 – that rule would seemingly equally apply to Keys.[56]

**3. 2008 OTS Findings**

Keys argues that the OTS findings resulting from the examination it started in January 2008 could not serve to render any February 2008 statements (including the 10-K certifications) false because the exam would not be completed and findings issued until months later – in fact, even after Keys had left the company. Of course, Plaintiffs have pled facts which indicate that the OTS had, by February 2008, already taken action clearly suggestive of a significant concern for IndyMac. *See* TACC ¶¶ 129-30. However, the only alleged mis-statements or omissions that Keys appears to be charged with from February 2008 (other than the ALL-related allegations and SOX certifications which, as addressed above, are not actionable) involve the statements involving the Homebuilder Division (which, as addressed above in connection with Perry's motion, is insufficiently pled and subject to a dismissal without leave to amend) and the statement concerning IndyMac's "fundamentally sound financial position," *see* TACC ¶¶ 7(e), 214(i), 218, 235, which is essentially the same statement as statement number 23 from

[56] To the extent the Court does not adopt that approach, the parties argue with respect to this issue as follows: Similar to EY, Keys argues that the Conduit Division had been closed for almost six months by the time the 2007 10-K was filed, such that the certification of internal controls in connection with that filing could not have been rendered false by virtue of the problems in that Division. As Plaintiffs point out, however, Keys certified IndyMac's internal controls on numerous occasions before the Conduit Division

Perry's Tab A. While Keys would appear to be correct that there are insufficient facts pled (at least at present) to make that latter statement false or misleading as a result of the OTS's examination or its findings, the analysis as it relates to Perry concludes that the statement is adequately pled as to the falsity element for other reasons (primarily because of the brokered deposit-based allegations). Because the parties have not addressed that basis as to Keys, however, it is unclear whether the TACC could properly be understood as having adequately alleged the falsity (or scienter) of that statement as to Keys. An amendment is therefore likely appropriate.

**4. Perry's February 12, 2008 Shareholder Letter**

Keys argues that he did not sign the letter (though he did sign the 8-K to which it was attached) and that, in any event, Plaintiffs have inappropriately combined three separate statements from across seven pages of text. However, Keys has not explained why the three statements could not be separated out and still stand as actionable claims, especially under *Brody*. In addition, Plaintiffs theorize that Keys 1) adopted the statement by virtue of filing it with the SEC and 2) also had a duty to correct Perry's statement, citing *In re Infosonics Corp. Securities Litigation*, No. 06cv1231 BTM(WMc), 2007 U.S. Dist. LEXIS 57784, *33 (S.D. Cal. Aug. 7, 2007). *See also In re ZZZZ Best Secs. Litig.*, 864 F.Supp. 960, 971 (C.D. Cal. 1994) ("Both the Supreme Court and the Ninth Circuit have clearly stated that an alleged failure to act cannot give rise to a Section 10(b) claim unless plaintiffs establish a specific relationship which creates such a duty."); *cf. Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 n.5 (9th Cir. 2000) (indicating that "substantial participation or intricate involvement in the preparation of fraudulent statements is grounds for primary liability even though that participation might not lead

material operating entity of the holding company." TACC ¶¶ 1, 12.

[2] IndyMac itself described Perry as "responsible for the overall direction and administration of all programs and services provided by the Company," including "setting the strategic vision and establishing a strategic, financial and risk management plan for the Company," "monitoring the Company's execution, financial and operating performance," "adapting the Company's strategic and execution plans based on Company performance and conditions in the mortgage market and U.S. economy," and "managing all key activities

complaint. *See Infosonics*, 2007 U.S. Dist. LEXIS 57784, at *33. The same is true here, meaning that the claim against Keys, to the extent it is dependent upon that theory, would be presently improperly pled.[57] Should it be re-pled, however, in the absence of some authority directly supporting the proposition that Keys may not be held liable for Perry's statement in this context, the Court would not preclude this allegation as it is alleged against Keys.

**5. <u>Safe Harbor</u>**

Keys argues that he is protected by the safe harbor, but for the most part focuses for that portion of his argument on statements concerning the adequacy of ALL. As noted above, loss causation problems would prevent the Court from even needing to address this argument. He also argues that the statement concerning IndyMac's credit risk at ¶ 101(a) of the TACC would be protected. However, the safe harbor is unavailable for that statement. *See* 15 U.S.C. § 78u-5(b)(2)(A).

Keys attempts also to argue that the safe harbor protects the statements made in Perry's February 12, 2008, letter to shareholders. Those statements, however, are clearly not forward-looking – they either related to the existing state of affairs or concerned a (present) <u>belief</u> that IndyMac could maintain its well-capitalized ratios, not whether IndyMac would, in fact, maintain such ratios.

**6. <u>Section 20(a) Violation</u>**

Plaintiffs argue that Keys is secondarily liable, by way of section 20(a), as a control person of IndyMac and the Bank, citing *No. 84 Employer-Teamster*. Of course, IndyMac itself is not a party in this action, so it is somewhat difficult to understand how Plaintiffs could rest a section 20(a) claim against Keys on IndyMac's role as a "primary violator" (though Keys has not raised this issue, suggesting it is not really much of one). Even assuming that IndyMac itself could serve as the primary violator for purposes of Keys's section 20(a) liability, in the absence of the financial statement/ALL-based allegations, it is questionable whether Plaintiffs have adequately pled Keys's "power to control" the "corporate actions" that remain for purposes of demonstrating any primary liability—which may exist in this case. *See No. 84 Employer-Teamster*, 320 F.3d at 945

Ultimately, however, because the pleadings are not yet settled on the 10(b)/10b-5 liability question, the Court will defer any detailed consideration of section 20(a) liability (both as to Perry and Keys) until the time that they are.