MARC M. SELTZER (54534)
mseltzer@susmangodfrey.com
RYAN C. KIRKPATRICK (243824)
rkirkpatrick@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150

SHERRIE R. SAVETT
*(Admitted Pro Hac Vice)*
ssavett@bm.net
ARTHUR STOCK
*(Admitted Pro Hac Vice)*
astock@bm.net
PHYLLIS M. PARKER
*(Admitted Pro Hac Vice)*
pparker@bm.net
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

*Attorneys for Lead Plaintiff and the Class*

(See Signature Page for Name and
Address of Additional Counsel for Plaintiff)

FILED
CLERK, U.S. DISTRICT COURT

MAY 2 7 2011

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| ROBERT C. DANIELS, on Behalf of Himself and All Others Similarly Situated, | Case No. CV 08-03812 GW(VBKx) |
| Plaintiff, | CLASS ACTION |
| vs. | **FIFTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS** |
| MICHAEL W. PERRY, A. SCOTT KEYS, and ERNST & YOUNG LLP, | |
| Defendants. | **JURY TRIAL DEMANDED** |

1565686v1/010900

# **TABLE OF CONTENTS**

Page

I.      INTRODUCTION ............................................................................ 1

II.     OVERVIEW OF THE CASE ......................................................... 2

        A.      The Treasury Report ......................................................... 3

        B.      The Trustee Complaint ...................................................... 4

        C.      The FDIC Complaint.......................................................... 6

        D.      The SEC Complaints ......................................................... 8

                1.      The Undisclosed Change in IndyMac's Capital Ratio
                        Calculation ............................................................. 11

                2.      IndyMac's Fraudulent DSPP Sales.......................... 12

                3.      Perry Authorizes  IndyMac's Backdated Capital
                        Contribution .......................................................... 13

        E.      Defendants' False and Misleading Statements ................... 14

III.    THE PARTIES AND CRITICAL PLAYERS ................................ 21

        A.      Plaintiff............................................................................. 21

        B.      The Holding Company and the Bank.................................. 22

        C.      Defendants........................................................................ 23

                1.      Officers ................................................................... 23

                2.      Ernst & Young LLP ................................................ 30

IV.     JURISDICTION AND VENUE ..................................................... 31

V.      CLASS ACTION ALLEGATIONS ............................................... 32

VI.     FACTUAL BACKGROUND REGARDING INDYMAC AND ITS CORE
        LENDING BUSINESS .................................................................. 34

        A.      General Background.......................................................... 34

B.  IndyMac's Underwriting, Risk Management, and Appraisal Practices Were Grossly Deficient Prior to and During the Class Period ..........................................................................................39

C.  Internal Audits, Outside Audits, and OTS Examinations Repeatedly Identified Underwriting, Appraisal and Internal Control Deficiencies at IndyMac .........................................64

VII.  DEFENDANTS MISLEAD AND DEFRAUD INVESTORS .....................69

A.  Defendant Perry Misleads Investors Regarding IndyMac's Risk Management, Underwriting, and Appraisal Practices .........................69

1.  False and Misleading Statements Related to Underwriting, Risk Management, and Appraisals....................69

2.  Defendant Perry Acted With Scienter ......................................72

B.  Ernst's Unqualified Opinions Regarding IndyMac's Internal Controls Over Financial Reporting Were Materially Misstated When Made ..........................................................................................76

1.  Applicable Accounting Standards, the Definition of "Material Weaknesses" in Internal Controls, and Ernst's Duty to Independently Assess Internal Controls ......................77

2.  IndyMac's Internal Controls Were Not Effective and Ernst Did Not Perform its Audits in Accordance with the Standards of the PCAOB and GAAS .........................................82

3.  Ernst Acted with Scienter when it Certified that Internal Controls Were Effective in the 2006 10-K Signed on February 26, 2007 ....................................................................86

4.  Ernst Acted with Scienter when it Certified that Internal Controls Were Effective in the 2007 10-K Signed on February 28, 2008 ....................................................................89

C.  On February 12, 2008, Defendants Perry and Keys Mislead Investors Regarding IndyMac's Dealings With the Office of Thrift Supervision and the Soundness of the Company .....................91

1.   OTS Initiates Its Review of IndyMac Four Months Early and Issues an Initial Ratings Downgrade on January 17, 2008.................................................................................91

2.   Perry, Keys, and other IndyMac Officials Internally Discuss the Dire Financial Condition of IndyMac ...................95

3.   Perry and Keys Make False and Misleading Statements Regarding IndyMac's Dealings with OTS and IndyMac's Financial Condition Following the Commencement of the January 2008 Emergency Examination. ......................................95

4.   Perry and Keys Made the Foregoing Statements With Scienter ...................................................................................98

D.   Defendants Perry and Keys Make Misleading Statements  About IndyMac's  Liquidity During the Class Period ....................................99

1.   False Statements on Liquidity ....................................................99

2.   The Truth About IndyMac's Grave and Incurable Liquidity Crisis .......................................................................101

3.   Defendants Perry's and Keys' False Statements About IndyMac's Liquidity Were Made With Scienter ....................103

E.   Defendant Ernst Misleads Investors by Failing to Include a "Going Concern" Reservation in Its 2007 Audit Opinion ................107

1.   Ernst Violated the Auditing Standards Governing the Issuance of a "Going Concern" Reservation ...........................107

2.   Ernst Acted with Scienter in Failing to Provide a Going Concern Reservation in Its 2007 Audit Opinion ....................111

F.   Defendant Perry Misleads Investors Regarding IndyMac's Dramatic Over-Reliance on Brokered Deposits .................................117

1.   During the Class Period, IndyMac Relied Excessively on Brokered Deposits to Maintain Its Reported Solvency, and Later Admitted That Those Brokered Deposits Were Used from an "Expediency Perspective" Only.......................117

2. False and Misleading Statements Relating to Brokered Deposits...........................................................................120

3. Defendant Perry Acted With Scienter .....................................123

G. All Defendants Misrepresent IndyMac's Assets, Liabilities and Earnings in Financial Statements.........................................................124

1. Defendants Perry and Keys Authored Materially Misleading Financial Statements .............................................126

2. Ernst's False and Misleading Statements Opining That IndyMac's 2006 and 2007 Financials Conformed with GAAP and GAAS ......................................................................127

3. The Facts Demonstrating the Inadequacy of IndyMac's Allowances for Loan Losses Were Known to Each Defendant.......................................................................................129

4. Defendants Knew of and Ignored Numerous Red Flags Demonstrating that the Allowance for Loan Losses in 2006 and 2007 Were Insufficient. ...........................................134

5. Defendants' Certification of Insufficient ALL in the Face of Rising Delinquencies, Declining Property Values, Riskier Loan Portfolios, and Numerous Adverse Audit Findings and Internal Control Problems, Violated GAAP......138

6. Defendants' Approval of Decreasing ALL for 2006 Violated Applicable Regulatory Guidance on Directional Consistency and Rendered the 2006 Financial Statements Materially False and Misleading .............................................143

7. Defendant Ernst Deliberately Disregarded Guidance Regarding ALL Provided in the 2006 AICPA Audit and Accounting Guide ................................................................147

8. The Standards of GAAS, and Contemporaneous AICPA Audit Risk Alerts, Required Ernst to Ensure that it Had a Thorough Understanding of IndyMac's Business, Internal Controls and Awareness of Growing Risks Facing the Banking Industry................................................................................150

9.   Ernst Ignored the AICPA Audit Risk Alert for 2007/2008
Which Identified Specific Risk Factors Relating to
IndyMac ...................................................................................154

10.  The Falsity of IndyMac's ALL Is Confirmed by The
Astonishing Degree to Which IndyMac's Reserves
Proved Inadequate....................................................................155

11.  Post-Class Period Improprieties and GAAP Violations
Confirm that Defendants' Manipulation of IndyMac's
Financial Statements was Deliberate.......................................157

H.   Perry And Keys Make Additional False and Misleading
Statements Regarding IndyMac's Credit and Loan Loss
Reserves and the Financial Soundness of the Bank...........................161

VIII. DEFENDANTS' FALSE AND MISLEADING STATEMENTS
PROXIMATELY CAUSED ECONOMIC LOSS TO INDYMAC'S
INVESTORS ...........................................................................................165

A.   Defendants' First Partial Disclosure ...................................................169

B.   Defendants' Second Partial Disclosure, Which Was
Accompanied by Multiple False and Misleading Statements............176

C.   The Class Period Ends .........................................................................180

D.   IndyMac's Losses Were Not the Result of General Market
Conditions and Were Instead the Result of the Concealed
Practices ...............................................................................................186

IX.  THE COLLAPSE OF INDYMAC AND OTHER POST-CLASS PERIOD
DEVELOPMENTS ...................................................................................187

X.   APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD-ON-
THE-MARKET DOCTRINE....................................................................188

XI.  NO STATUTORY SAFE HARBOR .......................................................189

XII. PRAYER ..................................................................................................196

## I.    INTRODUCTION

Lead Plaintiff Robert C. Daniels, individually and on behalf of all other persons or entities who purchased the common stock of IndyMac Bancorp, Inc. ("IndyMac" or the "Company") between March 1, 2007 and May 12, 2008, inclusive (the "Class Period"), alleges the following based upon information and belief, except as to those allegations concerning himself, which are based upon personal knowledge.  Plaintiff's information and belief allegations are based upon, among other things:  (a) the investigation conducted by and through his attorneys, including interviews with numerous former employees of IndyMac's banking subsidiary, some of whom conditioned their cooperation on a promise of anonymity; (b) review and analysis of filings made by IndyMac with the United States Securities and Exchange Commission ("SEC"); (c) review and analysis of data submitted by IndyMac's banking subsidiary to the United States Department of the Treasury's Office of Thrift Supervision ("OTS"); (d) review and analysis of data contained in the Audit Report entitled "*Safety and Soundness*: Material Loss Review of IndyMac Bank, FSB", dated February 26, 2009, issued by the United States Department of the Treasury's Office of Inspector General ("OIG"), Department of the Treasury (the "Treasury Report" or "OIG Report"); (e) review and analysis of press releases, public statements, news articles, securities analysts' reports, statements by government agencies, documents filed in IndyMac's bankruptcy court proceeding, and other publications disseminated by or concerning IndyMac; (f) review and analysis of complaints filed in other litigation involving IndyMac or its subsidiaries; (g) review and analysis of accounting literature and guidance including literature relevant to banking institutions; and (h) other publicly available information about IndyMac.  Many of the facts supporting the allegations contained herein are known only to the defendants or are within their control. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth in this complaint after a reasonable opportunity for discovery.

