confirmed that Frank Sillman, head of the IndyMac Mortgage Bank Division, regularly overrode underwriters' decisions to deny loans. Underwriters were pressured to approve loans and told to "do anything to keep the loan from going to Countrywide." Moreover, as an underwriting team leader, CW D received an e-mail towards the end of the month from his Regional Manager, imploring CW D to "approve as many loans as you can because we need a certain amount of mortgage volume this month."

86. On June 30, 2008, the Center for Responsible Lending (the "CRL") issued a report titled "IndyMac: What Went Wrong? How an 'Alt-A' Lender Fueled its Growth with Unsound and Abusive Mortgage Lending," which corroborates and/or reports the witness statements recounted above. The CRL describes itself as a national nonprofit, nonpartisan research and policy organization dedicated to protecting home ownership and family wealth by working to eliminate abusive financial practices. CRL is affiliated with Self-Help, the nation's largest community development financial institution. Based on interviews with 19 former employees, mostly underwriters, and review of pending actions against the Bank and affiliates, CRL uncovered evidence of pressure from managers and underwriters to approve unsound loans in contravention of IndyMac's internal underwriting guidelines, and the overruling of underwriters' decisions to deny loans with falsified paperwork and inflated appraisals.

87. The Treasury Report confirms CRL's findings. Following extensive review of documents and interviews with OTS, FDIC and IndyMac employees, the Report concludes that the Bank's "unsound underwriting practices" – including blatantly deficient and unsupported property appraisals – was a key factor causing the Bank's failure. In its discussion of this factor, the Treasury Report states:

> To explore the impact of thrift underwriting on loan performance, we
> reviewed 22 delinquent loans that represented a cross-section of the
> loan products in IndyMac's loans held to maturity portfolio. These

loans were 90 days or more delinquent as of August 31, 2008. We reviewed the loan files and discussed the loans with IndyMac officials who were retained by FDIC in the conservatorship. . . .

**For the loans reviewed, we found little, if any, review of borrower qualifications, including income, assets, and employment.** We also found weaknesses with property appraisals obtained to support the collateral on the loans. For example, among other things, we noted instances where IndyMac officials accepted appraisals that were not in compliance with the Uniform Standard of Professional Appraisal Practice (USPAP). We also found instances where IndyMac obtained multiple appraisals on a property that had vastly different values. There was no evidence to support, or explain why different values were determined. In other instances, IndyMac allowed the borrowers to select the appraiser. As illustrative of these problems, the file for one 80/20, $1.5 million loan we reviewed contained several appraisals with values ranging between $639,000 and $1.5 million. There was no support to show why the higher value appraisal was the appropriate one to use for approving the loan. (emphasis added)

88.    The OIG reviewed a sample of 22 loans in the course of its material loss review–out of a total loan portfolio of approximately 44,000 loans totaling $13 billion.    The Treasury Report included a detailed description of four loans it reviewed which dramatically illustrate some of the weakest underwriting practices. Three of the loans were originated during or just before the Class Period.

**Loan 1:** On May 2, 2007, IndyMac approved a $926,000 stated income loan for the borrower, which was secured by a one acre lot in Delray Beach, Florida. The loan was an adjustable rate mortgage with a 5-year

term and a beginning interest rate of 5.875 percent, which was subject to change monthly[.]

As a stated income loan, IndyMac performed no verification of the borrower's self-employment income of $50,000 a month ($600,000 annually). IndyMac also did not verify the borrower's assets. The loan file contained a copy of a signed request by the borrower to the Internal Revenue Service (IRS) for copies of past tax returns, but we found no evidence that IndyMac ever obtained the tax returns. According to an IndyMac official, IndyMac had borrowers sign such requests as a "scare tactic," assuming that they would be more forthcoming on their stated income. In practice, however, we were told that IndyMac seldom forwarded the signed requests on to the IRS.

The loan file contained an appraisal which indicated that the property value was $1.43 million. This value was based on comparable properties that had been improved with single family residences. However, the comparable properties were located closer to the ocean and bay, and their values were based on listing price instead of the actual selling price. The appraised value also did not take into consideration a slowdown in the real estate market.  We saw no evidence in the loan file that IndyMac resolved these and other anomalies with the appraisal.

**Loan 2:**  In November 2007, IndyMac approved a $3 million stated income loan, secured by the borrower's primary residence in Scottsdale, Arizona. The loan proceeds were used to refinance the primary residence which the borrower had owned for 11 years and reported its value as $4.9 million.

As a stated income loan, IndyMac performed no verification of the borrower's reported self-employment income of $57,000 a month

($684,000 annually). Contrary to IndyMac policy, the borrower selected the appraiser who appraised the property at $4.9 million. Notes in the loan file indicated that the borrower had listed the property for sale in November 2006, first at a price of $4.9 million that was later reduced to $4.5 million before the borrower pulled the property off the market. Despite this, the appraiser concluded that the value of $4.9 million appeared to be reasonable. IndyMac accepted the appraiser's value based on a review of online sale and public records. It did not physically inspect the property.

The borrower made no payments on the loan before default. The total delinquent loan amount as of November 2008 was $3,015,625. According to the IndyMac official, the property sold in October 2008 for $2.0 million.

**Loan 3:** In February 2007, IndyMac provided the borrower a stated income, 80/20 loan, for a combined total of $1.475 million, to purchase a property in Marco Island, Florida.

As a stated income loan, IndyMac performed no verification of the borrower's reported income of $28,500 a month ($342,000 annually). For 80/20 loans, IndyMac allowed an $800,000/$200,000 maximum loan amount and a maximum combined loan amount of $1 million. This loan was an exception to IndyMac policy as the combined loan amount of $1,475,000 exceeded the maximum combined loan amount. The loan exception was approved anyway.

Various appraisals in the loan file contained significant differences with no indication of how they were resolved by IndyMac. A January 2007 appraisal valued the property at $1.48 million. A valuation analysis prepared by an IndyMac employee on January 25, 2007, stated that the skill level of the appraiser was unacceptable–the

appraiser had not provided accurate comparable properties to the subject property and did not accurately consider the location of the property. The IndyMac employee estimated the property value at $1 million and recommended that another appraisal be obtained. Another note in the loan indicated that the IndyMac official overruled the employee's recommendation and the appraisal was accepted. The IndyMac official, however, adjusted the appraised value approximately 10 percent lower, to $1.33 million, citing as a justification that a property on the same street had sold for $1.97 million.

The borrower made no payments before defaulting on the combined $1.48 million loans. According to the IndyMac official, the borrower deeded the property to the thrift in lieu of foreclosure. The IndyMac official estimated in November 2008 that the property was worth about $700,000.

89.    The Treasury Report also noted that IndyMac faced significant risk because IndyMac "had several significant asset concentrations that warranted a higher level of capital in the current environment, such as nontraditional mortgage loans with negative amortization potential, Alt-A loans, and geographic concentration of loans in California and areas rated high-risk by several mortgage insurance companies."  According to the Treasury Report, OTS had filed a report in 2005 noting the dangerous asset concentrations in IndyMac's portfolio, and had expressed concerns with IndyMac's liquidity.

90.    IndyMac's improper and fraudulent lending practices were also documented in the complaint filed in the action styled *Financial Guaranty Insurance Co. v. IndyMac Bank, F.S.B.*, Case No. 08-CV-06010-LAP, in the United States District Court for the Southern District of New York.  The FGIC is a financial guaranty insurance company headquartered in New York, which works

closely with state and local governments.  The complaint in that case quotes former employees stating:

(a)     According to a former IndyMac central banking group vice-president, that IndyMac institutionalized exceptions to its own underwriting guidelines that allowed IndyMac to make and approve mortgage loans that should have been denied under the actual guidelines and that direct fraud by IndyMac loan sales representatives was rampant in the mortgage loan origination process at IndyMac;

(b)     According to a former IndyMac loan underwriter, that IndyMac's loan origination process had evolved into organized chaos where, at management's direction, any concessions or adjustments were made in order to close loans that would not normally be made, including adjusting appraisals to make the loan work;

(c)     According to a former IndyMac vice president in IndyMac's mortgage banking segment, that in order to keep pace with its competition, IndyMac greatly loosened its underwriting guidelines in order to bring in more loans;

(d)     According to a former IndyMac senior auditor in IndyMac's central mortgage operations, that an increasing number of loans were made through apparently fraudulent or misrepresented documentation and there was an increase in defaults because of these misrepresentations in the underwriting process, the relaxation of the underwriting guidelines and approval of borderline loans;

(e)     According to a former IndyMac investigator in IndyMac's central mortgage operations, that the quality of IndyMac's loan origination process had become a running joke within IndyMac,

and that a whole class of IndyMac – originated mortgages were referred to internally as "Disneyland Loans," because of insufficient documentation or the borrower's inability to repay the mortgage; and

(f)     According to a former IndyMac senior loan processor, that the increase in the number of IndyMac-originated delinquent loans was due to misrepresentations and fraud occurring in the mortgage loan origination process.

91.     A review of IndyMac loans by MBIA Insurance Company ("MBIA"), an insurer of certain asset-backed securities originated by IndyMac, showed that 418 of 6,970 loans securitized by IndyMac in mortgage pool INDS 2007-1 had defaulted by December 31, 2007, within one year of securitization, and typically, in little more than a year from origination. *All but 17 of the 418 defaulted loans were in material non-compliance with IndyMac's underwriting guidelines.* In mortgage pool INDS 2007-2, also insured and reviewed by MBIA, 294 of 297 defaulted loans were in material non-compliance with IndyMac's underwriting guidelines. Additional facts demonstrating IndyMac's inadequate and fraudulent underwriting practices are set forth in the complaint filed by MBIA in a case entitled *MBIA Insurance Co. v. IndyMac ABS, Inc.,* Los Angeles Co. Super. Ct. Case No. BC422358 (filed Sept. 22, 2009).

