were well aware of the dire financial position of IndyMac and the OTS's serious concerns about IndyMac's viability.

**2.      Perry, Keys, and other IndyMac Officials Internally Discuss the Dire Financial Condition of IndyMac**

181.  By January 2008, IndyMac's dire financial condition was the primary topic of discussion at IndyMac board meetings.  At the January 9, 2008 board meeting, Perry warned the Board that IndyMac could not count on raising any capital due, in part, to the poor market performance of IndyMac's stock.  FDIC Complaint ¶ 74(a).  Also at this meeting, the Board discussed the risk of a run on the bank.

182.  On or around February 8, 2008, Perry described IndyMac to an outside investor as "literally fighting for" its life.  *Id.* ¶ 74(b).  That same day, IndyMac's senior management told the Board that there was "a very real risk that the OTS could soon pressure the Bank to raise dilutive capital." *Id.* ¶ 137(c).

183.  By March 2008, the Bank, at the OTS's suggestion, and in recognition of its precarious state, began consideration of a "good bank/bad bank" strategy and "what happens" to IndyMac's senior managers if IndyMac failed.  *Id.* ¶ 74.

**3.      Perry and Keys Make False and Misleading Statements Regarding IndyMac's Dealings with OTS and IndyMac's Financial Condition Following the Commencement of the January 2008 Emergency Examination.**

184.         At the February 12, 2008 Fourth Quarter 2007 Earnings Conference Call, Perry was questioned by a securities analyst regarding regulatory actions that might be taken against IndyMac:

**Michael Rogers, Conning Assessment Management, Analyst**: . . .
For the regulatory perspective, do you see the tenor of regulation and

the scrutiny and the ***potential regulatory actions*** that your regulator could take, do you see that being maybe more severe going forward? Are they - any sense that they might require some more stressful reserve additions?

**Defendant Perry**: *I don't think so*, on the strip (sic) more stressful reserve additions.  I think we've had - we worked really hard over the years to build a very strong, positive and open relationship with our regulators. . . .

I think they have complimented us on our nimbleness in terms of our ability to change our business model, okay?  Certainly, they're concerned about the whole industry, what regulator wouldn't be, given what has gone on in the whole financial services sector. And certainly, they're more concerned about entities that are more susceptible to the housing market, like IndyMac. And I think that, given that, that we continue to have a positive relationship with them, ***they haven't asked us to do anything that -- they haven't asked us to do anything. . . . So, I feel like they think we're doing a pretty good job managing through this crisis period.. . . I don't think they're going to have concerns about our reserves*** (emphasis added).

185.  Perry's response was materially false and misleading.  Perry knew, as early as November 2007, that OTS was commencing, four months early, an investigation into IndyMac, and intended to downgrade the Bank's CAMELS rating, and also knew that the OTS had informed senior management, including Perry, that based on OTS' serious concerns about the Bank's capital adequacy, OTS concluded that IndyMac needed to raise significant outside capital.

186.  As OTS Director John M. Reich would later state regarding the examination, "[t]he OTS had significant concerns with the bank's funding strategy, had directed appropriate changes and was finalizing a new set of enforcement

actions to address its numerous problems.  IndyMac was actively seeking to arrange a significant capital infusion or find a buyer."  As described above, the "matters requiring IndyMac board attention" and the "corrective actions to be taken" were numerous and serious.   In addition, OTS had raised concerns regarding the Conduit Division in the January 7, 2007 inspection and required numerous corrective actions.

187.  In light of these facts – none of which were disclosed to investors during the Class Period – Perry's statements that (a) he did not think the OTS would require more stressful reserve additions; (b) OTS had not "asked us to do anything"; (c) OTS "think[s] we're doing a pretty good job managing through this crisis period"; and (d) "I don't think they're going to have concerns about our reserves," were all materially false and misleading.  They were intended to, and did, convey the materially false impression that OTS was somehow satisfied with IndyMac's financial condition and had vouched for IndyMac's viability, when in fact precisely the opposite was true.

188.  Also on February 12, 2008, Keys and Perry signed and filed an 8-K reassuring investors worried about the financial condition of the Company.  In that filing, Keys and Perry stated that "*We remain in a fundamentally sound financial position. . . . We believe we can maintain our 'well-capitalized' capital ratios even under worsening industry conditions*."  This statement was made four days after Perry had privately described IndyMac as "literally fighting for its life," and a month after the IndyMac board had discussed the likelihood of a run on the bank and the inability to raise capital.

189.  These statements were false and misleading in light of the drastic actions taken by OTS and FDIC a month earlier.  OTS had just initiated a review four months ahead of schedule, which ultimately required board response on issues such as "[d]evelop a clear strategy including scripts for media and customer inquiries to minimize effects of public disclosure of capital position and potential

run on deposits" and "[e]nsure that liquidity strategies are in place to manage the Bank's inability to access high-rate brokered deposits." Perry and Keys did not believe their statement that IndyMac was in a "fundamentally sound financial position," and, even if they did, it was still misleading because it failed to disclose known facts tending to seriously undermine the accuracy of those statements.

**4.    Perry and Keys Made the Foregoing Statements With Scienter**

190.   Perry and Keys made the foregoing statements with scienter because they had *actual knowledge* of OTS's actions and serious concerns about IndyMac, including concerns with the Bank's capital adequacy and high concentration of risky assets. Perry, as IndyMac's controlling officer, was the principal contact between IndyMac and the OTS.   As Perry told investors on February 12, 2008: "throughout this whole crisis . . . I probably send [our regulators] a note a day, okay." As discussed in the 2007 Proxy, Keys was responsible for all audit findings, and he and Perry were jointly responsible for reviewing and certifying IndyMac's internal controls (which are necessarily implicated by the OTS findings).

191.   As alleged in the Trustee Complaint, and as discussed above, Perry was aware, *as early as November 2007*, of the OTS' concerns about IndyMac's extremely weak financial condition, and its intention to downgrade IndyMac's CAMELS ratings.   Perry and Keys were  aware that regulators had initiated an examination four months ahead of schedule due to concerns specific to IndyMac. They also knew that, on January 17, 2008, OTS issued a letter notifying IndyMac's board of directors, chairman, and CEO that the Bank's composite CAMELS rating was downgraded from a 2 to a 3, and its asset quality rating was downgraded from 2 to 4.   In light of these facts, Perry's and Keys' February 12, 2008 statements – such as that OTS "thinks we're doing pretty good job managing through this crisis period" – were knowingly false.   Indeed, OTS examiners believed that IndyMac investors were being so misled by such statements that, in April 2008, one of them

recommended that OTS "should publicly disclose IndyMac's poor earnings position to prevent any liability to investors who had the potential to lose money should the institution fail."

### D. Defendants Perry and Keys Make Misleading Statements About IndyMac's Liquidity During the Class Period

#### 1. False Statements on Liquidity

192.   During the Class Period, Defendants Perry and Keys made numerous false statements touting IndyMac's supposedly "tremendous" and "strong" liquidity and "strong capital position" while in the possession of evidence clearly showing that IndyMac was under extreme financial distress, and that its survival was seriously in jeopardy.  Specifically, Perry and/or Keys made the following false and misleading statements:

a)   "You know, we have tremendous liquidity.... So, you know, the bottom line is I think we have a very strong and secure funding source and tremendous liquidity which I think, when you combine strong capital position with strong liquidity, that's what gets you through these cycles in the mortgage market." Statement of Perry, on July 31, 2007 2Q 2007 Earnings Call.

b)   "[W]e have very strong liquidity, a good amount of excess capital and there are no realistic scenarios that I can foresee that would impair IndyMac's viability[.]"  August 2, 2007 posting on IMBreport.com (the "IMB Blog") (quoting Perry).

c)   Downplaying liquidity risks as "about as close to none as you could have."  Statement of Perry, at September 7, 2007 "Investor Day" Conference.

d)   Assuring investors that "our liquidity is at an all-time high," and bragging that "we have very strong capital, reserves and liquidity to weather the current storm in our industry." November 6, 2007 posting on the IMB Blog (quoting Perry).

e)      Stating that and that "we are considered 'well-capitalized' by regulatory standards"   and that "[w]e…are confident that our liquidity position will remain strong going forward."   November 6, 2007 posting on the IMB Blog (quoting Perry).

f)      Reassuring investors that "[l]ong term, with our strong capital, reserves, and liquidity and with the great team we have in place, there is no doubt that we will be a mortgage industry survivor[.]"November 6, 2007 posting on the IMB Blog (quoting Perry).

g)      "We remain in a fundamentally sound financial position… We believe we can maintain our 'well-capitalized' capital rations [sic] even under worsening industry conditions. … We still have a solid cushion above the well-capitalized ratios."   February 12, 2008 Form 8-K (signed by Perry and Keys) and February 12, 2008 Annual Shareholder Letter (signed by Perry).

h)      "We currently believe our liquidity level is sufficient to satisfy our operating requirements and meet our obligations and commitments in a timely and cost effective manner." February 29, 2008 Form 10-K (signed by Perry and Keys).

i)      "As a result of our thrift structure and strong capital and liquidity positions, we were not forced to sell assets at liquidation prices and our [loan] funding capacity was not materially impacted." February 29, 2008 Form 10-K (signed by Perry and Keys).

j)      "We *may* be required to raise capital at terms that are materially adverse to shareholders." "While we currently have regulatory capital ratios in *excess of the 'well-capitalized' requirement* and have implemented a plan to reduce our balance sheet and increase our capital ratios, there can be no assurance that we will not suffer material losses or that our plans to reduce the balance sheet will succeed.   In those circumstances, we *may* be required to seek additional regulatory capital to maintain our capital ratios at the 'well-capitalized' level.

