- the effect of other external factors such as competition and legal and regulatory requirements on the level of estimated credit losses in the institution's existing portfolio.

294. According to the principle of "directional consistency," if the risk factors described above increase, so should ALL. As the 2006 ALLL Government Policy Statement made clear: "[C]hanges in the level of the ALLL should be directionally consistent with changes in the factors, taken as a whole, that evidence credit losses, keeping in mind the characteristics of an institution's loan portfolio. *For example, if declining credit quality trends relevant to the types of loans in an institution's portfolio are evident, the ALLL level as a percentage of the portfolio should generally increase, barring unusual charge-off activity*. Similarly, if improving credit quality trends are evident, the ALLL level as a percentage of the portfolio should generally decrease."

295. Perry and Keys violated the notion of "directional consistency" when they *decreased* ALL as a percentage of loans held for investment from 2005 to 2006, despite all known available information indicating that internal and external risk factors related to collectibility of loans had dramatically *increased*. First, Perry and Keys were aware of, *inter alia*, the Company's improper risk management, appraisal, and underwriting practices during the Class Period, as well as the declining loan quality and sharply increasing delinquencies resulting, in large part, from these practices. Second, Perry and Keys had access to and reviewed the underlying data and statistics in their own financials, and should have reviewed a sample of IndyMac's loans. All of this information would have demonstrated both that the risks in IndyMac's loan portfolio were dramatically heightened, and that the ALL should have been increased as necessary to match these heightened risks.

296. Defendant Ernst similarly disregarded the mandate to apply "directional consistency" to calculations of ALL when it gave its unqualified

opinion that IndyMac's decreasing ALL – in the face of rapidly rising delinquencies, declining property values, exotic and risky loans, and documented underwriting and internal control problems – "present[ed] fairly, in all material respects," the financial position of the Company.  Any audit at all would have shown that loans were granted with no regard for underwriting standards, and with little, if any, documentation of borrowers' income or employment, and that collateral values underlying the loans were untrustworthy because many were based on fraudulent appraisals and were concentrated in collapsing home-value markets of California and Florida.  All these factors clearly demonstrated that IndyMac's historic loss experience was a useless model for calculating ALL in 2006 and 2007, and that the ratio of ALL to LHFI should have increased in tandem with rising internal and external risk factors.

297.  Defendants Perry and Keys were aware of the 2006 ALLL Government Policy Statement because it was sent to banks, accompanied by a cover letter from The Office of the Comptroller of the Currency, Board of Governors of The Federal Reserve System, The Federal Deposit Insurance Corporation, National Credit Union Administration, and The Office of Thrift Supervision.  The cover letter, dated December 13, 2006, "suggested routing" the 2006 Policy Statement to the banks' Chief Executive Officer, Chief Financial Officer, Chief Lending Officer, and Board of Directors.  Defendants understood the  critical importance of the 2006 Interagency ALLL Policy Statement to IndyMac because it was sent from all five Federal government banking regulators, and addressed one subject only – the importance of GAAP as the proper standard for calculating ALL – and was specifically addressed to Defendants Perry and Keys, IndyMac's CEO and CFO at that time.

298.  In performing its audit, Ernst either intentionally or with deliberate recklessness disregarded the 2006 ALLL Government Policy Statement. Because of its extreme importance,  Ernst had a duty to be aware of this Policy Statement

and was required to apply the principle of directional consistency to ensure that IndyMac's financial statements were materially accurate.

### 7. Defendant Ernst Deliberately Disregarded Guidance Regarding ALL Provided in the 2006 AICPA Audit and Accounting Guide

299. The AICPA prepares and issues industry-specific Audit and Accounting Guides ("AAG"), including one for banks and other depository and lending institutions like IndyMac. As noted above at ¶¶ 141-151, in 2006, the AICPA Financial Institution Guide Combination Task Force ("Task Force") prepared and issued the 2006 AAG. Defendant Ernst was required to consider this guidance to ensure that IndyMac's financial statements, including the ALL, were prepared in accordance with GAAP.

300. As the 2006 AAG confirmed, loans and underlying collateral are the primary focus of the audit of financial institutions like IndyMac. The 2006 AAG noted that for financial institutions, like IndyMac, since loans usually are the most significant assets and generate the largest portion of revenues for banks, the auditor must understand the unique features of, and risk factors affecting, the Company's loan portfolios – and the consequent need to focus on the accuracy of the ALL estimate – at the time of the audit. (AAG 8.01). Thus, to plan and design audit procedures properly, the independent accountant needs to understand the institution's loan portfolio, lending processes, and loan accounting policies, as well as other factors such as economic conditions. (AAG 8.02).

301. The 2006 AAG identified specific risks that existed at IndyMac that were blatant red flags for all Defendants who prepared and audited IndyMac's financials. For example, § 316 requires examination of incentives and pressures present at the Company, including: (a) aggressive loan goals; (b) incentives for origination; (c) relaxation of credit standards; (d) excessive concentrations of lending; (e) excessive lending in new products; (f) frequent or unusual exceptions

to credit policy; and (g) financial stability or profitability is threatened by economic, industry or entity operating conditions, such as unusually large growth in the loan portfolio without commensurate growth in the ALL.  As discussed above ¶¶ 74-120, each one of these factors was present at IndyMac.

302.   The 2006 AAG also identifies collateral risk (where the value of collateral is declining) and concentration risk (where the loan portfolio is concentrated in certain products or geographic regions) as two major credit risks requiring higher ALL.  **Both** of those risks were present at IndyMac.

303.   The 2006 AAG identified the following factors related to loans as indicative of higher inherent risk (and, often, higher control risk) for loans and related amounts, **all of which** applied to IndyMac during the Class Period:

- High rate of growth in the loan portfolio;
- Significant changes in the composition of an institution's portfolio;
- Poor underwriting standards and procedures;
- Significant nontraditional lending activities that involve a higher degree of risk, such as highly leveraged lending transactions;
- Failure of personnel to follow management's written lending policies for underwriting and documentation;
- Loans that are continuously extended, restructured, or modified;
- Significant concentrations of loans in a particular industry or geographic area; and
- Significant concentrations of loan products with terms that give rise to a credit risk; such as, negative amortization loans, loans with high loan-to-value ratios, multiple loans on the same

collateral that when combined result in a high loan-to-value ratio, and interest-only loans. (AAG 8.133).

304. The 2006 AAG recommended that auditors focus on the following key factors to evaluate whether the ALLL estimate was reasonable:

- The effectiveness of the institution's internal control related to loans and the allowance for loan losses;

- Current local, national, and international economic conditions and trends, particularly as they have affected collateral values;

- Composition of the loan portfolio and trends in volume and terms of loans, as well as trends in delinquent and nonaccrual loans that could indicate historical loss averages do not reflect current conditions;

- Identified potential problem loans and large groups of problem loans, including *delinquent and nonaccrual loans* and loans classified according to regulatory guidelines;

- Concentrations of loans to individuals or entities and their related interests, to industries, and in *geographic regions*;

- Quality of the internal loan review and internal audit functions;

- The effects of changes in lending policies and procedures, including those for underwriting, credit monitoring, collection, and charge-offs that could indicate historical loss averages do not reflect current conditions; and

- Results of regulatory examinations.

(AAG 9.54).

305.  Ernst deliberately disregarded the foregoing standards.  Not only did Ernst ignore the obvious facts that delinquencies were increasing and collateral values were decreasing, Ernst also ignored (a) its knowledge, developed from the internal documents discussed herein, that the Bank's internal controls over lending practices were so defective that the Bank's processes provided an insufficient basis for calculating ALL; (b) its own finding that the Conduit Division, which originated approximately one-third of IndyMac's loans in 2006, was suffering from various significant internal control deficiencies, and (c) OTS's finding – which was communicated to Ernst and confirmed by an independent public accountant in early 2008 – that IndyMac's ALL methodology was flawed.  In the face of these and the other known facts set forth above, Ernst's unqualified opinions relating to the 2006 and 2007 financials statements were  intentionally or deliberately recklessly false.

**8.  The Standards of GAAS, and Contemporaneous AICPA Audit Risk Alerts, Required Ernst to Ensure that it Had a Thorough Understanding of IndyMac's Business, Internal Controls and Awareness of Growing Risks Facing the Banking Industry**

306.  GAAS is comprised of ten basic standards that establish the requirements of an auditor's performance and the objectives to be achieved in a financial statement audit.  Auditors are required to follow these standards in every audit they conduct.

307.  The GAAS standards fall into three basic categories:   General Standards, Fieldwork Standards, and Reporting Standards.  The *General Standards* provide critical guidance to the auditor on the exercise of due professional care in the performance of the audit.  The *Standards of Fieldwork* provide guidance on audit planning, evaluation of internal controls, and collection of sufficient

1565686v1/010900

150

evidential matter to form a reasonable basis for the auditor's audit opinion on the financials. The *Standards of Reporting* provide guidance to the auditor on the content of the audit report, and the remedies available to the auditor to modify that report if it cannot give an unqualified opinion that the financial statements audited have been prepared in material conformity with GAAP. AU § 150.02.

308. For purposes of its audits of IndyMac for 2006 and 2007, Ernst had a professional obligation, in accordance with GAAS, to perform the following procedures, among others:

(i)   In accordance with AU § 311 ("Planning and Supervision"), Ernst was required to perform specific audit procedures to obtain an understanding of IndyMac and its environment, including internal controls, and to be able to assess the risks of material misstatement in the financial statements (AU § 311.06-09). Further, Ernst was required to consider, when planning and performing its audits, matters affecting the industry in which IndyMac operated, such as economic conditions, government regulations, accounting practices common to the industry and financial trends and ratios pertaining to the Company. ***Thus, Ernst was required to be familiar with the Audit Risk Alerts ("ARAs") and AICPA Audit and Accounting Guides ("AAG") for auditors of banks and other lending institutions that were issued during the 2005-2008 periods***. These ARAs and AAGs specifically identified risks associated with data-based evidence indicating that mortgage lenders were engaging in loose underwriting, and were offering exotic, risk-laden, high loan-to-value products, including option ARMs, all of which required the auditor's increased skepticism and attention, especially with respect to audits of ALLL.

(ii)    Develop knowledge about IndyMac's accounting systems as they relate to the pricing models supporting the accounting estimates used to determine the allowance for loan losses (AAG Chs. 5, 9, and 10).

(iii)   Consider the operating effectiveness of controls for the origination of loans, including: "inspect[ion of] loan documents to determine whether the institution's lending policies [were] being followed" (AAG Ch. 8).