## II.   OVERVIEW OF THE CASE

1.   IndyMac was the holding company for IndyMac Bank, F.S.B. ("IndyMac Bank," the "Bank," or, collectively, "IndyMac"), formerly one of the ten largest residential mortgage originators and servicers in the United States. The Bank accounted for substantially all of the Company's assets and revenue. The Bank and IndyMac were essentially synonymous because the Bank was the only material operating entity of the holding company. During the Class Period, IndyMac stock lost over 90% of its market value, falling from a Class Period high of $37.50 per share on June 6, 2007, to $2.32 per share at the close of trading on May 13, 2008. On July 11, 2008, in part due to gross capital inadequacy, liquidity concerns, and extremely poor asset quality, the OTS seized IndyMac. The collapse of the Bank was, at the  time, the second largest failure of a thrift banking institution in United States history, the largest failure of any bank in 24 years, and has so far cost the FDIC about $12.75 billion – one-tenth of its insurance fund – to cover IndyMac Bank's deposits. IndyMac, the parent of IndyMac Bank, declared bankruptcy on July 31, 2008, and IndyMac and IndyMac Bank and their principal officers are currently the targets or subjects of investigations by the FBI, Federal Deposit Insurance Corporation ("FDIC"), SEC, and a federal grand jury in Los Angeles.

2.   The reasons for the Bank's collapse have now become evident:  it underwrote, originated and sold poor-quality, risk-laden mortgages, and used "brokered deposits" to fund rapid and irresponsible growth. As *The Economist* aptly put it in an article dated January 8, 2009: "What remains of IndyMac's franchise is of questionable value, to put it charitably.  It loaded up on dodgy mortgages, and most of its deposits were of the unstable brokered sort (today it has a mere $6.5 billion)."

3.   As numerous witnesses, independent reports, and news articles have documented, IndyMac was managed and operated with a singular focus: originate

as many loans as possible in disregard of quality or underwriting standards, and when deemed necessary, alter internal reports to hide known problems with loan originations. IndyMac was able to hide the perils it faced due to these reckless and unsafe practices as long as home values rose and few losses were caused by defaults because homeowners could refinance or sell their homes. And, due to the rise of complex mortgage-backed securities, IndyMac did not retain most of the direct risk posed by the loans it originated and underwrote prior to and during the first portion of the Class Period. The situation changed in the second half of 2007, when home prices dropped, credit markets froze, and IndyMac was no longer able to sell or securitize mortgages. Suddenly, IndyMac was left holding the low-quality and highly risky mortgages that it had originated and underwritten, and was subject to repurchase demands by those to whom it had previously sold its mortgages and derivative debt securities, creating enormous losses and acute capital inadequacies. As Jason Arnold of RBC Capital Markets observed: "The pure underlying factor that made the house fall down was that it was predicated on the view that home prices would continue to rise perpetually. When that didn't work out was when the cracks started to emerge."

### A. The Treasury Report

4.     Additional information concerning IndyMac's reckless and fraudulent practices came to light on February 26, 2009, when the OIG issued the Treasury Report. The Treasury Report is based on four months of investigative fieldwork, which included interviews with OTS, FDIC, and IndyMac Bank employees (including current and former members of IndyMac's Enterprise Risk Management Division and internal audit department), review of OTS supervisory files and records for IndyMac dating back to 2000, and review of IndyMac Bank documents that had been obtained by the FDIC.

5.     The OIG concluded that the Bank: (1) had institutionalized unsound loan underwriting practices; (2) lacked stable core deposits and relied excessively

on brokered deposits; and (3) had grossly inadequate loan loss reserves. Significantly, all of these violations of safe and sound banking practices resulted from key decisions made by defendants Michael W. Perry ("Perry") and A. Scott Keys ("Keys"), and were known by defendant Ernst & Young LLP ("Ernst") (collectively, "Defendants"), and none of these violations were adequately disclosed to the investing public.  Indeed, the Treasury Report reveals that in April 2008 – at the same time that Defendants were engaging in the wrongful course of conduct alleged herein – an OTS examiner recommended that OTS (a regulatory agency with limited resources and no obligation to IndyMac's shareholders) "should publicly disclose IndyMac's poor earnings position to prevent any liability to investors who had the potential to lose money should the institution fail."

6.     Also as set forth in the Treasury Report, in March 2008, a FDIC liquidity analysis showed "*the Bank needed up to $3.5 billion in additional capital to avoid failing.*" Defendants were all aware that the Bank needed to raise massive amounts of capital in order to survive, and that raising such enormous amounts was virtually impossible.

**B.     The Trustee Complaint**

7.     On November 13, 2009, IndyMac's Chapter 7 Bankruptcy Trustee filed a complaint against former IndyMac directors, including Perry, captioned *Alfred H. Siegel, Chapter 7 Trustee of the Estate of IndyMac Bancorp, Inc. Debtor v. Louis E. Caldera, et al.*, adversary proceeding 2-09-02645-BB (C. D. Cal. Bankr. Ct. 2009) (Blueblood, J.) (the "Trustee Complaint").    The Trustee Complaint, which is based upon, among other things, non-public data and documents regarding IndyMac, including documents submitted by IndyMac to the OTS, presents graphic details showing that prior to and during the Class Period, Defendants recognized IndyMac's perilous and rapidly deteriorating financial condition, and knew that IndyMac would not survive absent a massive outside

investment, which was highly unlikely, if not impossible.  For example, the following late 2007 and early 2008 facts and communications set forth in the Trustee Complaint all establish Defendants' knowledge of IndyMac's dire financial condition during the Class Period:

a)  On September 5, 2007, one of IndyMac's directors e-mailed senior management regarding a recent analysis by Moody. That director stated that Moody's "estimates are alarming" and *"it appears that we are drastically under-estimating our losses."* Trustee Complaint ¶ 228.

b)  *As early as November 2007*, the OTS recommended to senior management that, based on the Bank's capital ratios, IndyMac needed to raise significant outside capital. *Id.* ¶ 137(b).

c)  Also, *by November 2007*, senior management became aware that OTS intended to downgrade IndyMac's composite CAMELS rating from a "2" to a "3." In accordance with OTS's enforcement guidance, there is the presumption that formal enforcement action will be taken for an institution with a composite rating of "3." *Thus, no later than November 2007, both Perry and Keys were aware of IndyMac's precarious position, and any statements to the contrary were false and misleading. Id.* ¶ 137(b).

d)  Significantly, the Trustee Complaint confirms that IndyMac was not merely a victim of market conditions. On October 22, 2007, Perry admitted that: *"roughly 2/3rds of our credit losses were poor management judgment not the market." Id.* ¶ 231.

e)  January 9, 2008 IndyMac Board minutes – which Ernst was required to review -- memorialize a discussion among IndyMac directors, including Perry, on capital raising and *the risk of a run on the Bank* in which *Perry warns that IndyMac cannot count on raising any capital due*, in part, to the poor market performance of IndyMac's stock. *Id.* ¶ 74(a).

f)      On or around February 8, 2008, Perry described IndyMac to an outside investor as *"literally fighting for" its life. Id.* ¶ 74(b).

g)      Also on February 8, 2008, IndyMac's senior management told the Board that there was *"a very real risk that the OTS could soon pressure the Bank to raise dilutive capital." Id.* ¶ 137(c).

h)      Incredibly, on February 12, 2008, *just four days after* the February 8 statements, Perry and Keys told investors that IndyMac was in a *"fundamentally sound financial condition."*

## C.    The FDIC Complaint

8.      On July 2, 2010, the FDIC filed a lawsuit against four former IndyMac officers who headed the Company's Homebuilder Division ("HBD"). The case is captioned: *Federal Deposit Insurance Corporation, as Receiver for IndyMac Bank, F.S.B. v. Scott Van Dellen, Richard Koon, Kenneth Shellem, and William Rothman*, 10-cv-4915 (C.D. Cal. July 2, 2010) (the "FDIC Complaint"). The FDIC Complaint – which is the first case the FDIC filed against any of the banks that failed during the subprime crisis -- details the abusive underwriting and lending practices of the Homebuilder Division and alleges that IndyMac's losses on HBD's portfolio "are estimated to exceed at least $500 million." FDIC Complaint ¶ 5.

9.      In the FDIC Complaint, Perry is described as having hands-on, detailed knowledge of the deteriorating housing market and other specific risks facing the Homebuilder Division and IndyMac in general during the 2006-2008 time period.  For example, the FDIC Complaint details the facts demonstrating IndyMac upper management's knowledge that:

a)      "HBD followed a high risk underwriting strategy," and that "HBD ignored regulatory guidance in its underwriting as much as it ignored its own credit policies."  In fact, the FDIC alleges that "less than 1% of the loans

approved by HBD were approved without a credit policy exception." FDIC Complaint ¶ 44.

b)    "HBD's consideration of loan applications was superficial and hasty," as exemplified by Perry's so-called "Flamingo Rule," requiring employees seeking to discuss loans to "quickly present the issue (in the amount of time you can 'stand on one leg!'"). *Id.* ¶ 54.

c)    HBD's "credit risk matrix," purportedly designed to determine the acceptability of a borrower's credit, "was little more than window dressing for what in reality were very risky and poorly managed underwriting practices." *Id.* ¶¶ 56-60.

d)    HBD's compensation of its account officers rewarded risk taking and encouraged production without regard for loan quality. *Id.* ¶¶ 61-64.

e)    At the time of IndyMac's seizure, "HBD's high risk growth strategy and careless underwriting" resulted in "only a handful of performing loans out of roughly 220 loans in HBD's portfolio." *Id.* ¶ 67.