92.     The following examples are illustrative of the mortgage loans reviewed by MBIA and their non-compliance with Defendants' representations to investors:

(a)     On September 22, 2006, a loan with a principal balance of $39,600.00 was made to a borrower in Goodrich, Michigan on a property with an original appraisal value of $198,000.00 and a senior loan balance of $158,500.00. The borrower stated that he was employed as a truck driver, did not own his vehicle, and had income of $8,950.00 per month in 2006. The borrower had been

employed by his current employer for approximately 2 weeks when applying for the loan, demonstrated liquid assets of only $568.00, and had no prior housing payment history.   His stated income was not substantiated by the credit/asset profile.   The borrower filed for bankruptcy on February 18, 2008, and the borrower's court filings indicate the borrower earned $3,854 per month–less than 44% of what had been stated at the time of the origination of the loan.  (Loan #6074318 – INDS 2001-1).

(b)   On January 24, 2007, a loan with a principal balance of $70,500.00 was made to a borrower in Rosamond, California secured by a property with an original appraisal value of $352,654.00 and a senior loan balance of $282,100.00.  The borrower stated his income to be $11,000 per month.  However, the borrower demonstrated only $3,802.40 in net assets.  Further, the borrower was self-employed and had been at her job for only 7 months.  The loan file did not contain a required CPA letter to verify self-employment.  Moreover, prior to being self-employed, the borrower was an employee of the mortgage broker issuing the loan and prior to purchasing the property had lived with her family.  Accordingly, the stated income was unreasonable on its face based on the nature of the borrower's employment. (Loan # 125257414 – INDS 2007-2).

(c)   On February 5, 2007, a loan with a principal balance of $57,750.00 was made to a borrower in Hemet, California on a property with an original appraisal value of $385,000.00 and a senior loan balance of $308,0000.00. The borrower stated his income to be $11,700.00 per month as a food court manager at a local Costco Wholesale Club.  The stated income was unreasonable on its face based on the borrower's employment.   The borrower filed for bankruptcy on November 26, 2007.  The borrower's court filings indicated the borrower earned only $4,168 per month, less than 36% of what had been stated at the time of the origination of the loan. (Loan # 125280044 – INDS 2007-1).

93.     Those mortgage loans are illustrative of IndyMac's failure to comply with its own loan underwriting guidelines, contrary to representations made to purchasers of asset-backed securities, and investors.

94.     In addition, a significant number of mortgage loans had debt to income ratios far in excess of applicable underwriting guidelines, loan-to-value ratios far in excess of applicable underwriting guidelines, and were made on the basis of "stated incomes" that were unreasonable on their face.  The information conveyed to purchasers of those securities, including information regarding debt to income and loan-to-value statistics for the mortgage loan pools, was materially false.

95.     On July 2, 2010, the FDIC filed a lawsuit against four former officers, who headed IndyMac's Homebuilder Division ("HBD").  The case is captioned: *Federal Deposit Insurance Corporation, as Receiver for IndyMac Bank, F.S.B. v. Scott Van Dellen, Richard Koon, Kenneth Shellem, and William Rothman*, cv-10-4915 (C.D. Cal. July 2, 2010) (the "FDIC Complaint").   This case was the first filed by the FDIC against officers of any of the banks which failed as a result of the subprime crisis.  The FDIC Complaint details the abusive underwriting and lending practices of the Homebuilder Division and states that at the time the FDIC took control of IndyMac on July 11, 2008, the outstanding balance on HBD's portfolio of homebuilder loans was nearly $900 million.  The FDIC alleges in its complaint that IndyMac's losses on HBD's portfolio "are estimated to exceed at least $500 million." FDIC Complaint ¶ 5.

96.     The FDIC Complaint describes Perry as having hands-on, detailed knowledge of the deteriorating housing market and other specific risks facing the Homebuilder Division and IndyMac in general during the 2006-2008 time period, thus, showing that Defendant Perry possessed this information at the very same time that he made repeated public statements touting the success and prospects of

the Company and the Homebuilder Division to IndyMac's shareholders. For example, the FDIC Complaint alleges that:

a)    Perry frequently forwarded news articles warning of deteriorating conditions in the home builder market and cautioning the head of the Homebuilder Division, Van Dellen, to "be careful," including for example:

- A March 3, 2006 article in *The Wall Street Journal*. Perry underlined portions of this article that discussed reduced sales in single-family homes and reported the highest level of unsold new homes in nearly a decade. Perry made a handwritten note on the article stating, "Be careful, especially on our new construction projects."

- A September 11, 2006 article in the *Los Angeles Business Journal*. Perry sent this article to highlight declining sales rates. He circled a portion of the article that addressed a steep 32% decline in sales from the same month of the prior year.

- An October 2, 2006 article in *Outfront*. The first paragraph in the article stated that the "bad news keeps on coming from the home front." The article noted that KB Homes slashed earnings forecasts for the second time since June, and that shares had fallen 40% over the past year. Perry made a handwritten note on the article stating "I am in the middle of this one... I definitely think the economy will slow due to home prices abating."

- A November 8, 2006 article from an unknown publication. The article came from *Bloomberg News* and discussed declining sales experienced by home builder Toll Bros., Inc. and Beazer

Homes USA, Inc.  Once again, Perry made a handwritten note on the article stating, "Be careful."

- A May 4, 2007 article in *US Economics Analyst*.  Perry circled a portion of the article warning that a housing downturn in Florida was likely to cause an outright recession.  Perry also wrote a note on the article stating "Sell Florida.  Your first loss is your best loss."

FDIC Complaint ¶ 35.

Thus, Perry was fully aware that, despite his public statements to the contrary, the real estate economy was already slowing in 2006, and this would adversely affect IndyMac.

b) One of IndyMac's "core values" was that "speed rules at IndyMac." This was a firmly ingrained culture at IndyMac, and was part of IndyMac's focus on generating as many loans as possible, with little regard for credit quality.  Perry  implemented the "speed rules" concept through practices including his "Flamingo Rule," which required employees seeking his guidance to "pop in my office, quickly present the issue (in the amount of time you can 'stand on one leg!') and get my feedback."  Van Dellen implemented a similar arbitrary rule limiting discussions of loans in the loan committee to 20 minutes.  At one point, Van Dellen  even attempted to implement a policy abolishing loan approval memoranda altogether.  FDIC Complaint ¶ 54.

c) IndyMac's upper management commissioned an internal report of the Homebuilder Division in early 2008, which was subsequently reviewed by an outside consultant, who summarized his conclusions to Perry.  The report reviewed ten problem loans, including risky condo loans in Florida.  The consultant commented that the

weaknesses in the loans "were present at the origination of these deals. I don't think I'm using hindsight here." The FDIC Complaint also alleges that Perry responded by blaming Homebuilder management, stating "I was aware of the condo deals (and was opposed to them …. To me, it shows you can't be in this business. … because you are always getting screwed every down cycle and losing all your profits for years … because the management and loan officers are too 'in bed' with the builders and always will be. I was not aware of the other issues and they represent a disturbing lack of management, judgment and discipline in a business that was supposed to be all about credit risk management (unlike mortgage banking) …" A few months later on May 7, 2008, Perry wrote a note to [IndyMac's President] Wohl and Van Dellen attaching a copy of Koon's June 30, 2006 memorandum on "changing market conditions." Perry told Wohl and Van Dellen that Koon's departure [from HBD on July 15, 2006] and his memorandum "should have been the signal we needed to batten down the hatches and stop production." FDIC Complaint, ¶¶ 65-66.

97.    Facts alleged in the Complaint the SEC filed against S. Blair Abernathy ("Abernathy Complaint"), who succeeded Keys as Chief Financial Officer, provide further evidence that IndyMac's loans during the Class Period were based on fraudulent underwriting, and confirm that IndyMac executives *knew* about the pervasive fraud in borrower loan documents, because they received or had access to internal monthly reports issued by IndyMac Bank's PPQC department and distributed throughout the Company by e-mail and posted on IndyMac's intranet site.   Abernathy Complaint ¶¶ 16-20.   The PPQC reports disclosed the systemic and pervasive violation of underwriting standards at IndyMac.   The PPQC unit performed monthly quality control audits of the Bank's

loan production and issued monthly reports based on an analysis of a statistically valid random sample of the Bank's total loan production. *Id.* ¶ 16. The reports revealed that the "defect rate"[4] of a sample of IndyMac Bank's total loan production ranged from 10% to 22% from September 2005 though August 2007 and that the Conduit Division had a defect rate of up to 30% from April 2005 through August 2007; and that 12% to 18% of a random sample of IndyMac Bank's total loan production contained misrepresentations from January 2007 (when reporting of that statistic began) through August 2007. *Id.* ¶ 19. From May through August 2007, IndyMac Bank conducted six offerings of residential mortgage-backed securities ("MBSs") totaling $2.5 billion securitizing only Conduit Division loans. According to the SEC, each of these offerings misrepresented the quality of the loans underlying the MBSs, because of borrowers' misrepresented information in loan documents they filled out in obtaining the loans. *Id.* ¶ 15.