Such capital raising could be at terms that are very dilutive to existing shareholders..."   February 29, 2008 Form 10-K (signed by Perry and Keys). (Emphasis added)

        k)    Issuing prospectuses to raise capital from investors through IndyMac's DSPP beginning February 26, 2008.  These prospectuses stated that IndyMac "intend[ed] to use the net proceeds from [the offering] for general corporate purposes, including investment in our subsidiaries."  These prospectuses also incorporated IndyMac's SEC filings, which contained statements assuring investors of IndyMac's strong capital and liquidity positions.  DSPP Prospectuses for sales of IndyMac common stock beginning February 26, 2008, including April 3, 2008 and May 2, 2008 DSPP Prospectuses, pursuant to June 30, 2006 Form S-3 shelf registration statement signed by Perry and Keys.

### 2.    The Truth About IndyMac's Grave and Incurable Liquidity Crisis

      193.  On July 11, 2008, OTS placed IndyMac into receivership, formed a newly chartered thrift (IndyMac Federal Bank, FSB), and named the FDIC as conservator.  On July 31, 2008, IndyMac Bancorp filed for protection under the Chapter 7 liquidation provisions of the bankruptcy laws.  The estimated loss to the FDIC from the failure of IndyMac is $12.75 billion.

      194.  The public did not learn there was a significant risk that IndyMac would be unable to continue as a going concern until May 12, 2008, the close of the Class Period, when the stock price fell 32%.

      195.  On May 12, 2008, Perry revealed for the first time that, contrary to his prior representations, IndyMac might not be able to continue as a going concern because it faced a grave and incurable liquidity crisis.  Specifically, Perry admitted that "our capital ratios have clearly been depleted," and "clearly, there are scenarios in this environment where we could not be well capitalized and end up being [in]adequately capitalized for a short period of time."

196.   Also on May 12, 2008, in a small note in the "Capital" section of what would become IndyMac's last 10-Q released before receivership, the Company revealed that it was no longer a well-capitalized institution and that it was headed for insolvency.  Specifically, IndyMac reported that during April 2008, Moody's and Standard & Poor's downgraded the ratings on a large number of mortgage-backed security bonds, including $160 million of those issued by IndyMac and which the Bank retained in its portfolio.  IndyMac admitted that these downgrades would have negatively impacted the Company's risk-based capital ratio as of June 30, 2008, and further revealed that had these lowered ratings been in effect at March 31, 2008, the Company's total risk-based capital would have been 9.27%. IndyMac warned that if its regulators found its capital position to have fallen below well-capitalized (*i.e.* a minimum 10% risk-based capital ratio) to "adequately capitalized" (8-10% risk-based capital ratio), the Bank might no longer be able to use brokered deposits as a source of funds.  The Bank further revealed that if its level of deposit liquidity was reduced in this way, the Bank anticipated that it would reduce its assets and, most likely, curtail its lending activities.

197.   According to IndyMac's third quarter Form 10-Q issued on May 12, 2008, the Bank's risk-based capital ratio had dropped to 10.26% as of March 31, from 10.81% the previous quarter.  This ratio, which factors in asset quality and loan loss reserve coverage, must be at least 10% for an institution to be "well-capitalized" under regulatory guidelines.  IndyMac reported in the 10-Q that the Bank's risk-based capital was only $47 million above the minimum required for this 10% mark.  But it concealed the fact that, as explained below, some of that $47 million was actually fictional, the result of an improper, backdated $18 million contribution to capital from IndyMac's parent company.  As set forth below, had Ernst not allowed this improper, retroactive contribution to capital, IndyMac would have been forced to report that its capital had already slipped below the minimum level that regulators require for classifying banks as "well-capitalized," thus

putting $6.8 billion of brokered deposits -- or 37% of IndyMac's total deposits -- at risk.

198.   Immediately following these revelations, analysts lowered their earnings estimates for IndyMac, citing IndyMac's uncertain financial condition, serious credit challenges, and "questionable" capital adequacy.  Analysts remarked that IndyMac appeared "at risk from regulatory intervention," and that "the implications…could be very severe for the bank," including "very draconian actions by regulators."

### 3.   Defendants Perry's and Keys' False Statements About IndyMac's Liquidity Were Made With Scienter

199.   Contrary to these statements, IndyMac in fact had serious and long-standing liquidity problems.  As detailed in the Trustee Complaint, IndyMac had repeatedly violated its own liquidity policy and it knew no later than Fall 2007 that it would have to raise substantial capital in order to survive.

200.   On March 20, 2006, and March 31, 2006, Perry and Keys were sent memoranda from David Hayes, Senior Vice President of Corporate Finance, advising that IndyMac had breached its own Liquidity Policy as of January 31, 2006 and February 28, 2006, respectively, due to "minimal loan sales" "relative to funding volume."  Trustee Complaint ¶ 203(b)(c).

201.   On October 3, 2006, Perry was advised that IndyMac had violated its own Liquidity Policy because it had been unable to sell into the secondary market the loans it had generated, which caused Loans Held for Sale to increase by $2.9 billion. Perry acknowledged his awareness of the problem, and specifically IndyMac's violation of its own Liquidity Policy, by e-mail, noting, "I see this as a problem."  *Id.* ¶ 206.  On October 30, 2006, Keys acknowledged his awareness of the same issue, admitting at an Audit Committee meeting that: (a) "problem assets are trending up"; (b) only 84% of the loan production from the Conduit Division

had been sold in the third quarter, far short of 100% in the previous quarter; and (c) that Early Payment Defaults were rising. *Id.* ¶ 216.

202.   On or about March 8, 2007, the OTS presented IndyMac's Treasurer, Francisco Nebot, with a memorandum titled "Examiner Recommendations," listing five separate violations of IndyMac's Liquidity Policy that occurred in 2006. *Id.* ¶ 208. In addition to the foregoing facts, the following facts and communications identified in the Trustee Complaint all establish Defendants' knowledge, during the Class Period, of IndyMac's desperate financial condition and regulatory capital problems, its pressing need to raise billions in funds to remain well-capitalized, and the dismal prospects for raising such enormous amounts of outside capital:

203.   By September 2007, IndyMac's liquidity problems had worsened. On September 5, 2007, one of IndyMac's directors e-mailed senior management regarding a recent analysis by Moody. That director stated that Moody's "estimates are alarming" and "*it appears that we are drastically under-estimating our losses.*" Trustee Complaint ¶ 228.

204.   As early as November 2007, the OTS recommended to senior management that, based on the Bank's capital ratios, IndyMac needed to raise significant outside capital. *Id.* ¶ 137(b). At around the same time, senior management became aware that OTS intended to downgrade IndyMac's composite CAMELS rating from a "2" to a "3," creating a presumption that formal enforcement action would be taken. *Id.* ¶ 137(b).

205.   On January 4, 2008, Perry informed the Board of Directors and related parties that he did not want potential investors to conduct due diligence before submitting a term sheet because of concerns about how the marketplace would perceive Bancorp.   Trustee Complaint ¶ 139(b).

206.   January 9, 2008 IndyMac Board minutes – which Ernst was required to review -- memorialize a discussion among IndyMac directors, including Perry, on capital raising and *the risk of a run on the Bank* in which *Perry warns that*

*IndyMac cannot count on raising any capital due*, in part, to the poor market performance of IndyMac's stock. *Id.* ¶ 74(a).

207.   On or around February 8, 2008, Perry described IndyMac to an outside investor as "*literally fighting for*" its life. *Id.* ¶ 74(b).

208.   Also on February 8, 2008, IndyMac's senior management told the Board that there was "*a very real risk that the OTS could soon pressure the Bank to raise dilutive capital*." *Id.* ¶ 137(c).

209.   Incredibly, on February 12, 2008, just four days after the February 8 statements, Perry and Keys told investors that IndyMac was in a "*fundamentally sound financial condition*."

210.   On February 22, 2008, Darrel Dochow, the OTS's Western Regional Manager, sent an e-mail to Perry stating that "[c]learly capital is thin . . . in light of the deteriorated asset quality" and suggested that Bancorp may need to raise capital more expeditiously. Bancorp's Board Meeting Minutes dated February 26, 2008 observed that Perry warned the other Directors that, given regulatory scrutiny and the risk that conditions could worsen, it "must be prepared to recapitalize the Company." *Id.* ¶ 137(d).

211.   Defendants' statements in the 2007 Form 10-K filed on February 29, 2008 that assured investors that IndyMac had "strong capital and liquidity positions" were false.  As alleged in the SEC Complaint, e-mails between Perry and Keys on February 19, 2008, show that they knew that the Bank was certain to fall below the 10% well-capitalized ratio by the end of the first quarter 2008, and that they were able to maintain the ratio, in part, by changing the Bank's traditional method for calculating the ratio, which was not disclosed to investors.   SEC Complaint ¶¶ 19, 46-48.

212.   Furthermore, contrary to the February 29, 2008 vague statement in the 2007 10-K that IndyMac "*may*" be forced to sell more shares, Defendants' February 19, 2008 e-mails show that, Defendants had already decided to sell

IndyMac common stock in the DSPP for the undisclosed purpose to raise cash to protect the Bank's 10% well-capitalized status, and to use the rest of the proceeds to pay future preferred dividends. In fact, Defendants *had already begun* to sell shares on February 26, 2008. Defendants falsely represented in the prospectuses that the proceeds would be used for "general corporate purposes." SEC Complaint ¶¶ 19-20, 25. Pursuant to Item 504 of Regulation S-K of the Securities Act, 17 C.F. R. § 229.504, the prospectus was required to disclose "the principal purposes for which the net proceeds to the registrant from the securities to be offered are intended to be used and the approximate amount intended to be used for each such purpose." *Id.* ¶ 20, 24-25.

213.    As a member of IndyMac's board of directors, Perry authorized the offer and sales of stock through the DSPP, and Keys authorized the filing of DSPP prospectuses issued prior to April 25, 2008, when he left the Company. *Id.* at 20. The DSPP prospectuses stated in the section "Use of the Proceeds" that "We intend to use the net proceeds from sales of common stock directly issued by us under the plan for general corporate purposes, including investment in our subsidiaries." *Id.* ¶ 20.