(iv)    Obtain sufficient appropriate audit evidence by performing audit procedures to afford a reasonable basis for an opinion regarding the financial statements under audit, including documentation surrounding the company's computation of an allowance for losses and evidence underlying collateral values (presumably on a test basis, but the procedures for which could be adjusted based on red flags or other findings).

(v)     Evaluate "(a) whether management's assumptions [were] reasonable and reflect … market information …, (b) the fair value measurement was determined using an appropriate model …, [and] (c) management used relevant information that was reasonably available at the time" (AU § 328.26).

(vi)    Obtain sufficient appropriate audit evidence regarding the fair value of collateral (AU § 328.25, AAG Ch. 9, in a subsection titled "Management's Methodology").

(vii)   Perform tests to corroborate management's representations such that reliance thereupon is appropriate. (AU § 333, "Management Representations," ¶ 2, AU § 319.95).

(viii)  Consider the information contained in IndyMac's internal audits and/or reviews of the Conduit Division (completed in

2005) and the Home Construction Loan Division (completed in 2004).

309.  At every step of its audits, Ernst was required to exercise professional skepticism, a necessary component of due professional care when performing its audits.  (AU § 230, "Due Professional Care in the Performance of Work").

310.  Contemporary 2005/2006 GAAS pronouncements specific to the banking industry, and applicable to IndyMac, highlighted in great detail the deteriorating industry and economic risk factors plaguing the banking industry that posed risks which Ernst needed to be aware of in conducting its audit of IndyMac in 2006, including the methods for calculating and adequacy of ALL for loans held for investment.  For example, the 2005-2006 AICPA Risk Alert ("ARA") warned of industry and economic developments and economic factors in the mortgage banking sector, including: (1) relaxation of lending standards, (2) the much talked-about housing bubble, and (3) the influx of new risky loan products introduced into the marketplace to gain competitive advantage, such as option ARMs, resulting in negative amortization.

311.  Similarly, AU § 316 requires examination of incentives and pressures present at a company for purposes of determining the risk that fraud may have occurred in the preparation of the financial statements, including: (a) aggressive loan goals; (b) incentives for origination; (c) relaxation of credit standards; (d) excessive concentrations of lending; (e) excessive lending in new products; (f) frequent or unusual exceptions to credit policy; and (g) financial stability or profitability is threatened by economic, industry or entity operating conditions, such as unusually large growth in the loan portfolio without commensurate growth in the ALL.

312.  Each of these risk factors was applicable to IndyMac.  Yet Ernst failed to qualify its audit opinion despite a *decrease* in the ALL to LHFI ratio in 2006, and in 2007 approved a slight percentage increase, which with intentional or

deliberate recklessness ignored the cataclysmic deterioration in the Bank's loan portfolio and adverse external conditions such as declining housing prices in areas of the Bank's largest concentrations, all of which impaired the Bank's loan portfolio to a much greater extent than reflected in the ALL.

313.   The 2005-2006 ARA also stated that auditors need to be aware of the following risks for home equity loans ("HELOCs"), a large part of IndyMac's business, and major source of losses, as Defendants ultimately admitted:

- Interest-only features that require no amortization of principal for a protracted period;
- Limited or no documentation of a borrower's assets, employment and income;
- Higher loan-to-value and debt-to-income ratios;
- Lower credit risk scores for underwriting home equity loans;
- Greater use of automated valuation models and other collateral evaluation tools for the development of appraisals and evaluations; and
- An increased number of transactions generated through a loan broker or other third party.

314.   Ernst was required to take into account these risks when planning and performing its audits of IndyMac's 2006 and 2007 financial statements.  It either did so and falsely certified IndyMac's financials, or it failed to conduct proper audits and nonetheless certified that it did.

**9.   Ernst Ignored the AICPA Audit Risk Alert for 2007/2008 Which Identified Specific Risk Factors Relating to IndyMac**

315.   The AICPA issued an Audit Risk Alert ("ARA") for 2007/2008 setting forth "Bank, Credit Union, and other Depository and Lending Institution Industry Developments." This ARA emphasized the importance of understanding the company and its environment under AU § 311 ("planning and supervision") to

assess the risks of material misstatement in the company's financials. The ARA highlighted the risks specifically affecting mortgage banks in light of the changing economy, increasing mortgage delinquencies, and declining property values. It advised auditors to scrutinize internal controls, examine incentive structures, and carefully evaluate ALL. In approving IndyMac's ALL in the 2007 Form 10-K – which, *as a percentage of non-performing LHFI, was even lower than in the 2006 Form 10-K* – Ernst deliberately disregarded these highly-publicized risks and IndyMac's long history of underwriting, appraisal, and internal control deficiencies.

### 10. The Falsity of IndyMac's ALL Is Confirmed by The Astonishing Degree to Which IndyMac's Reserves Proved Inadequate.

316. Not surprisingly, IndyMac's ALL proved grossly inadequate. In the fiscal year 2007, *IndyMac had to increase ALL by an astonishing $395 million – 600% of the ALL set at the beginning of that year*. During that year, IndyMac had net charge-offs for bad loans of $52.2 million – *a full 85% of the $62 million reserve it set as of December 31, 2006*. Those charge-offs are enormous relative to the reserves because reserves are set for the life of a loan. FAS 5 requires the accrual of a loss contingency when information available before the issuance of the financials indicates that it is "probable" that the loan portfolio has been impaired *at that date*, and the amount of loss can be "reasonably estimated." FAS 5, AICPA § 9.32. If available facts and circumstances indicate that it is "probable" that a loan or portfolio of loans has been impaired at the balance sheet date, such a conclusion applies to the entirety of the loan, not to one year's portion thereof. FAS 5 makes no mention of one-year's worth of interest and principal, and thus, there is no time period limitation on when the loss is probable. When charge-off eventually occurs, the entire loss on the loan is recorded, and the entire loan removed from the Company's books and records.

317.   ***Thus, expending 85% of the ALL in the very first year indicates that the ALL was inadequate by many multiples***.   Moreover, IndyMac ultimately exceeded its $62.4 million 2006 year-end ALL in the next quarter, taking a $46 million charge-off on uncollectible LHFIs in the first quarter of 2008.   ***Thus, by the end of first quarter 2008, IndyMac had already accumulated charge-offs equal to 160% of the $62.4 million ALL set at the end of 2006, with a growing number of defaults still coming down the pipeline***.   The following chart, derived from IndyMac's SEC filings, shows the increases to ALL and actual loan losses during the Class Period:

|  | *FY 2006* | 1Q2007 | 2Q2007 | 3Q2007 | 4Q2007 | *FY 2007* | 1Q2008 |
|---|---|---|---|---|---|---|---|
| **ALL Reserve Balance (m)** | *$62.4M* | $67.6M | $76.8M | $161.7M | $398.0M | *$398M* | $483M |
| **HFI Charge-offs (aka "Realized Credit Losses")[8]** | *$12.8M* | $4M | $8M | $13.4M | $27M | *$52.2* | $46M |
| **HFI "Credit Costs" (i.e., increases to ALL)** | *$20M* | $10.7M | $17.2M | $98.3M | $269M | *$395.5M* | $131.5M |

318.   Because IndyMac entered bankruptcy, it filed no quarterly or annual financial statements with the SEC after that point, and had no opportunity to restate earlier periods.

319.   While it is impossible to calculate the exact degree by which IndyMac under-reserved in light of the lack of access to IndyMac's internal reports, the most appropriate proxy is adding (a) charge-offs on that same portfolio of loans and (b) increases to ALL on that same portfolio of loans.   Under this measure, ***IndyMac under-reserved by at least 400%*** at the outset of 2007, when it decreased ALL in the face of rising NPAs, delinquencies and loan losses.   However, this is simply a

---

[8] These numbers do not include charge-offs and reserves for the $10.3 billion in loans transferred from the loans held-for-sale portfolio to the loans held-for-investment portfolio.   Those assets were marked down by over $400 million upon transfer, and incurred over $80 million in losses in the first quarter of 2008.

proxy; under the express provisions of GAAP, ALL is not a forecast of future charge-offs. Rather, it is measured by current internal and external conditions at the time the reserve is calculated. Thus, regardless of what the future charge-offs ultimately were, IndyMac's ALL was egregiously low throughout the Class Period based on the facts known at the time: increasing delinquencies, increasing NPAs, increasing realized loan losses, decreasing property values, and deficient underwriting. Furthermore, any comparison to "actual" charge-offs would require the highly unreasonable assumption that, despite failing to remedy internal control deficiencies and grossly misstating and underestimating its ALL and Secondary Market Reserves throughout the Class Period, Defendants recorded timely and sufficient charge-offs.

### 11. Post-Class Period Improprieties and GAAP Violations Confirm that Defendants' Manipulation of IndyMac's Financial Statements was Deliberate.

320. Ernst and Perry committed other financial improprieties that demonstrate their disregard for requirements of presenting fair and accurate financial disclosures to investors. As reported on December 22, 2008, Treasury Department Inspector General's investigation of IndyMac uncovered that, on May 9, 2008, Ernst had permitted IndyMac to backdate cash infusions from the holding company back to March 31, 2008. This backdated transaction was done to maintain the illusion that IndyMac was a well-capitalized institution when, in fact, it was not well-capitalized at that date. In fact, Perry falsely asserted that IndyMac remained well-capitalized at the May 12, 2008 conference call.

321. This improper backdating plainly violated GAAP, and misled investors, who had a right to know that IndyMac was not "well-capitalized" as of March 31, 2008, or, at the very least, had the right to know that IndyMac was only well-capitalized due to a backdated capital infusion. This type of fraud is presumably what led one OTS examiner to suggest, in April 2008, that OTS

publicly disclose IndyMac's financial condition to prevent further losses by, and liability to, IndyMac investors. It also speaks to Defendants' willingness to knowingly commit fraud and to mislead not just investors, but those charged with regulating IndyMac, including arms of the Federal government.

322. The Treasury Department subsequently conducted a follow-up report on the back-dating at IndyMac. As explained above, the Treasury Department Backdating Report concluded that the backdating was improper because "the accounting treatment is not in accordance with generally accepted accounting principles (GAAP) and allows for misleading financial reporting by the thrifts."

323. Ernst's workpapers presented to the Inspector General showed that the backdating occurred in April 2008. A further investigation by the Inspector General revealed that the backdating in fact occurred on May 9, 2008. Thus, Ernst misrepresented to federal authorities facts regarding the backdating of a capital infusion. This conduct strongly implies that Ernst was not acting as an independent auditor when it certified IndyMac's 2006 and 2007 Form 10Ks, and was instead motivated by its close relationship with IndyMac and the substantial fees it was earning from the engagement (over $3.5 million in 2006, and over $6 million in 2007).