10.    As alleged in the FDIC Complaint, at least by early 2008, "***IndyMac's upper management discussed serious problems in HBD[.]***"   For example, IndyMac commissioned an internal report of the Homebuilder Division in early 2008, which concluded that loans in this Division were riddled with problems, and that the weaknesses in the loans "***were present at the origination of these deals. I don't think I'm using hindsight here.***" The FDIC Complaint alleges that Perry received and reviewed this internal report. *Id.* ¶¶ 65-66.

11.    As demonstrated below, Defendants Perry and Keys were in possession of this adverse information at the very same time that Perry made repeated public statements touting the success and prospects of the Company and the Homebuilder Division to IndyMac's shareholders.

**D.     The SEC Complaints**

12.     On February 11, 2011, the SEC filed a complaint against Perry and Keys charging them with, *inter alia*, violating Section 10(b) of the Exchange Act and Rule 10b-5, by issuing false and misleading statements about the financial stability of IndyMac and its main subsidiary, IndyMac Bank, in SEC filings and in offering documents for $100 million in new stock sales, despite receiving regular internal reports in 2007 and 2008 about IndyMac's deteriorating capital and liquidity positions. *Securities and Exchange Commission v. Perry and Keys*, Case No. 11-cv-01309-GHK (C.D. Cal. Feb. 11, 2011) (the "SEC Complaint").

13.     The SEC stated in a press release issued on the same date that Perry and Keys "'made false and misleading disclosures about IndyMac at a time when the company's financial condition was rapidly deteriorating. Truthful and accurate disclosure to investors is particularly critical during a time of crisis, and the federal securities laws do not become optional when the news is negative,' said Lorin L. Reisner, Deputy Director of the SEC's Division of Enforcement."

14.     The SEC Complaint provides the following new evidence showing that in 2007 and 2008, Perry and Keys knew the depth of IndyMac's deteriorating financial condition.

• E-mails between Perry and Keys on February 19, 2008, show that they understood that the Bank was precariously close to or was certain to fall below the 10% well-capitalized ratio by March 31, 2008. These e-mails, and a phone call with an OTS official on February 26, 2008, further show that Defendants knew IndyMac was able to maintain the 10% threshold only by changing the traditional method of calculating the ratio. This change was not disclosed to investors. SEC Complaint ¶¶ 19, 46-47[1].

---

[1] Capital ratio is a key regulatory metric of a bank's safety and soundness (the "C" in the CAMELS factors, which measure bank safety and soundness), and, in particular, the bank's total risk-based capital ratio (the "capital ratio"). The capital

- On February 26, 2008, Defendants began to raise $100 million by selling IndyMac common stock through IndyMac's Direct Shareholder Purchase Plan ("DSPP") by means of a series of prospectuses, in which they represented that the offerings were for "general corporate purposes." In fact, the true purpose was to raise new capital to maintain the Bank's 10% well-capitalized threshold and to permit IndyMac to pay preferred dividends in future quarters. SEC Complaint ¶¶ 19, 20.

- Defendants Perry and Keys regularly received reports and information about Indymac and the Bank's capital and liquidity position, including frequent forecasts of the Bank's capital ratio, by e-mail and in meetings, and in reports on capital raising through IndyMac's DSPP, and were well aware of IndyMac's deteriorating capital and liquidity position. SEC Complaint ¶¶ 5, 13, 51. In his Answer to the SEC Complaint filed April 15, 2011 ("Keys Answer"), Keys admitted that "as CFO, he supervised the departments that forecast financial results and that he received frequent forecasts of the Bank's capital ratio" (Keys Answer at ¶ 13), and further admitted that "he was aware of Indymac's capital and liquidity positions and regularly received updated forecasts for Indymac Bank's capital ratio, reports on capital raising through DSPP, and information on events such as downgrades on MBS bonds held by Indymac Bank." *Id.* at ¶ 51.   Keys further admitted that as CFO, he participated in the filing of IndyMac's periodic reports and stock offering disclosures, that he received

---

(... cont'd)

ratio is computed by dividing a thrift's total risk-based capital (*e.g.* shareholder equity) by total risk-weighted assets, such that the greater the presumed risk of an asset, the greater the "risk-weighting" and the reserved capital needed to support the asset.  SEC Complaint ¶ 11.  A bank's risk-based capital ratio must be 10% or greater for the bank to be considered "well-capitalized."   As described herein, IndyMac would suffer severe regulatory consequences if its capital ratio fell below the 10% threshold, including, *inter alia*, an inability to accept brokered deposits.

information regarding the financial condition of both IndyMac Bancorp and IndyMac Bank while he was the acting CFO until April 24, 2008, and that he received information showing that their financial condition was deteriorating. *Id.* at ¶ 5.  In his Answer to the SEC Complaint on April 15, 2011 ("Perry Answer"), Defendant Perry admitted that "as CEO, he sought and received information concerning the financial condition of IndyMac and the Bank." Perry Answer at ¶ 13.  The SEC alleges that despite being well-informed about IndyMac's financial condition and being responsible for IndyMac's financial reporting, Perry and Keys knowingly or recklessly failed to disclose the extent of IndyMac's deteriorating capital and liquidity positions in IndyMac's filings, and in prospectuses in 2008, which incorporated false statements about IndyMac's capital levels and liquidity.  *Id.* ¶ 51.

- Facts alleged in the SEC Complaint against S. Blair Abernathy (who succeeded Keys as IndyMac's CFO) (the "Abernathy Complaint")[2], provide further evidence that IndyMac's loans were based on fraudulent underwriting, and that Defendants *knew* this because they received or had access to internal monthly reports issued by IndyMac Bank's Post Production Quality Control ("PPQC") department.  The PPQC monthly reports, based on a statistically valid random sample of the Bank's total loan production, identified pervasive systemic defects in IndyMac's underwriting process, and were distributed throughout the Company by e-mail and posted on IndyMac's intranet site. Abernathy Complaint ¶¶ 16-20.

---

[2] *Securities and Exchange Commission v. Abernathy*, Case No. 11-cv-01308-JFW (C.D. Cal. Feb. 11, 2011).

### 1.   The Undisclosed Change in IndyMac's Capital Ratio
### Calculation

15.   The SEC Complaint alleges that on February 19, 2008, Keys informed Perry and other IndyMac executives that a significant one-day rise in interest rates caused IndyMac Bank's forecasted capital ratio at March 31, 2008 to be at or slightly under 10%.   SEC Complaint ¶ 19.   In their Answers, Perry and Keys do not deny that this conversation took place.   Perry and Keys Answers at ¶ 19. The SEC further alleges that in response, Perry sent Keys and other IndyMac executives an e-mail stating that IndyMac would sell stock to investors to raise up to $50 million through the DSPP for two purposes: to keep the Bank's capital ratio above 10% and to maintain the preferred dividend payment. *Id.*

16.   Also in a February 19, 2008 e-mail, which both Defendants concede was sent (Perry and Keys Answers at ¶ 46), Perry informed Keys and other IndyMac executives that he wanted to change the way to calculate IndyMac's capital ratio in order to keep the Bank's capital ratio above 10% at March 31, 2008. SEC Complaint ¶ 46.   In that e-mail, Perry explained that he would seek waiver of certain regulatory requirements for calculating the capital ratio, including the requirement that subprime loans be double risk-weighted as compared to non-subprime loans.   SEC Complaint and Keys Answer at ¶ 46.   Perry sought relief from the double risk-based requirement so that IndyMac would require less capital to support its subprime loan holdings and thereby improve IndyMac Bank's capital ratio.   Perry and Keys purportedly obtained this weighting relief during a telephone call with an OTS official on February 26, 2008.   ***Without this change in the way IndyMac calculated its capital ratio, the Bank's risk-based capital at March 31 would have fallen below the 10% well-capitalized level***.   *Id.* ¶¶ 46-48.   Investors were not informed of the material fact that the Bank was only able to maintain its well-capitalized ratio at March 31 by changing the calculation methodology.   *Id.* at ¶ 47.

## 2.    IndyMac's Fraudulent DSPP Sales

17.    On February 26, 2008, IndyMac began selling its common shares through the DSPP pursuant to a June 30, 2006 Form S-3 automatic shelf registration statement and an October 11, 2007 prospectus.  Defendants Perry and Keys signed IndyMac's June 30, 2006 Form S-3.  SEC Complaint ¶ 20.  As a member of IndyMac's board of directors, Perry had authorized the offer and sale of stock through the October 11 DSPP prospectus, and the subsequent DSPP prospectuses, and Keys, as CFO, authorized the filing of the October 11 prospectus and subsequent prospectuses until his departure from the Company in April 2008. *Id.* ¶¶ 20, 31, 56. The prospectuses for those stock sales represented that the proceeds would be used for "general corporate purposes."  This was false.  Item 504 of Regulation S-K of the Securities Act, requires a prospectus to disclose the principal purposes for which the net proceeds from the securities to be offered are intended to be used and the approximate amount intended to be used for each such purpose. *Id.* ¶ 20.  IndyMac's DSPP prospectuses were not updated nor amended as they should have been to disclose that the true (but undisclosed) purpose of the offering was to preserve IndyMac Bank's 10% well-capitalized ratio, and to pay future preferred dividends to IndyMac shareholders. *Id.* ¶¶ 19-22.  The DSPP prospectuses also incorporated by reference the false statements about IndyMac's strong capital and liquidity in the 2007 8-K and/or 10-K. ¶¶ 22, 26, 32, 40, 41.

18.    IndyMac's 2007 Form 10-K filed on February 29, 2008, signed by Perry and Keys and incorporated into the DSPP prospectuses for sales of IndyMac stock, represented that IndyMac had "strong capital and liquidity positions," that the Bank "currently [has] regulatory capital ratios in excess of the 'well capitalized' requirement," and that IndyMac "may" be required to raise outside capital from investors at terms adverse to existing investors.  These representations were all false.  In truth, Perry and Keys *knew* that the Bank's capital and liquidity had already deteriorated dangerously; they *knew* that the Bank was on the brink of

losing its "well-capitalized" status unless they changed the method of calculating the capital ratio; and they *knew* that IndyMac had already been forced to begin raising capital to bolster the ratio. *Id.* ¶¶ 24-27, 46-47.