98.     Specifically, from 1994 to August 2007, IndyMac's PPQC department conducted monthly quality control audits of the Bank's loan production, then selected a statistically valid random sample of the Bank's total loan production and ***assessed each loan*** to determine whether the borrower or a third party, such as the mortgage broker or appraiser, misrepresented information in obtaining the loan. The PPQC reports concluded, among other findings, that from January through

---

[4]   The PPQC reported the "defect rate" as follows:  If PPQC identified a loan misrepresentation, it recalculated the loan's estimated lifetime loss using the corrected information.  PPQC then determined the increase in the loss estimate between the loan as underwritten and as corrected.  PPQC rated the estimated loan loss as "severe" if it had a misrepresentation finding and the loss estimate increased by more than 50 basis points.  PPQC also rated a loan "severe" if it had an underwriting error and an increase in the loss estimate greater than both 100% and 100 basis points.  PPQC rated loans as "moderate" if the loss estimate increased by up to 50 basis points and was based on a loan misrepresentation, or increased by both 50% to 100% and 50 to 100 basis points and was based on an underwriting error.  In addition to the "severe" and "moderate" rates, PPQC reported the "defect" rate, which was the "severe" and "moderate" rates combined.  Abernathy Complaint ¶ 18.

August 2007, 12% to 18% of IndyMac's loans contained the following misrepresentations regarding important loan and borrower characteristics:

(1)   borrowers stated that the home was their primary residence when it actually was a second home for which they would be less likely to repay the loan;

(2)   the appraisals were inflated to artificially lower the loan-to-value ratio;

(3)   borrowers overstated their income, for example, a flooring installer gave a stated income of $13,500 per month;

(4)   borrowers overstated their employment, for example, one stated that he worked for a trucking company but actually had quit nine months earlier;

(5)   borrowers overstated assets, or understated or failed to disclose liabilities, for example, one borrower stated that he had $29,000 in savings when he had zero, and another obtained loans on two properties from different banks; and

(6)   borrowers were "straw buyers" – a borrower with good credit obtained a loan for a relative with poor credit, thus concealing the true identity, employment and credit history of the borrower.

Abernathy Complaint ¶¶ 16, 19.

99.   According to the Abernathy Complaint, the misrepresentation information identified in the PPQC reports was extremely reliable:  Before the PPQC made a finding that a loan contained a misrepresentation, it developed **actual proof** that the information on the loan application was false.  For example, PPQC did not find an employment misrepresentation occurred unless the **borrower admitted** that the information was false, or the **employer confirmed** that the borrower did not work there.  PPQC, however, gave each mortgage production

unit, including the Conduit Division, the opportunity to dispute any finding before it became final. The Conduit Division disagreed with PPQCs findings only about 2% of the time. PPQC prepared monthly audit reports and distributed them about three to four months after the audited month. The reports supplied spreadsheets that provided loan-by-loan detail of PPQC's findings with supporting reasons and the response of the business unit responsible for the loans. According to the SEC, the PPQC Department distributed the monthly reports by e-mail and posted them on IndyMac's intranet website. Abernathy Complaint ¶¶ 16-20. Thus, they were available to the Defendants.

100. The loan information was material. The MBSs in these six offerings experienced substantial loan delinquencies and ratings downgrades. Abernathy Complaint ¶ 5. The shoddy underwriting increased the risk of default and foreclosure, requiring an increase in ALL. Further, as alleged herein in ¶¶ 328-335, these MBSs were likely subject to warranties from IndyMac to repurchase the loans if they breached underwriting representations and warranties – which they did – thus requiring IndyMac to increase the level of Secondary Market Reserves.

101. On July 20, 2008, *The New York Post* published an article by investigative reporter Teri Buhl titled "[OTS] Officials Missed IndyMac Red Flags." That article listed three "red flags" that regulators should have noticed, and that Defendants – including Ernst – were aware of long before the Bank's collapse:

> IndyMac was late in adhering to a federal rule banning lenders from lending to people who did not provide ample documentation verifying their income.
>
> The rule, which was mandated by a group of regulators that included the Federal Reserve, FDIC and OTS, took effect in September 2006. But according to internal IndyMac compliance documents reviewed by *The Post*, IndyMac didn't comply until November 2007 - something OTS compliance officials should have spotted.

Another missed opportunity, [advocacy group The Committee for Responsible Lending] said, came when the lender would pull employees in on the weekends in 2006 to tweak loan documents by inflating home appraisals on mortgages that had been rejected by Wall Street. Had OTS safety and soundness officers reviewed IndyMac's appraisal valuation processes, CRL said, they would have noticed the practice.

The third strike for the regulators came in August 2007, when IndyMac bought branches of the defunct American Home Mortgage, even though data show the bank had a growing problem with non-performing assets.

"The bottom line is that the IndyMac failure could have been prevented if common sense lending standards had been required in 2006," said Martin Eakes, CRL's CEO.

102. Further evidencing the fraudulent quality of the loans underwritten and originated by IndyMac, and its deviation from safe and sound banking practices, on December 31, 2008, *Bloomberg.com* reported that Fannie Mae and Freddie Mac had found IndyMac to be liable to repurchase between $1 billion and $10 billion in loans that violated representation and warranty agreements between IndyMac and those agencies. When a mortgage originator sells the loan, it makes representations and warranties to the buyer with respect to the borrower, the property securing the loan, the mortgage instruments, and the underwriting. If those representations and warranties are false or breached – which most commonly occurs when there is fraud, misrepresentation, or unexpected delinquency from poor quality in the underlying mortgage – the originator/underwriter is obligated to repurchase the mortgage. James Lockhart, the director of the Federal Housing Finance Agency, the regulator of Fannie Mae and Freddie Mac, explained the reason for such incredibly large repurchase

1565686v1/010900

demands:  "In 2006 and 2007, the underwriting was so poor, there was a lot of fraud that happened or a total misrepresentation."

103.   IndyMac's fraudulent underwriting practices also encompassed its solicitation and use of artificially inflated property appraisals.   IndyMac's solicitation and use of inflated appraisals from non-independent appraisers is currently the subject of investigations by the FBI and FDIC.  As *The New York Post* reported on August 3, 2008:

> The federal investigation into mortgage fraud at IndyMac Federal Bank has expanded into the company's Homebuilder Division, according to a bank executive interviewed by the FBI and FDIC. Investigators have seized 2005-06 construction loan audit reports from the files of the Homebuilder Division, the executive told *The Post*, and later questioned him and other workers about the reports, he said.

> The recently renamed Homebuilder Division, which lent money on commercial and residential construction projects until [it] stopped lending at the end of 2007, had a staggering 52 percent of its $1.3 billion in loans classified as non-performing as of March 31, [2008], according to a government filing.

> Even in a down market, a non-performing rate closer to 20 percent to 30 percent is more usual, according to a person familiar with the local real estate market.

> Based on the question asked by investigators, one focus of the probe appears to center on whether or not the appraisal inspectors inflated real-estate development project values and whether IndyMac loan officers gave independent appraisers false information.

> "They asked about how we verify appraisal values," said the executive, who spoke on the condition of anonymity.

"I explained the lack of risk controls in place for that group, such as loan officers who were allowed to pick their own appraisers instead of using a third party to assign an independent appraiser - which is a typical industry practice," he said.

104.   Independent witnesses have corroborated the existence of such fraudulent appraisal practices.   According to Andrew Eliopolus ("Eliopolus"), President of Eliopolus Development, a private construction company, IndyMac approved a $36.5 million loan to Eliopulos Development in order to develop real estate near Lancaster, California that contained 539 home plots on about 900 acres. Later, in April 2007, in connection with a renewal on the loan, IndyMac commissioned an appraisal and determined that the property was worth $82 million.   On the basis of this appraisal the loan was extended through December 31, 2007.   This appraisal permitted IndyMac to claim that the loan-to-value ratio was 33%, and that the loan was oversecured.   In order to extend the loan beyond January 1, 2008, IndyMac required a new appraisal, which was completed in December 2007, and determined that the property was worth only $17 million, even though there had not been a significant shift in real estate values in the area where the project was located in the eight months between the two appraisals.   The loan had been reviewed by the "IndyMac Bank Senior Loan Committee," which Eliopolus was told consisted solely of Perry.

105.   According to Vernon Martin, the Company's Chief Commercial Appraiser in 2001 and 2002, IndyMac hired Perry's father and father-in-law as the sole construction inspectors in the Sacramento, California region.   Perry's father remained associated with IndyMac as a purportedly independent inspector through 2008.   IndyMac also relied heavily on a small number of appraisers who were known to be more "flexible" than others, that is, more willing to grant higher appraisals to parcels of land.   In one instance, prior to the Class Period, a commercial property that had been purchased for $2 million was appraised at $17

million a few months later, even though the property had no tenants. In another instance, an undeveloped parcel of land was purchased for $18 million, and appraised at $30 million on the claimed basis that the developer added value to the property simply by buying it.

106.   According to former IndyMac loan officer Cody Holland ("Holland"), IndyMac continued to manipulate appraisals into the Class Period, and said manipulation affected both residential and commercial mortgages. Specifically, IndyMac selected particular appraisers who were known to inflate their appraisals for properties where the loan appeared questionable. Holland's statements are corroborated by the confidential witnesses cited in the complaint in the action styled *Cedeno v. IndyMac Bancorp, Inc., et al.*, Case No. 06-CV-6438-JGK, filed in the United States District Court for the Southern District of New York, who are alleged to have said that IndyMac told its outside appraisers the "target value" that was needed to secure approval of a residential loan. Appraisers who accommodated the Bank's requested appraisal values were rewarded with additional work, while those who did not were cut off. IndyMac's Chief Appraiser and other executives were aware of and acquiesced in this practice. IndyMac's management intimidated and threatened to fire employees who rejected fraudulent appraisals.

107.   The Treasury Report also identified particularly unsound underwriting, risk management and appraisal practices "in several significant areas of [IndyMac's] operations" based on interviews with OTS, FDIC and IndyMac employees and review of documents. In particular, The Treasury Report also found that the appraisals in the Homebuilders Division ("HBD") (1) violated policies and procedures; (2) violated OTS and Uniform Standards of Professional Appraisal Practice; (3) used inflated appraised values; (4) lacked market analysis and feasibility studies to support appraised value; (5) valued properties far in

excess of the recent sale prices for the subject properties; and (6) used retail values for subdivisions instead of prospective market value at the time of completion.