214.    IndyMac's DSPP prospectuses did not disclose the true reasons for the DSPP stock sales - that Perry specifically planned to use the proceeds to infuse needed capital into IndyMac Bank to shore up the Bank's capital ratio, as well as to enable the Company to continue paying preferred dividends. Nor did they disclose that IndyMac Bank would not be able to maintain the capital ratio at March 31, 2008 unless it changed the method of calculating the ratio. Neither did the April 3 and May 2 prospectuses reveal that by the time IndyMac issued the prospectus on April 3, its liquidity had deteriorated to the point that it had only about $21 million in cash remaining. ¶¶ 32, 41.

215.   As discussed above, Perry and Keys received frequent reports of IndyMac's capital ratio and were well aware of IndyMac's deteriorating capital and liquidity positions.

**E.      Defendant Ernst Misleads Investors by Failing to Include a "Going Concern" Reservation in Its 2007 Audit Opinion**

216.   Ernst intentionally, or with deliberate recklessness, failed to include a "going concern" reservation in its February 28, 2008 audit opinion on IndyMac's financial statements for the year-ended December 31, 2007.  Such a reservation would have stated what the Defendants knew and investors did not: that there was a significant risk that IndyMac would be unable to meet its obligations over the next few months, and would likely be forced into liquidation.  Because of Ernst's failure to include a going concern reservation in its 2007 Audit Opinion, the public did not learn there was a significant risk that IndyMac would be unable to continue as a going concern (i.e., operating as of one year from the date of the December 31, 2007 financial statements), until May 12, 2008, the close of the Class Period, when IndyMac revealed that it was no longer a well-capitalized institution and that it was headed for insolvency.

**1.      Ernst Violated the Auditing Standards Governing the Issuance of a "Going Concern" Reservation**

217.   AU § 341 requires auditors to evaluate whether there is "substantial doubt" about the entity's ability to continue as a going concern for, generally, the year following the date of the financial statements under audit. Where substantial doubts exist, the auditor's opinion should contain a "going concern reservation." As set forth in AU § 341.12: "If … the auditor concludes that substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time remain, the audit report should include an explanatory paragraph (following the opinion paragraph) to reflect that conclusion." AU § 341.12. As defined in AU § 341.02, "reasonable period of time" means "not to exceed one year beyond the

date of the financial statements being audited." Of course, IndyMac did not last even close to one year, and was instead placed into conservatorship by the FDIC on July 11, 2008, *less than five months* after Ernst's "clean" opinion.

218. The 2006 AAG states that there are five primary factors that an auditor must consider in determining whether a going concern reservation is needed:

1.  Recurring operating losses;

2.  Indications of strained liquidity;

3.  Failure to meet minimum regulatory capital requirements or to adhere to the terms of an approved capital plan;

4.  Concerns expressed or actions taken by regulatory authorities regarding alleged unsafe or unsound practices; and

5.  Indications of strained relationships between management and regulatory authorities. 2006 AAG 5.108-118.

219. *Four of these five* conditions were *already* present at IndyMac by February 28, 2008, when Ernst signed its unqualified opinion contained in IndyMac's 2007 10-K. Specifically: (1) IndyMac had experienced operating losses in Q3 and Q4 of 2007; (2) liquidity was a recurrent concern of the Board of Directors, as described in the Trustee Complaint; (3) the CAMELS downgrade had already been communicated by the OTS on January 17, 2008; and (4) the communications discussed in Board minutes indicated a strained relationship between OTS and IndyMac. Moreover, the SEC Complaint provides detailed evidence that on February 19, 2008, Keys alerted Perry that IndyMac Bank's capital ratio was forecast to fall *below* the minimum 10% regulatory capital level by March 31, and that Perry immediately (1) sought OTS permission to change the method of calculating IndyMac's risk-based capital, and (2) began to raise new

capital from investors through the DSPP, through prospectuses that asserted that the proceeds would be used "for general corporate purposes" – without disclosing that the proceeds were actually needed to bolster the capital ratio. These events occurred in the days *before* Ernst certified the audit. The desperate measures were of no avail. A month later, IndyMac had fallen out of compliance with minimum capital requirements, even using the undisclosed revised methodology.

220. Under established accounting principles, Ernst was required to consider all events that occurred in the period between the balance sheet date and the issuance of the financial statements to identify potential subsequent events that could impact IndyMac's current financial statements or its future operations. Particular guidance resides within GAAP and generally accepted auditing standards ("GAAS") regarding the obligation of an independent auditor to consider the effect that events that have occurred subsequent to the balance sheet date of a subject company's financial statements may have on either (a) those financial statements or (b) the future operations of the company.

221. In Emerging Issues Task Force ("EITF") Topic D-86, Issuance of Financial Statements ("EITF D-86"), the FASB provided the following, in relevant part, regarding a company's obligation to refrain from issuing information, especially in public filings with the SEC, that is misleading:

> [T]he SEC staff observed that Rules 10b-5 and 12b-20 under the Securities Exchange Act of 1934 and General Instruction C(3) to Form 10-K specify that financial statements must not be misleading as of the date they are filed with the Commission. For example, assume that a registrant widely distributes its financial statements but, before filing them with the Commission, the registrant or its auditor becomes aware of an event or transaction that existed at the date of the financial statements that causes those financial statements to be materially misleading. If a registrant does not amend those financial statements or

omissions when they are filed with the Commission, the registrant will be knowingly filing a false and misleading document. In addition, registrants are reminded of their responsibility to, at a minimum, disclose subsequent events, while independent auditors are reminded of their responsibility to assess subsequent events and evaluate the impact of the events or transactions on their audit report. (Footnotes omitted.)

222.   Statement on Auditing Standards § ("AU") 560, *Subsequent Events* ("AU 560"), is the pre-eminent accounting guidance regarding subsequent events and the considerations to be made relating thereto by both an auditor and a company to whom such events might occur.   According to AU 560, "events or transactions sometimes occur subsequent to the balance-sheet date, but prior to the issuance of the financial statements, that have a material effect on the financial statements and therefore require adjustment or disclosure in the statements... referred to as 'subsequent events.'" (AU 560.01).

223.   One type of subsequent event which would warrant particular treatment by the auditor is described by AU 560 as:

...those events that provide additional evidence with respect to conditions that existed at the date of the balance sheet and affect the estimates inherent in the process of preparing financial statements. All information that becomes available prior to the issuance of the financial statements should be used by management in its evaluation of the conditions on which the estimates were based. The financial statements should be adjusted for any changes in estimates resulting from the use of such evidence. (AU 560.03).

224.   AU 560 also provides that an auditor generally should determine, among other things, whether any unusual adjustments have been made during the period from the balance-sheet date to the date of inquiry. (AU 560.12).

### 2.    Ernst Acted with Scienter in Failing to Provide a Going Concern Reservation in Its 2007 Audit Opinion

225.    The allegations in the Trustee Complaint and the related Transcript provide compelling facts to support a cogent inference that Ernst intentionally or with deliberate recklessness failed to include a "going concern" reservation in its 2007 Audit Opinion on February 28, 2008.    The facts demonstrating Ernst's scienter include:

(a)    In October 2007, Keys informed the Board of Directors that IndyMac had violated its own Liquidity Policy because it had transferred $175 million to IndyMac Bank.  Trustee Complaint ¶ 209.

(b)    In November 2007, senior management had been informed that OTS intended to downgrade the Bank's CAMELS rating from "2" to "3", and would require IndyMac to raise significant outside capital. *Id.* ¶ 137(b).

(c)    At a January 9, 2008 Joint IndyMac and IndyMac Bank Board Special Meeting, Perry warned that IndyMac could not count on raising capital due to poor market conditions and discussed the risk of a run on the bank. *Id.* ¶ 74(a). Ernst was obligated to review these Board Minutes as part of its 2007 audit, and therefore knew that liquidity problems and the risk of a bank run were being discussed internally.

(d)    On January 17, 2008, more than a month before Ernst issued its audit opinion, OTS issued a letter to all members of IndyMac's Board stating that the Bank's CAMELS assets rating had been downgraded from "2" to "4" effective December 31, 2007. Ernst was required to review this letter as part of its audit.

(e)    IndyMac Board Meeting Minutes of February 8, 2008, which Ernst was required to review, acknowledge the "very real risk" that OTS would require IndyMac to raise dilutive capital. *Id.* ¶ 137(c).

(f)    Perry stated to an outside investor on February 8, 2008 that IndyMac was "*literally fighting for*" its life." *Id*. ¶ 74(b).

(g)    By March 2008, FDIC determined that, to avoid failure, the Bank needed to raise an astonishing *$3.5 billion* in additional capital to avoid collapse. *Id*. ¶ 137(e).

226.  Ernst was also aware of the fact that OTS commenced its 2008 examination four months early "because of IndyMac's deteriorating position." The Treasury Report confirms that OTS contacted the FDIC on December 20, 2007.  ." The FDIC becomes involved in examinations "when a thrift exhibits material deteriorating conditions that could result in the institution becoming troubled in the near future.  In this regard, FDIC may need to develop contingency plans for a thrift's possible failure or begin the resolution process." Treasury Report at 43.

227.  As the auditor of IndyMac, a highly regulated company in the highly regulated banking industry, either Ernst was aware of these actions and discussions between IndyMac officials and the OTS and FDIC – the Bank's principal regulators – yet failed to take proper action, *or* Ernst was deliberately reckless in disregarding these actions and discussions, in which case Ernst performed "no audit at all."

228.  Ernst's scienter is further supported by Ernst's approval of Perry and other IndyMac senior managers' fraudulent backdating of a cash infusion to March 31, 2008 in order to mask the fact that IndyMac did not meet the minimum capital requirements for classification as "well-capitalized" at March 31, 2008, as confirmed in the OIG's May 21, 2009 Audit Report entitled "Safety and Soundness: OTS Involvement With Backdated Capital Contributions by Thrifts" (OIG-09-037) (The "Backdating Report"), and by allegations in the Trustee Complaint and the SEC Complaint.

229.  The improper backdating approved by Ernst was specifically designed to conceal – and did conceal – from investors the threat to IndyMac's financial

viability if IndyMac's capital ratio were to fall below the 10% well-capitalized threshold. Ernst's conduct violated the requirements that an auditor maintain independence in actions and appearance during an audit engagement (*see* AU § 220), as well as professional integrity and professional skepticism (AU § 230 and AU § 316), and demonstrates that Ernst was *not* acting as an independent auditor nor upholding its many obligations under GAAS.