324. The SEC Complaint against Perry and Keys charges that Perry authorized IndyMac to contribute $18 million to IndyMac Bank on May 9, 2008, but to backdate that amount as if it were contributed on March 31, 2008. The SEC Complaint also adds new facts demonstrating Perry's active involvement in concealing the backdating. Specifically, IndyMac's draft first quarter 2008 Form 8-K accurately stated that "IndyMac contributed $70 million to...[IndyMac] Bank during Q1 08 and another $[18] million on May 9th." However, Perry changed the draft so that the final 8-K falsely stated that IndyMac "contributed $88 million to the Bank during Q1 08," as though the $18 million was contributed on March 31, 2008. SEC Complaint ¶¶ 49, 53. Perry admits that the IndyMac backdating

occurred on May 9, 2008 "with the knowledge and approval" of "IndyMac's outside auditors at Ernst & Young," among others.  Perry Answer at ¶ 49.

325.  In addition to authoring and certifying the aforementioned financial statements, Perry and Keys repeatedly and falsely boasted that IndyMac's credit reserves were not only adequate and proper, but that they were "conservative."  For example:

(a)    "[W]e have conservatively built up our credit reserves well ahead of credit losses."  Statement by Perry, on April 26, 2007, 1Q Earnings Call With Securities Analysts and Investors.

(b)    "[W]e were still more conservative on our Alt-A and subprime residuals than the values that they did after they wrote them down.  That's all I can say now....  I think we feel very comfortable that [our residuals] are valued properly and conservatively and that we have a lot of credit reserves there."  Statement by Perry, on April 26, 2007, 1Q Earnings Call With Analysts and Investors.

(c)    "Credit reserves prudently increase well ahead of credit losses.  IndyMac continued to prudently increase allowance for loan losses in the face of a difficult credit environment."  Exhibit 99.2 to IndyMac's, April 26, 2007 Form 8-K, signed by Keys.

(d)    "[W]e feel we prudently manage [noninvestment grade and residual securities] and continue to be very conservative in valuing these securities."  Statement by Perry, on July 31, 2007 2Q 2007 Earnings Call.

(e)    "Long term, with our strong capital, reserves, and liquidity and with the great team we have in place, there is no doubt that we will be a mortgage industry survivor[.]"  November 6, 2007 posting on the IMB Blog (quoting Perry).

(f)    "[W]e do believe we will see significant improvement in the fourth quarter and in 2008 given the large reserves we established this quarter."  November 6, 2007 posting on the IMB Blog (quoting Perry).

(g)   "We believe that the credit reserves we have now built up are sufficient to absorb these charge-offs such that we are currently forecasting that our total credit provision/costs in 2008 will be roughly $372 million, down from $1.45 billion in 2007, which we believe will have a significant positive impact on our drive to return IndyMac to profitability in 2008. . . . We have the capital . . . to absorb nearly triple our presently forecasted 2008 credit costs and fight our way through until the housing and mortgage markets do stabilize."   IndyMac February 12, 2008 Press Release (quoting Perry).

(h)   "We have an incredibly strong war chest of credit reserves at the end of '07."   Statement by Perry, on February 12, 2008 4Q 2007 Earnings Conference Call.

(i)   "We've reserved properly.  I don't think [our regulators are] going to have concerns about our reserves."   Statement by Perry, on February 12, 2008 4Q 2007 Earnings Conference Call.

(j)   "We believe we have a very realistic forecast [for a profitable 2008] given the reserves that we built up at 12/31/07."   Statement by Perry, on February 12, 2008 4Q 2007 Earnings Conference Call.

(k)   "[T]he point that I would make is we built up incredibly strong reserves at the end of '07, okay?"   Statement by Perry, on February 12, 2008 4Q 2007 Earnings Conference Call.

(l)   "We remain in a fundamentally sound financial position. . . . We believe we can maintain our 'well-capitalized' capital  ratios even under worsening industry conditions. . . . We still have a solid cushion above the well-capitalized ratios."   February 12, 2008 Form 8-K (signed by Perry and Keys) and February 12, 2008 Annual Shareholder Letter (signed by Perry).

326.   These statements were false and misleading for the same reasons that IndyMac's ALL, and statements related specifically thereto, were falsely stated. IndyMac's loan loss reserves were not even within the realm of reason, let alone

"conservative" or "incredibly strong." There is a strong inference that Perry and Keys made the foregoing statements with scienter for all of the reasons stated above with respect to ALL itself.

### H.   Perry And Keys Make Additional False and Misleading Statements Regarding IndyMac's Credit and Loan Loss Reserves and the Financial Soundness of the Bank

327.  In addition to the ALL, which was a reserve attributed to probable losses in IndyMac's portfolio of loans held for investment ("LHFI"), IndyMac also maintained Secondary Market Reserves to cover probable losses related to loans which IndyMac sold to investors in the secondary market, but for which IndyMac retained a "residual interest." Residual interests arise when a seller of loan retains some stake in, or ongoing obligation relating to, loans sold to third parties. Residual interests include, among other things, the right to service the loans, warranties and/or representations made at the time of sale regarding the purported conformity of such loans with stated underwriting guidelines (whether originated by IndyMac or acquired), or, similarly, the credit quality and performance of such loans, or buyback provisions that might arise in the event of early payment default by the borrower or other examples of the loans' failure to adhere to the warranties of quality and performance afforded the secondary market participants by a seller of loans such as IndyMac.  IndyMac stated, in its 2006 Form 10-K, that its Secondary Market Reserves related to the potential obligation to repurchase whole loans, loans sold to Government-Sponsored Enterprises ("GSEs"), or loans sold in securitizations to investors.  Thus, IndyMac's Secondary Market Reserve related to two of the primary residual interests mentioned above: (1) reserves for representations and warranty claims, and (2) reserves for repurchases arising from early payment defaults.

328.  Like the ALL, the Secondary Market Reserve was a critical accounting policy for IndyMac, and, as Defendants knew, calculation of this

reserve had a material impact on the Company's financial statements. The combination of the ALL and Secondary Market Reserve comprised about 95% of what the Company referred to, in its 2006 Form 10-K, as "Credit-related reserves" as of December 31, 2006.

329. In the face of substantial internal and external market factors contributing to the deterioration of loan quality throughout 2006 and 2007 the amount of IndyMac's repurchases from defective loans and from early payment defaults rose dramatically. Similar to IndyMac's accounting for the ALL, however, IndyMac's treatment of Secondary Market Reserves violated the principle of "directional consistency" described within the InterAgency Policy Statement, demonstrating that the Secondary Market Reserves maintained by IndyMac as of December 31, 2006 were understated.

330. Specifically, despite all of the foregoing negative internal and external factors impacting the quality of loans sold by IndyMac through secondary markets, and all of the factors that evidenced the decline of the real estate and mortgage industries discussed herein, IndyMac's Secondary Market Reserves as a percentage of loans sold significantly declined – *i.e.*, from 52.85% at the end of 2005 to 42.93% at the end of 2006, as shown in the following chart:

| 12/31/05 | SMR | $27,638,000 | |
| Loans Sold | | $52,297,000 | = 52.85% |
| 12/31/06 | SMR | $33,932,000 | |
| Loans Sold | | $79,049,00 | = 42.93% |

331. This decline resulted from, and demonstrates, the same disregard by IndyMac of the principle of "directional consistency" evident in IndyMac's treatment of its ALL during the Class Period. Ultimately, the shortfall in Secondary Market Reserves manifested itself when, from 2005 to 2007, the number of loans that IndyMac was required to repurchase because of breached

warranties and early payment defaults increased dramatically – *i.e.*, from $108 million in 2005, to $194 million in 2006, *to **$613 million in 2007***. As result, the Secondary Market Reserves maintained by IndyMac were woefully short of the volume of loans it was forced to repurchase during the Class Period. In fact, loan repurchases in 2006 and 2007 exceeded the Secondary Market Reserves established at year-ends (*i.e.*, December 31, 2005 and December 31, 2006) by 698% and 1808%, respectively, as shown in the following chart:

| | | |
|---|---|---|
| 12/31/05   SMR | $27,638,000 | |
| 2006 Total Loans Repurchased | $194,000,000 | = 698% |
| 12/31/06   SMR | $33,932,000 | |
| 2007 Total Loans Repurchased | $613,000,000 | = 1808% |

332.   This decline demonstrates IndyMac's failure to adequately record and maintain Secondary Market Reserves during the Class Period. Specifically, this chart demonstrates quite clearly the magnitude by which Secondary Market Reserves maintained by IndyMac were inadequate and wholly disconnected from the true obligations such reserves were meant to cover in order to prevent massive losses by IndyMac. In simpler terms, IndyMac was forced to repurchase, in 2006, close to ***seven times*** the dollar value of loans it had reserved for in its Secondary Market Reserves of December 31, 2005, and it was forced to purchase, in 2007, more than 18 times the losses it had estimated as of December 31, 2006.

333.   In its 2007 10-K, IndyMac, for the first time, included a section entitled "Credit Reserves Embedded in Non-Investment Grade and Residual Securities," in which the Company explained more fully that the deteriorating credit market forced it to retain and repurchase more of its "non-investment grade and residual securities," which it had historically sold into the secondary market. IndyMac stated: "worsening loan performance has necessitated an increase in the amount of credit losses estimated in these securities." In connection with its Non-investment grade and residual securities, the Company reported that "net realized

credit losses" increased from $25 million in 2005, to $27 million in 2006, to $235 million in 2007, yet its "credit reserves" as a percentage of "non performing assets" had been *cut almost in half* from 2005 to 2006 – from 140% at year end 2005, to 77% at year end 2006, rising only to 78% at year end 2007.

334.   The SEC Complaint against Abernathy offers additional evidence that IndyMac's Secondary Market Reserves were inadequate and that Defendants knew or were deliberately reckless in disregarding the extensive borrower misrepresentations in IndyMac loans, and that such breaches of warranties would likely mean that IndyMac would be forced to repurchase the loans, requiring massive increases in the reserves covering those losses.   The Abernathy Complaint identifies six residential MBS offerings conducted by IndyMac through IndyMac Mortgage Loan Trust ("IMSC") to the secondary market from May 29, 2007 through August 30, 2007, totaling about $2.5 billion, securitizing only loans produced by IndyMac's Conduit Division. Abernathy Complaint ¶¶ 15, 21. According to the SEC, each of those six offerings misrepresented the quality of the loans underlying the offerings, including false statements about borrower income, employment, appraisals and other information on the  applications for those loans. Monthly reports issued by IndyMac's PPQC unit before and during the offering period indicated that 12% to 18% of its loans, including loans underlying the six offerings, contained misrepresentations of borrower income, employment, appraised value of the property, true identity of the borrower, and other misrepresentations, all of which increased the likelihood of default.  *Id.* at ¶¶ 16-19, 23.   Thus, these six offerings in 2007 totaling $2.5 billion would certainly cause increased losses in the Secondary Market reserves when the repurchase obligations were triggered.   Defendants knew about the risk in these offerings because the misrepresentations were described in the PPQC reports issued in this period, and were available to Defendants on IndyMac's intranet. *Id.* at ¶ 20.