### 3. Perry Authorizes IndyMac's Backdated Capital Contribution

19.     On March 20, 2008, Keys recommended to Perry that IndyMac (the Holding Company) contribute $75 million to IndyMac Bank on March 31, 2008, for the principal purpose of protecting IndyMac Bank's capital ratio, even though Perry and Keys knew that IndyMac would be left with only $16 million in cash. Perry and Keys finally agreed to reduce IndyMac's capital contribution to $70 million after IndyMac's treasurer raised concerns about the parent's dwindling cash, leaving IndyMac with $21 million in cash, only enough to pay three quarters of preferred dividends without raising additional capital. *Id.* ¶¶ 29, 30. The $70 million contribution, which further depleted Bancorp's funds, was recorded on March 31, 2008. *Id.* ¶ 30.

20.     Perry instigated the "backdating" of an additional capital contribution from IndyMac Bancorp to the Bank in order to maintain the Bank's 10% well-capitalized ratio for the quarter ended March 31, 2008. On May 9, 2008, Perry authorized IndyMac to contribute to IndyMac Bank $18 million and to record the $18 million contribution as if it had occurred on March 31, 2008. The original draft of IndyMac's Form 8-K announcing first quarter 2008 earnings on May 12, 2008 contained the accurate statement that IndyMac contributed $70 million to IndyMac Bank on March 31, 2008, and another $18 million on May 9, 2008. Perry was actively involved in changing the draft 8-K from the accurate statement to make it appear that all $88 million was contributed by March 31, 2008. This change was made specifically and solely to conceal the backdating. *Id.* ¶ 53.

### E.   Defendants' False and Misleading Statements

21.    Notwithstanding these fundamental weaknesses, IndyMac, Perry, and Keys made a variety of false positive statements to investors regarding IndyMac's financial condition in order to raise desperately needed capital, prop up the Company's stock price, and prevent a run on the Bank.  For example, on August 28, 2007, in a press release announcing the hiring of 600 employees from a failed mortgage lender, Perry stated that IndyMac had "weathered the storm," "remain[ed] in a solid financial position," had "limited exposure to the current market-related liquidity issues that many other mortgage lenders are experiencing," and would return to profitability in 2008.   Throughout the Class Period, Defendants continued to maintain, falsely, that IndyMac employed "strong underwriting guidelines," was a "prudent manager of risks," had "high standards… for credit quality," and had "conservatively built up" and "prudently increase[ed] reserves" "well ahead of credit losses."

22.    In addition, Ernst  issued unqualified opinions on IndyMac's 2006 Form 10-K and 2007 Form 10-K, falsely certifying that IndyMac's financials, including reported ALL, complied with Generally Accepted Accounting Principles ("GAAP"), and that the Company's internal controls over financial reporting were effective.  Ernst also publicly stated in each of its opinions that it performed its audits and evaluations in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB").  As set forth in detail herein, each of these public statements was false when made, as Ernst's audits failed to comply with the standards of the PCAOB and Generally Accepted Auditing Standards ("GAAS") for multiple reasons, and Ernst was aware of numerous facts demonstrating significant internal control deficiencies and material weaknesses at IndyMac at the time it issued its "clean" opinions.

23.    The false and misleading statements at issue in this case fit into seven general categories:

(a)   **False Statements Regarding Underwriting and Appraisal Standards and Practices**: In order to reassure investors about the quality of the mortgage portfolio that IndyMac was carrying on its balance sheet, Perry repeatedly touted IndyMac's "strong" and "prudent" underwriting practices, the "superior" credit quality of its loans, and the fact that IndyMac purportedly independently verified appraisals and credit scores.  These statements were all materially false and misleading.  While the particulars are alleged in more detail below, IndyMac top management's true philosophy and practices are epitomized by defendant Perry's own words, reported to have been uttered to other Company employees: "Business guys rule.  F*** you to compliance guys."  The Treasury Report concluded that among the key causes of IndyMac's failure were its high risk business strategy, aggressive growth, and unsound loan underwriting practices.

(b)   **False Statements Regarding IndyMac's Internal Controls**: In order to effectively audit IndyMac's compliance with GAAP and the adequacy of the Company's internal controls, Ernst was required to, but did not, follow applicable PCAOB and GAAS standards in evaluating, *inter alia*, IndyMac's internal controls, including with respect to its adherence to underwriting guidelines, its reserving methodology, and its accounting for ALL and Secondary Market, or "residual" Reserves. Accordingly, Ernst's unqualified opinions on IndyMac's Forms 10-K for 2006 and 2007, falsely certifying that the Company's internal controls over financial reporting were effective, and falsely stating that Ernst performed its audits in compliance with the standards of the PCAOB, were materially false and misleading.  Ernst's audits failed to comply with the standards of the PCAOB and GAAS for the reasons set forth herein, and Ernst was aware of numerous facts -- including its own findings of internal control deficiencies in 2006, as well as internal audit reports, external audit reports, and OTS examination reports, as well as monthly reports of the Company's total loan production issued by IndyMac Bank's PPQC department on the Company's intranet, which found

pervasive and systemic defects in the Bank's underwriting process – all demonstrating serious internal control deficiencies and material weaknesses at IndyMac at the time Ernst issued its "clean" opinions.

(c) **False Statements Related to IndyMac's Dependence on Brokered Deposits**: Perry repeatedly assured investors that IndyMac's deposit base was "stable," that IndyMac had "managed [its deposits] well," and that the risk of deposits leaving the Company was not on "our radar screen of being [a] concern to us." These statements were materially false and misleading: During the Class Period, over 37% percent of IndyMac's deposits were brokered deposits, known within the industry as "hot money" because they can and are easily moved to another institution. On June 30, 2008, IndyMac admitted that such deposits were being used for "expediency" purposes only, and that IndyMac had been actively trying to reduce its reliance upon them. The Treasury Report concluded that one of the causes of IndyMac's failure was its lack of core, stable deposits, noting that during the period August 2007 through March 2008, its brokered deposits increased from about $1.5 billion to $6.9 billion.

(d) **False Statements Related to OTS Oversight and IndyMac's Financial Condition After Commencement of the OTS Examination**: On February 12, 2008, Perry was questioned regarding any actions the OTS had taken in relation to IndyMac. Perry responded that "I think they have complimented us on our nimbleness in terms of our ability to change our business model . . . they haven't asked us to do anything . . . I feel like they think we're doing a pretty good job managing through this crisis period." Similarly, on February 12, 2008, both Perry and Keys issued a Form 8-K reassuring investors that IndyMac was in a "fundamentally sound financial position." Unknown to the investing public, in January 2008, the OTS initiated an examination of IndyMac *four months ahead of schedule* based on concerns that IndyMac was *not* "fundamentally sound." Within ten days of the initiation of that examination, on January 17, 2008, OTS informed

IndyMac's Board of Directors (which included Perry) that it was downgrading IndyMac's "Capital Adequacy, Asset Quality, Management Administration, Earnings, Liquidity and Sensitivity" composite ("CAMELS") rating to 3, and lowered the asset quality and earnings component ratings to 4, based on results of off-site monitoring and initial findings of the examination started on January 8, 2008. According to OTS's enforcement guidance, this created a presumption that formal enforcement action would be taken against the Bank.   In light of Perry's and Keys' actual knowledge of the OTS's actions and serious concerns for the viability of IndyMac, their false and misleading representations to the contrary were at the very least deliberately reckless.

(e)   **False Financial Statements and False Statements Regarding IndyMac's Allowances for Loan Loss Reserves**:   IndyMac issued financial statements for year-end 2006 and throughout the Class Period with allowances for loan losses ("ALLs") that were grossly inadequate.  However, IndyMac and the Individual Defendants falsely and repeatedly stated that those reserves were not only adequate and reported in a manner consistent with GAAP, but were in fact "conservative," and that the OTS did not "have concerns about our reserves." These statements were materially false and misleading. As explained below, the ratio of reserves to loan assets in IndyMac's financial statements was lower in 2006 than it had been in 2005, even though IndyMac had abandoned its pre-existing underwriting standards and the general economic conditions in the home loan mortgage market had worsened, both of which would necessarily result in increased delinquencies and foreclosures and Secondary Market Reserves. Defendants' egregious violations of GAAP resulted in inadequate loan loss allowances, as well as Secondary Market Reserves for loan products and securities in which it retained a residual interest, which fraudulently inflated net income and earnings per share, and gives rise to a strong inference of scienter.   The extraordinary degree to which IndyMac's purportedly "conservative" loan loss

allowances were inadequate further confirms that Perry and Keys were deliberately manipulating IndyMac's books and records rather than merely being slow to foresee risks to IndyMac's business.    Defendant Ernst fraudulently certified financial statements containing those inadequate ALLs and Secondary Market Reserves.  The Treasury Report confirmed that one of the key causes of IndyMac's failure was its grossly inadequate loan loss reserves, noting that IndyMac's ALLs actually declined as a percentage of total loans every year from December 31, 2005 to December 31, 2006, even as the Company's loan portfolio was becoming riskier, charge-offs and defaults rose, and property values declined.    Moreover, Defendants used outdated models to set ALL, which improperly relied on outdated historic assumptions and similarly failed to adjust IndyMac's models for estimating ALL in light of known loosening and, in some cases, the complete abandonment of established underwriting guidelines.    As explained below, the credit crisis, which began to engulf the mortgage industry beginning in 2006, and accelerated rapidly in 2007, rendered previous models for calculating ALL irrelevant.    Specifically, the collapse of housing prices, lax underwriting and increased offerings of exotic, risky loans by lenders, massively increased borrower defaults and foreclosures, together with the evaporation of the secondary market to absorb the toxic loans, meant that historic default rates were no longer suitable bases for calculating ALL, as Defendants either knew or with deliberate recklessness disregarded.    Moreover, Defendants received regular reports before and during the Class Period from IndyMac Bank's PPQC department, which described pervasive and systemic defective underwriting of the Bank's loans.  As a result, the ALL was either inestimable or insufficient.