108.    In early 2008, an independent auditor was brought in to examine IndyMac's appraisal practices, among other things.   The primary finding of the firm, based on interviews with retail and wholesale underwriters, was that IndyMac underwriting was not centrally managed and was not consistent across the Company.

109.    In short, fraudulent and reckless loan underwriting practices–including the solicitation and use of fraudulent, manipulated appraisals–were pervasive both prior to and during the Class Period.  As discussed below, IndyMac and Perry not only concealed these practices, they made repeated false statements touting the relatively conservative nature of IndyMac's underwriting policies and practices in order to reassure investors that IndyMac would "fare better" than other lenders.

C.    **Internal Audits, Outside Audits, and OTS Examinations Repeatedly Identified Underwriting, Appraisal and Internal Control Deficiencies at IndyMac**

110.    Perry, Keys, and Ernst were fully aware of these deficiencies in underwriting and internal controls because they were repeatedly identified in internal audits, outside audits, and OTS examinations – yet never corrected.

111.    For example, the Conduit Division was one of IndyMac's most troubled divisions.   An internal IndyMac audit identified problems with the Conduit Division's loan approval and underwriting processes as early as 2005, and recommended that the division increase investment in infrastructure and personnel. According to OTS, no changes were ever made.

112.    In 2006, an IndyMac internal audit again reported problems in the Conduit Division.  That same year, Ernst itself reported the Conduit Division as a financial reporting control deficiency.  Ernst found that the division did not have

1565686v1/010900

64

an effective process or system in place to oversee the execution of its trading activities or for monitoring the exposure to sellers, which increased credit risk. Perry and Keys were also aware that the Conduit Division in particular was producing defective loans, because the PPQC department distributed monthly reports that showed that the Conduit Division had a defect rate of up to 30% from April 2005 through August 2007. The PPQC distributed the monthly reports by e-mail and posted them on IndyMac's intranet site. Abernathy Complaint ¶¶ 19-20.

113. According to OTS, the problems were never addressed and Ernst continued to certify IndyMac's financial statements and internal controls. Indeed, in its January 2007 examination OTS *again* found that the problems in the Conduit Division remained uncorrected. This time, it referred the matter to IndyMac's Board of Directors – Chaired by Perry – and required it to "provide actions taken (1) to address the internal audit findings noted in the 2006 and 2007 internal audits, (2) to improve the internal control environment, and (3) to ensure the Division develops more robust, transparent management reports." OTS then required that the following corrective action be taken: "Ensure the Conduit Division corrects the internal audit findings noted in the last report and ensure that the Division is operating in a strong internal control environment. In addition, the Division must develop more robust, transparent management reports." Moreover, according to the Treasury Report, "IndyMac management" independently identified credit risks in the Conduit Division in *February 2007*, including the need to implement tighter seller approval and underwriting standards.

114. In its January 2007 examination, OTS also identified serious issues with IndyMac's appraisals. OTS found that the borrowers, rather than the mortgage originator, were paying the appraisers directly, which did not ensure appraiser independence. In several of the loan files, the OTS appraiser noted inadequate documentation. In the examiner workpapers, the OIG noted that the examiner found appraisals where the property valuation was made without

physical site inspection of the subject property or comparable properties, appraisals for which the appraiser was not located in the immediate area, appraisals where the valuations were based on public data sources, and appraisals in which no photos of the property or comparables were provided.

115.   According to the Treasury Report, there is no evidence that IndyMac ever adequately addressed these appraisal issues.   Indeed, in early 2008, an independent auditor was brought in to examine IndyMac's appraisal practices, among other things.   The primary finding of the firm, based on interviews with retail and wholesale underwriters, was that IndyMac's appraisal policies were deficient and underwriting was not centrally managed and was not consistent across the Company.

116.   The January 2007 examination also identified problems with IndyMac's forecasting, ALL methodologies, and the classification of troubled assets, requiring the following corrective actions to be taken by IndyMac:

- "Establish a policy and related procedures for the identification and classification of troubled collateral dependent loans."

- "Refine current ALLL practices or introduce new methodologies to take advantage of more robust data and improve forecasts."[5]

- "Ensure the new earning forecasting process is implemented."

- "Develop and implement thrift-wide risk measures and sub-allocate, as appropriate, to all individual business units."

117.   Most, if not all, of these issues were never corrected.   For example, in January 2008 – a year after the January 2007 OTS examination – an independent accounting firm brought in to examine IndyMac's financial reporting identified persisting deficiencies in IndyMac's calculation of ALL.   The independent

---

[5] "ALLL" stands for "allowance for loan and lease losses."   Because IndyMac did not have substantial leasing activities, its financial statements generally refer to ALL.   For purposes of this complaint, the acronyms "ALL" and "ALLL" are interchangeable.

accounting firm found that there were no internal controls in place to ensure that different divisions were applying the same standards, and no internal controls were in place to ensure that they were using sound methodology in calculating ALL.

118.    The January 2008 OTS Examination, discussed in greater detail below, confirmed that serious internal control problems were never corrected – and deteriorated even further – throughout 2007.   The 2008 Examination Report identified ten "matters requiring IndyMac Bank board attention," and 24 "corrective actions [needed] to be taken by IndyMac."   Four of the ten matters requiring IndyMac board attention related to internal controls, and at least ten of the corrective actions related to internal controls problems that affected the calculation of ALL.  The OIG Report defines "matter requiring board attention" as "[a] thrift practice noted during an OTS examination that deviates from sound governance, internal control, and risk management principles, and which may adversely impact the bank's earnings or capital, risk profile, or reputation, if not addressed; or result in substantive noncompliance with laws and regulations, internal policies or processes, OTS supervisory guidance, or conditions imposed in writing in connection with the approval of any application or other request by the institution."

119.    IndyMac had also been aware of potential problems with the Home Construction Lending ("HCL") Division well before the Class Period.  In 2004, an internal audit found several problems, including: (1) a $517 million bridge loan for which an appraisal was not obtained to support collateral value; (2) loans with expired insurance policies; (3) 22 loans that did not have evidence of building permits on file; (4) 122 title endorsements checks for new liens or delinquent taxes recorded against property that could affect IndyMac's lien position; and (5) money provided to borrowers for 18 loans did not have supporting documentation for these amounts as required with such documents as invoices or contracts.

120.   In the January 2007 examination, the OTS identified these same problems with the HCL Division as persisting.  According to its 2007 Report of Examination, the OTS reported serious concerns in the underwriting standards of the HCL Division and could not verify that management had determined that sufficient funds existed to complete projects.  Overall, the examiners noted a number of findings related to the HCL Division portfolio. One of the OTS examiners stated in an e-mail to another examiner, with regard to the HCL Division, that the "appreciation in the market during the last 4 to 5 years was a wonderful deodorant to any sloppy or loose underwriting or fund control processes." OIG Report at 23-24.

121.   As IndyMac's two most senior officers, Keys and Perry were aware of each of these audits and reports.  Both certified in six different class period SEC filings that they were "responsible for establishing and maintaining internal controls" and "ha[d] designed such internal controls to ensure that material information relating to the company . . . is made known to such officers by others within those entities." As defined by SEC rules, "internal controls" include both those related to financial reporting and those necessary to ensure disclosure of material facts to investors.  Moreover, Keys was responsible for and compensated based on his management of all reports and audits relating in any way to internal controls.   Each of the above reports and audits necessarily affected IndyMac's financial reporting, as items such as loan loss allowances are necessarily based on the collateral value of assets.

122.   As discussed in more detail below, Ernst was also aware of each of these audits and reports.  Not only is investigation of such facts necessary for a PCAOB-compliant audit, but Perry and Keys certified on six occasions that they disclosed "all significant deficiencies in the design or operation of internal controls which could adversely affect the issuer's ability to record, process, summarize, and report financial data and have identified for the issuer's auditors any material

weaknesses in internal controls."  Moreover, with respect to the Conduit Division, Ernst had itself identified internal control deficiencies therein.

## VII.  DEFENDANTS MISLEAD AND DEFRAUD INVESTORS

### A.  Defendant Perry Misleads Investors Regarding IndyMac's Risk Management, Underwriting, and Appraisal Practices

#### 1.  False and Misleading Statements Related to Underwriting, Risk Management, and Appraisals

123.  As alleged above, IndyMac systematically disregarded sound underwriting practices, systematically overrode IndyMac's own underwriting standards and risk control procedures, routinely approved loans based on fraud and misrepresentations, engaged in fraud and misrepresentation in accepting mortgage applications, fired or forced out employees who attempted to sound the alarm regarding IndyMac's underwriting practices, and otherwise fostered a corporate culture that encouraged employees to push mortgages through without regard to underwriting standards.

124.  Notwithstanding these practices, defendant Perry repeatedly represented to investors throughout the Class Period that IndyMac had "strong underwriting guidelines," was a "prudent manager of risks," independently verified appraisals and income for reasonableness, had "high standards . . . for credit quality," and had put "risk management at the core of [IndyMac's] operations." The false and misleading statements regarding the Bank's underwriting practices and risk management are summarized below:

(a)  "We manage [the] credit risk [associated with non-performing assets] by implementing strong underwriting guidelines and risk-based pricing."  IndyMac March 1, 2007 Form 10-K and April 26, 2007 Form 10-Q (signed by Perry).

(b)  "[W]e verify [our] appraisal[s], we review [our] appraisals. We get not only a full appraisal but we do an automated appraisal in

addition to it.   We independently check their credit.   We verify employment.   We verify their income and their assets and we check their income for reasonableness.   We do a lot of steps on those loans. We think that's a prudent business for us."   Statement by Perry, on April 26, 2007, 1Q Earnings Call With Securities Analysts and Investors.