230.   On April 20, 2010, the Bankruptcy Court conducted a hearing at which the court denied the motions of defendant Perry and the other former IndyMac Bancorp directors to dismiss the Trustee's Complaint. *See* Adversary Proceeding Case No. 2:09-ap-02645-BB, Docket No. 67-4, filed May 14, 2010 ("Transcript") Transcript at 132-133.   The court found that IndyMac's Chapter 7 Trustee adequately alleged that the directors had wrongly "downstreamed" $355 million from the parent into IndyMac.   Of the $355 million "downstreamed" money, $175 million was transferred in 2007, despite Defendants' knowledge that the situation at IndyMac was a "hopeless" lost cause, because IndyMac's hopes for survival hinged on a *$3.5 billion* capital infusion, which Defendants knew was impossible to obtain, and Defendants knew of red flags indicating that the Bank was in danger of being seized by the OTS or FDIC at any time.   The court agreed that this was a total waste of Bancorp's assets, because Defendants knew the money was being poured into a "rathole," "that the OTS was going to -- or the FDIC was going to be taking over any time."   Transcript at 32, 41, 57.

231.   One of the indicia that the auditor must consider in determining whether a going concern reservation is needed is "[f]ailure to meet minimum regulatory capital requirements."   2006 AAG 5.112.   Based on allegations in the SEC Complaint against Perry and Keys, Ernst intentionally or with deliberate recklessness disregarded that IndyMac's risk-based capital ratio was at or near the 10% well-capitalized threshold, and that the volatile credit environment meant that any small event – such as a rise in interest rates – could cause the ratio to fall

below the threshold.  Ernst knew that falling below the minimum 10% "well-capitalized" level would restrict the Bank's ability to freely access brokered deposits – its lifeblood – and therefore Ernst was required to closely monitor this metric.  At the time Ernst certified the 2007 audit on February 28, 2008, Ernst intentionally or with deliberate recklessness disregarded that the Bank's well-capitalized ratio was precarious and that the measures taken to protect it provided only a temporary quick fix.  Thus, there was substantial doubt that IndyMac would still be operating as of one year from the date of the December 31, 2007 financial statements, requiring a going concern reservation.

232.   Specifically, as alleged in the SEC Complaint, e-mails between Perry and Keys on February 19, 2008 show that, at that date, Defendants knew that the Bank's capital ratio could fall below the 10% well-capitalized ratio by March 31, 2008, and caused them to change the method of calculating the ratio to protect it. SEC Complaint ¶¶ 19, 46.  Ernst also knew that the Bank's capital ratio was the most important metric to measure the Bank's safety and soundness, and that falling below the regulatory minimum 10% would have severe regulatory consequences, including curtailing the Bank's access to brokered deposits.  Capital ratios measure the Bank's financial strength and regulatory compliance, and are one of the most critical ratios for the auditor.  2006 AAG, Ch. 5, 5.65.  Perry and Keys received frequent reports of the Bank's capital ratio by e-mail and in meetings (SEC Complaint ¶ 13), and Ernst was obligated to know of these forecasts, and any other events that could bring IndyMac's capital ratio below 10%.  Ernst was also required to be aware of any communications between IndyMac and the OTS discussing changing the method of calculating the ratio or any other attempts to "fix" this serious problem.  Ernst knew that failure to meet minimum regulatory capital requirements was one condition that, with others, would warrant a "going concern" reservation in its audit opinion under AU § 341.

233.   At the very least, the "[t]hreat of failing to meet minimum capital adequacy requirements that could cause adverse regulatory actions" is a "Fraud Risk Factor" that could cause a material misstatement in the financial statements, under 2006 AAG, Ch. 5, Exhibit 5-1 (Fraud Risk Factors).   Given Perry's and Keys' preoccupation with raising the capital ratio in the wake of the rise in interest rates on February 19, 2008, and the repercussions if it fell below the minimum 10%, and the various existing and likely threats to the ratio in the then-volatile economic climate, it is inconceivable that Ernst was not aware of the threat in the days before it issued its clean audit opinion on the Company's 2007 financial statements in the Form 10-K filed on February 29, 2008, and it is clear that Ernst should not have certified that IndyMac's internal controls were effective at that date.

234.   Ernst also knew that OTS guidance required double-weighting of subprime assets in calculating risk based capital ratios.   Indeed, IndyMac's 2006 year-end Form 10-K filed on March 1, 2007, and  the 2007 year-end Form 8-K filed February 12, 2008, explicitly stated that IndyMac followed the "double-weighting" method in calculating its capital ratios.   The 2007 8-K stated:

> The OTS guidance for subprime lending programs requires a lender to quantify the additional risks in its subprime lending activities and determine the appropriate amounts of allowances for loan losses and capital it needs to offset those risks.... We report our subprime loan calculation in an addendum to the Thrift Financial Report that we file quarterly with the OTS.   *All subprime loans HFI [held for investment], and subprime loans HFS [held for sale], which are either delinquent or more than 90 days old since origination, are supported by capital two times that of similar prime loans.*  (Emphasis added).

The 2006 Form 10-K used substantially the same language.   Because Ernst knew IndyMac's established and stated method for double-weighting subprime assets,

Ernst intentionally or with deliberate recklessness disregarded that IndyMac departed from IndyMac's own stated "double-weighting" policy before February 28, 2008, when Ernst issued its clean and unqualified opinion, without reservations, on IndyMac's ability to continue as a going concern in connection with its audit of the 2007 financials in IndyMac's Form 10-K. Tellingly, the 2007 10-K, which contained Ernst's unqualified opinion, omitted the language which had been included in the earlier 2006 Form 10-K and the 2007 Form 8-K, cited in bold above, but made no mention of any change in the Company's accounting practices.

235. Ernst intentionally or with deliberate recklessness disregarded these subsequent events. Ernst either intentionally or with deliberate recklessness disregarded that a steep rise in interest rates, like other market forces in the volatile credit market of the time, would adversely impact the Bank's credit ratio. For example, a rise in interest rates would cause borrowers to have difficulty repaying their loans, increasing defaults and foreclosure rates. Moreover, Ernst intentionally or with deliberate recklessness disregarded that IndyMac would be able to keep the ratio above 10% primarily by the undisclosed agreement with the OTS to modify the method of calculating the capital ratio to IndyMac's benefit, and that this did not represent long term assurance that the Bank would remain well-capitalized. In accordance with AU § 341, as part of the ***"procedures normally performed" in the audit of IndyMac Bank to identify conditions that would require a going concern reservation, Ernst was required to know about and review communications from the OTS.*** *See* 2006 AAG 5.111 (examples of audit procedures "normally performed" by bank auditors to identify conditions and events requiring going concern reservation include: review of subsequent events; reading of the minutes of meetings of the board of directors and important committees of the board; confirmation with related and third parties of the details of arrangements to provide or maintain financial support; review of the financial strength and liquidity of the

116

parent company; review of reports of significant examinations and related communications between examiners and the institution and review of compliance with regulatory capital requirements.").

### F.   Defendant Perry Misleads Investors Regarding IndyMac's Dramatic Over-Reliance on Brokered Deposits

#### 1.   During the Class Period, IndyMac Relied Excessively on Brokered Deposits to Maintain Its Reported Solvency, and Later Admitted That Those Brokered Deposits Were Used from an "Expediency Perspective" Only

236.   Brokered deposits are certificates of deposit that are marketed to independent brokers who are charged with dividing holdings of wealthy individuals or cash-rich businesses into $100,000 units to enable them to take full advantage of FDIC insurance.   Brokered deposits are also known to bank analysts and examiners as "hot money."   Unlike consumer deposits, in which there is a relationship between the bank and the consumer and the deposit base therefore remains relatively constant, brokered deposits will quickly move to whichever institution will pay the highest interest rate.   Thus, while brokered deposits can help boost liquidity, they also can pose liquidity risks when large numbers are withdrawn in a short period.

237.   Excessive reliance on brokered deposits is a red flag to investors and has been implicated in many of history's largest bank failures.   As FDIC Chairwoman Sheila Bair has stated: "It is quite easy to get brokered deposits, and there's not a lot of market discipline with the brokered deposits.   When there's excessive reliance on them, particularly to fuel rapid growth on the balance sheet, that's definitely a high-risk factor."   Steve Andrews, President and CEO of the Bank of Alameda, has made similar comments:   "As a general rule, if an institution is relying on brokered deposits to fuel asset growth, it should raise a red flag with

both investors and regulators. . . Keeping the percentage under 10 percent is a prudent approach versus letting the percentage creep over 25 percent or more."

238.   From December 2006 to March 2008, 64% of IndyMac's growth in overall deposits was fueled by brokered deposits.   As of March 31, 2008, brokered deposits made up 37% of IndyMac's overall deposits.   These facts – which were highly material and would have immediately raised red flags with investors – were never disclosed in a meaningful and reasonably accessible fashion to investors during the Class Period.

239.   According to the *Los Angeles Business Journal*, in a "Special Report" on IndyMac titled "IndyMac's Last Gasps," published on September 15, 2008, IndyMac's core deposits in the first quarter of 2008 – $3 billion out of total deposits of $19 billion – were far below the industry standard:   For many banks, core deposits can account for more than 50 percent of a deposit base.   The article quotes a bank president and consultant as noting that "Anytime you see an institution that is growing through noncore deposits, it is one of the big red flags that should alert either the regulators or the public that the institution may be engaged in some kind of higher-risk, higher-reward activity."

240.   According to the *Los Angeles Business Journal,* Perry favored brokered deposits as part of his strategy to use the Company's thrift status as an engine for making more loans rather than building a stable deposit base of local customers with checking and savings accounts.   Perry fostered the use of brokered deposits to help fund IndyMac's rapid growth.   The article quotes a former CFO of IndyMac's Mortgage Bank who said that Perry "did not value deposit gathering – period.   [Perry] said, 'Deposit gathering is a commodity business and asset gathering is where the money is.'"