## VIII.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS PROXIMATELY CAUSED ECONOMIC LOSS TO INDYMAC'S INVESTORS

335.  Defendants' misrepresentations and omissions caused and maintained the artificial inflation in IndyMac's stock prices throughout the Class Period until the truth was revealed to the market.

336.  Defendants' statements during the Class Period concealed the Company's improper lending practices, including its lax underwriting and improper appraisal practices, as well as the true extent of the Company's loss exposure with respect to both (a) the progressive and prospective impact of deficient underwriting practices, and (b) IndyMac's misguided foray into riskier loan products and markets.  Further, Defendants' failure to account for IndyMac's practices of appraisal inflation, deficient underwriting, and ineffective internal controls when determining the ALL and Secondary Market Reserves resulted in the Company's financial statements being materially false and misleading.  As explained in detail above at ¶¶ 140-151, there was an inextricable link between IndyMac's (1) failure to follow established underwriting and lending guidelines, (2) lack of internal controls surrounding both underwriting and the computation of loan loss reserves and Secondary Market Reserves, and (3) inaccurate financial statements.  Together, Defendants' misrepresentations concealed crucial information about IndyMac's true credit risks and loss exposure, and caused the market to overvalue IndyMac by way of an inflated per share stock price.

337.  The Company's piecemeal disclosures of increased and growing credit losses and loan loss reserves revealed previously concealed adverse information about IndyMac's financial health – specifically regarding its true credit risks and the magnitude of those risks, its ineffective internal controls, and its true loss exposure – and those disclosures are causally linked to the resulting declines in IndyMac's stock price.

338. *First*, as alleged, Defendants' fraudulent actions and misrepresentations regarding the quality of IndyMac's underwriting and loss reserving process caused the Company's loan loss reserves to be knowingly and materially understated because IndyMac faced materially greater risk of losses than disclosed or recorded in its financial statements. Because Defendants fraudulently overstated the quality of IndyMac's underwriting and loss reserving practices and methodologies, Defendants caused the market to misunderstand, and underestimate, IndyMac's expected credit losses. Similarly, IndyMac's undisclosed reliance on fraudulently inflated appraisal values had the effect of overstating the value of the collateral attached to its loan and mortgage-related assets, and understating loan to value ratios, which are important metrics used by investors and others in evaluating the quality of loan portfolios.

339. *Second*, it is clear that underwriting and credit quality, credit losses, and loan loss reserves are crucial metrics in evaluating the performance of a lending institution. Even a cursory review of the reports issued by securities analysts that covered IndyMac, and the transcripts of IndyMac's conference calls with analysts, confirms that analysts focused specifically on credit quality, credit losses, and loan loss and residual reserves as critical metrics in evaluating the Company's financial performance and condition.

340. *Third*, there was a coherent economic and logical link between Defendants' misstatements and the decline in IndyMac's stock price because Defendants' actions in fraudulently overstating the quality of IndyMac's underwriting practices and loss reserving methodologies made it entirely foreseeable that the Company would, at some point, be required to incur larger than expected credit losses and record greater loss reserves, resulting in declines in the market price of IndyMac stock when such losses, including those incurred from the recognition of and increase in substantial credit reserves, were incurred.

341. Thus, Plaintiff's allegations that the Company and Defendants fraudulently withheld and misrepresented information regarding the nature and magnitude of the losses to which IndyMac was subject, its practices to effect purported management of such risks, as well as IndyMac's appraisal and underwriting practices, and its loss reserving process, demonstrate the causal link, both economically and logically, between those misrepresentations and the declines in IndyMac's stock prices.

342. Indeed, in each of the corrective disclosures detailed below, IndyMac revealed evidence of deteriorating financial performance, specifically including substantially greater than expected credit losses and the need for increases in loss reserves. These disclosures directly contradicted the Defendants' numerous and repeated statements to the effect that the Company's loss exposure was contained and properly managed. Immediately after each one of these partial disclosures, many of the analysts following IndyMac downgraded their ratings on IndyMac stock and/or lowered their earnings estimates, and in doing so, *specifically cited the Company's increased credit losses and loss reserves.* The analyses of analysts, summarized below, strongly support the conclusion that IndyMac's partial disclosures with respect to credit losses and loss reserves contributed materially to the declines in IndyMac's stock price.

343. The truth about IndyMac's financial condition and the true risks associated with its mortgage-related assets began to enter the market with a series of partial disclosures and revelations beginning on November 6, 2007, and continuing to May 12, 2008 and thereafter. Defendants mitigated the impact of those disclosures and prevented the full truth about IndyMac from being revealed by making contemporaneous false and misleading statements that minimized and denied the facts being revealed to the market. As a result of Defendants' continuing misrepresentations and denials, the artificial inflation in IndyMac's stock price did not come out of the stock price all at once, but rather came out over

time, in bits, pieces, and spurts, as the stock continued to trade at artificially inflated, albeit lower, prices throughout the Class Period.

344.   Ultimately, as the market gained a more complete understanding of the magnitude of the loss exposure facing IndyMac and the implications for IndyMac's financial condition and continued solvency and viability, the price of IndyMac's common stock plummeted ***more than 90%***, falling from a Class Period high of $37.50 per share on June 6, 2007, to $2.32 per share at the close of trading on May 13, 2008.   As set forth in detail below, these enormous declines in IndyMac stock prices were the result, at least in part, of the truth emerging about IndyMac's improper underwriting and appraisal practices, serious internal control deficiencies, larger than expected credit losses, huge increases in loan loss reserves, and the severe liquidity crisis the Company was experiencing during the Class Period.

345.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for IndyMac stock. When the truth about IndyMac was revealed to the market, and the risks that Defendants fraudulently concealed materialized, the price of IndyMac's stock declined in response, as the artificial inflation caused by Defendants' material omissions and false and misleading statements was removed from the price of IndyMac securities, causing substantial damage to Plaintiff and members of the Class.

346.   The disclosures beginning on November 6, 2007, and continuing through May 12, 2008, specifically concerned, *inter alia*, accounting and internal control issues, credit losses and reserves, and capital and liquidity position issues, of which Perry and Keys had knowledge, and with which Ernst was directly involved and aware of in conducting its 2007 audits.

## A. Defendants' First Partial Disclosure

347.   On November 6, 2007, less than two months after Perry specifically reassured the market about IndyMac's purportedly "strong" and "prudent" risk management, the Company issued a press release revealing that it lost $202.7 million in the third quarter of 2007, or $2.77 per share, and that it expected its loan loss provisions to grow to as much as *$1.39 billion* in the fourth quarter.

348.   The loss announced on November 6, 2007 was well above analysts' estimates and also far exceeded IndyMac management's guidance of $.50 earnings per share for the third quarter, which Defendants provided to the market just four weeks before announcing losses of -$2.77 per share.   Significantly, Defendants admitted that the third quarter losses were "drive[n]" by increased credit reserves, and disclosed that provisions for future credit losses had been increased 47%, to $1.39 billion. IndyMac also revealed on November 6, 2007 that 63% of the $408 million of third quarter 2007 credit costs were related to riskier loan products – HELOCs and Second Liens – as well as losses in the Homebuilder Division.

349.   Also on November 6, 2007, Perry hosted the Company's Third Quarter 2007 earnings conference call with analysts.   During that conference call, and in a PowerPoint presentation made available on the Company's website, and filed with the SEC in a Form 8-K signed by Keys, Perry blamed the following factors for IndyMac's loss, thereby partially disclosing some of the previously undisclosed risks:

(1)   sharply increasing delinquency trends at IndyMac and for the industry, especially for seconds in second mortgages;

(2)   worsening existing and new housing sales trends led to a substantial rise in non-performing loans in IndyMac's Homebuilder portfolio;

(3)   a significant ramp up in loan delinquencies and foreclosure rates to a level above the 20-year high that was reached in the second quarter of 2002;

1565686v1/010900                                    169

(4)   that the Company "substantially bolstered [its] loan loss provision, the bulk of which is going to [its] subdivision construction business where we I think increased the provision there something like $75 million in the quarter"; and

(5)   dramatically increased provisions for future credit losses, including the increasing of credit reserves by 47%, to $1.4 billion.

350.   Increases to ALL – reflecting the inadequacy of IndyMac's prior reserves and the undeniable manifestation of declining market conditions, which were known, or should have been known, to Defendants – was a leading cause of IndyMac's third quarter losses.  ALL increased by an astonishing ***471% in 3Q 2007***, more than any other credit cost.   According to IndyMac's earnings presentation, increases to ALL accounted for losses of $0.59 per share during that one quarter.  Credit marks on delinquent loans held-for-sale accounted for losses of $.44 per share, and credit marks on current loans held-for-sale accounted for losses of $.54 per share. Both markdowns reflected the poor underwriting and inadequate collateral values on those loans.  As one of IndyMac's presentation slides stated: "Key Driver of Q3 07 Loss Was Increased Provisions for Future Credit Losses."

351.   In the November 6, 2007 presentation, IndyMac also announced the closing of the Conduit Division, which, as discussed throughout this Complaint, was riddled with internal control problems.  The Conduit Division accounted for $59 million of after tax losses in the third quarter of 2007 alone.  And, despite being closed in Fall 2007, the Conduit Division would ultimately account for 18% of IndyMac's net losses in 2007.  These disclosures, including the revelation that IndyMac was closing the Conduit Division, revealed adverse information about the Conduit Division that Defendants' misrepresentations had previously concealed, and therefore loss causation exists as to the Conduit Division allegations.

352.   In addition, IndyMac revealed on November 6, 2007 that the Homebuilder Division – which had been shut down in 2007, just six months after

IndyMac declared it to be a "very prudent business" for the Company,  and which had been cited in numerous audits as an internal control problem – accounted for 15% of IndyMac's 2007 net losses.  The November 6, 2007 presentation disclosed that non-performing Homebuilder assets were expected to rise to $330M in the fourth quarter of 2007 – reflecting 30% of all Homebuilder assets.  As IndyMac revealed, the Homebuilder Division's portfolio "is showing rapid deterioration as home sales and home prices decline – necessitating a larger allowance for losses." IndyMac further admitted in the same presentation that "[e]ven though we reduced our exposure (as a percentage of assets) to Homebuilders…we should have reduced it even further."