(f)    **False Statements About IndyMac's Liquidity and Capital Position:**  Throughout the Class Period, Defendants Perry and Keys made false statements touting the Company's "strong" liquidity and capital position, and falsely downplayed IndyMac's extremely weak financial condition.  Defendants

represented, for example, that IndyMac had "tremendous liquidity," "very strong liquidity," and stated that IndyMac's liquidity risks were as "about as close to none as you could have."   Defendants also repeatedly assured investors that the Company "remain[ed] in a fundamentally sound financial position."   These statements, and numerous similar statements identified herein, were materially false and misleading.  As discussed below, at the time they made these statements specifically touting IndyMac's liquidity, Defendants knew that IndyMac's liquidity was in fact precarious and that the Bank was not "financially sound," but was instead in dire financial condition and faced a very real threat of liquidation.  For example, Defendants' statements that the Bank  has "strong capital and liquidity positions" and "currently [has] regulatory capital ratios in excess of the 'well-capitalized requirement,'" in IndyMac' 2007 Form 10-K filed on February 29, 2008, were false and misleading.  According to the SEC Complaint, statements by Defendants Perry and Keys after February 19, 2008, including in IndyMac's 2007 10-K and a series of prospectuses, about IndyMac Bank's liquidity and capital ratio levels, were false and misleading because they failed to disclose that the Bank could only maintain its 10% well-capitalized ratio at March 31, 2008 by changing the method of calculating that ratio.  SEC Complaint ¶¶ 24-25, 46-47.  In addition, Defendants' statements in IndyMac's prospectuses for stock offerings through the DSPP that the proceeds would be used for "general corporate purposes" were false and misleading because they failed to disclose that the proceeds would be used principally to protect the 10% ratio, because IndyMac's capital and liquidity were rapidly deteriorating.  *Id.*  ¶¶ 20-22.

(g)   **Ernst's Failure to Include a "Going Concern" Reservation in its 2007 Audit Opinion**:  Ernst was deliberately reckless in failing to include a "Going Concern" reservation in its 2007 audit opinion, issued on February 29, 2008.   Such a reservation would have stated what Defendants, including Ernst, knew, and investors did not:  That there was a significant risk that IndyMac would

be unable to meet its obligations over the next few months, and might be forced into liquidation and that, consequently, IndyMac met the conditions for an auditor to include a Going Concern reservation in his/her audit opinion under AU § 341. Specifically, there was "substantial doubt" about IndyMac's ability to continue as a going concern as of February 28, 2008, the date Ernst signed its 2007 audit opinion. One of the indicia that the auditor must consider in determining whether a Going Concern reservation is needed is "failure to meet minimum regulatory capital requirements." 2006 AAG 5.108-118.[3] The allegations in the SEC Complaint concerning Defendants' efforts beginning on February 19, 2008 to change the methodology used for calculating the Bank's 10% well-capitalized threshold in order to conceal and forestall the Bank's failure are evidence that Ernst – *before* signing the 2007 10-K on February 28, 2008 – intentionally, or with deliberate recklessness, disregarded the risk that IndyMac could soon fall below the 10% minimum well-capitalized threshold, and confirm that there was substantial doubt that the Bank would survive for a reasonable period of time. However, because of Ernst's failure to include a Going Concern reservation in its 2007 opinion, the public did not learn there was a significant risk that IndyMac would be unable to continue as a going concern until May 12, 2008, the close of the Class Period, when Perry admitted that IndyMac's "capital ratios clearly have been depleted," and that IndyMac could soon "not be well capitalized." Immediately following this revelation, IndyMac's stock price plummeted 32%.

24.    Defendants' false and misleading statements were intended to, and did, facilitate IndyMac's efforts to raise the capital it needed to stay solvent for as long as it did, and to prevent a run on its banking subsidiary by the Bank's depositors. IndyMac sold over $700 million of common and preferred stock

---

[3] AICPA Audit and Accounting Guide for Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies and Mortgage Companies (with conforming changes as of May 1, 2006) (referred to herein as the "2006 AAG" or "AAG").

during the Class Period and, throughout the Spring of 2008, IndyMac was secretly seeking a private capital infusion (a project known within IndyMac by the code words "Project Ironman").

25.     The truth about the adverse condition of IndyMac's mortgage portfolio and financial position began to be partially revealed on November 6, 2007, and further revelations were made on May 12, 2008, when the Company announced its results for the first quarter of 2008, admitted that it would not be profitable in 2008, and reported that it suffered a first quarter loss of $184.2 million (a loss of $2.27 per share) because of writedowns in the value of its assets and increases to reserves.  The Company also held an investor conference call on May 12, 2008, in which Perry attributed the massive quarterly loss and the inability to return to profitability to, *inter alia*, rapidly increasing non-performing assets and loan repurchase demands from secondary market investors, and revealed that as a result,  IndyMac would have to establish significant credit reserves for these and forecasted future Non-Performing Assets ("NPAs") and charge-offs.

26.     IndyMac's losses were directly correlated to IndyMac's reckless loan underwriting and appraisal practices, and revealed the falsity of IndyMac's prior statements regarding the "conservative" nature of its loan loss reserves.

27.     As a result of these disclosures on May 12, 2008, IndyMac's stock dropped from a close of $3.43 per share on May 9, 2008, to close at $2.32 per share on May 13, 2008 on high volume – a two-day decline of $1.11 per share, or *32%*, and a *90% drop* from its Class Period high of $37.50 per share.

## III.     THE PARTIES AND CRITICAL PLAYERS

### A.     Plaintiff

28.     Plaintiff Daniels purchased the common stock of IndyMac during the Class Period as detailed in the certification filed with Daniels' original complaint, has not sold those shares, which are now worthless, and has suffered injury and damages as a result of the wrongful acts of Defendants as alleged herein.

### B.   The Holding Company and the Bank

29.   Non-party IndyMac was a savings and loan holding company for wholly-owned subsidiaries and majority-owned subsidiaries, including its principal asset IndyMac Bank, F.S.B, its only material operating subsidiary.   IndyMac is a Delaware corporation whose principal executive offices were located at 888 East Walnut Street, Pasadena, California 91101-7211.   During the Class Period, IndyMac's common stock traded on the New York Stock Exchange under the symbols NDE (until April 30, 2007) and IMB (effective May 1, 2007).   As of May 6, 2008, 100,888,890 shares of IndyMac common stock were issued and outstanding.   On July 31, 2008, IndyMac filed a petition for bankruptcy relief seeking liquidation under Chapter 7 in the United States Bankruptcy Court for the Central District of California.   But for its bankruptcy, IndyMac would have been named as a defendant herein.

30.   Non-party IndyMac Bank was a hybrid thrift/mortgage bank headquartered in Pasadena, California.   IndyMac Bank originated mortgages in all 50 States of the United States and, as of February 2008, was (1) the largest savings and loan headquartered in Los Angeles County, California, and the seventh largest nationwide, based on its reported assets; (2) the second largest independent mortgage lender in the nation; (3) the ninth largest residential mortgage originator, based on third quarter 2007 mortgage origination volume; and (4) the eighth largest mortgage servicer.   The OTS closed IndyMac Bank on July 11, 2008, and appointed the FDIC as receiver.   On the same date, the OTS chartered a new institution, IndyMac Federal Bank, FSB, appointed the FDIC as conservator of IndyMac Bank, and transferred substantially all of IndyMac's assets and certain liabilities to a new corporate entity, IndyMac Federal Bank.   But for its liquidation, the Bank would have been named as a defendant herein.

## C.     Defendants

### 1.     Officers

31.     Defendant Perry was Chairman of the Board, a director and Chief Executive Officer ("CEO") of IndyMac and IndyMac Bank.

32.     Defendant Perry joined IndyMac in January 1993 having previously had over 20 years of business experience with mortgage banking companies, financial institutions and real estate firms, including four years as an auditor with KPMG Peat Marwick.     He is also a Master Certified Mortgage Banker, as designated by the Mortgage Bankers Association, and a Certified Public Accountant.   Perry made and participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings.   He was the public face of the Company.   Perry signed each of the Company's quarterly reports on Form 10-Qs issued during the Class Period, and the Company's Form 10-Ks for the years ended December 31, 2006 and 2007, respectively.   As reported in the Company's latest proxy statement, on its Schedule 14A filed with the SEC on March 24, 2008 ("the 2008 Proxy"), defendant Perry had "responsibility for the day-to-day operations of IndyMac [since] 1993."   Perry's responsibilities are described in the 2008 Proxy as follows:

> As the Company's Chairman and Chief Executive Officer, Mr. Perry is responsible for the overall direction and administration of all programs and services provided by the Company and for ensuring that all aspects of the Company's activities are conducted commensurate with the best interests of shareholders, customers, employees, and other key stakeholders.  His responsibilities include: (i) setting the strategic vision and establishing a strategic, financial and risk management plan for the Company, (ii) recruiting and retaining a senior management team which has the talent and experience to execute the plan, (iii) monitoring the Company's execution, financial and operating performance, (iv)

adapting the Company's strategic and execution plans based on Company performance and conditions in the mortgage market and U.S. economy, and (v) managing all key activities related to IndyMac's being a public corporation.  He reports to the Board of Directors as the highest ranking official of the Company.  Based on his broad responsibilities, Mr. Perry is the only Named Executive Officer of the Company whose short-term cash incentive compensation is based solely on the year over year EPS growth rate of the company.

Mr. Perry's responsibilities, as described above, are significantly broader than any other Named Executive Officer at the Company.

33.    As alleged in the SEC Complaint, Perry knew about IndyMac's deteriorating liquidity and capital positions because he received regular internal reports about IndyMac's liquidity, capital raising needs and activities, and capital ratio, a key regulatory metric of a bank's safety and soundness.  Perry received frequent forecasts of the Bank's capital ratio by e-mail and in meetings, and information on material events such as downgrades on MBS bonds held by IndyMac Bank.  Perry also received regular reports on capital raising through the Company's DSPP.  SEC Complaint ¶ 13, 51.  Perry was well informed of IndyMac's financial condition and was an integral participant in IndyMac's financial reporting process. *Id.* at ¶ 51.  For example, Perry participated in drafting exhibits to the Q1 earnings 8-K filed on May 12, 2008, and changed the language to conceal the backdating of capital contributions to IndyMac Bank.  Perry changed the accurate statement that IndyMac "contributed $70 million to….[IndyMac] Bank during Q1 08 and another $[18] million on May 9th", to falsely state that IndyMac "contributed $88 million to the Bank during Q1 08". *Id.* at ¶ 53.