(c)   "We have made significant investments in our pre-production and post-production quality control processes to identify potential issues that could cause repurchases.   We believe that these efforts have improved our production quality."   IndyMac, April 26, 2007 Form 10-Q (signed by Perry).

(d)   stating that the Company would "maintain our high standards for customer service and credit quality."   July 19, 2007 Posting on the IMBreport.com (quoting Perry).

(e)   Touting   "prudent   underwriting   practices"   in   the Homebuilder Division.   Statement by Perry, on July 31, 2007 2Q 2007 Earnings Call.

(f)   "Our philosophy is to put risk management a the core of our operations[.]"  IndyMac July 31, 2007 Form 10-Q and November 6, 2007 10-Q (signed by Perry).

(g)   Touting   "prudent   regulatory   compliance   and   risk management" and strong risk management practices.   IndyMac September 7, 2007 Press Release (quoting Perry).

(h)   "I would say today 99% of our production is prior approved, fully underwritten under the stringent underwriting guidelines."   Statement by Perry, on November 6, 2007 3Q 2007 Earnings Call.

125.   These statements were false and misleading for the reasons alleged in ¶¶ 73-121 above.  Throughout the Class Period, IndyMac had grossly deficient – and in fact fraudulent – underwriting and risk management policies and practices. IndyMac in fact applied loose or non-existent underwriting standards, overrode decisions of quality control personnel, and had poor quality loans, as confirmed by IndyMac's delinquency rates and massive repurchase demands.  As Joanne Kim, CEO of Wilshire Bancorp Inc., stated: "IndyMac was willing to buy anything."

126.   IndyMac also made false and misleading statements relating specifically to underwriting and credit quality of IndyMac's Homebuilder Division, including the following:

(a)   "At December 31, 2006, non-performing loans for the builder construction portfolio are at 0.78%. . . .  We manage this credit risk by implementing strong underwriting guidelines and risk-based pricing.  Our current weighted average loan-to-value ratio is 73%."  IndyMac 2006 Form 10-K, issued March 1, 2007.

(b)   "The bulk of our subdivision construction business is a very prudent business. . . . I think we clearly substantially tightened our condo guidelines but I would say overall I am very pleased with our underwriting and credit quality."  Statement by Perry, on July 31, 2007 2Q 2007 Earnings Call.

(c)   Purported good performance of builder construction divisions is attributable in part to "prudent underwriting practices." Statement by Perry, on July 31, 2007 2Q 2007 Earnings Call.

(d)   "We've . . . done a great job in underwriting those [subdivision construction] loans. It's just a really challenging cycle for those homebuilders now."  Statement by Perry, on November 6, 2007 Securities Analyst Conference Call.

127. These statements were false and misleading for the reasons alleged in Paragraphs 104-105, and 119-120, above. The underwriting on IndyMac's Homebuilder Division loans was particularly rife with fraud and inadequate controls, as confirmed by the Treasury Report. Indeed, six months after declaring the Homebuilder Division to be a "very prudent business" for IndyMac, the Company – in the wake of rising delinquencies and defaults – shut down the entire division. The Homebuilder Division is currently the target of an FBI investigation and, as discussed above in ¶¶ 8-11, its former key officers are Defendants in a case brought by the FDIC.

## 2.   Defendant Perry Acted With Scienter

128. Perry made the above statements with scienter because he had actual knowledge of IndyMac's deficient and fraudulent underwriting, risk management, and appraisal policies.

129. In addition to the facts above which show the falsity of Perry's statements (and thus also show his scienter in making those statements), numerous additional facts support a strong inference of Perry's scienter. *First*, as demonstrated above, Perry was personally involved in the fraud. As Leigh stated, in 2006, Perry was aware of the preliminary report that Leigh had prepared containing negative findings, including that 11 to 15 percent of all current loans had problems, far exceeding the industry norms. Leigh also stated that she believes that Perry fired her and others because Perry and Minier sought to hide the negative findings in her report from IndyMac's board, and the only way for them to do that was to fire Leigh and other employees. "They did not want anything found." Those actions are completely inconsistent with Perry's public statements about the importance of risk management and sound loan underwriting. Perry also made structural changes – such as the termination of senior compliance officers and placing compliance under the control of central mortgage operations – that were clearly intended to "neuter" the compliance department.

130.   **Second**, because IndyMac's underwriting guidelines directly affected the value and credit quality of IndyMac's loans – and therefore were fundamental to IndyMac's overall financial condition – IndyMac senior management, including Perry, closely monitored and managed IndyMac's prime and subprime lending underwriting guidelines and operations.

131.   **Third**, Perry  knew of the findings by IndyMac's internal audit team concerning the home construction lending division in 2004, 2005, and 2006, discussed in ¶ 119 above.  Perry also knew of Ernst's concerns regarding internal controls in the Conduit Division in 2006 (¶  122), and the concerns reflected in the OTS's January 2007 Report of Examination regarding IndyMac's appraisal practices. ¶ 113.  He also knew that these concerns remained uncorrected.  As detailed in the FDIC Complaint, Perry also knew of the serious problems that pervaded the Homebuilder Division.   ¶ 96.   In addition, as detailed in the Abernathy Complaint, Perry and Keys knew the reasons for and numbers of defective loans, and that the Conduit Division was responsible for many of them, because the PPQC department issued detailed monthly reports with rates of defects, including a chart that broke down the findings by business unit, and a spreadsheet providing loan-by-loan detail, which were distributed by e-mail and were posted internally on IndyMac's intranet.   The PPQC reports stated, for example, that the Conduit Division had a loan defect rate of up to 30% from April 2005 through August 2007, and that 12% to 18% of a random sample of IndyMac Bank's total loans contained misrepresentations which ranged from 12% to 18% from January through August 2007.   Abernathy Complaint ¶¶ 19-20.

132.   According to the Treasury Report, in the beginning of 2007, Perry "expressed concerns about the thrift's subprime portfolio in an e-mail message to his executives that discussed the secondary market disruption."   In the message, Perry "stated that the thrift's financial condition was suffering from the effects of its subprime loans and was in the process of structuring a transaction to sell

approximately $1.1 billion of them." However, Perry also stated that "Wall Street had 'pulled financing from investors.'" The Treasury Report also stated that Perry "said that the thrift also needed to revisit product guidelines in the high risk areas such as subprime, fully financed mortgages, as well as the thrift's highest loan-to-value (LTV) products and make those products 'considerably more conservative.'"

133. The claim and counterclaim in the actions between IndyMac and PMI, a mortgage insurance company which insured many of IndyMac's mortgages, provide additional evidence that Defendants, including Perry, intentionally or with deliberate recklessness   disregarded the extent and severity of the defective underwriting tainting IndyMac's loans, requiring increases to ALL, and exposing IndyMac to serious undisclosed risk of loss. In 2008, IndyMac sued PMI for rescinding certain mortgage contracts in the action captioned *IndyMac Federal Bank, F.S.B. v. PMI Mortgage Ins. Co.*, N.D. Cal. C.A. No. 08-4303, September 12, 2008. In its counterclaim against IndyMac (Docket No. 27 filed November 24, 2008) PMI alleged that between May and August 2007, IndyMac delivered 6,242 loans, with an aggregate value of over $500 million, to PMI, which would insure payments on these loans following securitization. PMI determined that ***over 80% of the loans delivered in this period contained material underwriting deficiencies***, and sought to rescind its insurance agreement. Counterclaim ¶¶ 4-7, 37. PMI informed IndyMac Bank of its findings by a letter to an IndyMac senior officer dated December 4, 2007. The letter, from a PMI Managing Director, stated: "as our account team has discussed with you, it is clear that the audit results far exceed our tolerance for data and decision variances." *Id.* ¶ 40.

134. Given the dramatic effect that PMI's rescission, discussed above, would have on IndyMac, the facts described in the PMI lawsuits would necessarily have been made known to Defendants and required a further adjustment to ALL.

135. At the very same time IndyMac was engaging in these deficient and fraudulent underwriting practices, Perry was publicly stating that IndyMac was

employing "prudent" risk management and strict underwriting guidelines. ¶124(e). Perry also insisted – falsely – that: "[W]e verify [our] appraisal[s], we review [our] appraisals.  We get not only a full appraisal but we do an automated appraisal in addition to it.  We independently check their credit.  We verify employment.  We verify their income and their assets and we check their income for reasonableness.  We do a lot of steps on those loans.  We think that's a prudent business for us."

136.   The foregoing paragraphs provide **direct evidence** of Perry's personal involvement in directing the improper lending, appraisal, and underwriting practices at IndyMac.  Even apart from this direct evidence , the fraud and misconduct was so pervasive at IndyMac that there is a strong inference that Perry was aware of it.  Perry was not a detached executive; instead, he was described by numerous witnesses as a "hands-on manager" who sometimes personally reviewed mortgage applications.  According to a former manager at IndyMac quoted in the September 15, 2008 *Los Angeles Business* article, "[a]ll the strategic direction of IndyMac was Mike [Perry] dictating it."  Indeed, he was the sole public face of the company – answering virtually every question on Company earnings calls himself.  And IndyMac's own regulatory filings describe the broad scope of his duties.  Specifically, Perry was:

> …responsible for the overall direction and administration of all programs and services provided by the Company and for ensuring that all aspects of the Company's activities are conducted commensurate with the best interests of shareholders, customers, employees, and other key stakeholders.  His responsibilities include: (i) setting the strategic vision and establishing a strategic, financial and risk management plan for the company, (ii) recruiting and retaining a senior management team which has the talent and experience to execute the plan, (iii) monitoring the Company's execution, financial and operating performance, (iv) adapting the Company's strategic and execution plans based on

Company performance and conditions in the mortgage market and U.S. economy, and (v) managing all key activities related to IndyMac's being a public corporation.  He reports to the Board of Directors as the highest ranking official of the Company.