241.   On May 12, 2008, the final day of the Class Period, IndyMac disclosed for the first time the extent of its reliance on brokered deposits, telling investors in the Form 10-Q that if IndyMac were to fall under well-capitalized

levels (as it simultaneously revealed it might), and that "even with a [brokered deposit] waiver, if the interest rate limitations on brokered and solicited deposits were to be reduced, either by the lack of a full brokered deposit waiver or by the interest rate limits on brokered or solicited deposits, we anticipate that we would reduce our assets and, most likely, curtail our lending activities." In other words, IndyMac was stating that it was so heavily reliant on brokered deposits that *any* limitation on its ability to accept them would cause the Company to restrict its lending activities.

242. As explained below, these disclosures directly contradicted Defendants' Class Period statements that the Company's reliance on brokered deposits "isn't on our radar screen of being important to us."

243. On June 30, 2008, IndyMac admitted that it had been forced to rely on brokered deposits since "last summer" to maintain liquidity when the credit market collapsed. IndyMac further stated that brokered deposits "were used from an expediency perspective" only and that IndyMac had been working on reducing its reliance upon them. Thus, IndyMac admitted that brokered deposits are not a prudent and stable funding base.

244. In an August 1, 2008 interview, FDIC chairwoman Sheila Bair confirmed that IndyMac was "unattractive" to buyers precisely because of its reliance on brokered deposits: "[IndyMac] did not have a strong what we call a core deposit base. A lot of the deposits were brokered, meaning securities brokers just placed deposits [for] the institution – as opposed to the institution having a relationship with the customer directly. ... So there are a number of things about this institution that, to be honest with you, make it unattractive to a potential purchaser."

245. The Treasury Report concludes that "lack of core deposits" was a key trigger of IndyMac's failure. The Treasury Report accurately characterizes brokered deposits as one of IndyMac's "volatile funding sources," which the

Report defined as a "source of funds that may present a potential risk to earnings and capital associated with brokered or other rate-sensitive deposits that may be only temporarily available or require premium rates to retain."

246.  As of September 2006, IndyMac had over $9 billion in outstanding FHLB advances. An FDIC examiner commented in examination workpapers reviewed by the IG, that IndyMac's FHLB advances represented 34 percent of total assets, high in comparison to other similar size institutions. This examiner also wrote that IndyMac should be monitored closely. OTS's examiner responded that these were "eye-opening stats." In March 2008, FHLB advances remained high, at 32 percent of total assets.

247.  IndyMac increased its use of brokered deposits beginning in August 2007, when the market for the thrift's loans collapsed. During the period August 2007 through March 2008, brokered deposits increased from about $1.5 billion to $6.9 billion.

248.  The Treasury Report notes that the lack of core deposits was fatal when combined with IndyMac's aggressive business strategy and deficient underwriting: "This strategy ultimately caused the thrift to make a large number of bad loans, resulting in credit losses that could not be overcome, particularly when the real estate and secondary markets collapsed in mid-2007 and loans had to be held to maturity. At this point, IndyMac's capital position was put in jeopardy and, combined with its lack of retail deposits and reliance on brokered deposits and FHLB advances, caused a liquidity crisis."

## 2.  False and Misleading Statements Relating to Brokered Deposits

249.  As alleged in Paragraphs 238-241 above, during the Class Period IndyMac dramatically increased its reliance on brokered deposits, which are a far less stable source of capital than consumer deposits. During the Class Period, IndyMac never disclosed in a meaningful manner reasonably accessible to

investors the percentage of its deposits that were brokered deposits. Stock analysts were unaware of the Company's increasing dependence on brokered deposits, as evidenced by the absence of any discussion of the issue prior to the end of the Class Period.

250. Notwithstanding the foregoing, IndyMac repeatedly and falsely touted IndyMac's "purportedly stable funding" base and stated that the maturation of CDs (a common instrument of brokered deposits) "*isn't on our radar screen of being important to us*." Specifically, Perry made the following false and misleading statements:

(a) "I don't know [the average time to maturity on CDs] off the top of my head, *but there isn't anything [where] you're kind of going that I'm worried about* . . . the CD maturing and I'm going to have a big liquidity issue at some point here. *It just isn't on our radar screen of being of concern to us*. I mean, we're monitoring those types of situations, and certainly, whenever a financial institution has a loss, you could have a loss of confidence, but I think given the fact that over 95% of our deposits are federally insured, I think we've managed that pretty well." Statement of Perry, made on February 12, 2008 4Q 2007 Earnings Conference Call.

(b) "*I think we've managed [our deposits] pretty successfully and I think expect to manage it*[.]" Statement of Perry, on February 12, 2008 4Q 2007 Earnings Conference Call.

(c) "The bottom line is, *we have a very stable funding structure[.]*" Statement of Perry, on February 12, 2008 4Q 2007 Earnings Conference Call.

(d) "*[W]e have very strong liquidity, a good amount of excess capital and there are no realistic scenarios that I can foresee that would impair IndyMac's viability[.]*" August 2, 2007 Posting on the IMBreport.com (quoting Perry).

(e)    Touting liquidity risks as "*about as close to none as you could have*." Statement of Perry, at September 7, 2007 "Investor Day" Conference.

(f)    "You know, *we have tremendous liquidity*. . . . So, you know, the bottom line is I think *we have a very strong and secure funding source and tremendous liquidity* which I think, when you combine strong capital position with strong liquidity, that's what gets you through these cycles in the mortgage market." Statement of Perry, on July 31, 2007 2Q 2007 Earnings Call.

251.   These statements were materially false and misleading for the reasons alleged in at ¶¶ 236-248, above. Brokered deposits are not stable assets – they are, in the words of the IG, "volatile funding sources," a fact that Perry admitted on June 30, 2008, when he stated that such deposits were used from "an expediency perspective."   And it is beyond reasonable dispute that excessive reliance on brokered deposits poses a liquidity risk.

252.   Moreover, in light of Perry's admission on June 30, 2008 that IndyMac had been actively working to reduce its reliance on brokered deposits – a fact never disclosed to investors during the Class Period – Perry's February 12, 2008 statements that (a) the maturation of CDs "just isn't on our radar screen of being of concern to us," and (b) IndyMac had "managed [its deposits] pretty well," were false and misleading. While CDs and brokered deposits are not the same, CDs are a common vehicle for brokered deposits. The analyst's question regarding maturity of CDs was reasonably understood to be directed at the issue of brokered deposits and the potential for bank-runs, because brokered deposits are highly volatile and frequently moved after maturation.   Thus, Perry's statement that such maturations were not on IndyMac's "radar screen" and that IndyMac had "managed [its deposits] pretty well" were intended to, and did, convey to investors that those assets were stable and that IndyMac did not have concerns with such withdrawals. That implication was false. If IndyMac had been actively working to reduce its dependence on brokered deposits and such

deposits were only used as an "expediency" measure (as admitted in June 2008), the risk posed by excessive reliance on brokered deposits certainly was on IndyMac's "radar screen," and rendered IndyMac's funding base anything other than "stable."  Indeed, IndyMac admitted on May 12, 2008, that its reliance on brokered deposits was so great that  even an interest rate limitation would cause IndyMac to curtail its lending activities.  Thus, Perry's statements were materially misleading.

### 3.    Defendant Perry Acted With Scienter

253.   Defendant Perry made the foregoing statements with knowledge that they were false and misleading.  IndyMac maintained internal reports of the percentage of deposits that were brokered deposits, and those reports were transmitted to regulators.  In light of his managerial responsibilities and role, Perry saw those reports.  Perry's knowledge is also evidenced by Perry's June 30, 2008 blog posting stating that IndyMac had began actively building such deposits since the summer of 2007 to increase liquidity, that such deposits had been used as an "expediency" measure, and that IndyMac was allegedly working to reduce its reliance upon them.  It is implausible (and certainly not more probable than not) that Perry did not know about IndyMac's excessive reliance on brokered deposits until after February 12, 2008.  Further, former CFO of IndyMac Mortgage Bank, David Balsam, confirmed in a September 15, 2008 *Los Angeles Business Journal* article that he had discussions with Perry regarding brokered deposits and that reliance on brokered deposits were part of IndyMac's strategic direction.  Finally, Perry, as a mortgage industry veteran, was aware that over-reliance on brokered deposits was a factor in many of the savings and loan failures of the 1980s and therefore poses liquidity risks.

### G.    All Defendants Misrepresent IndyMac's Assets, Liabilities and Earnings in Financial Statements

254.    All Defendants are liable for their participation in the issuance of false and misleading financial statements during the Class Period.  Defendants Perry and Keys signed IndyMac's Forms 10-K for 2006 and 2007 and IndyMac's interim quarterly reports on Forms 10-Q, falsely stating that the financial statements therein, which included the ALL, were prepared in conformity with GAAP.  In the Form 10-Ks for 2006 and 2007, Ernst falsely stated that it had completed an audit conducted pursuant to the standards promulgated by the PCAOB and GAAS, established by the American Institute of Certified Public Accountants ("AICPA") (together, "GAAS"), and affirmed that the financial statements had been prepared in conformity with GAAP.  In fact, the Company's financial statements contained materially insufficient ALL on IndyMac's portfolio of loans held for investment ("LHFI").

255.    Because ALL was directly related to, among other things, net income and earnings per share, the understatement of the critical ALL metric had the effect of inflating earnings for the reported periods.  Moreover, the understatement of ALL gave investors a false picture of the Company's true financial health by understating the actual amount of IndyMac's impaired loans as of the date of the financial statements.

256.    ALL is also a critical metric because it affects the Company's capital levels.  Under OTS policy, when the ALL exceeds 1.25 percent of risk-weighted assets, it must be excluded from the equation that measures risk-based capital levels.  If the threshold were to fall below 10 percent, IndyMac would not have been considered "well-capitalized" for regulatory purposes.  A lack of a "well-capitalized" classification has numerous adverse effects, most notably the inability to accept brokered deposits.  Because IndyMac relied on brokered deposits for its solvency, IndyMac had a strong incentive to understate ALL.