353.   Also on November 6, 2007, Defendants issued a Form 10-Q for the quarterly period ended September 30, 2007 ("Third Quarter 10-Q"), which provided additional disclosures regarding IndyMac's Homebuilder Division. Specifically, the Third Quarter 10-Q noted that IndyMac's Homebuilder portfolio had serious problems, "resulting in an increase in classified and non-performing loans and our allowance for loan losses at quarter-end. All loans in the portfolio are assigned a credit grade quarterly. . . .  At September 30, 2007, non-performing loans for the builder construction portfolio rose to 9.03%, or $106.1 million, from 0.78%, or $9.0 million, at December 31, 2006, and zero at September 30, 2006."

354.   The disclosures and admissions set forth above, revealed adverse information about the Homebuilder Division that Defendants' misrepresentations had previously concealed, and therefore loss causation exists as to the Homebuilder Division allegations.

355.   In the November 6, 2007 conference call, Perry also made numerous admissions regarding the Company's deficient underwriting and risk management practices, openly admitting that (a) *"credit risk management needs to improve"* (b) "in hindsight, *we could have expanded more cautiously* from 2005 to 2007," (c) "*[w]e went too far in expanding our product*; (d) *"We took too much*

*exposure from Seconds, HELOC, and Subprime"*; (e) ***Clearly this quarter, we've done a poor job managing credit risks and a poor job overall on an absolute bases"***; and (f) ***"[o]ur underwriting procedures failed to detect speculators."***

356.   Acknowledging that IndyMac's prior risk control and underwriting practices had been deficient, Perry stated that "IndyMac has also taken appropriate steps to make the hard lessons learned about credit risk permanent," including (a) "implementing companywide a 'Principles of Credit Underwriting'...[which] management, underwriters, and others involved in credit process must sign"; (b) establishing an "early detection and accountability system for current production and new products...that are designed to prevent credit mistakes from becoming major costs"; (c) making IndyMac's "Chief Investment Officer, who is independent of production and secondary marketing, . . . solely responsible for all non-GSE products, guidelines, and risk-based pricing, because the Thrift might own them any time the secondary market becomes disrupted"; and (d) "reorganize[ing] and upgrade[ing] our regional CEOs, and will now hold them fully accountable for both production and credit quality."

357.   Perry further admitted that IndyMac's Alt-A delinquency rate was now 7.3%, which was higher than the industry average of 6.85%, and was trending upwards relative to the industry.   This indicated that the risks created by IndyMac's extensive participation in the risky Alt-A market and concomitant deficient underwriting practices were materializing in the form of higher delinquencies.

358.   In response to these disclosures, analysts downgraded their ratings of IndyMac, citing concerns over the Company's credit problems, increases in loan loss provisions, and its ability to maintain its dividend.   For example, on November 7, 2007, RBC issued a report lowering its rating of IndyMac from "Outperform" to "Sector Perform," and raising its risk rating from "above average risk" to "speculative risk."   RBC explained that the downgrade reflected concern about the

"percolating" "credit problems" at IndyMac.   RBC also lowered its earnings estimates for IndyMac, noting that the $2.77 per share loss for the third quarter of 2007 was "well below our estimate and guidance," and "much more material" than the earnings guidance provided by Company management.   RBC noted that increasing non-performing assets at IndyMac, which "jumped 61% [quarter to quarter] to $829 million," together with increased loan loss reserves, charges, and "[m]ortgage market challenges and likelihood of further credit performance erosion," all called for reduced earnings estimates.

359.   RBC specifically noted that IndyMac's fundamental failure to ensure basic loan underwriting practices were in place and being followed had created the credit losses and consequent increased reserves at IndyMac: *"[c]redit weakness thus far has largely been driven by weak underwriting standards."*   RBC's analysis is entirely consistent with Plaintiff's allegations regarding deficient internal controls at IndyMac, and is consistent with the findings with respect to ineffective internal controls of Ernst, the OTS, IndyMac's internal audit department, and a separate independent accountant engaged by IndyMac during the Class Period to look at IndyMac's computation of ALL.

360.   In this November 7, 2007 report, RBC also expressed concern with IndyMac's disclosure of sharply increasing non-performing assets and the fact that "IMB increased loan loss reserves 47% during the quarter to $161 million or 20% of NPAs."   In issuing its ratings downgrade, *RBC specifically identified "higher reserving for losses" as one of the key "credit-related factors" negatively impacting earnings in the third quarter.*

361.   Also on November 7, 2007, Wachovia significantly reduced its earnings estimates for IndyMac, specifically citing *"increased credit loss provision assumptions for 2008."*   Wachovia noted that "[IndyMac] management is…projecting total [non-performing assets] to climb to 3.55% in Q4," and "[a]s such, *we increased our credit loss provision assumptions for 2008, significantly*

*reducing our EPS outlook."* Wachovia specifically noted that the "most troubled area was the homebuilder construction portfolio, where NPAs soared 165% in the quarter to $106.1mm and are expected to increase by another $224mm by year end." Wachovia explained that while total net charge-offs for the third quarter 2007 remained "relatively low at only $13.4mm (given total NPAs of over $828mm)," *"they [i.e. IndyMac management] are obviously expecting more with the build in the loss reserve."* This analysis, however, did not suggest that IndyMac's performance would be strong going forward as a result of increased credit-related reserves, nor did it anticipate that future losses would be adequately covered by then-existing reserves. Instead, *Wachovia's analysis of Defendants' disclosures led Wachovia to reduce its earnings estimates – precisely because of the rising delinquencies and the need for credit loss reserves.* This analysis was followed by a 16.9% drop in IndyMac's stock price, clearly illustrating the causal linkage between Defendants' prior misrepresentations about loss reserves, the partial disclosure of the truth regarding reserves, and the declines in IndyMac's stock prices. Further, this analysis demonstrates the critical significance (and obvious materiality) of information regarding IndyMac's credit losses and credit reserves to investors.

362. Likewise, in a November 9, 2007 report, Fox-Pitt Kelton Cochran Caronia Waller ("Fox-Pitt") lowered its earnings estimates for IndyMac. In a report entitled "Credit Charges Drive Wider than Expected Loss," issued on November 7, 2007, Fox-Pitt explained that IndyMac's third quarter loss of -$2.77 per share was "well above our -$0.50 estimate and [management's] internal guidance of $0.50 p/s, which they provided just three weeks before quarter end."

363. Analysts specifically recognized the connection between IndyMac's abysmal underwriting standards and the credit losses caused by IndyMac's risky loans, which in turn required higher than expected loan loss reserves. For example, as noted above, in its November 7, 2007 report downgrading IndyMac

stock, RBC stated that IndyMac's **"[c]redit weakness thus far has largely been driven by weak underwriting standards[.]"** As RBC observed, "IMB has changed its underwriting standards to conform to GSE standards over the past 90 days…but now credit performance is a more material concern," indicating that IndyMac's prior underwriting standards were not in line with those required for GSE-eligible loan products. Similarly, Wachovia noted in its November 7, 2007 report that "tighter underwriting standards….should help credit performance and restore some faith in the secondary market," though it did not "anticipate this happening in the near-term as evidenced by our new [*i.e.* lower] estimates."

364. The Company's partial disclosures on November 6, 2007 caused IndyMac's common stock to plummet, dropping from a closing price of $12.49 on November 6, 2007 to a closing price of $10.38 on November 8, 2007, on high volume – **a two-day decline of $2.11, or 16.9%.** By comparison, the S&P Bank Index (symbol: BIX) declined only 5.9% over the same two days.

365. This substantial price drop immediately following the disclosures of delinquencies trending upwards, a massive increase in non-performing loans, and huge increases loan loss allowance demonstrates that the artificial inflation in the stock price caused by, among other things, nondisclosure of faulty and/or deficient underwriting and appraisal practices, inadequate risk management, and inadequate loan loss reserves, had been partially dissipated. Each of these improprieties would reasonably be expected to contribute to subsequent increases in non-performing assets and the need for further and significant write-downs to IndyMac's LHFI portfolio and residual interests.

366. Defendants prevented an even steeper decline in the price of IndyMac stock by Perry falsely assuring investors on November 6, 2007, that **"our liquidity is at an all-time high,"** and representing that "once we get through these credit costs, [IndyMac will be] generating significant income because not all of those loans are bad." Similarly, in a November 6th post on IndyMac's blog (the "IMB

Blog"), Defendants bragged that even with the third quarter 2007 loss, *"we have very strong capital, reserves and liquidity to weather the current storm in our industry,"* and that *"we are considered 'well capitalized' by regulatory standards."* The Company also claimed in the blog post that "[w]e have $1.39 billion in reserves for future credit losses, or 9.5 times our current quarter's charge-offs," and that "[w]e increased our total liquidity from $4.1 billion at the end of the second quarter to a record $6.3 billion at the end of the third quarter, and are *confident that our liquidity position will remain strong going forward."*

367. Also in the November 6, 2007 IMB Blog post, the Company reassured investors that *"we do believe we will see significant improvement in the fourth quarter and in 2008 given the large reserves we established this quarter[.]"* Continuing to tout the Company's purportedly "strong" capital, reserves, and liquidity, Defendants concluded the November 6, 2007 IMB Blog post by reassuring investors that: *"Long term, with our strong capital, reserves and liquidity and with the great team we have in place, there is no doubt that we will be a mortgage industry survivor,* and we are confident that our returns on capital will be at or above 15% once this current down cycle ends."

368. The foregoing statements painted a wholly inaccurate picture of IndyMac's financial condition at November 6, 2007, and were all materially false and misleading. As demonstrated herein, Defendants intentionally or with deliberate recklessness disregarded the numerous facts and information available to them indicating that IndyMac's financial condition was much more fragile than Defendants were willing to admit.

**B.    Defendants' Second Partial Disclosure, Which Was Accompanied by Multiple False and Misleading Statements**

369. On February 12, 2008, just three months after assuring investors about the "significant improvement" Defendants expected in the fourth quarter, specifically as a result of the purportedly "large reserves we established in [the

third] quarter," IndyMac announced in a press release that it would post a record loss for the fourth quarter of 2007, the result of a record increase in credit reserves. The Company reported a ***net loss of $509.1 million, or -$6.43 per share, for the fourth quarter of 2007***, compared with net earnings of $72.2 million, or $0.97 per share, in the fourth quarter of 2006. As set forth below, analysts expressed surprise at the magnitude of the loss, which was far greater than analysts' consensus expectations of -$1.38 per share.