34.    Moreover, according to witnesses, news articles, and as alleged in greater detail below, Perry was a "hands-on-manager" who sometimes personally

reviewed mortgage applications, and was well aware of IndyMac's fraudulent and improper mortgage origination practices.  In a special report on IndyMac dated September 15, 2008, and titled "IndyMac's Last Gasps," the *Los Angeles Business Journal* described, based on a review of internal IndyMac documents and employee interviews,  Perry's hands-on-management-role as so extreme as to amount to "a sort of corporate dictatorship."  According to the article "Perry's fingerprints were all over IndyMac, all the way down to a multipart, SAT-style test that employees had to pass before being hired."  Employees "painted a detailed picture of a Company colored by an aggressive and sometimes boorish Chief Executive who created a corporate culture that gave the Company little chance of surviving a major market downturn."  Perry reviewed and had access to numerous reports before and during the Class Period which revealed the extent of the Company's deteriorating financial condition and utter abandonment of loan underwriting standards, and signed the Company's financial statements and Sarbanes-Oxley Act certifications, as alleged below.

35.    During the Class Period, Perry was paid a portion of his compensation in the form of IndyMac stock, a fact which he touted to investors in a comment on the Company's "IMB Report" blog, on November 29, 2007.  Perry also used his own purchases of IndyMac stock as a way to support his statements to the public that IndyMac had "turned the corner."  On that occasion, Perry responded to an IndyMac shareholder's suggestion that "insider buying" at what were claimed to be then depressed stock price levels would send a strong message to the market about the viability of IndyMac.  In his response, Perry stated he agreed with the shareholder and committed to purchasing additional shares as soon as the window for insiders to trade opened, which would occur once 4th quarter earnings were released in late January 2008.

36.    Under pressure to keep to his public promise, and in an effort to bolster confidence in IndyMac while IndyMac was actively seeking a major capital

infusion or find a buyer, a deferred compensation plan trust of which Perry was the beneficiary acquired 328,988 shares of IndyMac stock on February 15, 2008, at the market price of $7.93 per share.  Under IndyMac's deferred compensation plan, executives may elect to invest balances in IndyMac common stock or in a cash fund.   According to IndyMac's 2008 shareholders' proxy statement, the investments vest over a period of three to five years.  The February 2008 purchase was made with a long-term cash incentive grant made in 2007 and awarded to him in March 2008 with a "target value" of $2,812,966.  Also in March 2008, Perry was paid a short-term cash incentive grant with a "target value" of $3,429,288.  Thus, in making the February 2008 purchase, Perry was using unvested deferred compensation plan funds derived from IndyMac.

37.    In addition, the total purchase amount was a very small expenditure relative to the amount of money Perry had earned from prior sales of IndyMac stock and the value of Perry's total stock holdings.  Specifically, Perry reaped over $32 million dollars by selling IndyMac stock during the period from 2003 to 2007, and his salary and non-equity compensation in 2006 totaled $4,086,779.

38.    Perry and other top executives and directors were required to own and refrain from selling IndyMac stock in accordance with certain Company requirements.  Under IndyMac's "Stock Ownership Guidelines," IndyMac's CEO, "whose tenure now exceeds five years," was "expected to own common stock (including 70 percent of the net value of vested stock options) with a value equal to five times his annual salary."  All other IndyMac executive officers with tenure of more than three years were expected to own certain minimum amounts of common stock with values equal to certain multiples of their salary.   According to IndyMac's Proxy:  "Currently [as of March 24, 2008], due to the current market conditions… all of the NEOs [named executive officers] and 6 of the 9 non-employee directors are out of compliance with the ownership requirements and will refrain from selling IndyMac stock until such time as they are in compliance."

Thus, Perry's February 2008 purchase helped to bring him in compliance with Company guidelines.

39.    Defendant Keys was, at all relevant times, Executive Vice President and Chief Financial Officer ("CFO") of IndyMac, until April 25, 2008, when he took a leave of absence.  As the Company's Executive Vice President and Chief Financial Officer, Keys had direct responsibility for the content of IndyMac's public financial statements and reports.  Keys participated in the making of false and misleading statements, including the preparation of the improper press releases and SEC filings prior to his departure on April 25, 2008.  Defendant Keys signed the Company's quarterly reports on Form 10-Qs issued during the Class Period prior to April 25, 2008, and the Company's annual report on Form 10-Ks for the years 2006 and 2007.

40.    As described in the SEC Complaint, Keys, as the CFO, was responsible for supervising IndyMac's financial reporting department.  He received and reviewed multiple versions of the 2007 Form 10-K, including a review with the audit committee of IndyMac's board of directors prior to the filing of the annual report on February 29, 2008. SEC Complaint ¶ 54.  As the CFO, Keys supervised the two IndyMac departments that forecasted IndyMac's financial results, including IndyMac Bank's capital ratio, and received regular reports on capital raising through the DSPP, and information on material events, such as downgrades on MBS bonds held by IndyMac Bank.  Keys, like Perry, received frequent forecasts of the Bank's capital ratio by e-mail and in meetings. *Id.* ¶¶ 13, 51. Keys also supervised IndyMac's investor relations department, which managed IndyMac's DSPP. *Id.* ¶ 13.  Thus, Keys, like Perry, was well informed of IndyMac's financial condition and was an integral participant in IndyMac's financial reporting process. *Id.* ¶ 51.  In his Answer, Keys concedes that as CFO he participated in the filing of IndyMac's periodic reports, that he received information about the financial condition of IndyMac and the Bank, which showed

that the financial condition of both were deteriorating, that he received frequent forecasts of the Bank's capital ratio and capital raised through the DSPP, and that he was aware of IndyMac's capital and liquidity positions.  Keys Answer at ¶¶ 5, 13, 51.

41.    Keys also signed Sarbanes-Oxley Act certifications accompanying each of those reports.  In those certifications, Keys represented that he was "responsible for IndyMac's establishing and maintaining disclosure controls and procedures and internal control over financial reporting," and that he had designed IndyMac's internal controls to ensure that all material issues were brought to his attention.

42.    Mr. Keys' wide-ranging responsibilities at IndyMac were detailed in the Company's 2007 proxy statement:

> As the Company's Chief Financial Officer, Mr. Keys has goals that are milestone based, rather than revenue based. ... Those goals include: ... the maintenance of a strong, effective, and automated financial reporting control environment, including the timely resolution of any financial reporting control/deficiencies discovered by Mr. Keys, other members of IndyMac management, Internal Audit, and the Company's independent registered public accounting firm, Ernst & Young, LLP. This includes policies and procedures for all his areas of responsibility, especially external and internal financial reporting.

Thus, defendant Keys reviewed and had access to all reports before and during the Class Period that revealed the extent of the Company's deteriorating financial condition and financial reporting and control deficiencies.

43.    Prior to joining IndyMac in 2002, Keys had been a partner at Ernst, serving as partner in charge of Ernst's Ohio Valley banking practice.  According to IndyMac's press release, "[Keys] specialized in the financial services industry and was one of Ernst & Young's top experts in mortgage banking and asset

securitization." From his work as an accountant within the banking practice, Keys was thoroughly knowledgeable of the need to understand all aspects of a business in order to prepare materially accurate financial statements. In particular, Keys' experience as both an accountant and chief financial officer for banks made him aware of the centrality of accurate calculation of ALL to the accuracy of financial statements of a bank and bank holding company.

44. Keys' compensation was also tied to the performance (or, more accurately, publicly reported performance) of the Company. Keys' total compensation for 2007 was $1,274,658, which included $542,875 in salary, and $312,500 in short term cash incentive compensation and $370,094 long-term incentive compensation.

45. During the Class Period, Perry and Keys, as senior executive officers and directors of IndyMac, were privy to non-public information concerning the Company's business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, Perry and Keys, intentionally or with deliberate recklessness, disregarded the fact that the materially adverse information alleged herein had not been disclosed to, was being concealed from, and was the subject of misrepresentations to the investing public.

46. Perry and Keys participated in the drafting, preparation, and approval of the various public and shareholder and investor reports and other communications complained of herein and intentionally, or with deliberate recklessness, disregarded the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership, and top executive and managerial positions with IndyMac, the Defendants had access to the adverse undisclosed information

about IndyMac's financial condition and performance as particularized herein and intentionally, or with deliberate recklessness, disregarded that these adverse facts rendered the positive representations made by or about IndyMac and its business issued or adopted by the Company materially false and misleading.

47.     Perry and Keys, because of their positions of control and authority as the top officers and as directors of the Company, and their duties as set forth in IndyMac's proxy statement, and by their obligation to sign these documents, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Perry and Keys were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, Perry and Keys are responsible for the accuracy of the public reports and releases detailed herein, and are therefore primarily liable for the representations contained therein.

48.     Perry and Keys are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of IndyMac's stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme (i) deceived the investing public regarding IndyMac's business, operations, and the intrinsic value of IndyMac's stock; and (ii) caused plaintiff and other members of the Class to purchase IndyMac's stock at artificially inflated prices and suffer damages as a proximate result thereof.

## 2.     Ernst & Young LLP

49.     Defendant Ernst was IndyMac's auditor for fiscal years 2006 and 2007.  It is one of the four largest accounting firms in the United States, and has represented itself as an expert in accounting for the financial services industry. Ernst provided an unqualified auditor's report on IndyMac's financial statements

in each of these years, representing that it had conducted its audits in accordance with Generally Accepted Auditing Standards ("GAAS") and that IndyMac's financial statements were prepared and presented in conformity with GAAP, which is required of all SEC filers.   Ernst also issued unqualified opinions regarding IndyMac management's assessment of internal controls, representing that it had conducted its audits in accordance with the standards of the PCAOB. These reports were included and published in IndyMac's Form 10-Ks for 2006 and 2007.   In fact, as alleged below, all of these   representations were false. Ernst's audits were not conducted in accordance with GAAS and the financial statements failed to comply with GAAP.   Further, IndyMac was suffering from numerous significant deficiencies and material weakness in internal control, and Ernst failed to comply with the auditing standards of the PCAOB for numerous reasons.