* * *

Mr. Perry's responsibilities, as described above, are significantly broader than any other Named Executive Officer at the Company.

*See* IndyMac's Proxy Statement dated March 24, 2008.

137.  Defendant Perry himself, in the statements concerning underwriting and appraisal practices quoted in this Complaint, represented to the investing public that he had personal knowledge of the practices he was discussing.

**B.      Ernst's Unqualified Opinions Regarding IndyMac's Internal Controls Over Financial Reporting Were Materially Misstated When Made**

138.  As set forth above, IndyMac repeatedly made exceptions to its underwriting, appraisal, and lending guidelines in order to originate larger mortgage volume.   These practices, among others identified herein, evidence significant deficiencies and material weaknesses in the Company's system of internal controls and contributed to the improper reporting of financial results and performance data at all times throughout the Class Period.

139.  Notwithstanding these material deficiencies, Ernst  issued unqualified opinions on IndyMac's 2006 Form 10-K and 2007 Form 10-K, falsely certifying that IndyMac's financials, including reported ALL, complied with GAAP, and that the Company's internal controls over financial reporting were effective.  Ernst also publicly stated in each of its opinions that it performed its audits and evaluations in accordance with the standards of the PCAOB.

1. **Applicable Accounting Standards, the Definition of "Material Weaknesses" in Internal Controls, and Ernst's Duty to Independently Assess Internal Controls**

140. Because underwriting is one of the major processes for a lending institution, the controls related to underwriting are critically important to ensure the material accuracy of the financial statements. Therefore, the auditor must focus on and continually monitor the internal controls for underwriting in assessing and certifying the internal controls in its audit of the financial statements. Applicable accounting standards and guidance make clear the interrelationship between a lending institution's (1) adherence to established underwriting guidelines, (2) internal controls surrounding both underwriting and the computation of loan loss reserves, and (3) the accuracy of its financial statements. In fact, these three factors are inextricably linked, and are considered as such both by auditors – who are required to consider the effectiveness of internal controls over financial reporting in the area of credit losses for purposes of performing an audit on the financial statements of a lender such as IndyMac – and by investors, who understand and can reasonably expect an auditor's "clean" opinion to encompass, among other things, consideration of each of these three factors sufficient to render an unqualified opinion regarding the material conformity of the institution's financial statements with GAAP.

141. For example, particular guidance available to and required to be considered by Ernst for purposes of its audits of IndyMac included the AICPA Audit and Accounting Guide for Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies and Mortgage Companies (with conforming changes as of May 1, 2006) (the "2006 AAG" or "AAG").[6] Defendant Ernst was required to consider this guidance to ensure both that it had

---

[6] The AICPA, along with the PCAOB, is the primary governing body for auditors and is responsible for the promulgation of auditing standards.

performed its audits in accordance with GAAP and, ultimately, that such audits would allow it to render an opinion regarding the material conformity of IndyMac's financial statements, including the ALL, with GAAP. Loans are "the most significant assets" of a bank and "generate the largest portion of revenues." AAG 8.01. Therefore, to conduct a proper bank audit, the auditor must focus on the bank's lending process, including the nature of the loan portfolio and underwriting quality, as well as other factors such as general economic conditions. AAG 8.02. As IndyMac stated in its 2006 and 2007 Forms 10-K, the Company's business is "primarily" focused "on single-family lending and the related production and sale of loans."

142.   The 2006 AAG confirms that because of the risk for errors or fraud in financial statements of companies like IndyMac, whose major business was loans, it is critical for the auditor to focus on internal controls and testing of the underwriting process to be certain that the Company has established and followed particular guidelines in the origination of loans, primarily to ensure the quality of such loans. As the AAG states, *"[e]ffective internal control over financial reporting in this area should provide reasonable assurance that errors or fraud in management's financial statement assertions about the loan portfolio – including those due to the failure to execute lending transactions in accordance with management's written lending policies – are prevented or detected."* (AAG 8.136).

143.   As the 2006 AAG explains, an independent accountant can only obtain a "sufficient understanding" of internal controls, including with respect to underwriting and the allowance for loan losses, by performing procedures to understand the Company's policies and practices:

> AU § 319, as amended, requires that, in all audits, the independent
> accountant obtain an understanding of each of the five components of
> internal control (the control environment, risk assessment, control

activities, information and communication, and monitoring) sufficient to plan the audit. A sufficient understanding is obtained by performing procedures to understand the design of policies and procedures relevant to an audit of financial statements and determining whether they have been placed in operation. The auditor is also required to assess control risk for the relevant assertions embodied in the account balances, transaction class, and disclosure components of the financial statements. (AAG 9.49).

144. The 2006 AAG emphasizes the importance of effective internal controls, including with respect to "the lending process" (*i.e.* underwriting and appraisal practices):

> *Effective internal control related to estimating the allowance for loan losses should reduce the likelihood of material misstatement of the allowance for loan losses.* The independent accountant should obtain an understanding of how management developed the allowance for loan losses, how the process has changed from prior periods, and an understanding of the institution's loan portfolio, *lending process, loan accounting policies*, market focus, trade area, and other relevant factors. (AAG 9.50).

145. As the 2006 AAG makes clear, and as Ernst was required to know, underwriting and internal control failures at IndyMac had the potential to impact – and in fact did impact – not only the calculation of ALL, but also the accuracy of the financial statements overall: *"Because compliance with a well-defined lending policy is essential to an institution's asset quality, failure to follow that policy could have a substantial impact on the reliability of financial statement assertions."* (AAG 9.51).

146. Because loans held for investment ("LHFI") were IndyMac's largest asset, and the ALL was the primary means by which IndyMac could adjust the

carrying value of those assets to reflect market conditions and expectations of collectibility, it was critical for IndyMac and Ernst to ensure both: (1) that underwriting controls were in place and being followed (because the effectiveness of controls surrounding the underwriting process formed a baseline for assessing the quality of loans in the LHFI portfolio); and (2) that internal controls surrounding the actual computation of ALL were in place and being followed.

147.  One of the substantive tests Ernst was required to perform to obtain evidence about the effectiveness of internal controls over financial reporting in the area of credit losses was to read minutes of meetings of the board or loan committee for evidence that the board periodically reviewed and approved the ALL, to check whether it complied with GAAP, and to verify that it was based on appropriate documentation.  AAG 9.52.  As discussed below in ¶ 204, for example, IndyMac Audit Committee board minutes in December 2006 revealed that early payment defaults were rising.

148.  The 2006 AAG gives the following example of one way in which a bank's failure to follow underwriting guidelines can result in greater credit risk, understated ALL, and misstatements in the bank's financial statements:

> For example, authority limits established in management's written underwriting policies are based in large part on (a) the knowledge and skill of the reviewing loan officer or committee and (b) the credit risk the institution is willing to assume on a particular type of loan.  A loan made for an amount in excess of an officer's limit, or for an unauthorized loan type, would normally involve great amounts of credit and other risks.  Accordingly, management's financial statement assertions about impairment and valuation of the loan portfolio, for example, may be affected. (AAG 9.51).

149.  The illustration cited in the 2006 AAG is just one example of how underwriting failures and weak internal controls related to underwriting might

impact the calculation of ALL and therefore the financial statements of an institution as a whole, including at IndyMac.   Other documented violations of underwriting policies at IndyMac – including, for example, pushing through loans despite the borrowers' inability to pay, failing to obtain documentation evidencing borrowers' income, and relying on inflated appraisals, among other violations – all increased the risks relating to loan quality and collectibility within IndyMac's loan portfolio.   These risks – which were concealed from investors -- arose, in part, because of deficiencies and material weaknesses in IndyMac's internal controls surrounding its underwriting policies.

150.   As discussed above, the 2006 AAG confirms that because of the risk for errors or fraud in financial statements of companies like IndyMac, whose major business was loans, ***it is critical for the auditor to focus on internal controls and testing of the underwriting process*** to be certain that the Company has established and followed particular guidelines in the origination of loans, primarily to ensure the quality of such loans.

151.   Examples of typical internal control activities relating to financial reporting of mortgage banking activities include use of a quality control function to monitor underwriting and documentation practices.   AAG 10.47.   In addition, AAG 9.59 emphasizes that Ernst was required to consider reports of the Company's own independent loan review function or internal audit, such as the PPQC reports, to identify poorly documented loans and other sources of risk in the loans.

152.   As discussed below, Ernst knew that the loan performance and quality data supplied by IndyMac to calculate the ALL was unreliable.   For example, as the SEC alleged in the Abernathy Complaint, evidence of pervasive and systemic defects in the underwriting process, including in borrower loan documents, was reported in internal monthly reports issued by IndyMac's PPQC department.   The PPQC audited IndyMac Bank's loan production monthly and selected a

statistically valid random sample of the Bank's total loan production. Abernathy Complaint ¶¶ 16-19. The reports were distributed throughout the Company by e-mail and posted on IndyMac's intranet site. *Id.* ¶ 20. These reports were available to Ernst. The reports revealed that the sample's "defect rate" ranged from 10% to 22% from September 2005 though August 2007, and that the Conduit Division had a defect rate of up to 30% from April 2005 through August 2007; and that the percentage of the Bank's loans that contained misrepresentations ranged from 12% to 18% from January 2007 (when reporting of that statistic began) through August 2007. *Id.* ¶ 19. Based on this evidence, Ernst had an obligation to view the loan information with skepticism and collect its own evidence, and to independently assess IndyMac's internal controls before certifying the Company's ALL.

153. Because Defendants failed to adequately increase the ALL in the face of these increased risks and potential or probable losses, IndyMac's LHFI portfolio was overstated, resulting in overstatements of the balance sheet and income statement. As set forth in detail below, in view of these and other known facts, Ernst's unqualified opinions on IndyMac's 2006 and 2007 statements were intentionally or deliberately recklessly false.