257.   Consistent with requirements of GAAP, as well as existing SEC guidance, relevant established rules and interpretive literature of accounting bodies, and by federal bank regulatory agencies, Defendants Perry and Keys were required to ensure that the ALL was recorded and maintained at a level appropriate to cover estimated losses on loans determined to be impaired as of the date of the issuance of the financial statements.   To make this determination, Defendants would have to take into account *all* internal and external factors affecting the collectibility of the portfolio as of the evaluation date.  This would include, *inter alia*, the undisclosed poor quality, and high risk nature of the Company's loan portfolio, as well as known internal factors that would affect loan collectibility, including the   Company's dubious underwriting and appraisal practices. Defendant Ernst was concurrently required to adhere to GAAS and the requirements of the PCAOB in its audits of these financial statements, to ensure material conformity with GAAP thereby.

258.   All Defendants were aware of every one of the factors that caused the level of ALL to be understated at the time they were issued in the financial statements in IndyMac's Forms 10-K for the years ended 2006 and 2007, respectively.  As discussed below, the level of ALL decreased from year-end 2005 to year-end 2006, and did not increase sufficiently in 2007, even as the real estate industry, and IndyMac's own business, collapsed further.  Defendants failed to increase ALL despite the fact that the numerous critical statistics and ratios – including rising delinquencies, non-performing assets as a percent of total assets, and high-risk negative amortization  ARMs – were all rising at the same time that external conditions, such as home prices in IndyMac's principal market areas, were further deteriorating.  These negative internal and external factors all clearly indicated that IndyMac's loan portfolio was subject to increasing risk of default, and therefore under GAAP and other regulatory guidelines the ALL should have increased  commensurate with these seriously increased credit risks.

### 1.  Defendants Perry and Keys Authored Materially Misleading Financial Statements

259.  Defendants Perry and Keys both signed each of the annual reports on Forms 10-K and quarterly reports on Forms 10-Q issued during the Class Period, as well as the Sarbanes-Oxley Act certifications in which Perry and Keys asserted that they had taken appropriate steps to assure themselves – and investors – that the Company's financial statements were produced through a system of adequate controls, and were free from material misstatements.  Thus, the financial statements are statements of, and the responsibility of, Perry and Keys.

260.  As of December 31, 2006, the Company reported an allowance for loan losses of $62.3 million, compared to $55.1 million as of December 31, 2005. In 2006, however, the $62.3 million allowance was approximately 0.62% of the total loan portfolio of assets held for investment, whereas the relationship at the end of 2005 reflected a ratio of 0.67%.  This reduction lacked any reasonable basis because of the multitude of company-specific negative statistics (including, *e.g.*, increasing delinquency rates and increasing percentages of non-performing assets) as well as economic and geographic factors (such as a heavy concentration of loans in California, where housing prices were deteriorating), all of which were contributing to deterioration in the credit quality of the loan portfolio as of December 31, 2006.

261.  As of December 31, 2007, the Company reported an allowance for loan losses of $398.1 million.  This was a significantly higher percentage of the total loan portfolio than had been reported in 2006, but was still patently unreasonable in light of (1) the continuing and rapidly accelerating collapse of the real estate market in 2007, and (2) the sharply increasing rates of default and delinquency suffered by IndyMac's loan portfolio resulting, in part, from IndyMac's loosened underwriting standards and the use of inflated appraisals in the credit review process.

262. For example, in 2007, the allowance represented only 30% of the value of non-performing loans held for investment, significantly below the 58% ratio in 2006 and 127% ratio in 2005. *See* Chart in ¶ 274 below. As such, the Company's relevant financial statements materially understated the allowance for loan losses, materially overstated the value of IndyMac's loan portfolio net of the allowance for loan losses, and, thereby, overstated its net income during the Class Period, because the numbers reported in its public filings were not prepared or presented in conformity with GAAP and were not faithful to SEC guidelines.

## 2. Ernst's False and Misleading Statements Opining That IndyMac's 2006 and 2007 Financials Conformed with GAAP and GAAS

263. Ernst issued unqualified (or "clean") audit opinions on IndyMac's 2006 and 2007 financials, which were included in the Company's Forms 10-K for years ending December 31, 2006 and 2007, respectively, in which Ernst falsely represented that it had conducted its audits in conformity with GAAS, and that IndyMac's financial statements were prepared and presented in conformance with GAAP. Specifically, IndyMac's 2006 Form 10-K contained the following false representation by Ernst:

> We have audited the accompanying consolidated balance sheets of IndyMac Bancorp, Inc. and subsidiaries (the Company) as of December 31, 2006 and 2005, and the related consolidated statements of earnings, shareholders' equity and comprehensive income, and cash flows for each of the three years in the period ended December 31, 2006. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).

Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of the Company at December 31, 2006 and 2005, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2006, in conformity with U.S. generally accepted accounting principles.

* * *

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of the Company's internal control over financial reporting as of December 31, 2006, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 26, 2007 expressed an unqualified opinion thereon.

264.  The 2007 Form 10-K contained a substantially identically worded representation by Ernst, with only dates changed.  The financial report within the 2007 Form 10-K republished all of the financial misrepresentations in the 2006 report, including the materially misleading loan loss allowance, and Ernst falsely

stated that both the 2006 and 2007 financial statements were presently in conformity with GAAP.

265.   When an auditor represents that a company's financial statements conform in all material respects with GAAP, the auditor "indicates [his] belief that the financial statements taken as a whole are not materially misstated."  AU § 312. Indeed, "[f]inancial statements are materially misstated when they contain misstatements whose effect, individually or in the aggregate, is important enough to cause them not to be presented fairly, in all material respects, in conformity with [GAAP]."  AU § 312.

### 3.   The Facts Demonstrating the Inadequacy of IndyMac's Allowances for Loan Losses Were Known to Each Defendant

266.   As the auditor of IndyMac's financials, Ernst was well aware of the rising delinquencies and increasingly risky composition of IndyMac's loans held for investment ("LHFI") portfolio.  As set forth in greater detail below, Ernst, as independent auditors of IndyMac,  had access to all of the Company's regularly-generated reports, including the PPQC monthly reports of the Bank's loans, which identified pervasive systemic defects in IndyMac's underwriting process and were available on IndyMac's intranet site.   Abernathy Complaint ¶¶ 16-20.   Ernst similarly had access to all internal, external, and OTS audit findings showing material deficiencies in IndyMac's system of internal controls.  Indeed, both Keys and Perry certified in IndyMac's 2006 and 2007 10-Ks that all material deficiencies in internal controls over financial reporting that would affect financial reporting in any way had been reported to Ernst.  Furthermore, Ernst was aware of its own audit findings, including its finding in 2006 that the Conduit Division possessed significant serious internal control problems.

267.   As IndyMac's two highest executives, with ultimate responsibility over both financial reporting and financial controls, Perry and Keys also had access

to and reviewed all reports and audits. Indeed, according to IndyMac's 2007 Proxy, Keys' compensation was tied to his ability to manage all audit findings and supervise all financial reports. Moreover, Keys, as IndyMac's Chief Financial Officer, would have been responsible for ensuring that the ALL adequately reflected all internal and external factors impacting the carrying value of loans in IndyMac's held for investment portfolio, including the value of collateral and the collectibility of such loans.

268. In addition, as the Company stated in its 2007 10-K, in the "Management" section: "[m]anagement maintain[ed] a central database of internally identified findings, and this, in conjunction with operational and financial controls, requires follow-up and accountability for any issues identified in this process." Additionally, IndyMac internally created a "Portfolio Characteristics Report" every month, which listed all of the individual loans in IndyMac Bank's portfolio, and stated whether they were non-performing. This Report was submitted to Executive Vice President Patrick Hymel and the Enterprise Risk Management Group, and was available to Perry, Keys, and Ernst.

269. As discussed in ¶¶ 129-137, Perry was also aware of – and in fact directed – IndyMac's severely deficient underwriting and risk managements practices. Keys was similarly aware of IndyMac's failure to conform with fundamental underwriting and appraisal standards. Because appraisals dictated the collateral value of assets – and therefore the carrying value of loans and the measure of probable losses built into the ALL, which directly affected financial reporting – Keys necessarily was aware of OTS's January 2007 Report of Examination, which identified "serious issues with IndyMac's appraisals," including appraisals made without physical site inspection, appraisals based on public data, and appraisals performed by appraisers hired by the borrower. That same report also identified problems with the underwriting standards in the HCL Division, and serious underwriting deficiencies in the Conduit Division –

deficiencies that had been noted in multiple audits dating back to 2004 and yet remained uncorrected.  Keys was also necessarily aware of those prior internal and external audits of the Conduit Division – which originated $31 billion in loans in 2006 – because he was responsible for managing all internal and external audits that affected financial reporting.

270.  The reports issued by IndyMac Bank's PPQC department and distributed by e-mail and posted on Indymac's  intranet site detailed the systemic and pervasive violation of underwriting standards in IndyMac's loans before and during the Class Period.  Abernathy Complaint ¶ 16.  The reports revealed that the Bank's loan sample's "defect rate" ranged from 10% to 22% from September 2005 though August 2007, and that the Conduit Division had a defect rate of up to 30% from April 2005 through August 2007, and that the percentage of the random sample of IndyMac Bank's loans containing misrepresentations ranged from 12% to 18% from January 2007 (when reporting of that statistic began) through August 2007, including inflated appraisals and false information about the borrowers' income, employment, assets and credit history. *Id.* ¶ 19.