370.   In the February 12, 2008 press release, Perry revealed that the -$6.43 per share quarterly loss was driven by substantial credit losses and a massive increase in the Company's loan loss reserves:

> "We absorbed $863 million in total pre-tax credit provisions/costs during the quarter, and this led to our quarterly loss of $509 million....Excluding non-investment grade and residual securities, total Q4-07 charge-offs were $99 million, and the total related credit reserve at December 31 was $1.1 billion, or 11.3 times the charge-off amount in the fourth quarter of 2007.

371.   Also on February 12, 2008, Perry hosted the Company's fourth quarter 2007 earnings conference call with analysts. During the conference call, ***Perry disclosed that credit reserves increased 71% from the third quarter alone, to $2.4 billion at 12/31/07, which was four times higher than the $619 billion in reserves at 12/31/06.*** The huge increase in reserves taken that quarter, although inadequate and untimely, as discussed above, included a $269 million increase to ALL. Perry also admitted the Company's growing exposures from delinquencies in its loan portfolios, including the failed Homebuilder Division.

372.   In addition, IndyMac disclosed that non-performing assets in its HCL Division rose to $480 million from $103 million in the prior quarter –reflecting an astonishing 40% of all loans – due to, *inter alia*, a "reappraisal of over 66% of the portfolio showing substantial declines in value in land and development projects,

and re-assessment of borrower ability to pay principal and interest in a timely fashion given the precipitous drop in sales." In response, IndyMac had to increase the HCL reserves by $199 million. These corrective adjustments reflected the fact that the HCL loans were not properly underwritten and were based on fraudulent appraisals. And, in reality, the principles underlying that adjustment to carrying value could have been applied to the entirety of IndyMac's balance sheet given the state of the real estate and mortgage-related industries at the time.

373. IndyMac also announced in February 2008 that it had transferred $10.7 billion in loans held-for-sale to loans held-for-investment because they were no longer marketable. In performing this transfer, IndyMac was required to take a $600 million credit mark on these loans, including $474 million purported to represent a "reserve for future realized credit losses." This assertion – that the Company was reserving for "future realized" losses – was itself counterintuitive. These disclosures clearly reflected the abysmal quality of IndyMac's loans, the materialization of years of deficient underwriting and appraisals, and, perhaps most importantly, a similarly abysmal effort by IndyMac to adjust the carrying value of the loans by a mere 5.6%, despite indications – including the need to transfer the loans from its held-for-sale portfolio–that such "assets" were severely impaired.

374. In response to these disclosures, analysts further lowered their ratings and earnings estimates for IndyMac, specifically citing the Company's credit performance and increases in loan loss reserves, and questioning IndyMac's evaluation of its credit risk. For example, in a February 13, 2007 report, RBC lowered its rating on IndyMac from "Sector Perform" to "Underperform," and also lowered its 2008 EPS estimates and 12-month price target for IndyMac. RBC cited the "sizable exposure to credit risk in [IndyMac's] thrift portfolio," and noted that "[t]raditional loss reserves totaled $398 million at 4Q07, approximately 1.97% of total loans." RBC questioned whether IndyMac's loss reserves would "adequately cover credit losses in the year ahead," and expressed concern that

"[c]redit write-downs in the quarter drove the decline in capital ratios, and further potential for credit erosion leaves us concerned that additional write-downs may leave IndyMac under-capitalized in the eyes of regulators."

375.   RBC's analysis demonstrates that despite IndyMac's claims that it had $474 million purportedly representing a "reserve for future realized credit losses," analysts understood that total reserves only "totaled $398 million" at the end of the 2007 fourth quarter.  Thus, the position of analysts is consistent with, and supports, the allegations that Defendants falsely represented the Company's ALL and related "credit reserves."

376.   Similarly, Fox-Pitt issued a report on February 12, 2008 entitled "Kitchen Sink Quarter? IndyMac Posts Record Quarterly Loss," noting that "the magnitude of the quarterly loss [-$6.43 per share] was well above our expectation" of just -$1.06 per share, and was also "well above…consensus of -$1.38." Fox-Pitt explained that the $863 million taken in pre-tax credit costs demonstrated that, as alleged throughout this Complaint, *"the company has been under reserved for some quite some time."*   Fox-Pitt also expressed concern about the true extent of IndyMac's credit challenges, noting that "the $372MM in embedded credit costs for the year appears too low, given the recent trajectory of delinquencies."

377.   Recognizing analysts' and investors' concerns,  Perry and Keys made numerous false and misleading statements on February 12, 2008, including in the Company's Form 10-Q, press release, and Form 8-K, and on the investor conference call and the IMB Blog.   Those misrepresentations included reassurances that (a) IndyMac was a *well-capitalized, "fundamentally sound financial institution" with "an incredibly strong war chest of credit reserves,"* (b) OTS did not have concerns with IndyMac's financial position, (c) independent auditors had evaluated IndyMac's ALL methodology and found it effective, and (d) IndyMac's deposit base was stable and well-managed.

378.   In fact, IndyMac represented in its conference call with investors on February 12, 2008 that because of IndyMac's purportedly "*incredibly strong reserves at the end of '07*," the Company expected to be "solidly profitable from Q1 '08 through all of 2008."   Perry told investors that the Company would return to profitability as early as the first quarter of 2008, and specifically stated that "*we believe we have a very realistic forecast [for 2008] given the reserves that we built up at 12/31/07.*"   According to Perry, because the Company had already "put away 1.45 billion of credit costs in 2007," it was able to project just $372 million of  credit costs for 2008, and this anticipated decline in credit costs would be "a key driver of our return to profitability."   Perry acknowledged that such a drastic reduction in credit costs might not "seem realistic, given the housing market," but dismissed any such concerns, saying that "the point that I would make is we built up incredibly strong reserves at the end of '07, okay?"

379.   These reassurances were materially false and misleading, and served to conceal from investors the full extent of the Company's loss exposure arising from IndyMac's undisclosed and improper lending practices, deficient internal controls, and inappropriate accounting and reserving for credit losses.  In fact, the full extent of the loss exposure confronting the Company, and the true loan loss provisions IndyMac was required – but failed – to take, were far more significant than the Company disclosed in its February 12, 2008 statements.

380.   Nevertheless, Defendants' efforts to diminish the impact of the February 12 revelations, including by forecasting a swift return to profitability in 2008 thanks to "incredibly strong reserves," were successful, albeit materially false and misleading.  As Wachovia stated in a report issued on February 13, 2008, "the stock reacted favorably to the Company's outlook for 2008."

### C.    The Class Period Ends

381.   On May 12, 2008, the market gained a much fuller understanding of the magnitude and severity of the loss exposure that had impacted, and was still

facing, IndyMac.   On that date, IndyMac issued a press release directly contradicting Perry's prior assurances to investors, including his statements, just three months earlier, that the Company had established "incredibly strong reserves" which would ensure IndyMac's return to profitability.   Specifically, IndyMac announced that rather than reporting a profit for the first quarter of 2008, it would record a ***net loss of $184.2 million, or $2.27 per share***, compared with net earnings of $52.4 million, or $0.70 per share, in the first quarter of 2007.   The Company finally admitted that, *"[w]ith respect to profitability, we do not expect that IndyMac will be able to return to overall profitability until the current decline in home prices decelerates."*   Also contrary to prior representations, IndyMac revealed on May 12 that it was suspending the dividend on its preferred shares.

382.   As Perry explained during the May 12, 2008 earnings conference call with analysts, IndyMac's reserves were nowhere near adequate, much less "incredibly strong."   Instead, IndyMac's financial condition was rapidly deteriorating because of, *inter alia*, "rapidly increasing non-performing assets and loan repurchase demands from secondary market investors, and as a result, the need to establish significant credit reserves for these and forecasted future [non-performing assets] and charge-offs."   Perry admitted that "clearly with the benefit of hindsight we made mistakes in our lending and mortgage banking activities."

383.   In a shocking disclosure, Perry also revealed on May 12 that, in direct contradiction to his prior assurances, IndyMac might not be able to continue as a going concern because it faced a grave and incurable liquidity crisis.   As Perry admitted: "because we're one of the few mortgage bankers out there, and because of the significant hits we've taken, ***our capital ratios have clearly been depleted. . . . So as a result of that, our total risk-based capital ratio was relatively close to the well capitalized minimum.   It was 10.26.   The ratio there is 10.   Clearly, there are***

*scenarios in this environment where we could not be well capitalized and end up being adequately capitalized for a short period of time.*"

384. Perry also admitted the persistent deficiencies in IndyMac's financial reporting and forecasting, joking that "you can laugh all you want about this, but when we forecast the third quarter losses, we missed by 12 times; when we forecast fourth quarter credit losses, we missed by 8 times and in the first quarter this year, when we forecast the first quarter, we missed by 2 times." While the credit losses are a broader category than ALL, both are intimately related and based on similar valuations, as well as impacted by both underwriting deficiencies and an ineffective or inconsistent methodology for quantifying losses. Perry was essentially acknowledging–after repeatedly claiming that IndyMac's reserves were "conservative" and its ALL methodology sound–that IndyMac's financial reporting procedures and internal controls were fundamentally flawed.

385. The Company revealed additional details of its problems in its Form 10-Q for the quarterly period ended March 31, 2008, issued May 12, 2008, filed with the SEC and signed by Perry. In that report, the Company disclosed for the first time that (a) had the April 2008 Ratings Downgrades by Moody's and Standard & Poor's of mortgage-backed securities of which IndyMac retained a total of 29 bonds with a carrying value of $160 million, been in effect on March 31, 2008, IndyMac's total risk-based capital ratio would have been 9.27%, and IndyMac would no longer have been deemed a "well-capitalized" savings association under federal regulations and could no longer accept brokered deposits without a waiver; and (b) "even with a waiver, if the interest rate limitations on brokered and solicited deposits were to be reduced . . . we anticipate that we would reduce our assets and, most likely, curtail our lending activities." *Thus, IndyMac disclosed that its reliance on brokered deposits was so great that even an interest rate limitation would cause IndyMac to curtail its lending activities.*

386.   This was IndyMac's first disclosure directly to investors of the extent to which it relied on brokered deposits.  Defendants' disclosures on May 12, 2008 contrasted sharply with, and revealed the falsity of, their previous assertions that reliance on brokered deposits was not even "on our radar screen of being a concern" to IndyMac.  Because the May 12 disclosures revealed adverse information about IndyMac's reliance on brokered deposits, which Defendants' misrepresentations had previously concealed, loss causation exists as to the brokered deposit allegations.