50.   During the Class Period, Ernst was apprised of all material issues surrounding IndyMac's internal controls and financial reporting. In periodic financial reports filed with the SEC dated March 1, 2007, April 26, 2007, July 31, 2007, November 6, 2007, and February 29, 2008, Perry and Keys both certified that Ernst had been notified of (a) "all significant deficiencies in the design or operation of internal controls" and (b) "any fraud, whether material or not."

## IV.   JURISDICTION AND VENUE

51.   This Court has jurisdiction over the subject matter of this action pursuant to section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331, 1337 and 1367.

52.   The claims alleged herein arise under sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC.

53.   Venue is proper in this District pursuant to section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) and (c).   Substantial acts in furtherance of the alleged

fraud and its effects, including the preparation and dissemination to the investing public of materially false and misleading financial statements, occurred in this District.   Additionally, the Company's headquarters are located in Pasadena, California, in this District.

54.   In connection with the acts, omissions and other wrongs complained of herein, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities markets.

## V.   CLASS ACTION ALLEGATIONS

55.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who purchased or otherwise acquired the common stock of IndyMac during the Class Period of March 1, 2007 through May 12, 2008, inclusive, and who were damaged thereby.   Excluded from the Class are Defendants, the officers and directors of IndyMac and its subsidiaries, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants, IndyMac, or the IndyMac Bank have or had a controlling interest.

56.   The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, IndyMac's stock was actively traded on the New York Stock Exchange.   While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by IndyMac or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

57.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws that is complained of herein.

58.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

59.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Whether the documents, reports, filings, releases and statements caused to be disseminated to the Class by Defendants during the Class Period misrepresented material facts about the business, performance and financial condition of IndyMac;

(c)    Whether Defendants participated in and pursued the common course of conduct and fraudulent scheme complained of herein;

(d)    Whether Defendants acted intentionally or with deliberate recklessness in making false and misleading statements of material fact; and

(e)    Whether the market price of IndyMac stock during the Class Period was artificially inflated due to the misrepresentations and omissions complained of herein.

60.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for members of the Class to individually redress the wrongs done to

them.   There will be no difficulty in the management of this action as a class action.

## VI.   FACTUAL BACKGROUND REGARDING INDYMAC AND ITS CORE LENDING BUSINESS

### A.   General Background

61.    At all relevant times, substantially all of IndyMac's lending business involved loans secured by real estate.   Prior to and during the Class Period, IndyMac specialized in Alt-A single family mortgages, which were made to borrowers who were not required to verify their income or provide documents in order to obtain their loans.   Because of the lack of income verification, Alt-A loans were not as conservative as conforming loans, which were eligible to be sold to government sponsored enterprises ("GSEs"), such as Fannie Mae and Freddie Mac.   Alt-A loans are also sometimes referred to as "no doc" loans, "low doc" loans, "stated income loans" and "liar loans."   IndyMac also offered subprime mortgage loans, which are mortgages that are offered to relatively less creditworthy borrowers, and, like the various non-traditional adjustable rate mortgage ("ARM") products described below, typically could not be sold to GSEs such as Fannie Mae and Freddie Mac.

62.    IndyMac also extended varieties of risky loans to its Alt-A customers as well as to its prime customers:

- Option ARM loans.   With an ARM loan, instead of a fixed rate of interest, the interest rate is periodically adjusted over the term of the loan based on indices such as Treasury securities or the London Interbank Offered Rate ("LIBOR").   Option ARM loans are unique among ARM loans in that they give the borrower the option each month to make either a full, interest-only, or a "minimum payment," less than the interest due on the loan.   Such minimum payment Option ARM loans were thus negatively amortizing loans.

- "100% LTV (loan-to-value) loans" and "80/20 loans." With these loans, the home buyer took out two loans, one for 80% of the purchase price and another for 20% of the purchase price or "value" of the property.

- "Hybrid ARMs." With these loans, the initial interest rate is fixed for some period of time, usually two to five years, and then "floats," or changes according to an established banking index, thereafter.

- Home equity lines of credit ("HELOCs"). These loans allowed homeowners to obtain cash by borrowing money either through a first or second lien loan or line of credit on a home they already owned.

- "Closed End Seconds." These loans were secured by second mortgages on a home, and were junior in priority in the event of foreclosure.

- Teaser rate loans and Negative Amortization Loans. These loans required extremely small payments, or no payments at all, typically for the first six months, and then required much larger payments thereafter.

63.     During the period from 2001 through 2006, IndyMac's lending practices were extremely lucrative for IndyMac and its executives. IndyMac's publicly reported profits tripled during that time. Prior to 2007, when the market for mortgages was expanding exponentially, Defendants largely ignored the risks involved in the non-traditional mortgages originated by IndyMac and encouraged IndyMac's sales staff to originate mortgages without adhering to prudent origination and securitization practices. As an analyst at Friedman, Billings, Ramsey observed about IndyMac, "[t]he sales culture took over and the sales division really drove the company."

64.     In 2005 and 2006, there were signs the market had hit its peak and some lenders began to make fewer loans. IndyMac nonetheless increased its

lending volume by 50 percent.  According to David Balsam, the Chief Financial Officer of IndyMac Mortgage Bank until 2006, quoted in the *Los Angeles Business Journal* article noted above and dated September 15, 2008:  "Other people, meaning Wells Fargo, and so on, they pulled back.  When Mike [Perry] thought he was winning market share, he wasn't really winning market share – they were relinquishing market share to him.  In [IndyMac's] busy-ness to grow, they took on a lot of loans, in some cases very thin-margin loans that were lower quality."  The article also quoted Joanne Kim, CEO of Wilshire Bancorp Inc., the Los Angeles-based parent of Wilshire State Bank, a $2.4 billion-asset institution that sold as much as 80 percent of its loans to IndyMac and Countrywide as stating: "IndyMac was willing to buy anything."

65.    IndyMac's focus on originating and underwriting as many loans as possible without regard to quality posed few problems for IndyMac when housing prices were increasing and interest rates remained low.  There were several reasons for this.  First, if a buyer was not able to afford his payments, the bank received title through foreclosure to a home worth more than the amount owed.  Second, property owners could refinance or sell their properties prior to default so long as property values continued to increase and interest rates remained low.  Third, borrowers –particularly those who purchased a second home or investment property – were more likely to default on a depreciating asset than an appreciating asset.  As one analyst has succinctly explained in regard to Alt-A loans:

> Because little or no determination is made of the borrower's ability to service the loan, the home itself becomes the source of the repayment. . . . The lender is literally banking on the borrower's ability to refinance the loan at some point or, once again in a worst case scenario, sell the home at a price that satisfies the outstanding loan obligation and allows the borrower to recover most, if not all, of his/her equity.

66.    As the real estate market slowed in 2006 and 2007, and housing prices stagnated and then fell, the importance of loan *quality* came to the forefront. With home prices declining and refinancing increasingly unavailable, customers' ability to actually pay their mortgages became critical to minimize IndyMac's loss exposure. Thus, sound underwriting practices and accurate and reliable appraisals of property values also became critical to minimizing IndyMac's loss exposure. Defendant Perry reassured investors on April 26, 2007, that IndyMac's loss exposure was minimal even in the face of declining home values because of IndyMac's purportedly rigorous underwriting standards: "We get not only a full appraisal, but we do an automated appraisal, in addition to it.  We independently check their credit.  We verify their employment.  We verify their income and their assets and we check their income for reasonableness.  We do a lot of steps on those loans.  We think that's a prudent business for us."  However, as Defendants well knew, Alt-A loans, by definition, involved very few, if any, of those rigorous underwriting practices.

67.    To further reassure investors of the "safety and soundness" of the Company's business, IndyMac repeatedly touted the low loan-to-value ("LTV") ratios on its Alt-A loans.  A low LTV ratio of 70% meant that the lender should not lose money even if the price of the property declined by 20%, or more, depending on the cost of foreclosure.  Obviously, this meant that property had to be valued fairly in the first instance:  an artificially inflated appraisal would result in an artificially low LTV ratio, which would create a false impression that the mortgage loan was less risky.

68.    IndyMac's mortgage default rate began to rise in 2006, almost doubling between year-end 2005 and 2006.  In 2007, the default and foreclosure rates on IndyMac mortgages began to sky-rocket with 90 day delinquencies doubling in the first two quarters, and tripling in the third and fourth quarters.

69.     For capital markets-funded lenders such as IndyMac, there were two exit strategies for a loan: sale or securitization.  Even among depositories such as IndyMac, the capital required of investments in non-prime loans by bank/thrift regulators discouraged them from holding these assets in whole loan form because of the impact on their balance sheets.  When foreclosures started to surge in 2007, the market for securities backed by non-conforming loans (such as those in which IndyMac specialized) froze up.  IndyMac found it increasingly difficult to sell or securitize its mortgages in order to raise capital.  As a result, billions of dollars in loans held for sale had to be converted into loans held for investment, and capital reserves had to be increased.  From September 30, 2007 to December 31, 2007, for example, IndyMac's single-family residence ("SFR") loans held for investment increased from $4.9 billion to $13.1 billion, while loans held for sale decreased from $14 billion to $3.4 billion.  As summarized in IndyMac's Fourth Quarter 2007 earnings report, "IndyMac transferred $10.3 billion of loans to its SFR [single-family residence] loans held for investment portfolio due to a lack of investor demand for those non-agency products . . .."

70.     In addition to being unable to sell or securitize its mortgages, IndyMac became subject to increasing "repurchase" demands from the investors to whom IndyMac had sold mortgages and mortgage-backed securities.  Contracts between lenders originating subprime mortgage loans and purchasers of those loans typically require the originating lender to buy back faulty loans in certain circumstances. For example, repurchase is often required if a borrower defaults on an early payment, or representations and warranties made to investors regarding, primarily, the quality of the underlying loans, were false or breached.  Repurchase demands to IndyMac sky-rocketed in 2007.  According to IndyMac's earnings presentation for fourth quarter 2007, IndyMac's repurchase volume increased from $194 million in 2006 to $613 million in 2007, a 300% increase.