### 2. IndyMac's Internal Controls Were Not Effective and Ernst Did Not Perform its Audits in Accordance with the Standards of the PCAOB and GAAS

154. Recognizing the importance of reliable internal financial controls to the accuracy of financial statements – and therefore to investors – Congress enacted Section 404 of the Sarbanes-Oxley Act, requiring audits of internal financial controls ("SOX 404"). SOX 404 requires external auditors such as Ernst to audit and express an opinion on the effectiveness of their public company clients' internal financial controls. Sarbanes-Oxley also requires public accounting firms that audit public companies to register with the PCAOB and to adhere to professional standards established by the PCAOB for audits of public companies.

155.   In order to effectively audit IndyMac's compliance with GAAP and the adequacy of the Company's internal controls, Ernst was required to, but did not, follow applicable PCAOB and GAAS standards in evaluating, *inter alia*, IndyMac's internal controls, including with respect to its adherence to underwriting guidelines, its reserving methodology, and its accounting for ALL and Secondary Market, or "residual" Reserves.

156.   Auditing Standards No. 2 and No. 5 were promulgated by the PCAOB following passage of the Sarbanes-Oxley Act, and are binding on all registered public accounting firms ("AS 2" and "AS 5").   AS 2 applies to audits for fiscal years beginning on or after November 15, 2004, and AS 5 applies to audits for fiscal years ending on or after November 15, 2007.   Under AS 2 and AS 5, Ernst was required to complete a careful examination of IndyMac's underwriting practices, sufficient to determine whether management's representations about adherence to underwriting guidelines in the context of maintaining purportedly effective controls over financial reporting were true or false. AS 2 provides that the objective of an audit of internal control over financial reporting is to form an opinion "as to whether management's assessment of the effectiveness of the registrant's internal control over financial reporting is fairly stated in all material respects."   PCOAB's rulemaking in connection with AS 2 provides: "An auditing process restricted to evaluating what management has done would not provide the auditor with a sufficiently high level of assurance that management's conclusion is correct.   The auditor needs to evaluate management's assessment process to be satisfied that management has an appropriate basis for its conclusion.  The auditor, however, also needs to test the effectiveness of internal controls to be satisfied that management's conclusion is correct, and therefore, fairly stated.  Indeed...investors expect the independent auditor to test whether the company's internal control over financial reporting is effective, and Auditing Standard No. 2 requires the auditor to do so."

157.   Similarly, PCOAB's rulemaking in connection with AS 5 makes clear that Ernst could not simply rely on the assessment of internal controls reached and communicated to it by IndyMac management or third parties, but was instead required to conduct its own independent assessment of internal controls before it could issue a "clean" opinion.   According to AS 5:   "The auditor is required to provide an independent opinion on the effectiveness of the company's internal control over financial reporting....The auditor cannot obtain sufficient evidence to support an opinion on the effectiveness of internal controls based solely on observation of or interaction with the company's controls.   Rather, the auditor needs to perform procedures such as inquiry, observation, and inspection of documents, or walkthroughs, which consist of a combination of these procedures, in order to fully understand and identify the likely sources of potential misstatements[.]"   After performing an independent analysis, an independent auditor is not permitted to issue a clean opinion if any "material weaknesses" exist.

158.   Ernst's unqualified opinions regarding the effectiveness of IndyMac's system of internal controls were materially false and misleading.   As set forth herein, and as confirmed by numerous internal and external audit reports, OTS reports, and the testimony of former IndyMac employees, IndyMac had materially deficient internal controls in areas critical to financial reporting, most notably with respect to underwriting, IndyMac's ALL and Secondary Market Reserve calculations, and particularly in the Conduit Division, HCL Division and Homebuilding Division.

159.   As discussed above, the quality of the loans originated by IndyMac, and in particular the risk level of IndyMac's loans, was crucial to determining, among other things, the calculation of the ALL and the Secondary Market Reserves.   The calculation of the ALL and Secondary Market Reserves was, in turn, critical to the accuracy of IndyMac's financial statements.   However, as set forth below at ¶¶ 269-278, IndyMac failed to properly provision against the

Company's incurred and probable losses because, among other things, it did not take into account the Company's ineffective risk management, unreliable appraisal practices, high-risk loan products, and deteriorating underwriting practices. These failures resulted in the Company's financial statements being materially misstated.

160.   An audit performed in accordance with the standards of GAAS and the PCAOB would need to adequately consider and address IndyMac's internal controls relating to these processes. Had Ernst complied with GAAS and PCOAB standards, it should have uncovered the material understatement of, and errors in, IndyMac's ALL and Secondary Market Reserve and the material weaknesses of IndyMac's related internal controls at the time of its 2006 and 2007 audits. Ernst's audits either failed to detect this critical information, or Ernst did in fact obtain this critical information but then did nothing with it, in violation of applicable accounting standards. In other words, had Ernst complied with GAAS and the standards of the PCAOB, the only reasonable professional conclusions it could have drawn were that (1) IndyMac's reported ALL and Secondary Market Reserves were insufficient and that the Company had failed to account for, *inter alia*, the high-risk, low-quality loans it originated, bought, and/or sold, in violation of GAAP; and (2) that IndyMac's internal controls over financial reporting were so ineffective that the Company's financial statements were not fairly presented in accordance with GAAP.

161.   For example, as part of its audit planning, as well as its required assessment and testing of internal controls, Ernst was required by GAAS and PCOAB standards, but either failed to test on a sufficient basis, or recklessly disregarded the need to do so, to determine whether IndyMac's mortgage loans were being originated both (1) using a system of internal controls and (2) in material compliance with the Company's established underwriting standards. As set forth above, IndyMac management's claim that IndyMac adhered to its published underwriting guidelines was false, and this lack of compliance with and

numerous exceptions to underwriting guidelines was one of the major reasons why IndyMac's loans were experiencing increasing delinquencies and defaults throughout 2006 and 2007 and at the time of Ernst's audits.

162.  Because, as alleged in detail below in ¶¶ 254-333, Defendants' wrongdoing resulted in a material understatement of the ALL and Secondary Market Reserves, it is clear that a "material weakness" existed within the realm of the calculation of those amounts, whether referred to as such or not by Ernst.  AS 2, Paragraph 10, which applied to Ernst's 2006 audit, defines a "material weakness" as: "a significant deficiency, or combination of significant deficiencies, that results in *more than a remote likelihood* that a material misstatement of the annual or interim financial statements will not be prevented or detected." In promulgating AS 5 in 2007, the PCAOB adopted a new definition of "material weakness," which is the same definition used by the SEC in 17 C.F.R. § 210.1-02. This definition, which applied to Ernst's 2007 audit, provides that: "[t]he term material weakness means a deficiency, or a combination of deficiencies, in internal control over financial reporting...such that there is a *reasonable possibility* that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis."

### 3.  Ernst Acted with Scienter when it Certified that Internal Controls Were Effective in the 2006 10-K Signed on February 26, 2007

163.  Ernst signed its 2006 audit opinion on February 26, 2007.  Ernst certified IndyMac's internal controls, stating: "In our opinion, management's assessment that IndyMac Bancorp, Inc. maintained effective internal control over financial reporting as of December 31, 2006, is fairly stated, in all material respects, based on the COSO criteria. Also, in our opinion, IndyMac Bancorp, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2006, based on the COSO criteria." This opinion

was materially false and misleading.  By that time, Ernst had actual knowledge of material weaknesses in IndyMac's internal controls.

164.   The most glaring example was the Conduit division, which originated 33% of all of IndyMac's loans in 2006.  IndyMac internal audit teams identified serious problems with the Conduit Division in both 2005 and 2006.  More importantly, Ernst itself reported on financial control deficiencies stemming from the Conduit Division in 2006.  Ernst found that the Division did not have an effective process or system in place to oversee the execution of its trading activities or for monitoring the exposure to sellers.  At the IndyMac board meeting on December 5, 2006, a director noted that loans originated through the Conduit Division were especially likely to lead to early payment defaults, which would require IndyMac to repurchase loans it had sold to third parties at a loss.  Assuming that it complied with applicable audit standards, Ernst reviewed the minutes of this meeting.   Despite having actual knowledge of the material weaknesses in the internal controls of that division, Ernst issued an unqualified opinion that the internal controls were effective. The Conduit Division ultimately accounted for a material part of IndyMac's losses in 2007.

165.   The material weaknesses in the Conduit Division were not corrected by the time Ernst issued its March 1, 2007 opinion.  OTS began a comprehensive examination of IndyMac on January 8, 2007, and completed that investigation on March 21, 2007.   The OTS found that the problems in the Conduit Division remained uncorrected, and referred the matter to IndyMac's Board of Directors for corrective action.  With respect to the Conduit Division, the OTS required the Board to "provide actions taken (1) to address the internal audit findings noted in the 2006 and 2007 internal audits, (2) to improve the internal control environment, and (3) to ensure the Division develops more robust, transparent management reports." The OTS also required IndyMac to take certain "corrective actions" for the Conduit Division, including: "Ensure the Conduit Division corrects the internal

audit findings noted in the last report and ensure that the Division is operating in a strong internal control environment."   Though these findings were issued after Ernst's March 1, 2007 opinion, they confirm that Ernst knew that the problems that Ernst itself had previously identified had not gone corrected.  Indeed, the Treasury Report confirms that the problems went uncorrected until *November 2007*, when the Conduit Division was closed.  Moreover, Ernst was required to make inquiries to OTS examiners even *"if the examination [was] still in progress," "or [if] their examination report [was] still pending."*  2006 AAG 5.180.