271.  The following chart shows five key metrics which alone demonstrate that IndyMac should have reported higher ALL in the 2006 Form 10-K and subsequent reports issued during the Class Period:

<u>Case Schiller Index, Value of 30 and 90 Day Delinquent Loans,</u>

<u>and Loan Loss Allowance</u>

| | Value of Delinquent Loans | | Delinquent Loans as % of Loans Outstanding | | 3 Month Change in Case-Schiller Index - Los Angeles | 12 Month Change in Case-Schiller Index – Los Angeles | Loan Loss Allowance as % of Loans Held for Investment Outstanding |
|---|---|---|---|---|---|---|---|
| | 30 Day | 90 Day | 30 Day | 90 Day | | | |
| 12/31/05 | 136,676 | 63,220 | 0.95% | 0.44% | 3.48% | 21.80% | 0.67% |
| 03/31/06 | 144,694 | 94,107 | 0.89% | 0.58% | 1.31% | 18.30% | 0.65% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 06/30/06 | 132,430 | 105,094 | 0.87% | 0.69% | 1.73% | 13.00% | 0.66% |
| 09/30/06 | 191,949 | 122,703 | 1.05% | 0.67% | .026% | 7.10% | 0.61% |
| 12/31/06 | 292,979 | 164,572 | 1.50% | 0.84% | -1.42% | 2.00% | 0.62% |
| 03/31/07 | 442,419 | 294,772 | 2.36% | 1.51% | -2.01% | -1.40% | 0.76% |
| 06/30/07 | 579,655 | 447,253 | 2.84% | 2.19% | -0.93% | -4.10% | 0.89% |
| 09/30/07 | 609,838 | 704,064 | 2.70% | 3.12% | -2.80% | -7.00% | 1.89% |
| 12/31/07 | 817,793 | 1,344,834 | 4.12% | 6.78% | -.854% | -13.70% | 2.40% |
| 03/31/08 | | | | | -11.1% | -21.72% | 2.89% |

272. Thus, at the same time that IndyMac was *decreasing* ALL (*i.e.* from December 31, 2005 to December 2006), real estate prices had turned, 30-day delinquencies were up 58% from the previous year, and 90-day delinquencies were up over 90% from the previous year,

273. All of the data on this chart was well known to all Defendants. The value of loans and value of delinquent loans were required to be filed and were filed by IndyMac with the FDIC every quarter, under the direction of Perry and Keys. Ernst was responsible, under GAAS and PCAOB standards, to be familiar with industry conditions as well as the condition of IndyMac particularly its loan portfolio, which was its principal business – for purposes of conducting its audits. Ernst would have seen, as part of its audit procedures, documents filed by the Bank with FDIC. The Case-Schiller index data is the most highly regarded index of real estate prices, is published by Standard & Poor's, and is readily available over the internet and through many business news services. The Case-Schiller index is updated monthly, and is well known to real estate financial professionals.

274. The following chart, based entirely on information contained in IndyMac's Form 10-Ks, shows that IndyMac assumed progressively greater risks each year – which risks became embedded in the loans carried in its loan portfolio

– yet it decreased ALL  as of the end of 2006, and had insufficiently increased ALL as of December 31, 2007, in violation of GAAP:

|  | FY 2005 | FY 2006 | FY 2007 |
|---|---|---|---|
| Non-performing assets as % of total assets | .34% | .63% | 4.61% |
| ALLL as % of non-performing loans held-for-investment | 127% | 58% | 30% |
| ALLL as a % of all non-performing assets | 76% | 34% | 26% |
| HELOC 30-day delinquencies | 0.21% | 1.56% | 3.50% |
| Option ARMS Negative Amortization | 56% | 83% | 91% |
| Repurchases of Sold Loans | $108M | $194M | $613M |

275.   Not only was the risk of loss rising; realized loan losses had already risen.   Indeed, from December 31, 2005 to December 31, 2006, realized LHFI losses increased by 67%, from $7.7 million in FY 2005 to $12.8 million in FY 2006.   From December 31, 2006 to December 31, 2007, those losses increased to $52.2 million in FY 2007 – by another 400% – *for an aggregate increase of 578%*.   In the face of these actual, already realized losses, Perry and Keys *decreased* the ALL ratio at the end of 2006.   Furthermore, the modest increase in ALL at the end of 2007 was clearly inadequate in light of the 578% increase in realized loan losses from the 2005 levels.

4.      **Defendants Knew of and Ignored Numerous Red Flags Demonstrating that the Allowance for Loan Losses in 2006 and 2007 Were Insufficient.**

276.   At the time Perry and Keys signed, and Ernst gave its unqualified opinion on, the 2006 and 2007 financial statements (in March 2007 and February 2008, respectively), each intentionally or with deliberate recklessness disregarded the following facts or red flags, which were in their possession, including from available Company reports.  In addition to the facts set forth above, which show the falsity of Defendants' statements (and thus also show their scienter in making those statements), these facts contradicted and undermined information in the financial statements, particularly the allowance for loan losses, which resulted in material misstatements of IndyMac's financial statements, including overstatements of income and earnings.   Specifically, Defendants acted with scienter in making the statements above, including filing false and misleading financial statements with the SEC and disseminating such financial statements to the investing public, as they intentionally or with deliberate recklessness disregarded that:

(a)      The percentage of loans delinquent by 90 days increased 91% between 2005 and 2006.  IndyMac's delinquency rates skyrocketed in late 2006 and throughout 2007, and yet IndyMac's allowance for loan losses *decreased* for the year 2006 and then increased slowly in 2007.

(b)      Home prices in the Los Angeles metropolitan area, where the Bank had a significant concentration, had gone from increasing at an astonishing rate of 21.80% in 2005 to decreasing by 1.42% in the last three months of 2006, yet IndyMac *decreased* its ALL as a percentage of loans held for investment and nonperforming loans as of December 31, 2006 as compared to the end of the prior fiscal year, as depicted in its Forms 10-K.  During 2007, home prices in that area continued to decline at a rapid rate, and by December 31, 2007, had fallen 13.7%

from the previous year.  Nevertheless, IndyMac's ALL was still insufficient to cover probable losses in its portfolio as of December 31, 2007.

(c)     The Company had ever-increasing exposures – which were the direct result, at least in part, of IndyMac's efforts to increase volume at the expense of sound underwriting  in its highest-risk loan categories:

(i)     Option ARMs comprised approximately 75% of all loans made by IndyMac from 2004 to 2006, and 75% of borrowers were making only minimum payments on those ARMs in 2006.

(ii)    Negative Amortization ARM loans increased from 56% of all Option ARM loans at the end of 2005 to 83% of all Option ARM loans at the end of 2006, to 91% of all Option ARM loans at the end of 2007.  *See* ¶ 274.

(iii)   The Conduit Division originated 33% of the Bank's loans in 2006, up from 25% in 2005. Defendants were all aware that loans from this Division presented greater risks than loans generated by other divisions.  *See* ¶¶ 111-113.

(iv)    Non-performing loans – the highest – risk category of all – ***increased*** from 0.34% of all assets at year-end 2005 to 0.63% at year-end 2006, to 4.61% at year-end 2007.  Despite this, the ALL as a percentage of non-performing loans held for investment ***declined*** from 127% in 2005 to 58% in 2006 to 30% in 2007.  *See* ¶ 274.

(d)     OTS had released the results of its examination on January 8, 2007 (just before the 2006 Form 10-K was released), and: (i) found serious

underwriting and internal control deficiencies in the Conduit Division; (ii) required IndyMac to "[r]efine current ALLL practices or introduce new methodologies to take advantage of more robust data and improve forecasts"; (iii) required IndyMac to "[e]stablish a policy and related procedures for the identification and classification of troubled collateral dependent loans"; and (iv) "identified serious issues with IndyMac's appraisals." This information was known to Defendants prior to issuance of the 2006 Form 10-K.  *See* ¶¶ 113-117, 120-121.  Ernst was required to know the results of examinations by the Bank's regulators among the substantive tests necessary to evaluate the reasonableness of the ALL.  AAG 9.54.  Recent regulatory exam reports provide information to identify loans that contain high credit risk and are likely to fail and require increased ALL.  AAG 9.59.

(e)    On January 17, 2008, OTS downgraded the Bank's CAMELS ratings, crucial metrics of the Bank's financial health, as of December 31, 2007, citing, *inter alia*, deficient practices affecting ALL, and requiring twenty-four different corrective actions.  This information was known to Defendants prior to issuance of the 2007 Form 10-K.

(f)    IndyMac's internal audit review noted serious underwriting problems in its HCL Division as early as 2004, and continued to cite the underwriting problems in this Division in 2005 and 2006.  These issues remained uncorrected through 2007 until the Division was closed. *See* ¶ 119.

(g)    Ernst itself, in its management report to IndyMac's Board in connection with its year-end audit for 2006, found that IndyMac's Conduit Division, which was responsible for many of IndyMac's problem loans, experienced financial reporting control deficiencies in 2006, and yet, despite the magnitude of loans originated within that division, no changes or adjustments to the ALL were made.  *See* ¶¶ 112-113.

(h)     As discussed in Paragraphs 87-93 above, the OIG found IndyMac to have engaged in fundamentally unsound and fraudulent loan underwriting and real estate appraisal practices, which the OIG was able to identify by examining 22 individual loan files, and which securitization insurer MBIA also determined by examination of a small number of IndyMac loan files. The conclusions of the OIG and MBIA are corroborated by numerous witnesses who described a Company-wide culture that, at every level, emphasized increased loan origination volume in derogation of safe and sound underwriting standards. *See* ¶¶ 74-86.

(i)     IndyMac had high concentrations of risky loans in California and Florida, two of the areas where real estate was collapsing most dramatically in 2006 and 2007.

(j)     Until November 2007, IndyMac failed to adhere to a federal rule, issued jointly by the Office of the Comptroller of the Currency, the Federal Reserve, the FDIC, the OTS, and the National Credit Union Administration, effective in September 2006, that forbade lending to individuals without income verification in most circumstances. *See* Interagency Guidance on Nontraditional Mortgage Product Risks, 71 Fed. Reg. 58609, 58614 (Oct. 4, 2006), ¶ 101 above.

(k)     As determined by the independent accountant engaged by IndyMac separate from its relationship with Ernst,  IndyMac's business units were, throughout the Class Period, inconsistently calculating ALL, and senior management failed to provide detailed guidance on how the business units should develop historical loss data, look-back periods, and other baseline factors essential to the calculation.. *See* ¶ 5.  These findings demonstrate the direct causal link between deficiencies in processes expected to be governed by internal controls and the end-game financial statements included in the Company's public filings, especially with respect to ALL.