387.   IndyMac further disclosed on May 12, 2008 that it had incurred $123 million in charge-offs during the prior quarter, and had to increase ALL *again*–this time by $131.5 million.  IndyMac also disclosed that its 30-day delinquency rate was 8.42%, and its HCL non-performing assets had reached $584 million.

388.   The market reacted swiftly to these disclosures and the reactions of analysts, discussed below, as IndyMac stock dropped to close at $2.32 per share on May 13, 2008 on high volume, from a close of $3.43 per share on May 9, 2008 and a close of $3.06 per share on May 12, 2008 – *a two-day decline of $1.11 per share, or 32%.*   The price drop on this date represents a dissipation of the artificial inflation caused by Defendants' misrepresentations respecting quality of underwriting and appraisals; reliance on brokered deposits; the inadequacy of loan loss reserves; capital adequacy and liquidity position; and overall financial condition.

389.   Perry's statements on May 12 stand in stark contrast to – and operated to correct -- his earlier statements regarding the Company's liquidity, capital ratios, and purportedly "well-capitalized" status.   These disclosures also revealed the falsity of Ernst's "unqualified" opinion on IndyMac's 2007 financial statements, and Ernst's failure to include a going concern reservation in that opinion.

390.   Immediately following the May 12 revelations, Fitch's downgraded IndyMac's ratings, and analysts once again lowered their earnings estimates, citing

IndyMac's uncertain financial condition, serious credit challenges, and "questionable" capital adequacy. RBC lowered its price target and estimates for IndyMac stock in a report issued on May 13, 2008, citing "key credit concerns," including "rising credit costs and increased [loan loss] provisioning[.]" Noting that earnings in the first quarter 2008 were "negatively impacted by credit related provisioning, losses, and negative mark-to-market securities," RBC stated that increasing credit costs and loss reserves would "more than offset any improvement in operating profitability in 2008." RBC reiterated its view that, given the disclosures of sharp increases in NPAs, the Company's reserves "will not adequately cover credit losses in the year ahead[.]"

391. Similarly, as Reuters reported in a May 13, 2008 article entitled "IndyMac slides after analyst says needs capital," analyst Paul Miller of Friedman, Billings Ramsey said the Company's May 12 disclosures showed the Bank needed to raise significant capital. As Miller wrote, "[o]ur primary concern is that IndyMac has minimal capital cushion, but losses will continue at least through year-end....IndyMac needs to raise additional capital – the question is not if, but how much and at what cost."

392. In its May 13, 2008 report, RBC expressly stated that it was lowering its estimates for IndyMac *"[g]iven the company's very high exposure to credit risk (in the form of riskier geographic and loan characteristics)."* RBC explained that IndyMac's high concentration of risky loans, including pay-option ARMs, interest-only loans, and "reduced borrower documentation standards of Alt-A," together with *"a sizable number of loans from the weak 2006-2007 vintages in IMB's single-family residential loan book does not bode well for credit performance ahead."* As RBC explained, "[c]redit write-downs in the quarter drove the decline in capital ratios and further potential for erosion leaves us concerned that additional write-downs may leave IndyMac under-capitalized in the eyes of regulators."

393.   Similarly, in a May 14, 2008 report, Wachovia reduced its earnings estimates for IndyMac, citing, *inter alia*, the Company's failure to "aggressive[ly]" increase reserves in view of rising NPAs.  As Wachovia stated:  *"[W]e believe IMB's credit has performed worse than peers, as NPAs are at the high-end of the range while they have not been as aggressive building reserves for the investment portfolio relative to competitors."*

394.   The reactions of analysts to the May 12, 2008 disclosures further establish the corrective nature of these revelations.   As noted above, analysts responded to these disclosures by voicing serious concern over IndyMac's uncertain financial condition and "questionable" capital adequacy.  For example, analyst RBC clearly understood IndyMac's disclosures on May 12 to indicate that the Company was now facing "severe" and "draconian" actions by regulators.  Based on the May 12 disclosures, RBC concluded that the "risk inherent in holding onto IMB shares in the current environment exceeds the benefits," reiterating that *"we would not rule out FDIC receivership if credit problems continue to worsen materially from here."*   This statement shows the direct correlation between poor credit quality and depleted liquidity, the combination of which ultimately led IndyMac into receivership.

395.   The May 12, 2008 disclosures, and analysts' reactions to those revelations, demonstrate the falsity of Perry's statements regarding IndyMac's dealings with the OTS, including his representations, on February 12, 2008, that IndyMac was in a "fundamentally sound financial position" and could maintain its "well-capitalized" capital ratios.  These disclosures directly contradicted Perry's February 12, 2008 statements, and revealed adverse information about IndyMac's dire financial condition and urgent need for additional regulatory and other capital, which Defendants' misrepresentations had previously concealed.  Accordingly, loss causation exists as to Defendants' false statements regarding IndyMac's dealings with the OTS.

396.   Furthermore, Ernst's material misstatements and omissions in its publicly issued 2007 audit opinion – specifically, its failure to include a going concern reservation in that opinion -- demonstrate both the artificial inflation Ernst's conduct caused in the price of IndyMac stock and that Ernst's conduct proximately caused foreseeable losses to Plaintiff and members of the Class. While IndyMac was still operating at the end of the Class Period, May 12, 2008, its situation was so dire that it was seized and closed by the OTS *less than two months later*, on July 11, 2008.

### D.   IndyMac's Losses Were Not the Result of General Market Conditions and Were Instead the Result of the Concealed Practices

397.   Following the collapse of IndyMac, facts have emerged that confirm that the losses announced in these foregoing disclosures were not the result of general market forces, but rather mismanagement within IndyMac that Defendants affirmatively concealed from investors.  For example:

- On October 22, 2007, Perry privately admitted that "roughly 2/3rds of our credit losses were poor management judgment not the market." Trustee Complaint ¶ 231.

- On October 31, 2007, Perry told the IndyMac Board that "we made some serious mistakes with respect to credit management." *Id.* ¶ 233.

- In reacting to analyst downgrades after the Company reported missing its estimates and made other negative disclosures in the November 6, 2007 earnings forecast, Perry privately wrote that it was undeniable that "we made too many mistakes and we [senior managers] all had a hand in where we are today."  *Id.* ¶ 234.

- On January 8, 2008, in an e-mail to management regarding the Bank's poor management of credit risk, Perry stated, "[T]he losses are 100% operating management's fault (from me on down)." *Id.* ¶ 235.

398.   These admissions demonstrate that Defendants cannot attempt to negate loss causation by pointing to general market conditions.  IndyMac's losses were the result of the decisions that IndyMac made with respect to underwriting, risk management, internal controls, reliance on brokered deposits, and reliance on historical models to forecast losses.  These were the same decisions that IndyMac affirmatively concealed from investors during the Class Period.

399.   Because the May 12, 2008 disclosures with respect to IndyMac's critical capital needs and liquidity revealed adverse information about IndyMac's financial health that Defendants' prior misrepresentations had concealed, causing the stock to plummet 32% on May 13, 2008, it is clear that the stock decline and the misstatements are causally related.  Accordingly, loss causation exists as to the false statements regarding IndyMac's liquidity and Ernst's failure to provide a going concern reservation.

IX.   **THE COLLAPSE OF INDYMAC AND OTHER POST-CLASS PERIOD DEVELOPMENTS**

400.   The market continued to learn more precisely how dire IndyMac's financial condition was shortly after the close of the Class Period.  On July 11, 2008, IndyMac Bank, the majority owned subsidiary and principal asset of IndyMac, was seized and closed by the OTS.  The FDIC was appointed receiver of the Bank.  On the same day, the OTS chartered a new institution, IndyMac Federal Bank, appointed the FDIC as conservator and transferred substantially all of the assets and certain liabilities of the Bank to IndyMac Federal Bank.  Perry is no longer affiliated with the Bank, nor is he affiliated with the IndyMac Federal Bank.  Since the Bank is in conservatorship, and its holding company, IndyMac, has filed for Bankruptcy, they are not named as a defendant in this Action.

401.   On July 16, 2008, the *Associated Press* reported that "[t]he FBI is investigating failed bank IndyMac Bancorp Inc. for possible fraud."

402.   On July 31, 2008, IndyMac filed for Chapter 7 bankruptcy protection in Los Angeles.   Chapter 7 is liquidation of the Company's assets to pay off its creditors.   The bankruptcy court filing signed by Defendant Perry estimated that IndyMac had between $50 million and $100 million in assets, but $100 million to $500 million in liabilities.   IndyMac Bank, operated since July 11, 2008 by the federal government, is no longer connected to the holding company IndyMac Bancorp at the time of the bankruptcy filing.

403.   As set forth above, on February 26, 2009, the OIG issued the Treasury Report, following its intensive review of documents and interviews, to determine the causes of IndyMac's failure, which cost the FDIC insurance fund approximately $12.75 billion.   The Treasury Report concluded that the causes of IndyMac's failure were IndyMac's (1) high risk business strategy and aggressive growth; (2) lack of core deposits; (3) inadequate loss reserves; and (4) unsound loan underwriting practices.   The Report emphasizes that IndyMac was exposed to heightened risk from its burgeoning portfolio of non-traditional loans, especially option ARMs.   ARMs comprised nearly 3 of every 4 loans that IndyMac made during the years 2004 through 2006.   In 2006, 75 percent of borrowers who took the option ARM were only making the minimum payment.

X.   **APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE**

404.   At all relevant times, the market for IndyMac stock was an efficient market for the following reasons, among others:

(a)   IndyMac stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)   As a regulated issuer, IndyMac filed periodic public reports with the SEC and the NYSE;

(c)   IndyMac regularly communicated with public investors via established market communication mechanisms, including through regular

disseminations of press releases on the national circuits of major newswire services, through analyst and investor conference calls and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

       (d)   IndyMac was followed by numerous securities analysts, including Wachovia, Lehman Brothers, The Friedman, Billings, Ramsey Group, RBC Capital Markets, Fox-Pitt Kelton Cochran Caronia Waller, and Roth Capital Partners, who issued regular reports and recommendations during the Class Period. Each of these reports was publicly available and entered the public marketplace.

       405.  As a result of the foregoing, the market for IndyMac stock promptly digested current information regarding IndyMac from all publicly available sources and reflected such information in IndyMac stock prices. Under these circumstances, all purchasers of IndyMac stock during the Class Period suffered similar injury through their purchase of IndyMac stock at artificially inflated prices, and a presumption of reliance applies.