71.     Thus, in contrast to its past practices, pursuant to which IndyMac underwrote or originated loans and quickly moved them off its books, IndyMac now owned those mortgages – because (a) it was unable to sell or securitize them, (b) it had to repurchase them, and/or (c) it was unable to get brokers to repurchase them.   As a result, IndyMac's adherence to its internal underwriting guidelines became critical to the Company's survival, and its failures to do so previously were contributing to its downfall.   Instead, IndyMac violated its internal guidelines, and became substantially exposed to severe risks caused by its deficient underwriting practices.

72.     In short, IndyMac's business model had always depended on two elements: (a) rising real estate prices and (b) the ability to sell loans in the secondary mortgage market. As long as real estate prices were rising, individuals who could not afford their loan payments would be able to avoid default by selling their property, or, if a borrower did default, IndyMac could recover its loan value through foreclosure. And as long as IndyMac was able to sell loans it originated, it would not retain the risks of poorly underwritten loans. The low default and delinquency rates IndyMac experienced in the 2002-2005 period were entirely dependent on both of these conditions. With the disappearance of these two conditions, IndyMac's business model fell apart.  Historical default rates were not a suitable basis for calculating expected losses in its loan portfolio going forward. Nonetheless, IndyMac, like Countrywide and Washington Mutual, improperly continued to rely on those outdated historical models.

**B.     IndyMac's Underwriting, Risk Management, and Appraisal Practices Were Grossly Deficient Prior to and During the Class Period**

73.     Because, prior to August 2007, IndyMac was able to avoid the risks associated with poorly underwritten mortgages, defendant Perry encouraged a

company culture that focused on originating as many loans as possible without regard to prudent underwriting practices.

74.    IndyMac's institutional disregard for basic principles of underwriting and risk management has been documented in numerous articles, lawsuits, and investigative reports, and has been corroborated by both confidential and non-confidential witnesses interviewed by Lead Plaintiff's counsel.

75.    Michelle Leigh ("Leigh") was First Vice President and Division Head of Post Production Quality Control in the Consumer Lending Group at IndyMac from August 4, 2004 to September 2006.  In that position she was responsible for sampling and reviewing all types of IndyMac loans.  According to Leigh, the PPQC audited between 600 and 1200 loans each month, and she had access to detailed information about IndyMac's actual loan underwriting practices.  Soon after she took over the PPQC, Leigh discovered that there were a high percentage of loans that never should have been made. There were three categories of loans that the PPQC reviewed. The first was called 'Current' and consisted of loans that had been funded in the past 90 days. The second category was "Delinquent" and consisted of loans that were 90 days or more past due.  The third category was "Fraud," which was evaluated by IndyMac's Enterprise Risk Management Division.  The industry norm for "problems" in the Current category – measured relative to compliance with underwriting guidelines or other risk factors – was 1% to 2%.  However, Leigh discovered at IndyMac, in the Current category, between 11% and 15% of the loans had problems – ten times the industry norm.  She discovered that in the Delinquent category, approximately 25% of the loans had problems.

76.    Leigh was required to write PPQC quarterly reports on her findings in her sampling of loan audits.  Leigh prepared one preliminary report that identified 63 adverse findings of significant problems in the loans that she had reviewed. Leigh took her report to her Senior Vice President, Nick Niland ("Niland").

Niland and Leigh went over her adverse findings with the business units and with Michelle Minier ("Minier"), Executive Vice President in charge of IndyMac's central Mortgage Operations. Leigh stated that Minier ridiculed Leigh's concerns. Minier told Leigh that she did not know what she was talking about in the findings she put in the report and instructed her to wipe off most of the loans that had significant findings. Leigh told Minier that they would not do so, or the regulators would shut down IndyMac Bank. Leigh stated that she was told by Minier that Perry was aware of Leigh's preliminary report. The original report prepared by Leigh indicated deficiencies in internal control, and appears to have been known by members of IndyMac management. According the IndyMac's 2007 Proxy Statement, Keys was responsible for reviewing and resolving such issues. Leigh understood that her report or the information contained therein was to be provided to the Board of Directors. Minier instructed Leigh to take out the negative information from her preliminary report before the final report was given to IndyMac's Board of Directors. Leigh refused to alter her report, telling Minier that it was accurate. The report was given to an IndyMac attorney who re-wrote the report, reducing the number of adverse findings from 63 to 11. According to Leigh, the attorney, who had been hired by Minier, said he did not care about regulators and had found that regulators could be manipulated. In addition, Niland told Leigh that if the loans stayed on the report it would lower bonuses for management, and if they were removed, it would result in higher bonuses.

77.    An example of one non-conforming loan in Leigh's preliminary report was a "stated income" home loan to an employee of Disneyland, who claimed an annual income of $90,000. In fact, the borrower's loan file disclosed that she earned $11.00 per hour as a cafeteria cashier. According to Leigh, Minier refused to permit this loan to be included in Leigh's preliminary  report to IndyMac's Board of Directors. Leigh was so offended by the actions of Minier, the attorney, and Niland that on September 8, 2006 she wrote letters to the FDIC, Freddie Mac,

and Fannie Mae complaining that IndyMac Bank was operating in a manner that was not in compliance with regulatory guidelines.

78.    The Bank's PPQC Department had been put under the supervision of the Mortgage Operations Department, eliminating any checks on the Mortgage Operations Department.   This organizational structure and lack of oversight violated FDIC, Fannie Mae and Freddie Mac regulations.  *See* 12 C.F.R. § 364, Appendix A, Part II, A. Leigh was ultimately fired by IndyMac at approximately the same time as  other top internal control supervisors, including Charles Williams ("Williams"), the head of Bank's internal audit department.  According to Leigh, Perry asked Williams to ignore a major problem that Williams had discovered, but Williams refused to do so.  According to Leigh, she and Williams were terminated (directly or constructively) because they called attention to structural deficiencies in the Bank's internal controls, and noted specific deficiencies in internal controls over loan underwriters.  Leigh also stated that she believes that she and Williams were fired because Perry and Minier sought to hide the negative findings reflected in Leigh's report from IndyMac's board, and the only way for them to do that was to fire them.  "[T]hey did not want anything found."

79.    Unchecked, shoddy internal controls remained the rule into and throughout the Class Period.  Wesley E. Miller ("Miller"), who worked as an underwriter for IndyMac in California from 2005 to 2007, stated that when he rejected a loan as questionable, he was berated by sales managers who then went over his head and obtained approval of the loan from senior vice presidents. According to Miller, the underwriters' decisions might simply be overruled or the underwriter might be pressured or ordered to change his decision, because the managers' instructions were to "find a way to make this [loan application] work."

80.    Scott Montilla ("Montilla"), a former IndyMac loan underwriter in Arizona during the same time period, stated that about one-half of his decisions to reject loans were overridden by the Bank's executives.  Moreover, according to

Montilla, some borrowers told him that they had no idea their stated incomes were being inflated as part of the application process.

81.     Confidential Witness A ("CW A") was a Manager in IndyMac's fraud audit and investigation unit from December 2004 until October 2007.  According to CW A, everyone at IndyMac knew that the underwriters were "pushing" bad loans and that the idea that IndyMac's Alt-A loans were any different than subprime loans was nonsense.  Often, CW A's investigations would reveal that the IndyMac underwriter or sales person had pushed through a loan with inadequate or fanciful documentation.  CW A stated that the front office often overrode any findings or improper conduct by underwriters, with no or weak explanations.  According to CW A, central mortgage operations, including Perry, knew full well of the rampant loan fraud but did not care so long as home prices continued to rise.  According to CW A, Perry had "vitriol" for quality control/audits and Perry took actions to "neuter" the quality control/audits department by moving the quality control department from the secondary mortgage division to the central mortgage operations division. As a result, the quality control department was now controlled by the very division it was supposed to monitor.

82.     Confidential Witness B ("CW B") was a Senior Underwriter who joined IndyMac in 1997, and worked in IndyMac's Wholesale Mortgage Division until July 2008.   CW B confirmed that underwriters were incentivized by IndyMac's bonus system to approve loans without adequate review, and some took advantage of the opportunity.  For example, one underwriter in Wisconsin was approving 20 loan applications per day.  CW B was also assigned to process loan applications acquired in connection with IndyMac's hiring of over 1,400 professionals from American Home Mortgage, a bankrupt loan originator that had concentrated heavily in making subprime loans.  For loans that had previously reached the first stage of approvals at American Home Mortgage, she and other employees were instructed to approve loans whether or not they met IndyMac's

standards. Many loans did not meet IndyMac's standards, but were approved anyway. CW B described American Home Mortgage employees as operating a "fraud shop" within IndyMac. Eventually IndyMac hired ten former American Home Mortgage underwriters to approve additional loans generated by that company because IndyMac appraisers were unwilling to approve many of these loans.

83. Cody Holland joined IndyMac as a loan officer in September 2007. According to Holland, IndyMac regularly violated its own internal guidelines for loan approvals. Although the guidelines at that time required borrowers to have minimum FICO scores of 620, loans were approved for borrowers with scores as low as 580. IndyMac also regularly approved loans with loan-to-value ratios as high as 100%, notwithstanding Perry's public statements that IndyMac had discontinued such loans.

84. Confidential Witness C ("CW C") was a Mortgage Underwriter in a regional office of IndyMac beginning in August 2007. According to CW C, loan underwriters were told to approve loans that did not satisfy the current guidelines. Loan officers regularly bypassed regional underwriters to gain approval of loans outside the guidelines by contacting senior operations management at the Bank's Pasadena headquarters, who would order approval of loans in markets with which they were not familiar. FICO score requirements were regularly waived in order to increase loan volume. Also, according to CW C, IndyMac went so far as to instruct employees during loan underwriting training sessions as to how to obtain exceptions to the lending guidelines, and underwriters began to view the mortgage guidelines as a joke. In addition, appraisals were frequently provided by a small number of brokers who were chosen because of their willingness to inflate appraisals.

85. Confidential Witness D ("CW D") was an IndyMac Underwriting Team Leader from 2005 to July 2007, and supervised eight underwriters. CW D