166.    Moreover, even if the material weaknesses had been corrected by March 1, 2007 – which they were not – Ernst still had the duty to disclose them in its audit opinion because the loans originated in the Conduit division in 2006 remained part of the Company's portfolio and would – and did – affect IndyMac's losses throughout the following year.  Indeed, despite being closed in Fall 2007, the Conduit Division would ultimately account for 18% of IndyMac's net losses in 2007. In short, Ernst had actual knowledge of serious unresolved deficiencies in the internal controls of the Conduit division as of March 1, 2007 and nonetheless certified the effectiveness of those internal controls.  Ernst's certification was false and, at the very least, deliberately reckless.

167.    In addition, as alleged by the SEC in the Abernathy Complaint, red flags of material weaknesses in IndyMac's internal controls were demonstrated by the evidence of pervasive fraud in borrower loan documents in internal monthly reports issued by IndyMac's PPQC department through August 2007.  The PPQC department performed monthly quality control audits of the Bank's total loan production, which were distributed throughout the Company by e-mail and posted on IndyMac's intranet site.  Abernathy Complaint ¶ 20.  These reports were thus available to Ernst.  The reports revealed that the loan sample's "defect rate" ranged from 10% to 22% from September 2005 though August 2007, and that the Conduit Division had a defect rate of up to 30% from April 2005 through August 2007; and

that the percentage of the Bank's loans that contained misrepresentations ranged from 12% to 18% from January 2007 (when reporting of that statistic began) through August 2007. *Id.* ¶ 19.   Based on this evidence, Ernst had an obligation to view the loan information with skepticism and collect its own evidence, and to independently assess IndyMac's internal controls before certifying the Company's ALL.

>       **4.      Ernst Acted with Scienter when it Certified that Internal Controls Were Effective in the 2007 10-K Signed on February 28, 2008**

168.   Ernst certified the effectiveness of the internal controls in IndyMac's 2007 10-K on February 28, 2008, stating: "In our opinion, IndyMac Bancorp, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2007, based on the COSO criteria."   This opinion was materially false and misleading.   By this time, Ernst had received the final results of the 2007 OTS Examination, finding that the problems in the Conduit Division remained uncorrected. Perry's announcement of the planned closure of the Conduit Division on November 6, 2007, did not "cure" the problems that IndyMac suffered as a result of that division's severe internal control problems because those assets remained on IndyMac's books and needed to be accounted for in IndyMac's reserves.

169.   Further, by the time Ernst issued its February 28, 2008 certification, other internal control deficiencies had been identified and – assuming Ernst complied with audit standards – brought to Ernst's attention, including:

- The findings by the OTS in the 2007 examination that there were serious deficiencies in IndyMac's appraisal practices and that IndyMac needed to refine its ALLL practices so as not to rely on historical models;

- The findings of an independent auditor in early 2008 that IndyMac's appraisal policies were deficient and underwriting was not centrally managed and was not consistent across the Company;

170.   The January 2008 findings of a second independent auditor concluded that no internal controls were in place to ensure that different divisions were applying the same ALL standards and that no internal controls were in place to ensure that they were using sound methodology in calculating ALL.  Moreover, as discussed above, red flags evidencing the material weaknesses in IndyMac's internal controls were found in internal monthly reports issued by IndyMac's PPQC department through August 2007.   The PPQC department performed monthly quality control audits of the Bank's total loan production, which were distributed throughout the Company by e-mail and posted on IndyMac's intranet site.   Abernathy Complaint ¶ 20.   These reports were available to Ernst.   The reports revealed that the sampled loans' "defect rate" ranged from 10% to 22% from September 2005 though August 2007, and that the Conduit Division had a defect rate of up to 30% from April 2005 through August 2007, and that 12% to 18% of the random sample of IndyMac Bank's loans contained misrepresentations from January 2007 (when reporting of that statistic began) through August 2007. *Id.* ¶ 19.    Based on this evidence, Ernst had an obligation to view the loan information with skepticism and collect its own evidence, and to independently assess IndyMac's internal controls before certifying the Company's ALL.

171.   In light of these facts, Ernst's unqualified February 28, 2008 opinion regarding the effectiveness of IndyMac's internal controls was materially false and misleading.

**C.     On February 12, 2008, Defendants Perry and Keys Mislead Investors Regarding IndyMac's Dealings With the Office of Thrift Supervision and the Soundness of the Company**

**1.     OTS Initiates Its Review of IndyMac Four Months Early and Issues an Initial Ratings Downgrade on January 17, 2008**

172.   As indicated above, IndyMac Bank was regulated by OTS.   This supervision was critical to investors, who relied on OTS to ensure that IndyMac was properly valuing assets and liabilities and ensuring that the Company remained "well-capitalized."   As Roth Capital Partners observed in a May 1, 2007 analyst report, "the benefit of neither the company's access to the [Federal Home Loan Bank] system or its supervision by the OTS should be underestimated in our opinion."   Thus, investors evaluating the health of the company relied heavily upon the views of and actions taken by OTS.

173.   According to the OTS Fact Sheet on IndyMac, the OTS became concerned with IndyMac's financial condition by November 2007.   According to the OTS Fact Sheet, IndyMac changed its business model in November 2007 to focus on originating agency-eligible loans "[i]n response to market conditions and OTS concerns."

174.   As set forth in the Trustee Complaint, by November 2007, senior management became aware that OTS intended to downgrade IndyMac's composite CAMELS rating from a "2" to a "3."   In accordance with OTS's enforcement guidance, there is the presumption that formal enforcement action will be taken for an institution with a composite rating of "3."   Furthermore, as early as November 2007, the OTS recommended to senior management that, based on the Bank's capital ratios, IndyMac needed to raise significant outside capital.   Thus, no later than November 2007, both Perry and Keys were aware of the OTS' serious

concerns about IndyMac and its precarious position, and any statements to the contrary were false and misleading.

175. On January 7, 2008, OTS began an examination of IndyMac "four months ahead of schedule due to concerns the agency noted through its off-site monitoring and meetings with management." *See id.* According to OTS spokesman William Ruberry, OTS also "called in the FDIC with us early on in the process." The Treasury Report confirms that OTS contacted FDIC on December 20, 2007 "because of IndyMac's deteriorating position."

176. Ten days after initiating the exam, on January 17, 2008, OTS "[i]ssued initial ratings downgrades based on the off-site monitoring and the initial findings of the regular examination." Specifically, OTS issued a letter to IndyMac's board of directors, chairman, and CEO, stating that the bank's composite CAMELS rating was downgraded from a 2 to a 3, effective December 31, 2007. The Asset Quality and Earnings component ratings were adjusted from a 2 to a 4.[7] Within six months of beginning its examination, the OTS repeatedly downgraded the Bank's CAMELS ratings, and even sought a consent order to address the Bank's unsafe and unsound banking practices.

177. The Treasury Report indicates that the severity of the downgrade of the critical composite CAMELS rating from a 2 to a 3 on January 17, 2008, would almost certainly trigger a formal enforcement action by the OTS under OTS's enforcement guidelines. Thus, as of at least November 2007, and certainly by January 17, 2008, Perry and Keys knew that OTS had serious concerns about, among other issues, the Bank's capital adequacy and that it was virtually certain that a formal enforcement action would be taken.

---

[7] A "4" is the second lowest rating. According to the FDIC Manual, an Asset Quality rating of "4" is "assigned to financial institutions with deficient asset quality or credit administration practices." This means that "the levels of risk and problem assets are significant, inadequately controlled, and subject the financial institution to potential losses that, if left unchecked, may threaten its viability."

178.   As a result of the examination commencing January 7, 2008, OTS identified and enumerated *ten* different matters that required the attention of IndyMac's Board of Directors, chaired by Perry, including:

- (i) "Return the Bank's capital ratios to a level that supports its risk profile."

- (ii) "Provide the OTS with a forecast that includes a range of capital necessary to achieve and maintain sufficient capital ratios until implementation of the new strategic plan can provide income at a level that will support the Bank operations."

- (iii) "Ensure that liquidity strategies are in place to manage the Bank's inability to access high-rate brokered deposits, and if additional restrictions are placed on Federal Home Loan Bank Board (FHLB) and Federal Reserve Bank (FRB) borrowing limits."

- (iv) "Develop a clear strategy including scripts for media and customer inquiries to minimize effects of public disclosure of capital position and potential run on deposits."

- (v) "Ensure that timely valuations are obtained for problem loans and that sufficient adjustment is made to address declining real estate values."

- (vi) "Provide the OTS with a detailed plan for reducing the level of classified and non-performing assets."

- (vii) "Provide OTS with a detailed business plan and budget supporting the new Government Sponsored Enterprise Business oriented business model, or any alternative business strategy."

- (viii) "Ensure that all significant risks are identified, quantified, monitored and controlled to preserve the safety and soundness of the institution."
- (ix) "Ensure adequate resources are available to provide support and documentation for assumptions used in risk management models, valuation models, and information submitted to OTS for the Thrift Financial Report."

179.   OTS also identified *twenty-four* different "corrective actions to be taken by IndyMac," including:

- (i) "Develop a contingency plan to ensure uninterrupted funding should the bank be unable to access broker deposits."
- (ii) "Develop plans for responding to media and customer inquiries regarding the Bank's inability to meet funding obligations."
- (iii) "Augment capital to ensure that it supports the Bank's risk profile."
- (iv) "Ensure that timely valuations are obtained for problem loans and that sufficient adjustment is made to address declining real estate values."
- (v) "Enhance the forecasting process to include worst case scenarios and contingency plans."
- (vi) "Ensure adequate resources are available to provide support and documentation for assumptions used in risk management models, valuation models, and information submitted to OTS for the Thrift Financial Report."

180.   Thus, at least by November 2007, and at the very latest by the end of January 2008, IndyMac – including its two most senior officers, Perry and Keys –