(1)     The number of loans that had to be repurchased by IndyMac *nearly doubled in 2006, and tripled in 2007* – reflecting the fundamentally deficient quality of IndyMac's underwriting.

277.   All of the factors discussed above demonstrate that IndyMac was facing increasing risks of loan defaults in 2006, compared to earlier periods, and establish that the principle of "directional consistency," discussed in ¶¶ 290-297 below, required that ALL at December 31, 2006 should have been higher as a percentage of LHFI, not lower, than in 2005.  Perry's and Keys' certification of the ALL in IndyMac's financial statements, and Ernst's unqualified opinion thereon, were deliberately false and misleading in light of these numerous and glaring red flags.

278.   The monthly reports which IndyMac's PPQC unit distributed internally by e-mail and posted on IndyMac's intranet site provided Defendants with additional red flags demonstrating that IndyMac's loans were defective, risky, and likely to suffer high rates of default. Abernathy Complaint ¶¶ 16-20. Because of the frequency, content, reliability,  and accessibility of these PPQC reports, Ernst was aware of the reports and their data, and, if not, was deliberately reckless in not knowing about them.

### 5.   Defendants' Certification of Insufficient ALL in the Face of Rising Delinquencies, Declining Property Values, Riskier Loan Portfolios, and Numerous Adverse Audit Findings and Internal Control Problems, Violated GAAP

279.   Management is required to report its financial statements, including the determination of ALL, in accordance with GAAP.  The Company's auditor, in order to issue an unqualified audit opinion on the reported financials, including ALL, must ensure that those financials, including ALL, have been prepared in material conformity with GAAP.  Despite these requirements with respect to ALL, Perry and Keys falsely reported that IndyMac's 2006 and 2007 year-end

financials on Forms 10-K and its quarterly financials on Forms 10-Q, which included the ALL, complied with GAAP, when they did not. Defendant Ernst falsely issued unqualified opinions asserting that the year-end 2006 and 2007 financials, including the ALL, were presented in accordance with GAAP, when they were not.

280. The Company's portfolio of loans held for investment was presented within the Company's balance sheet separately from other asset balances such as cash, securities, or loans held for sale. Aligned with the loan portfolio was an allowance for loan losses. The Company's allowance for loan losses was, purportedly, meant to reflect, as reported in the relevant financial statements, the Company's estimate of all probable credit losses resident within the loan portfolio. This estimate of probable losses was required by GAAP.

281. In IndyMac's financial statements, the Company used the term "ALL" to refer to Allowance for Loans Losses on Loans Held for Investment. In other words, IndyMac calculated ALL only for its loans held for investment ("LHFI") portfolio – not for loans held for sale, and not for repurchases. The term "Credit Reserves" is a broader term which includes other categories of reserves and refers to the total amount of reserves for losses on lending–related assets on the balance sheet. While only one category of "Credit Reserves" referred to ALL, all five categories of "Credit Reserves" related to reserves for losses involving IndyMac's lending activity. "Credit Costs" refer to an increase in all categories of reserves during a particular quarter. Credit Costs are taken as an expense on the Company's Income Statement and reduce income for that quarter.

282. GAAP are the official standards accepted by the SEC and promulgated, in part, by the AICPA. Each Defendant certified that IndyMac's financial statements were in material conformity with GAAP. Each is liable for these misrepresentations. Among the GAAP violations by Defendants are:

(a)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. (FASCON 2 ¶¶ 95, 97);

(b)    The provisions of Financial Accounting Standard ("FAS") No. 5 ("FAS 5"), which provides that an estimated loss from a loss contingency, such as the collectibility of receivables, should be accrued (*i.e.*, increase the allowance for loan losses) by a charge to income, and requires the accrual of a loss contingency when information available prior to the issuance of the financial statements indicates that a loss on a loan or portfolio of loans (1) is *"probable"* (defined as likely to occur) to have been incurred at the date of the financial statements and (2) the amount of the loss can be *reasonably estimated*. (FAS 5 ¶¶ 3, 4, 8);

(c)    In the context of lending, FAS No. 5  requires consideration of underwriting, and provides that a loan may even be impaired *at origination* "*if a faulty credit granting decision has been made or loan credit review procedures are inadequate or overly aggressive, in which case, the loss should be recognized at the date of loan origination*." *See* AAG 9.36.

283.    SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. The responsibility for preparing the financial statements in conformity with GAAP rests with the Company's management. *See* AU § 110.03.

284.    In addition to those requirements provided in GAAP, the SEC provides direct guidance on the proper accounting for credit losses, in SAB 102, Selected Loan Loss Allowance Methodology and Documentation Issues ("SAB 102").  Specifically, SAB 102 states that *"[i]t is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied*

*process.*" Therefore, pursuant to SAB 102, a loan loss allowance methodology generally should "[c]onsider all known relevant internal and external factors that may affect loan collectibility...[and] be based on current and reliable data[.]" SAB 102 provides that the "[f]actors that should be considered in developing loss measurements" include:

- Levels of and trends in delinquencies and impaired loans;
- Levels of and trends in charge-offs and recoveries;
- Trends in volume and terms of loans;
- Effects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices;
- Experience, ability, and depth of lending management and other relevant staff;
- National and local economic trends and conditions;
- Industry conditions; and
- Effects of changes in credit concentrations.

285.   SAB 102 further states that "*[f]or many entities engaged in lending activities, the allowance and provision for loan losses are significant elements of the financial statements.   Therefore, the staff believes it appropriate for an entity's management to review, on a periodic basis, its methodology for determining its allowance for loan losses.*"   Thus, in addition to evaluating loans for impairment at origination, lenders are expected to reevaluate their reserving methodology, and therefore their loans and loan portfolios, for impairment, every financial reporting period thereafter.

286.   The SEC's Financial Reporting Release 28 § 401.9 ("FRR 28") also provides, in relevant part, that "[b]ecause the allowance [for loan and lease losses] and the related provision are key elements of financial statements of registrants engaged in lending activities, it is critical that those judgments be exercised in a

disciplined manner that is based on and reflective of adequate detailed analysis of the loan portfolio."

287.   In addition to the foregoing standards, according to the AICPA Guide, § 9.17:

- Loan evaluations by management (and tests of such by independent accountants to the extent they are performed as part of the engagement) should avoid the following:

    a)   *Collateral myopia.*   This is the failure to see beyond collateral values to a financial weakness in the borrower....

    b)   *Inadequate collateral appraisals.*   This is the failure to critically review appraisals to understand the methods employed, assumptions made, and limitations inherent in the appraisal process, including undue reliance on management appraisals.

288.   As discussed in ¶¶ 276-278 above, Defendants violated applicable GAAP standards and SEC guidance by ignoring all of the evidence – internal and external – that the credit quality of IndyMac's loan portfolio had deteriorated as a result of, among other things: (1) underwriting violations; (2) ineffective risk management practices; (3) inflated appraisal values; (4) rising delinquencies and increasing concentrations in high-risk, exotic loans like option ARMs, with a rise in negative amortizations; and (5) the growth of IndyMac's Conduit Division, which was identified as a financial reporting control deficiency by Ernst in 2006, and which IndyMac's internal audit group reported as having problems as early as 2005.   Additional risk factors known to but disregarded by Defendants included the collapse of the housing market, especially in California and Florida, where IndyMac's loans were concentrated.

289.  Ernst violated GAAS by issuing an unqualified opinion on the purported material conformity of IndyMac's financial statements with GAAP despite all of the foregoing evidence, as well as despite an awareness that (1) internal controls surrounding the computation of ALL were deficient and, (2) therefore, the computation of ALL was rendered ineffective and, ultimately, insufficient to reflect all of the inherent and known and probable losses in the LHFI portfolio.

6.   **Defendants' Approval of Decreasing ALL for 2006 Violated Applicable Regulatory Guidance on Directional Consistency and Rendered the 2006 Financial Statements Materially False and Misleading**

290.  The federal banking regulatory agencies which regulated IndyMac considered the accounting for ALL so critical that, on December 13, 2006, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the FDIC, the OTS, and the National Credit Union Administration, issued a Revised Interagency Policy Statement On the Allowance for Loan and Lease Losses ("the 2006 ALLL Government Policy Statement").

291.  The 2006 ALLL Government Policy Statement reaffirmed that: (1) for lending institutions like IndyMac, "ALLL represents one of the most significant estimates in an institution's financial statements and regulatory reports"; (2) GAAP presents the most appropriate means for management to calculate ALL; and (3) established GAAP principles require management to consider *all relevant internal and external circumstances* in determining the amounts of ALL in accordance with GAAP and SEC rules (principally FAS 5 and SAB 102).

292.  The 2006 ALLL Government Policy Statement further confirms the GAAP requirement that ALLL should be "*directionally consistent*" with changes in the risk factors facing a lending institution. This means that  if the risk factors

facing a lending institution – such as inadequate underwriting, delinquencies, negative amortization ARMS, and/or falling home prices reducing collateral values – rise, then ALLL should rise as well.

293.   According to the 2006 ALLL Government Policy Statement, in determining IndyMac's ALLL in accordance with GAAP, Defendants were required to consider "all significant factors that affect the collectibility of the portfolio as of the evaluation date," including "those qualitative or environmental factors that are likely to cause estimated credit losses associated with the institution's existing portfolio to differ from historical loss experience." To do so, Defendants were required, for example, to conduct a comprehensive, well-documented, and consistently applied analysis of IndyMac's loan portfolio. Among the qualitative or environmental factors that Defendants should have considered in estimating ALL were the following:

- changes in lending policies and procedures, including changes in underwriting standards;
- changes in international, national, regional, and local economic and business and real estate market conditions that affect collectibility of the loans;
- increased volume of the loan portfolio and changes in the nature and terms of the loans;
- increases in volume and severity of past due loans, and nonaccrual loans;
- changes in the value of the underlying collateral;
- the existence and effect of concentrations of credit, and changes in the level of such concentrations, including geographic concentration of loans; and