## XI.  NO STATUTORY SAFE HARBOR

       406.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. False statements contained in the 2006 and 2007 audited financial statements of IndyMac, which all Defendants represented had been prepared in conformity with GAAP are not eligible for "safe harbor" status by statute, *see* 15 U.S.C. § 78U-5(B)(2)(A). To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false

forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of IndyMac who knew that those statements were false when made.

## FIRST CLAIM FOR RELIEF

**(Against Defendants Perry and Keys for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)**

407.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

408.   During the Class Period, Defendants Perry and Keys carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase IndyMac stock at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants Perry and Keys, and each of them, took the actions set forth herein.

409.   Defendants Perry and Keys (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of IndyMac's stock in an effort to maintain artificially high market prices for those securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   Defendants Perry and Keys are sued as primary participants in the wrongful and illegal conduct charged herein and Defendants Perry and Keys are sued as controlling persons, as alleged below.

410.   Defendants Perry and Keys, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of

the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of IndyMac as specified herein.

411. Defendants Perry and Keys employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of IndyMac's sound financial position, prudent management of risks, and the soundness of its mortgage originations and securitizations, despite the challenging market conditions, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about IndyMac and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of IndyMac stock during the Class Period.

412. Each of the Defendants Perry and Keys' primary liability, and controlling person liability, arises from the following facts: (i) Defendants Perry and Keys were each high-level executives and/or a director of IndyMac during the Class Period and members of the IndyMac's management team or had control thereof; (ii) Defendants Perry and Keys, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of IndyMac's plans, statements and/or reports; (iii) Defendants Perry and Keys were advised of and had access to other members of IndyMac's management team, internal reports, and other data and information about the IndyMac's operations at all relevant times; and (iv) Defendants Perry and Keys were aware of the Company's dissemination of information to the investing public, which they knew or were deliberately reckless in disregarding was materially false and misleading.

413.   Defendants Perry and Keys made the misrepresentations and omissions of material facts set forth herein, either intentionally or with deliberately reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such material misrepresentations and/or omissions were done intentionally or with deliberate recklessness  and for the purpose and effect of concealing IndyMac's financial condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.   As demonstrated by Defendants Perry and Keys' misstatements of IndyMac's business and operations throughout the Class Period, Defendants Perry and Keys, if they did not make the misrepresentations and omissions alleged intentionally, were deliberately reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

414.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of IndyMac stock was artificially inflated during the Class Period.   In ignorance of the fact that market prices of IndyMac stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants Perry and Keys, or upon the integrity of the markets in which IndyMac's stock trades, and/or on the absence of material adverse information that was either intentionally or deliberately recklessly disregarded by Defendants Perry and Keys but not disclosed in public statements by Defendants Perry and Keys during the Class Period, Plaintiff and the other members of the Class acquired IndyMac stock during the Class Period at artificially high prices and were damaged thereby.

415.   At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known

the truth regarding, *inter alia,* IndyMac's financial condition, fraudulent loan origination and securitization practices and the riskiness of its loans, which facts were not disclosed by Defendants Perry and Keys, Plaintiff and other members of the Class would not have purchased or otherwise acquired their IndyMac stock, or, if they had acquired such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

416.   By virtue of the foregoing, Defendants Perry and Keys have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

417.   As a direct and proximate result of Defendants Perry's and Keys' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of IndyMac's stock during the Class Period.

## SECOND CLAIM FOR RELIEF

### (Against Defendants Perry and Keys For Liability
### Under Section 20(a) of the Exchange Act)

418.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

419.   Defendants Perry and Keys acted as controlling persons of IndyMac and IndyMac Bank within the meaning of Section 20(a) of the Exchange Act as alleged herein.   By virtue of their high-level positions with the Company and participation in and/or awareness of the Company's operations, Defendants Perry and Keys had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.   Defendants Perry and Keys were provided with, or had unlimited access to, information about IndyMac's and IndyMac Bank's financial condition, its loan origination and securitization practices, and the low credit quality of its loans and copies of the Company's reports, press releases, public filings and other

statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

420.   In particular, Defendants Perry and Keys had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

421.   As set forth above, Defendants Perry and Keys, and non-defendants IndyMac and IndyMac Bank, each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.   By virtue of their positions as controlling persons, of IndyMac and IndyMac Bank, Defendants Perry and Keys are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of Defendants Perry's and Keys' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the IndyMac's stock during the Class Period.

## THIRD CLAIM FOR RELIEF

### (Against Defendant Ernst & Young LLP for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)

422.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

423.   During the Class Period, Defendant Ernst carried out a plan, scheme and course of conduct which was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase IndyMac stock at artificially inflated prices.

424.   Defendant Ernst (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in

acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of IndyMac's stock.

425.   Defendant Ernst, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of IndyMac as specified herein.   Specifically, Defendant Ernst deceived investors by falsely certifying the IndyMac's 2006 and 2007 Forms 10-K (filed March 1, 2007 and February 29, 2008, respectively).

426.   Defendant Ernst had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with deliberately reckless disregard for the truth in that it failed to ascertain and to disclose such facts, even though such facts were available to them.   Such material misrepresentations and/or omissions were done knowingly or deliberately recklessly and for the purpose and effect of concealing IndyMac's financial condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.

427.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of IndyMac stock was artificially inflated during the Class Period.   In ignorance of the fact that market prices of IndyMac stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendant Ernst, or upon the integrity of the markets in which the IndyMac's stock trades, and/or on the absence of material adverse information that was known to or with deliberate recklessness disregarded by Defendant Ernst but not disclosed in public statements during the Class Period, Plaintiff and the other members of the Class acquired IndyMac stock during the Class Period at artificially high prices and were damaged thereby.

428.   At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding IndyMac's financial condition, Plaintiff and other members of the Class would not have purchased or otherwise acquired their IndyMac stock, or, if they had acquired such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

429.   By virtue of the foregoing, defendant Ernst violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

430.   As a direct and proximate result of defendant Ernst's wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of IndyMac's stock during the Class Period.

## XII.   PRAYER

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment interest thereon;

C.     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

Dated:  May 27, 2011                    MARC M. SELTZER
                                        RYAN C. KIRKPATRICK
                                        SUSMAN GODFREY L.L.P.

1565686v1/010900                              196

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KENNETH S. MARKS
*(Admitted Pro Hac Vice)*
kmarks@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX  77002-5096
Telephone:  (713) 651-9366
Fax:  (713) 654-6666

SHERRIE R. SAVETT
ARTHUR STOCK
PHYLLIS M. PARKER
BERGER & MONTAGUE, P.C.


By _____
           Marc M. Seltzer

    Attorneys for Lead Plaintiff
    and the Class

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:  May 27, 2011

MARC M. SELTZER
RYAN C. KIRKPATRICK
SUSMAN GODFREY L.L.P.

KENNETH S. MARKS
*(Admitted Pro Hac Vice)*
kmarks@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX  77002-5096
Telephone:  (713) 651-9366
Fax:  (713) 654-6666

SHERRIE R. SAVETT
ARTHUR STOCK
PHYLLIS M. PARKER
BERGER & MONTAGUE, P.C.


By _____
　　　Marc M. Seltzer

Attorneys for Lead Plaintiff
and the Class

kal665936

# PROOF OF SERVICE

I, the undersigned, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 1901 Avenue of the Stars, Suite 950, Los Angeles, California 90067-6029.

On May 27, 2011, I served the foregoing document(s) described as follows:

**FIFTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**

on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as stated on the attached service list, as follows:

_____ BY MAIL:
I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

_____ BY PERSONAL SERVICE:
I caused to be delivered such envelope by hand to the offices of the addressee.

_____ BY FEDERAL EXPRESS OR OVERNIGHT COURIER

_____ BY FAX
I served by facsimile as indicated on the attached service list.

 XX  BY ELECTRONIC MAIL
I caused said documents to be prepared in portable document format (PDF) for e-mailing and served by electronic mail as indicated on the attached service list.

Executed on May 27, 2011, at Los Angeles, California.

_____ (State)  I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

 XX  (Federal)  I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

| Sandra L. Thomas | *Sandra L. Thomas* |
|---|---|
| (Type or Print Name) | (Signature) |

1

894409v1/010900

1

## SERVICE LIST

2

**PLAINTIFF'S COUNSEL**                      **DEFENDANTS' COUNSEL**

3
Marc M. Seltzer                               Tammy Albarran
mseltzer@susmangodfrey.com                    talbarran@cov.com

4
Ryan C. Kirkpatrick                           David B. Bayless
rkirkpatrick@susmangodfrey.com                dbayless@cov.com

5
SUSMAN GODFREY L.L.P.                          Kelly Patrice Finley
1901 Avenue of the Stars, Suite 950            kfinley@cov.com

6
Los Angeles, CA  90067-6029                    COVINGTON & BURLING LLP
Telephone:  (310) 789-3100                     One Front Street

7
Fax:  (310) 789-3150                           San Francisco, CA  94111-5356
                                               Tel:  (415) 591-6000

8
Kenneth S. Marks                               Fax:  (415) 591-6091
*Admitted Pro Hac Vice*

9
kmarks@susmangodfrey.com                       *Attorneys for Defendant*
                                               *Michael W. Perry*

10
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100

11
Houston, TX  77002-5096                         Miles N. Ruthberg
Tel:  (713) 651-9366                            Miles.Ruthberg@lw.com

12
Fax:  (713) 654-6666                            Robert W. Perrin
                                                Robert.Perrin@lw.com

13
Sherrie R. Savett                               Julie R. F. Gerchik
ssavett@bm.net                                  Julie.gerchik@lw.com

14
Arthur Stock                                    LATHAM & WATKINS LLP
astock@bm.net                                   355 South Grand Avenue

15
Phyllis M. Parker                               Los Angeles, CA  90071-1560
pparker@bm.net                                  Tel:  (213) 485-1234

16
BERGER & MONTAGUE, P.C.                          Fax:  (213) 891-8763
1622 Locust Street

17
Philadelphia, PA  19103                          *Attorneys for Defendant*
Tel:  (215) 875-3000                             *Ernst & Young LLP*

18
Fax:  (215) 875-4604

19
*Attorneys for Lead Plaintiff*
*And the Class*

20                                               Gregory S. Bruch
                                                 gbruch@willkie.com

21                                               Julie A. Smith
                                                 jasmith@willkie.com

22                                               Jessica L. Matelis
                                                 jmatelis@willkie.com

23                                               WILLKIE FARR
                                                   & GALLAGHER LLP

24                                               1875 K Street, NW
                                                 Washington, D.C.  20006-1238

25                                               Tel:  (202) 303-1000
                                                 Fax:  (202) 303-2000

26
                                                 *Attorneys for Defendant*
                                                 *A. Scott Keys*

27

28

2